| | | |
|---|---|---|
| JODY LEE MILES | * | |
| Inmate #272-901 | | |
| MCAC, 401 East Madison St. | * | IN THE |
| Baltimore, Maryland 21202 | | |
| | * | CIRCUIT COURT |
| Petitioner | * | FOR QUEEN ANNE'S COUNTY, |
| v. | * | MARYLAND |
| STATE OF MARYLAND | * | Case No. 4789PC |
| Respondent | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## AFFIDAVIT OF NEIL HOWARD BLUMBERG, M.D.

1.  I am a board certified forensic psychiatrist. I am a Diplomate of the National Board of Medical Examiners, the American Board of Psychiatry and Neurology and the American Board of Forensic Psychiatry. At current counsel's request, I interviewed Mr. Miles on July 30, 2007 and August 3, 2007, and submitted an initial report following those preliminary meetings with Mr. Miles. I performed several psychological tests on August 3, 2007. I again met with Mr. Miles on September 7, 2007 and September 19, 2007. This Affidavit supplements my work and opinions since August 2007.

2.  I have reviewed extensive documents provided by current defense counsel, including the following: (1) records from Caroline County Detention Center, (2) records from Kent General Hospital, (3) Pre-Trial investigation by Sharon Price dated January 23, 1998, (4) Report from the Department of Services for Children, Youth and Their Families dated June 9, 1997, (5) Records from Milton Medical Associates, (6) Social history provided by Anne Stanfield-Hagert, L.C.S.W.-C, (7) report by John Davis, Ph.D. of the Resource Group dated March 10, 1998, (8) Police interviews of Mr. Miles, Rebecca Chips, Mary Snively and Jona Miles, (9) Mr. Miles' medical records from Beebe Medical Center and Memorial Hospital at Easton, (10) lifeline chronology drafted by investigator Donald Steil, (11) Mr. Miles's records from Sand Diego City Schools, the



Delaware State Police Department of Public Instruction, (12) letters from Mr. Miles to Judge Price, Paul DeWolfe and William Kanwisher, (13) E.E.G. report from the University of Maryland Medical Center dated August 16, 2004, and (14) transcript of proceedings, including the testimony of Lisa Hopkins, Beverly Daisy, Lauren Miles, Janice Lewis and Melissa Berner.

    3.    In my July 30, 2007 and August 3, 2007 interviews with Mr. Miles, lasting approximately six hours, we discussed his childhood background at length. Mr. Miles reported growing up in an extremely dysfunctional and abusive family situation. Mr. Miles' account in this regard is confirmed by the pre-trial social history report of Anne Stanfield-Hagert, L.C.S.W.-C. His mother was either married or was involved with numerous men and would often abandon her children for days and sometimes weeks at a time. Mr. Miles reported that his mother was often verbally and physically abusive, administering severe physical abuse for little or no reason. Mr. Miles reported that he began drinking excessively at a young age. After spending multiple hours discussing Mr. Miles' childhood of verbal and physical abuse, I continued to inquire further about the abuse and the reasons why he was drinking. Mr. Miles ultimately reported to me that he was regularly sexually abused between the ages of eleven and fourteen years by an older male by the name of Charlie Stevenson. Mr. Miles reported that the sexual abuse involved fondling, oral sex, several occasions of Mr. Stevenson performing anal intercourse on him resulting in rectal bleeding, as well as taking pornographic photos of Mr. Miles. Mr. Miles advised that he first met Mr. Stevenson through his mother when she took him to Mr. Stevenson's house and they watched him play the piano. In my discussions with Mr. Miles during these visits, it became clear that he coped with the verbal, emotional, physical and sexual abuse by excessively drinking and engaging in hypersexual behavior with females throughout his teenage and adult years.

    4.    In my September 7th interview with Mr. Miles, he reported that, following our last visit, he had been reliving the significant emotional, physical and sexual abuse he sustained in his childhood. He described being upset as to why his mother never believed him, as she often called him a liar before he could say anything. Mr. Miles was

first introduced to Mr. Stevenson by his mother when she took him to Mr. Stevenson's house. Following that meeting, Mr. Stevenson would come to pick Mr. Miles up. Mr. Miles advised that after the first sexual encounter with Mr. Stevenson, he attempted to report the sexual abuse to his mother who simply slapped him across his face for returning home late. Mr. Miles described that Mr. Stevenson would come to pick him up and his mother forced him to go to Mr. Stevenson's house. The sexual abuse continued. Mr. Miles described in detail his prior relationships with women and his extreme sexual hyperactivity in adulthood, noting that it was a way to avoid being abandoned. He advised that the more women he was with, the more it would cover up the past abuse by Mr. Stevenson. Mr. Miles advised that he feels unattractive, very self-conscious. He is bothered when homosexual men show interest in him. Mr. Miles reported that his mother rationalized beating him and was unpredictable. If he laughed, she might beat him. As a result, Mr. Miles learned to hide everything. Mr. Miles advised that he was physically and emotionally abused by all of the men his mother had relationships with. He reported feeling emotionally overwhelmed, but hiding how vulnerable he felt.

5. I again interviewed Mr. Miles on September 19, 2007 for approximately three hours. Mr. Miles reported that in the weeks leading up to the offense, he was drinking all of the time, approximately 18 beers a day plus liquor. He reported that he did not previously meet or know Mr. Atkinson. He reported that, on the date of the offense, he had been driving around and was drinking for hours. He stopped at a Dunkin Donuts in Seaford. He went to a park in Seaford to meet Dawn Jett, a stripper friend, but she never showed. He drove to Salisbury to look for a prostitute. He met one and he later dropped her at a house and stopped at a convenience store where he purchased more beer. He drove to a park in Salisbury by the river and sat and had a beer. He then drove on Rout 50 West. He had to go to the bathroom. He saw a rest area on the left side of the highway in Mardela and went into the rest area. The door to the port-a-potty was closed and Mr. Miles waited. After waiting for awhile, he decided to leave. While driving from the rest area, he realized he was being pursued by another

vehicle driven by a man (whom he subsequently learned was Mr. Atkinson). Mr. Miles reported that he saw Mr. Atkinson staring at him. He reported being "freaked out" by the man. In an effort to lose the pursuing car, Mr. Miles drove down Old Bradley Road toward a wooded area. He no longer saw Mr. Atkinson's car. Mr. Miles exited his vehicle to go to the bathroom in the woods, when he saw the other car pull next to his. It was the same car that had been following him. Mr. Miles hid behind a tree. He thought at first that Mr. Atkinson did not see him. Mr. Miles related that Mr. Atkinson began walking into the woods and started coming towards him. Mr. Atkinson had his hand on his zipper, "it seemed like he was playing with his zipper". Mr. Miles reported "freaking out". Mr. Atkinson continued to walk toward him, tugging at his zipper. Mr. Miles thought Mr. Atkinson's actions were sexually motivated. He felt afraid, trapped, and cornered. He was unfamiliar with this wooded area. Mr. Miles reported that when he was younger, when Mr. Stevenson was in the area, he would escape into the woods. He also ran into the woods to escape from his mother. He was very familiar with that wooded area and could easily escape from his mother and Mr. Stevenson. However, Mr. Miles felt unsafe and trapped in the unfamiliar wooded area where Mr. Atkinson was pursuing him.

  6. I administered two specific tests to formally assess Mr. Miles for the presence of Posttraumatic Stress Disorder. The Trauma Symptom Inventory (TSI) was valid showing no evidence of exaggeration and revealed clinically significant elevations consistent with a diagnosis of Posttraumatic Stress Disorder. On the Detailed Assessment of Posttraumatic Stress (DAPS), Mr. Miles had a valid profile with no evidence of exaggeration. He has had exposure to a wide variety of severely traumatic events, placing him at a significantly elevated risk for developing Posttraumatic Stress Disorder. Of the eleven different types of clinically significant trauma to which Mr. Miles has been exposed, he reported the most severe and persistent of the traumatic events to be the sexual abuse he suffered between the ages of 11 and 14. Based upon my training and clinical experience, the testing I conducted, even numerous years after

the offense, is a valid method to determine whether he had Posttraumatic Stress Disorder at the time of the offense.

7.    As a result of my forensic psychiatric evaluation to date, it is my opinion to a reasonable degree of medical certainty that, at the time of the current offense, Mr. Miles was suffering from the following mental disorders: Posttraumatic Stress Disorder, Chronic; Depressive Disorder Not Otherwise Specified; and Alcohol Dependence.

8.    With respect to the initial mental health work performed in this case, I have several observations. Prior to my involvement, Mr. Miles was interviewed only one time by a mental health provider, Dr. Sheri Bellow. Original defense counsel did not request that additional time be spent and numerous critically important documents were never provided to Dr. Bellow for review. It is my understanding that Dr. Bellow was never advised that a social worker was involved in the case. My observations in this regard are as follows:

   a. In a case such as this, it is insufficient for a mental health evaluator to meet with the Defendant only one time. Only where the psychiatrist or psychologist is provided with a complete database of information previously compiled by other experts involved in the case would a one-time visit potentially be sufficient. Even in the majority of those cases, it is my opinion that in order to conduct a comprehensive forensic psychiatric or psychological evaluation, the evaluator must develop a trusting relationship with the client and, therefore, more than one meeting is required. In my experience as a psychiatrist working on death penalty cases at the time, it was well known to capital defense attorneys that a one-time meeting between the client and a mental health evaluator is insufficient to adequately assess a Defendant for potential mitigation in a capital sentencing case.
   b. It is imperative that the mental health evaluator be provided with all of the records in the case. It is clear that Dr. Bellow was not provided with the

necessary records, particularly the reports of the social worker who had interviewed some members of the Miles family. In my experience as a psychiatrist working on death penalty cases at the time, it was well known to capital defense attorneys that such information needed to be provided to and reviewed by the mental health evaluator. Moreover, it was well known to capital defense attorneys that requesting that mental health evaluators consult with other professionals who had interviewed witnesses or who would have conducted other examinations was critical to a proper analysis. Reviewing all available relevant records and discussing same with other involved professionals is essential to a proper analysis and diagnosis. Without this, the mental health evaluator is working in a vacuum and may easily miss important information.

c. Dr. Bellow, the only mental healthcare evaluator asked by original defense counsel to meet with Mr. Miles, chose to administer the MMPI. At the time of Mr. Miles' initial interview, the only specific test to assess the impact of trauma was the Trauma Symptom Inventory (TSI). While Dr. Bellow uncovered a history of significant physical abuse in her one-time meeting, she did not administer the TSI. The MMPI is inadequate to properly assess Posttraumatic Stress Disorder. Mr. Miles' report to Dr. Bellow of alcohol abuse, hyperactive sexuality and physical abuse should have served as a clear red flag of Posttraumatic Stress Disorder.

d. I have reviewed Dr. Bellow's experience at the time she met with Mr. Miles, and currently. She does not have formal training, nor is she board certified in, forensic psychology. From my review of her curriculum vitae, she has had no formal training in the proper performance of mental health evaluations in death penalty cases. Moreover, her training is in counseling and educational assessment. Without training in clinical psychology, her training to administer and interpret testing was more limited than it would have been had she received training in clinical psychology. In my experience as a

psychiatrist at the time, it was well known to capital defense attorneys that a mental health evaluator's lack of clinical experience would lead to limitations in this regard.

e. It is not at all uncommon for a victim of childhood sexual abuse to feel ashamed and unwilling to disclose the prior abuse, particularly in an initial visit with a mental healthcare provider. It is not unusual for a victim of childhood sexual abuse, when directly confronted with a question asking if abuse ever occurred, to initially deny its happening. Therefore, additional meetings with the Defendant will likely improve rapport and increase the likelihood that the Defendant will disclose relevant information concerning abuse. In addition, many Defendants are more willing to admit abusive events in response to questions on formal psychological measures as opposed to face-to-face interviews. As a result, use of the Trauma Symptom Inventory could uncover trauma related to sexual abuse even if such events were denied by the Defendant during the interview.

9. It is my opinion to a reasonable degree of medical certainty that, as a result of the previous years of significant sexual abuse by Mr. Stevenson, coupled with other significant emotional and physical abuse by his mother and her numerous boyfriends and husbands, Mr. Miles suffered from Posttraumatic Stress Disorder at the time of the offense. Mr. Miles experienced intense psychological distress when he was exposed to Mr. Atkinson advancing toward him in a homosexually aggressive manner. He experienced intense fear, helplessness and horror as Mr. Atkinson's sexually predatory behavior directly resembled the sexual abuse that he was subjected to as a child and adolescent. Mr. Miles felt emotionally overwhelmed. Mr. Atkinson's behavior prior to his death acutely exacerbated Mr. Miles' Posttraumatic Stress Disorder and led Mr. Miles to hold the subjective belief that his life, safety and physical integrity were imminently endangered. Mr. Miles' overwhelming anxiety and panic in response to Mr. Atkinson's behavior severely distorted his ability to think and perceive events in

a rational manner. Truly thinking that his life was imminently in danger, Mr. Miles believed that he needed to use deadly force to defend and protect himself. The acute exacerbation of his Posttraumatic Stress Disorder substantially impaired his thinking and behavioral controls and led Mr. Miles to hold the subjective belief that his use of deadly force was the only means by which he could defend and protect himself. From Mr. Miles' subjective point of view, he was acting in self-defense.

10. Due to the shame and embarrassment, among other emotions, arising from the previously undisclosed homosexual child abuse Mr. Miles suffered, and the failure of defense counsel to engage the significant involvement of a mental health professional beyond an initial visit, Mr. Miles was unable, without assistance, to previously disclose this history or the actual circumstances surrounding the offense.

*Neil Howard Blumberg, M.D.*

Neil Howard Blumberg, M.D.