IN THE CIRCUIT COURT FOR QUEEN ANNE'S COUNTY

JODY LEE MILES

v.

Case No. 17-K-97-4789

STATE OF MARYLAND

---

## MEMORANDUM OPINION and ORDER

This case is before the Court on Defendant's Motion to Correct Illegal Sentence. Defendant makes two arguments. First, Defendant claims that Maryland's death penalty statute is a "sanguinary law" in violation of Article 16 of the Maryland Declaration of Rights. Second, Defendant asserts that the weighing procedure employed by the jury during the sentencing phase of the trial is contrary to Article 24 of the Declaration of Rights because the jury was permitted to weigh the aggravating and mitigating factors by a preponderance of evidence standard. With respect to the first argument, the Court finds that Maryland's death penalty statute is not a "sanguinary law" under Article 16. Defendant's second argument is not properly before this Court because it alleges an error that does not inhere in the Defendant's sentence. Accordingly, the Court shall DENY Defendant's motion.

## I. FACTS AND PROCEDURAL HISTORY

A jury sitting in Queen Anne's County found Defendant Jody Lee Miles guilty of first degree felony murder and related offenses. After a two-day sentencing hearing, a jury sentenced Defendant to death. Defendant's convictions and death sentence were affirmed on direct appeal to the Court of Appeals. *Miles v. State*, 365 Md. 488 (2001). The Supreme Court of the United



DEFENDANT'S EXHIBIT

States denied Defendant's petition for a writ of certiorari. *Miles v. Maryland*, 534 U.S. 1163 (2002). Defendant subsequently filed for post-conviction relief, which was ultimately denied. The Court of Appeals denied Defendant's application for leave to appeal, and the United States Supreme Court denied certiorari. *Miles v. State*, 397 Md. 352 (2007); *Miles v. Maryland*, 552 U.S. 883 (2007).

On August 10, 2007, Defendant filed in this Court a motion to correct illegal sentence ("2007 motion"). In that motion Defendant argued that he was entitled to a new sentencing hearing because the jury, in deciding whether to impose the death penalty, was allowed to determine that the aggravating factors outweighed the mitigating factors by a preponderance of the evidence, rather than by a beyond a reasonable doubt standard. This alleged error, according to the Defendant, violated his constitutional rights under the Sixth Amendment and under Article 21 of the Maryland Declaration of Rights. This Court denied Defendant's motion, the Court of Appeals affirmed, and the Supreme Court denied Defendant's petition for certiorari. *Miles v. State*, 421 Md. 596, 597 (2011); *Miles v. Maryland*, 2012 U.S. LEXIS 2153 (U.S. Mar. 19, 2012).

On July 20, 2011, Defendant filed yet another motion to correct illegal sentence, which is currently before the Court. In his latest motion, Defendant argues that the statute under which he was sentenced to death is a "sanguinary law," contrary to Article 16 of the Declaration of Rights, which provides "[t]hat sanguinary Laws ought to be avoided as far as it is consistent with the safety of the State." MD. CODE ANN., CONST. Art. 16 (2003, 2011 Supp.). Under the Defendant's interpretation of Article 16, his sentence is unconstitutional because the statute that allows for the death penalty is not necessary for the safety of the State of Maryland. As such, his sentence is illegal and must be vacated.

Defendant later supplemented his motion on December 27, 2011, raising for the second time the alleged error concerning the weighing process employed by the jury.[1] Defendant asserts that although he argued in his 2007 motion that the weighing procedure employed by the jury violated his rights under Article 21 of the Declaration of Rights, that issue was never explicitly raised before the Court of Appeals. Defendant now argues that the fact the jury was permitted to find by a preponderance of evidence that the aggravating factors outweighed the mitigating factors violates Article 24 of the Declaration of Rights, which provides that "no man ought to be . . . deprived of his life . . . but by the judgment of his peers, or by the Law of the land." MD. CODE ANN., CONST. Art. 24 (2003, 2011 Supp.).

## II. MOTION TO CORRECT ILLEGAL SENTENCE

As a threshold issue, the Court must determine whether a motion to correct an illegal sentence is the proper vehicle by which the Defendant can raise the alleged errors. Maryland Rule 4-345(a) provides that a "court may correct an illegal sentence at any time." "A motion to correct an illegal sentence ordinarily can be granted only where there is some illegality in the sentence itself or where no sentence should have been imposed." *Evans v. State*, 382 Md. 248, 278-279 (2004); *Tshiwala v. State*, 424 Md. 612, 618-19 (2012). Thus, "a trial court error during the sentencing proceeding is not ordinarily cognizable under Rule 4-345(a) where the resulting sentence or sanction is itself lawful." *Matthews*, 424 Md. at 513 (quoting *Montgomery v. State*, 405 Md. 67, 74-75 (2008)); *Tshiwala*, 424 Md. at 619 ("[W]here the matter complained of is a procedural error, the complaint does not concern an illegal sentence for purposes of Rule 4-345(a)."). "In other words, a motion to correct an illegal sentence is not an alternative method of

---

[1] Defendant submitted a revised supplemental motion on January 9, 2012.

obtaining belated appellate review of the proceedings that led to the imposition of judgment and sentence in a criminal case." *State v. Wilkins*, 393 Md. 269, 273 (2006).

The Court of Appeals has recognized an exception to this general rule in capital cases. "Where a decision in an unrelated case rendered by the U.S. Supreme Court, following imposition of the death sentence in a Maryland case, supplie[s] a new judicial interpretation of a constitutional provision that might support an argument that an alleged error of constitutional dimension may have contributed to the imposition of the death sentence in that given case, . . . a motion to correct an illegal sentence [is] a proper vehicle to raise the new constitutional argument." *Baker v. State*, 389 Md. 127, 134 (2005); *Evans v. State*, 396 Md. 256, 272-73 (2006); *Grandison v. State*, 425 Md. 34, 73-74 (2012). The Court of Appeals has noted that this exception is exceedingly narrow. *Id.*

Defendant raises two arguments in his motion to correct illegal sentence. Each argument must be analyzed separately to determine whether it is properly before this Court.

### A. Article 16 Argument

Defendant argues that his sentence of death is repugnant to Article 16 of the Declaration of Rights, which provides, in relevant part, "[t]hat sanguinary Laws ought to be avoided as far as it is consistent with the safety of the State." MD. CODE ANN., CONST. Art. 16 (2003, 2011 Supp.). Defendant specifically argues that any statute authorizing the death penalty is "sanguinary law." The phrase "to be avoided," according to the Defendant, means "to be refrained from" or "to be made void." Thus, Defendant asserts that the clause at issue could either mandate that the legislature refrain from establishing the death penalty unless it is necessary to keep the State safe, or that laws establishing the death penalty are to be voided unless necessary to keep the State

safe. Finally, Defendant argues that the death penalty statute is not necessary for the safety of the State.

Defendant raises a novel constitutional argument. Maryland courts have not construed the meaning of a "sanguinary law" pursuant to Article 16. If Defendant's interpretation of Article 16 is correct, the death penalty for first degree murder constitutes a sentence that cannot be constitutionally imposed. In other words, Defendant is alleging his sentence is inherently illegal under the Declaration of Rights. As such, Defendant's argument is cognizable under a motion to correct illegal sentence. Because Defendant makes a *bona fide* argument challenging the constitutionality of the sanction imposed by this Court, the exception relating to capital cases is irrelevant.

The Court's conclusion is confirmed by the case of *Randall Brook Corp. v. State*, 316 Md. 315 (1989). In that case, a jury found the defendant guilty of 116 counts of possession of prohibited pornographic materials.[2] *Id.* at 318-19. Defendant was sentenced to $500 for each conviction. *Id.* at 319. After exhausting all avenues of appeal, Defendant filed a motion to correct illegal sentence. Defendant argued, *inter alia*, that his sentences were unconstitutional on at least two grounds: (1) the sentences constituted double jeopardy, contrary to the Fifth Amendment to the United States Constitution; and (2) the sentences were cruel, unusual, and disproportionate

---

[2] Specifically, defendant was found guilty under MD. CODE. ANN. (1957, 1982 Repl. Vol.), Art. 27, § 416D(a), which provided the following:

> Any person, firm or corporation is guilty of a misdemeanor if it knowingly displays for advertising purposes any picture, photograph, drawing, sculpture or other visual representation or image of a person or portion of the human body that depicts sadomasochistic abuse, sexual conduct or sexual excitement, or any verbal description or narrative account of these activities or items.

*See Randall Brook Corp.*, 316 Md. at 318-19.

punishment, contrary to the Eighth Amendment. *Id.* at 320, 322. The Court of Appeals granted certiorari after the Circuit Court denied Defendant's motion, and held that Defendant's arguments were cognizable under a Rule 4-345 motion. *Id.* at 322. The Court reasoned that the alleged constitutional violations, if meritorious, would render the sentence inherently illegal. *Id.* The Court noted that "[a]lthough these claims could have been raised under direct appeal, the failure to do so will not ordinarily constitute a waiver that will bar a collateral attack upon an illegal sentence." *Id.*

Defendant's constitutional claim is analogous to the claims made in *Randall Brook*. In both cases, the defendants alleged errors of constitutional dimension, which would render the sentence inherently illegal. Therefore, the Defendant's motion with respect to the Article 16 argument is proper.

### B. Article 24 Argument

Defendant's second argument relates to the procedure employed by the jury in weighing aggravating and mitigating circumstances, during the sentencing phase of the trial. Maryland's capital sentencing procedure allows the imposition of a death sentence upon a determination that the aggravating factors outweigh the mitigating factors by a preponderance of the evidence. *See*, MD. ANN. CODE, Art. 27, § 413(h) (1996, 1997 Supp.); MD. CODE ANN., CRIM. LAW § 2-303(i) (2002, 2011 Repl. Vol.).[3] Pursuant to this procedure, the jury in Mr. Miles's case was permitted to weigh the aggravating factor of felony murder against the mitigating factors presented by Defendant's counsel using a preponderance of the evidence standard.

As noted *supra*, Defendant challenged this weighing procedure in his August, 2007 motion to correct illegal sentence. In that motion, defendant primarily relied on *Cunningham v.*

---

[3] The latter citation is to the weighing procedure currently in place, which is effectively equivalent to the procedure in place at the time Defendant was sentenced.

*California*, 549 U.S. 270 (2007), a U.S. Supreme Court decision that was published in January, 2007. Defendant argued that, pursuant to *Cunningham*, Maryland's capital sentencing scheme violates the Sixth Amendment unless it requires that aggravating factors outweigh mitigating factors beyond a reasonable doubt. Defendant additionally asserted that the sentencing procedure violates Article 21 of the Maryland Declaration of Rights.[4] *See* MD. CODE ANN., CONST. Art. 21 (2003, 2011 Supp.).

This Court denied the motion on January 4, 2008.[5] Defendant timely appealed. Significantly, Defendant never explicitly raised the issue of the constitutionality of the weighing procedure under the Declaration of Rights. Rather, Defendant focused his argument on the Sixth Amendment. For reasons not directly pertinent to the issues currently before this Court, the Court of Appeals affirmed the denial of Defendant's motion, holding that "Maryland's capital sentencing procedure does not violate Sixth Amendment." *Miles v. State*, 421 Md. 596, 607 (2011). The Court did not address the sentencing procedure's constitutionality with respect to the Maryland Declaration of Rights.

Defendant's current motion, again, challenges the sentencing procedure under the Declaration of Rights. Defendant concedes that although Article 21 was mentioned in the 2007

---

[4] Article 21 provides:

> That in all criminal prosecutions, every man hath a right to be informed of the accusation against him; to have a copy of the Indictment, or charge, in due time (if required) to prepare for his defence; to be allowed counsel; to be confronted with the witnesses against him; to have process for his witnesses; to examine the witnesses for and against him on oath; and to a speedy trial by an impartial jury, without whose unanimous consent he ought not to be found guilty.

MD. CODE ANN., CONST. Art. 21 (2003, 2011 Supp.).

[5] The Court outright denied the motion and did not specify whether it was denying any particular claim.

motion, the Declaration of Rights issue was not explicitly raised before the Court of Appeals. Defendant now "requests that this Court vacate his sentence of death on the ground that permitting the death sentence based on a jury finding by a preponderance of the evidence that the aggravating factors outweighed the mitigating factors violated the Maryland Declaration of Rights." Revised Supplemental Motion at 2. This time, Defendant primarily relies on Article 24 of the Declaration of Rights which provides, in pertinent part, that "no man ought to be . . . deprived of his life . . . but by the judgment of his peers, or by the Law of the land." MD. CODE ANN., CONST. Art. 24 (2003, 2011 Supp.).[6]

Based on this procedural posture, the Court must determine whether Defendant's argument is the proper subject of a Rule 4-345(a) motion. Prior to addressing the merits of Defendant's 2007 motion, the Court of Appeals asserted that the Defendant's motion to correct illegal sentence was cognizable because *Cunningham*, a recent Supreme Court decision, may have supplied a new judicial interpretation of a constitutional dimension that would give the Defendant the right to a new sentencing hearing. Specifically, the Court stated that the motion could go forward "on the ground that [Defendant] has a right to appellate review of his claim that he is entitled to a new sentencing proceeding on the ground that *Cunningham* did establish a Sixth Amendment standard that must be applied retroactively." *Miles*, 421 Md. at 598 n.1. Thus, the 2007 motion was within the narrow exception, applicable to capital cases, permitting review

---

[6] In its entirety, Article 24 provides:

> That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.

MD. CODE ANN., CONST. Art. 24 (2003, 2011 Supp.).

of a sentencing procedure predicated upon a novel constitutional interpretation decided after imposition of a capital sentence.

Defendant cites no new judicial interpretation in the case at bar. Consequently, Defendant's motion may be cognizable under Rule 4-345(a) only under the general rule, where the alleged error resulted in illegality of the sentence itself. Defendant's Article 24 argument does not challenge the inherent illegality of his death sentence. Rather, it alleges error in the underlying *procedure* that resulted in the sentence. "The notion of an 'illegal sentence' . . . deals with substantive law, not procedural law." *Corcoran v. State*, 67 Md. App. 252, 255 (1986). An error in a sentencing procedure, even if it is of a constitutional dimension, may very well result in an inherently and substantively legal sanction. *Cf. State v. Wilkins*, 393 Md. 269, 275 (2006) (citing *Randall Brook*, 316 Md. at 323) ("An error committed by the trial court during the sentencing proceeding is not ordinarily cognizable under *Rule 4-345(a)* where the resulting sentence or sanction is itself lawful."); *Evans*, 282 Md. at 278-79. Indeed, "a sentence, proper on its face, [does not] become[] an 'illegal sentence' because of some arguable procedural flaw in the sentencing procedure." *Corcoran*, 67 Md. App. at 255. Therefore, the motion to correct an illegal sentence is not an appropriate vehicle to address Defendant's Article 24 argument.

The Court's decision is consistent with the narrow scope of the motion to correct illegal sentence. *See Tishwala*, 424 Md. at 619. A 4-345(a) motion is generally cognizable only where there is no conviction warranting any sentence, *see, e.g., Ridgeway v. State*, 369 Md. 165 (2002), or where the sentence exceeds the limits imposed by law, *see, e.g., Matthews*, 424 Md. 503. *See Chaney v. State*, 397 Md. 460, 466 (2007). Because imposing a punishment under these circumstances is particularly egregious, Rule 4-345(a) "creates a limited exception to the general rule of finality, and sanctions a method of opening a judgment otherwise final and beyond the

reach of the court." *State v. Griffiths*, 338 Md. 485, 496 (1995). In all other cases, the interests of finality outweigh a defendant's interests in challenging alleged errors beyond a direct appeal and a post-conviction petition.

In this case, the rule of finality trumps Defendant's ability to challenge the sentencing procedure employed in his case. "If there was some defect in the sentencing proceeding, that alleged defect could have been raised on direct appeal . . . or at the very least could have been raised in a petition for post conviction relief." *See Pollard v. State*, 394 Md. 40, 47 (2005). Defendant did not do so, despite having ample opportunity to raise the issue. Defendant here had a further opportunity to raise the Article 24 argument in his 2007 motion to correct illegal sentence, which for whatever reason he did not pursue. Accordingly, the Court will not permit Defendant's motion to serve as "an alternative method of obtaining belated appellate review of the proceedings that led to the imposition of judgment and sentence" in the underlying case. *Wilkins*, 393 Md. 273.

## III. ARTICLE 16 ARGUMENT

The Court shall now address the merits of Defendant's Article 16 argument. Defendant argues that the law under which he was sentenced to death is a "sanguinary law," in violation of Article 16 of the Maryland Declaration of Rights. In its entirety, Article 16 provides "[t]hat sanguinary Laws ought to be avoided as far as it is consistent with the safety of the State; and no Law to inflict cruel and unusual pains and penalties ought to be made in any case, or at any time, hereafter." MD. CODE ANN., CONST. Art. 16 (2003, 2011 Supp.). Defendant relies solely on the first clause of Article 16, hereinafter referred to as the "Sanguinary Laws Clause."

No reported Maryland decision has construed the Sanguinary Laws Clause. A proper interpretation of the clause requires the Court to first lay a proper foundation by explaining the

relationship between Articles 16 and 25 of the Maryland Declaration of Rights and the Eighth Amendment to the United States Constitution. The Court will then proceed to analyze the threshold question of what exactly is a "sanguinary law" within the scope of Article 16.[7] The textual and historical analysis undertaken by the Court will reveal that the statute under which the Defendant was sentenced is not a sanguinary law. Therefore, the Court need not interpret the remainder of the Sanguinary Laws Clause.

### A. Article 16, Article 25, and the Eighth Amendment

In arguing that his death sentence is an illegal sanction under the Sanguinary Laws Clause, Defendant raises a novel constitutional question. Maryland appellate courts have not had occasion to construe the Sanguinary Laws Clause, nor have they ascribed that clause any independent meaning. Courts have, however, interpreted the "cruel and unusual pains and penalties" clause of Article 16. This latter clause mirrors Article 25 of the Declaration of Rights, which declares "[t]hat excessive bail ought not to be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted, by the Courts of Law." MD. CODE ANN., CONST. Art. 25 (2003, 2011 Supp.).[8] Both Article 16 and Article 25 contain language very similar to the Eighth Amendment of the Constitution of the United States, which provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. Amend. VIII.

---

[7] At this juncture, no evidence supports ascribing any significance to Article 16's capitalization of the first letter of the word "Laws." Thus, the phrases "sanguinary law" or "sanguinary laws," when used in this opinion, refer to "sanguinary Laws," as used in Article 16.

[8] Article 16 prohibits "cruel *and* unusual pains and penalties", while Article 25 prohibits "cruel *or* unusual punishment." The Court of Appeals has not attached any significance to this variation in phrasing. *See Thomas v. State*, 333 Md. 84, 103 n.5 (1993); *Delnegro v. State*, 198 Md. 80, 88 (1951). Cases have used the terms "cruel and unusual" and "cruel or unusual" interchangeably. *See id.* This opinion, likewise, identifies the pertinent clauses in Articles 16 and 25 as the "cruel and unusual punishment" clause.

Both Article 16 and Article 25 were part of the original Declaration of Rights, adopted by Maryland's founding fathers on November 11, 1776.[9] *See, generally,* Dan Friedman, *The History, Development, and Interpretation of the Maryland Declaration of Rights,* 71 TEMP. L. REV. 637, 639-40 (1998); Dan Friedman, *Tracing the Lineage: Textual and Conceptual Similarities in the Revolutionary-Era State Declarations of Rights of Virginia, Maryland, and Delaware,* 33 RUTGERS L. J. 929 (2002) (hereinafter Friedman, *Tracing the Lineage*). Since the adoption of these articles, Maryland courts have given a limited meaning to the prohibition against cruel and unusual punishment contained within these articles. *See, generally,* DAN FRIEDMAN, THE MARYLAND STATE CONSTITUTION: A REFERENCE GUIDE 24-25 (2006) ("From 1776 until the 1960s, the Maryland courts gave their own cramped and meager interpretation of the clauses."). "The term 'cruel and unusual punishment' has usually been understood to mean barbarous punishment by torture." *Delnegro v. State,* 198 Md. 80, 88 (1951); *Walker v. State,* 53 Md. App. 171, 181-82 (1982). However, because Articles 16 and 25 have not fixed a standard as to what "cruel and unusual" actually means, "Legislatures and courts can only regard these provisions as advisory." *Kirschgessner v. State,* 174 Md. 195 (1938), *overruled in part on other grounds, Elmer v. State,* 239 Md. 1 (1965); *Walker,* 53 Md. App. at 182. Thus, the Court of Appeals has consistently held that "any sentence within the limit prescribed by law is valid and hence does not constitute cruel and unusual punishment in violation of constitutional protections." *Duff v. State,* 229 Md. 126, 127 (1962); *Apple v. State,* 190 Md. 661, 668 (1948) ("Ordinarily any punishment, authorized by a statute, and imposed by a court within the statutory limits is not cruel and unusual punishment."); *Reid v. State,* 200 Md. 89, 92 (1952); *Jones v.*

---

[9] These articles were originally enumerated Article 14 and Article 22, respectively. Dan Friedman, *The History, Development, and Interpretation of the Maryland Declaration of Rights,* 71 TEMP. L. REV. 637, 656, 660 (1998).

*State*, 247 Md. 530, 532 (1967); *Morrison v. State*, 234 Md. 87, 89 (1964); *Charles v. State*, 1 Md. App. 222, 231 (1967). Courts have, however, recognized an exception to this general rule where a sentence is so "grossly and inordinately disproportionate to the offense to such an extent that the sentence was evidently dictated not by a sense of public duty, but by passion, prejudice, ill will, or other unworthy motive." *Washington v. State*, 2 Md. App. 633, 634 (1967); *Mitchell v. State*, 82 Md. 527, 533-34 (1896); *Dutton v. State*, 123 Md. 373, 385-86 (1914); *Apple*, 190 Md. at 668; *Reid*, 200 Md. at 93; *Jones*, 247 Md. at 532-33.

The interpretation of Articles 16 and 25 began to shift in the 1960s when the Supreme Court of the United States made the Eighth Amendment's prohibition of "cruel and unusual punishments" binding on the states by virtue of the 14th Amendment. *See, generally, Robinson v. California*, 370 U.S. 660, 667 (1962); *Harmelin v. Michigan*, 501 U.S. 957, 997 (1991) (Kennedy, J., concurring); *State v. Bolden*, 356 Md. 160, 162 n.1 (1999). Since the incorporation of the Eighth Amendment, Maryland courts have held the prohibition against cruel and unusual punishment found in Articles 16 and 25 is *in pari materia* with the Eighth Amendment. *Evans v. State*, 396 Md. 256, 327 (2006) ("We have consistently construed [Articles 16 and 25] *in pari materia* with their federal counterparts and are not convinced that they should be read more broadly (or narrowly)."); *Walker*, 53 Md. App. at 183; *Harris v. State*, 312 Md. 225, 237 n.5 (1988); *Minor v. State*, 313 Md. 573, 589 n.4 (1988) (Eldridge, J., concurring); *Brooks v. State*, 104 Md. App. 203, 213 n.2 (1995); *see also, Phipps v. State*, 39 Md. App. 206, 212-13 (1978) (implicit *in pari materia* interpretation); *Phipps v. State*, 39 Md. App. 206 (1978) (same); *Tichnell v. State*, 287 Md. 695 (1980) (same); *State v. Stewart*, 368 Md. 26 (2002) (same). Thus, Maryland courts have deferred to Eighth Amendment jurisprudence and have generally not ascribed any independent meaning to the cruel and unusual punishment provisions in Articles 16

and 25. *See id.*; *Harris*, 312 Md. at 237 n.5 ("[W]e need not engage in separate discussions of these provisions."); DAN FRIEDMAN, THE MARYLAND STATE CONSTITUTION: A REFERENCE GUIDE 25 (2006); *but see, Bartholomey v. State*, 260 Md. 504 (1971), *vacated in part in remanded on other grounds*, 408 U.S. 938 (1972) (death penalty not cruel and unusual punishment under Articles 16 and 25); *Jones*, 247 Md. at 532 (death sentence for rape not cruel and unusual punishment under Article 16); *Glass*, 24 Md. App. 76 (1974).

Based on this history, the State raises two points. First, the State asserts that Article 16 is "directed toward legislative action." *See Thomas v. State*, 333 Md. 84, 92 (1993); *Walker v. State*, 53 Md. App. 171 (1982) (Article 16 is "apparently aimed more at the Legislature that makes the laws than at the courts which impose the penalties."); Friedman, *Tracing the Lineage*, *supra*, at 1018-19. That Article 16 is a legislative directive is of no consequence here. It is the province of this Court to invalidate a sentence imposed pursuant to a statute that is constitutionally prohibited. If, as Defendant alleges, the General Assembly circumscribed the requirements of Article 16 by enacting a statute that authorizes the death penalty, the Defendant's sentence must be declared illegal.

Second, the State argues that the Sanguinary Laws Clause should be interpreted *in pari materia* with Article 25 and the Eighth Amendment. The "*in pari materia*" principle generally provides that comparable statutory or constitutional provisions "should be construed together and, to the extent possible, harmonized." *See State v. Thompson*, 332 Md. 1, 7 (1993); *Maxwell v. State*, 40 Md. 273 (1874). As already noted, the *cruel and unusual punishment clauses* in Articles 16 and 25 are *in pari materia* with the comparable clause in the Eighth Amendment.

In this case, it is improper to construe the Sanguinary Laws Clause of Article 16 *in pari materia* with the Eighth Amendment because the latter does not contain a comparable provision.

Because the Bill of Rights lacks any prohibition of sanguinary laws, interpreting Article 16 *in pari materia* with the Eighth Amendment would render the Sanguinary Laws Clause mere surplusage. A constitutional provision should not be interpreted such that any "word, clause, sentence or phrase shall be rendered surplusage, superfluous, meaningless or nugatory." *Harford County v. Bd. of Supervisors*, 272 Md. 33, 39 (1974) (quoting *Thomas v. Police Comm'r*, 211 Md. 357, 361 (1956)); *Green v. Taylor*, 142 Md. App. 44, 53 (2001). Thus, absent any clear indication to the contrary, the Court in this case will not interpret Article 16 in a way that would give no independent meaning to the Sanguinary Laws Clause.[10]

### B. Interpretation of the Sanguinary Laws Clause

Because no Maryland court has construed the Sanguinary Laws Clause of Article 16, this Court must undertake a *de novo* interpretation. "Generally speaking, the same rules that are applicable to the construction of statutory language are employed in interpreting constitutional verbiage." *Brown v. Brown*, 287 Md. 273, 277 (1980). "Like construing a statute, to ascertain the meaning of a constitutional provision . . . [courts] first look to the normal, plain meaning of the language." *Davis v. Slater*, 383 Md. 599, 604 (2004). "[W]here the text of a constitutional provision is not ambiguous, the Court, in construing it, is not at liberty to search for its meaning beyond the Constitution itself." *Reed v. McKeldin*, 207 Md. 553, 560 (1955). However, when the constitutional language is ambiguous, a court may look to other sources to ascertain the meaning of the provision at issue. *Comptroller of the Treasury v. Clyde's of Chevy Chase, Inc.*, 377 Md. 471, 483 (2003).

---

[10] This conclusion is not inconsistent with the various cases, cited above, that have held that the cruel and unusual punishment clauses in Articles 16 and 25 are *in pari materia* with the comparable clause in the Eighth Amendment. Those cases are distinguishable in that they do not rely on the Sanguinary Laws Clause of Article 16.

As a threshold matter, the Court must define the term "sanguinary laws," as used in Article 16. If the law under which Defendant was sentenced is not a "sanguinary law," then the Sanguinary Laws Clause is inapplicable and the Court need not construe the remainder of the clause. Thus, the Court first looks to the text of Article 16 in order to define the term "sanguinary laws."

### 1. *Plain Meaning of the Text*

Interpreting the Sanguinary Laws Clause of Article 16 first requires an examination of the relevant text. *See Abrams v. Lamone*, 398 Md. 146, 172 (2007). The Court gives the words used by the founders their plain and ordinary meaning at the time the language was adopted. *See* Dan Friedman, *Applying Federal Constitutional Theory to the Interpretation of State Constitutions: The Ban on Special Laws in Maryland*, 71 MD. L. REV. 411, 429 n.94 (2012); *Cf. Ali v. CIT Tech. Fin. Servs.*, 416 Md. 249, 262 (2010) (examining usage of statutory language contemporary to the statute's adoption); *Chow v. State*, 393 Md. 431, 446-47 (2006) (same); *Harvey v. Marshall*, 389 Md. 243, 260 n.11 (2005). The plain language of Article 16 provides no obvious definition of the term "sanguinary laws." Thus, the most appropriate starting point to ascertain a meaning of that phrase is to consult dictionaries contemporary to the adoption of the Declaration of Rights.

The many founding-era dictionaries consulted by the Court do not directly define the phrase "sanguinary laws." The dictionaries of the time, however, consistently define the word "sanguinary" as "cruel; bloody; murderous." SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE: ABSTRACTED FROM THE FOLIO EDITION (1768); SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE: IN WHICH THE WORDS ARE DEDUCED FROM THEIR ORIGINALS (1799); WILLIAM KENDRICK, A NEW DICTIONARY OF THE ENGLISH LANGUAGE (1773); JOHN

WALKER, A DICTIONARY OF THE ENGLISH LANGUAGE (1775); NATHAN BAILEY, A UNIVERSAL ETYMOLOGICAL ENGLISH DICTIONARY (1794); THOMAS SHERIDAN, A COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (1796); NOAH WEBSTER, A COMPENDIOUS DICTIONARY OF THE ENGLISH LANGUAGE (1806). The word "sanguinary" is, indeed, rooted in the Latin word "sanguis," meaning "blood." D. P. SIMPSON, CASSELL'S LATIN DICTIONARY (Frank & Wagnalls 1977) (1959).

It is instructive to further define the words that comprise the definition of "sanguinary." The word "cruel," was defined by founding-era dictionaries as "[p]leased with hurting others; inhuman, hard-hearted; barbarous." SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE: ABSTRACTED FROM THE FOLIO EDITION (1768); NOAH WEBSTER, A COMPENDIOUS DICTIONARY OF THE ENGLISH LANGUAGE (1806) ("hardhearted, inhuman, bloody, fierce"). The term "bloody," in turn, means "stained with blood, murderous, cruel." NOAH WEBSTER, A COMPENDIOUS DICTIONARY OF THE ENGLISH LANGUAGE (1806); SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE: IN WHICH THE WORDS ARE DEDUCED FROM THEIR ORIGINALS (1799) ("cruel; murderous: applied either to men or facts"). "Inhuman" was defined as "[b]arbarous; savage; cruel; uncompassionate." SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE: IN WHICH THE WORDS ARE DEDUCED FROM THEIR ORIGINALS (1799). Similarly, "barbarous" had a meaning of "[c]ruel; inhuman" and "[s]tranger to civility; savage; uncivilized." SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE: ABSTRACTED FROM THE FOLIO EDITION (1768). Finally, "murderous" was defined as "[b]loody, guilty of murder." RICHARD COXE, WALKER'S DICTIONARY, A CRITICAL PRONOUNCING DICTIONARY OF THE ENGLISH LANGUAGE (1813).

It is reasonable to infer from these definitions of "sanguinary" and related phrases that the term "sanguinary laws" at the time of the founding encompassed laws that inflicted harsh, severe, cruel, inhuman, and/or barbarous punishment. Although useful as a starting point, the dictionary definitions provide little guidance in precisely determining the bounds of "sanguinary laws." Indeed, "dictionary definitions do not provide dispositive resolutions of the meaning of [constitutional] terms." *Marriott Emples. Fed. Credit Union v. Motor Vehicle Admin.*, 346 Md. 437, 447 (1997). Because the phrase "sanguinary laws" remains ambiguous, the Court must turn to other sources to determine what types of laws would be considered sanguinary at the time when the Article 16 was adopted.

No records of the Constitutional Convention exist that might shed light on the original meaning of the phrase "sanguinary laws." The phrase was, however, commonly used by founding-era jurists, philosophers, and politicians. The Court, therefore, looks to books, letters, speeches, and other materials that use the term "sanguinary" to describe laws or punishments. Through these materials, the Court will be able to determine how the term "sanguinary laws" was commonly used in the time period surrounding the adoption of Article 16. First, however, in order to understand the term "sanguinary" it is essential for the Court to place the Sanguinary Laws Clause in its historical context. Only through this historical context does the meaning of "sanguinary laws" become apparent.

### 2. Historical Context

#### a. The Bloody Code of England

The term "sanguinary" has its roots in the Latin word for blood, "sanguis." *See* D. P. SIMPSON, CASSELL'S LATIN DICTIONARY (Frank & Wagnalls 1977) (1959). It is no coincidence that the appropriate historical starting point in interpreting the Sanguinary Laws Clause is the

17th century, which marked the commencement of the so-called Bloody Code of England. The Bloody Code describes the statutes enacted in England, beginning in the 17th century through the early 1800s, which imposed disproportionate, severe, and indiscriminate punishments upon all classes of offenders. The death penalty was imposed for simple theft, forgery, and sodomy. More minor crimes were punished by branding, whipping, exhibition in the pillory, or transportation to a penal colony. *See, generally,* FRANK MCLYNN, CRIME AND PUNISHMENT IN EIGHTEENTH-CENTURY ENGLAND (2002). Punishments were harsh across-the-board, with little regard to the relative culpability of the offender; a shoplifter would receive the same punishment as a murderer.

In the reign of Queen Elizabeth I (1558-1609) approximately forty common law and statutory crimes were punishable by death. 1 ENCYCLOPEDIA OF CRIME AND PUNISHMENT 153 (David Levinson, ed.) (2002). Punishments for crimes such as theft, treason, and forgery were particularly severe. For example, "if anyone forged a deed or will with the intent to defeat the interest of any person in lands, he was to be placed upon the pillory, have both his ears cut off, his nostrils slit and seared with a hot iron, to be imprisoned all his life and forfeit all the profits of his lands." Hampton L. Carson, *Historical Studies in English Jurisprudence*, 40 AM. L. REGISTER & REV. 458, 460 (1892).

By 1688, approximately "fifty offences carried the death penalty:  the crimes so punishable were treason, murder, rape, and arson." MCLYNN, *supra*, at xi, 257. The number of capital crimes began to explode in the early 18th century. "Parliament was quick and casual in new capital punishment enactments, the most notable of which was the Black Act in 1722, by which offenses against public order, against the administration of justice, and against property and person, all were made punishable by death. There was not a criminal act that did not come

within its purview." SOL RUBIN ET. AL., THE LAW OF CRIMINAL CORRECTION 13 (1973). The Black Act provided for the death penalty for crimes such as stealing a fish out of a river, cutting down a tree in an orchard, and to appear in disguise in any forest and wound or kill a red deer. Carson, *supra*, at 460-61.

The number of capital crimes swelled to 165 in 1765 and to 225 by the early 1800s. McLYNN, *supra*, at 257. The addition of death-eligible offenses during this time period was "largely motivated by changing commercial practices and the desire to protect merchants' property and trade." 1 ENCYCLOPEDIA OF CRIME AND PUNISHMENT, *supra*, at 153. "In 1785, . . . no less than ninety-seven persons were executed in London for the offence of shop-lifting." Carson, *supra*, at 462.

The sheer number of capital crimes shocked the conscience of countless philosophers and politicians of the time. Writing in mid-Eighteenth Century, the revered jurist William Blackstone derided the hundreds of crimes punishable by death:

> [W]e shall find it more difficult to justify the frequency of capital punishment to be found therein, inflicted (perhaps inattentively) by a multitude of successive independent statutes upon crimes very different in their natures. It is a melancholy truth, that among the variety of actions which men are daily liable to commit, no less than a hundred and sixty have been declared by act of parliament to be felonies without benefit of clergy[11]; or, in other words, to be worthy of instant death.

---

[11] The benefit of clergy was a means by which "those affiliated with the Church could escape the brutal and tortuous punishments of the secular courts and be tried in an ecclesiastical court where they could receive leniency." 3 ENCYCLOPEDIA OF CRIME AND PUNISHMENT, *supra*, at 1400. The ecclesiastical courts did not impose the death penalty. RAPHAEL SEMMES, CRIME AND PUNISHMENT IN EARLY MARYLAND 27-28 (1938). The benefit of clergy was originally "was extended to clerics, nuns, and monks who could prove their literacy by reciting a passage from Psalm 51." 3 ENCYCLOPEDIA OF CRIME AND PUNISHMENT, *supra*, at 1400. Eventually, the benefit was extended to those who could read or recite the relevant Psalm. "Because of its unequal application and the legal confusion that it created, this practice, used primarily to avoid capital punishment, was eventually abolished." *Id.*

4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 18-19 (1769) (hereinafter COMMENTARIES) (footnote supplied). Other writers characterized the Bloody Code as "a system of laws that awards death for about two hundred offenses, and that draws no distinction between the most atrocious murderers and the stealing of a guinea, or the cutting down a forest tree." CHARLES G. HAINES, REPORT ON THE PENITENTIARY SYSTEM 10 (M. Day) (1822), *available at* http://lawlib.state.md.us/search/o?SEARCH=60723933    (hereinafter    REPORT    ON    THE PENITENTIARY SYSTEM). Thus, the Bloody Code of England has very aptly been described as being "sanguinary." BLACKSTONE, COMMENTARIES at 17-18; REPORT ON THE PENITENTIARY SYSTEM, *supra*, at 11-12.

### b. Harsh Laws in Colonial Maryland

The colonies in the United States largely inherited the harsh laws of England. GEORGE T. KURIAN, WORLD ENCYCLOPEDIA OF POLICE FORCES AND CORRECTIONAL SYSTEMS 77 (2d ed. 2006). "All of the American colonies drew principally on the jurisprudence and laws of the mother country in fashioning their criminal law." 2 CRIMINAL LAW REFORM: HISTORICAL DEVELOPMENT IN THE UNITED STATES 501 (Sanford H. Kardish ed., 1983) (hereinafter CRIMINAL LAW REFORM). Maryland was no exception. For a majority of Maryland's colonial history, English criminal laws were in force throughout the State. Marie Hallion, *Criminal Justice in the Province of Maryland*, 15 THE MARYLAND HISTORIAN 3, 4-6, 14 (1984). Statutes enacted by the General Assembly that supplemented the English laws were strikingly similar to their English counterparts. *See id.* at 6. For example, the 1639 *Act of Treasons* was almost identical to the English version of the statute on treason, except that in addition to criminalizing conspiracy to kill the King, it added conspiracy to kill the governor. *Id.*

Criminal statutes enacted by the General Assembly imposed punishments reminiscent of the harsh sanctions characteristic of the English law. The 1639 *Act of Felonies* made homicide, burglary, robbery, polygamy, sacrilege, sorcery, petit treason[12], sodomy, and rape all punishable by death. *Id.* Since at least the 1660s, grand larceny was punishable in Maryland by death. RAPHAEL SEMMES, CRIME AND PUNISHMENT IN EARLY MARYLAND 21-29 (1938). Punishment for the crime of perjury was, likewise, severe. Starting in 1650, a perjurer "was to be nailed to the pillory and loose both ears, or corporally punished in some other way." *Id.* at 266 n.4. Around the same time period, judges were required to provide branding irons so that certain criminals could be marked. *Id.* at 35. A branding of the letter "H," for example, likely identified a person who had stolen a hog, while an "R" marker likely indicated runaway a servant. *Id.*

The General Assembly enacted severe and brutal punishments into the 18th century. The 1729 "Act for the more effectual Punishing of Negroes, and other Slaves; and for taking away the benefit of Clergy from certain offenders" provided that if a slave was convicted of treason, murder, or arson, he or she could be sentenced "to have the right Hand cut off, to be hang'd in the usual Manner, the Head severed from the Body, the Body divided into Four Quarters, and Head and Quarters set up in the most publick Places of the County where such Fact was committed." 36 *Proceedings and Acts of the General Assembly of Maryland, October 1727 – August 1729*, 454-55. The Act further condemned to death, without the benefit of clergy, those who were convicted of "break[ing] into any Shop, Store-house, or Ware-house . . . and steal[ing] from thence any Goods, to the Value of Five Shillings." *Id.* Another statute, passed by the General Assembly in 1737, made it a capital crime, without the benefit of clergy, to break into a

---

[12] Petit treason, in essence, means killing of a superior by an inferior and it applied to a servant who killed a master, a wife who killed a husband, or by a member of the clergy killing his ecclesiastical superior. Hallion, *supra*, at 9-10.

"Tobacco-House" and steal any goods worth five shillings or more. Bacon, *Laws of Maryland* (1765) ("An Act for the more effectual Punishment of certain Offenders, and for taking from them the Benefit of Clergy.").

### c. The Age of Enlightenment

The Age of Enlightenment, which took root in the 18th century, brought about a fundamental change with respect to the common sentiment toward the cause of crime and the object of punishment. This spirit of reform "recognized humanity's essential dignity and imperfection." 1 ENCYCLOPEDIA OF CRIME AND PUNISHMENT, *supra*, at 442. It also reflected popular revulsion against the severe and cruel punishment characteristic of the time period. KURIAN, *supra*, at 76.

From the earliest of times, punishment was largely based on the principle of retribution and vengeance.[13] Public punishments were used to coax spectators into conforming to prevailing morals. "It was generally believed that the more gruesome the punishment the public observed, the more punishment would serve as a deterrent to crime." 1 ENCYCLOPEDIA OF CRIME AND PUNISHMENT, *supra*, at 330. Brutal and excessive punishments were deemed necessary to maintain order in society. 3 ENCYCLOPEDIA OF CRIME AND PUNISHMENT, *supra*, at 1400.

The Age of Enlightenment marked a philosophical shift in these traditional theories of punishment, toward reforming the offender. The purpose of punishment was "systematically reoriented from retribution to prevention through deterrence." 1 ENCYCLOPEDIA OF CRIME AND PUNISHMENT, *supra*, at 442. A general consensus arose during the Enlightenment that barbarous and extreme punishments were ineffective in preventing crimes. Thus, many philosophers urged

---

[13] "Retribution involves inflicting pain upon offenders through imprisonment or some other method of punishment that makes them 'pay their debt to society' for their harmful actions." 3 ENCYCLOPEDIA OF CRIME AND PUNISHMENT, *supra*, at 1399.

that punishments be made proportionate to the crime, an idea that, at the time, was quite radical. 2 ENCYCLOPEDIA OF CRIME AND PUNISHMENT, *supra*, at 513. "They championed replacement of capital and corporal punishments with fixed terms at humane, rehabilitation-oriented prisons as part of systematic, impartial, and reasoned criminal justice systems, aligned with the spirit of rationalism that characterized the Enlightenment." KURIAN, *supra*, at 76-77.

Enlightenment-era philosophers and jurists such as Montesquieu, Beccaria, Bentham, and Blacksone strongly influenced the changing attitudes of the time period. In his influential treatise "The Spirit of Laws," Montesquieu was highly critical of severe and extreme punishments as being ineffective in preventing crimes. CHARLES DE SECONDAT, BARON DE MONTESQUIEU, THE SPRIT OF LAWS 101, 104 (Ewing & Faulkner 1751) (1748). Applying the same severe punishment across-the-board, according to Montesquieu, actually encouraged more culpable criminal conduct:

> It is a great abuse amongst us, to subject to the same punishment a person that only robs on the high-way, and another that robs and murders. Obvious it is, that for the public security some difference should be made in the punishment. . . . [W]here the punishment of robbery and murder is the same, they always murder. The dead, say they, tell no tales.

*Id.* at 112.

"In 1764, Cesare Beccaria wrote the highly influential treatise *On Crimes and Punishments*, which argued for abolition of the death penalty and torture and for a general reduction in the severity of criminal punishment to make it more proportionate to the crime." John F. Stinneford, *Rethinking Proportionality Under The Cruel And Unusual Punishments Clause*, 97 VA. L. REV. 899, 956 (2011).[14] Beccaria specifically advocated for a scale of crimes

---

[14] In Defendant's motion to correct illegal sentence, counsel states that Charles Carroll of Carrollton, a member of the seven-member committee that drafted the Declaration of Rights, is known to have owned a copy of Beccaria's work.

that would create a "fixed proportion between crimes and punishments." CESARE BECCARIA, ON CRIMES AND PUNISHMENTS 28 (Philadelphia, Philip H. Nicklin 1819) (1764). "If an equal punishment be ordained for two crimes that injure society in different degrees," according to Beccaria, "there is nothing to deter men from committing the greater as often it is attended with greater advantage." *Id.* at 32.

Jeremy Bentham, likewise, despised what he viewed as unnecessarily severe punishments that were common in the late 1700s. He theorized that humane and sanitary prisons could reform criminals through reflection and meaningful work. KURIAN, *supra*, at 77. "In Bentham's view, those most deterrent punishments are those (a) having a level of severity comparable to – not more, no less -- the seriousness of the act and (b) those executed quickly and with certainty." 2 ENCYCLOPEDIA OF CRIME AND PUNISHMENT, *supra*, at 513.

Blackstone was yet another critic of severe and inhumane punishments. According to Blackstone, "punishments of unreasonable severity, especially when indiscriminately inflicted, have less effect in preventing crimes and amending the manners of a people than such as are more merciful in general, and yet properly intermixed with due distinctions of severity." 4 BLACKSTONE, COMMENTARIES at 16-17. As noted by the Supreme Court of Oregon, Blackstone "criticized the use of brutal punishments, which he referred to as 'sanguinary laws,' as 'a bad symptom of the distemper of any state.'" *State v. Wheeler*, 343 Ore. 652, 661, 175 P.3d 438, 444 (Or. 2007). Blackstone argued that the death penalty should be carefully applied, but did not agree with abolishing it altogether. *See* 4 BLACKSTONE, COMMENTARIES at 11.

### d. Founding Fathers Influenced by Enlightenment Ideals

The founding fathers of the United States and of the individual states were particularly influenced by the spirit of the Enlightenment and by the works of Enlightenment-era

philosophers. *See Wheeler*, 343 Ore. at 662; CRIMINAL LAW REFORM, *supra*, at 503-04; RONALD J. PESTRITTO, FOUNDING THE CRIMINAL LAW: PUNISHMENT AND POLITICAL THOUGHT IN THE ORIGINS OF AMERICA 140 (2000). By the time of the American Revolution, it was common sentiment that barbarous punishment and the death penalty were simply not appropriate for relatively minor crimes such as theft. Thus, "the principle of just deserts and proportionality between crimes and punishments was fundamental to the early American politics of punishment." PESTRITTO, *supra*, at 140. Accordingly, Enlightenment ideals were reflected in letters and other works produced by the founding fathers and in the constitutions they promulgated.

Thomas Jefferson, "[o]ne of the founders most sympathetic to the Enlightenment, . . . advocated milder penalties in the criminal code." *Id.* at 45. Jefferson "was convinced that the 'reformation of offenders' was 'an object worth of the attention of the laws.'" *Id.* Jefferson believed that criminal sanctions should be strict and certain, yet proportioned to the crime. It is in this context that Jefferson, in a letter to another personality of the time period, used the word "sanguinary" to describe the severe and disproportionate punishments of the time:

> It is only the sanguinary hue of our penal laws which I . . . object to. Punishments I know are necessary, & I would provide them, strict & inflexible, but proportioned to the crime. Death might be inflicted for murther & perhaps for treason if you would take out of the description of treason all crimes which are not such in their nature.

Thomas Jefferson, *To Edmund Pendleton, August 26, 1776, in* THE POLITICAL WRITINGS OF THOMAS JEFFERSON 38-39 (Merrill D. Peterson ed., 1993).

Soon after writing this letter, Jefferson introduced legislation in his home state of Virginia that required proportionality between crimes and punishments. *See* James Headley, *General Issue: Proportionality Between Crimes, Offenses, And Punishments*, 17 ST. THOMAS L.

REV. 247, 249-51 (2004). In the bill's preamble, Jefferson used the term "sanguinary" to refer to the disproportionate and cruel laws he was trying to reform:

> [I]t becomes a duty in the legislature to arrange in a proper scale the crimes which may be necessary for them to repress, and to adjust thereto a corresponding gradation of punishments. . . . And forasmuch the experience of all ages and countries hath shewn that cruel and sanguinary laws defeat their own purpose by engaging the benevolence of mankind to withhold prosecutions, to smother testimony, or to listen to it with bias, when, if the punishment were only proportioned to the injury, men would feel it their inclination as well as their duty to see the laws observed.

Thomas Jefferson, *A Bill for Proportioning Crimes and Punishments in Cases Heretofore Capital, in* PHILOSOPHICAL FOUNDATIONS OF CRIMINAL LAW 99 (Antony Duff & Stuart P. Green, 2011). Although Jefferson's proposal was debated, it was ultimately defeated.

Alexander Hamilton was, likewise, influenced by Enlightenment-era philosophies concerning punishment. *See* PESTRITTO, *supra*, at 136. Unlike Thomas Jefferson, Hamilton did not protest the severity of the criminal law, *per se. Id.* at 135-36. Rather, Hamilton advocated for liberal use of the pardon power to mitigate harsh punishments. Hamilton articulated this position in Federalist Paper No. 74, where he used the term "sanguinary" to refer to harsh and severe punishments:

> Humanity and good policy conspire to dictate, that the benign prerogative of pardoning should be as little as possible fettered or embarrassed. The criminal code of every country partakes so much of necessary severity, that without an easy access to exceptions in favor of unfortunate guilt, justice would wear a countenance too sanguinary and cruel.

THE FEDERALIST NO. 74 (Alexander Hamilton).

On the other hand, Benjamin Franklin's theory of punishment was more similar to Thomas Jefferson's in that it reflected revulsion toward the extreme punishments of the Bloody

Code. "In a well known letter to Benjamin Vaughan,[15] . . . Franklin expressed dismay that punishments were no longer proportioned to crimes." PESTRITTO, *supra*, at 126 (footnote supplied). "In this letter, dated, March 14, 1785, Franklin discussed the aspects of the English law which seemed to him most reprehensible: the lack of proportion between crimes and penalties and the cruelty of a legislation which in many cases did not hesitate to put to death people guilty of what Franklin considered minor offenses." Marcello Maestro, *Franklin and the Penal Laws*, 36 JOURNAL OF THE HISTORY OF IDEAS 558-59 (1975). Franklin derided the English practice imposing capital punishment for theft:

> Is there then no difference in value between property and life? If I think it right that the crime of murder be punished with death, not only as an equal punishment of the crime, but to prevent other murders, does it follow that I must approve of inflicting the same punishment for a little invasion of my property by theft? if I am not myself so barbarous, so bloody-minded, and revengeful, as to kill a fellow creature for stealing from me fourteen shillings, and three pence, how can I approve of a law that does it?

Benjamin Franklin, *Letter to Benjamin Vaughan* (1785), *in* THE OPINIONS OF DIFFERENT AUTHORS UPON THE PUNISHMENT OF DEATH (Basil Montagu ed. 1809).[16]

Benjamin Franklin, in 1776, was instrumental in drafting the Constitution of the state of Pennsylvania. *See* JOHN D. BESSLER, CRUEL AND UNUSUAL: THE AMERICAN DEATH PENALTY AND THE FOUNDERS' EIGHTH AMENDMENT 177-79 (2012). Franklin and Pennsylvania's other founders sought to ensure that the Bloody Code would not take root in the newly-formed state. Accordingly, the founders placed into the Constitution two sections aimed at reforming the brutal laws inherited from England:

---

[15] Benjamin Vaughan was a British politician and diplomat.

[16] In this passage, Franklin uses several terms associated with the word "sanguinary." *See* Section III B 1, *supra*. (defining the term "sanguinary").

> SECT. 38. The penal laws as heretofore used shall be reformed by the legislature of this state, as soon as may be, and punishments made in some cases less sanguinary, and in general more proportionate to the crimes.
>
> SECT. 39. To deter more effectually from the commission of crimes by continued visible punishments of long duration, and to make sanguinary punishments less necessary; houses ought to be provided for punishing by hard labour, those who shall be convicted of crimes not capital; wherein the criminals shall be imployed for the benefit of the public, or for reparation of injuries done to private persons: And all persons at proper times shall be admitted to see the prisoners at their labour.

PA. CONST. §§ 38-39 (1776). Both of these sections use the word "sanguinary." "In both instances, the Pennsylvania framers used the word to describe punishments that were *unnecessary* or *disproportionate* to the offenses committed." Friedman, *Tracing the Lineage*, *supra*, at 1019 (italics in original).

Reform of Pennsylvania's criminal laws pursuant to Sections 38 and 39 of the Constitution was delayed for approximately ten years due to the War for Independence. *See* Maestro, *supra*, at 560-61. During this ten year period, capital punishment was still imposed for about a dozen crimes, some as relatively minor as robbery and counterfeiting. *Id.* "Bodily mutilations, as well as the pillory and whipping were current penalties for most minor offences." *Id.* In 1786, however, the legislature implemented the constitutional reforms and limited capital punishment to four crimes: murder, treason, rape, and arson. *Id.* "Branding with a hot iron, ear cropping, whipping, and use of the pillory were abolished." *Id.*

Analogous provisions limiting "sanguinary laws" can be found in the constitutions of four other states, including Maryland's. The Vermont Constitution adopted a section almost identical to Section 39 of the Pennsylvania Constitution:

> SECTION XXXV. To deter more effectually from the commission of crimes, by continued visible punishment of long duration, and to make sanguinary punishments less necessary; houses ought to be provided for punishing, by hard labor, those who shall be convicted of crimes not capital; wherein the criminal

> shall be employed for the benefit of the public, or for reparation of injuries done
> to private persons; and all persons, at proper times, shall be admitted to see the
> prisoners at their labor.

VT. CONST. §35 (1777). The 1778 Constitution of South Carolina contained a provision virtually

identical to Section 38 of the Pennsylvania Constitution:

> XL. That the penal laws, as heretofore used, shall be reformed, and punishments
> made in some cases less sanguinary, and in general more proportionate to the
> crime.

S.C. CONST. Art. XL (1778). The New Hampshire Constitution contained an explicit

proportionality requirement within Article 18:

> XVIII. All penalties ought to be proportioned to the nature of the offence. No
> wise legislature will affix the same punishment to the crimes of theft, forgery and
> the like, which they do to those of murder and treason; where the same
> undistinguishing severity is exerted against all offences; the people are led to
> forget the real distinction in the crimes themselves, and to commit the most
> flagrant with as little compunction as they do those of the lightest dye: For the
> same reason a multitude of sanguinary laws is both impolitic and unjust. The true
> design of all punishments being to reform, not to exterminate, mankind.

N.H. CONST. Art. XVIII (1784).[17] All of these constitutions use the word "sanguinary" as a

reference to the brutal, severe, and disproportionate punishments characteristic of the Bloody

---

[17] In a letter written in 1820, New Hampshire Governor William Plumer described the reforms to
the criminal justice system that took place following the founding of that state. There, he used
the term "sanguinary law" to reference the multitude of crimes subject to the death penalty prior
to founding-era reforms:

> Previous to the establishment of the state prison, in 1812, there were in New-
> Hampshire, eight offences that, by law, subjected the offender to capital
> punishment; but in that year, they were reduced to two – treason and willful
> homicide. If this benevolent change in our laws has not diminished, it has not
> increased, the number of crimes. A sanguinary law, a law opposed to the feelings
> of humanity, cannot be executed. When death is the punishment to be inflicted,
> jurors will acquit, where, had the punishment been milder, they would convict,
> and the criminal have suffered for his offense.

Letter from William Plumber (September 21, 1820), *in* REPORT ON THE PENITENTIARY SYSTEM
55 (appendix) (1822).

Code. The founders of these newly sovereign states, inspired by the Enlightenment, ensured through their respective constitutions that the Bloody Code would not continue to terrorize their fellow citizens.

### 3. Common Usage of "Sanguinary"

With the historical background in mind, the Court will now examine the context in which the term "sanguinary laws" and related phrases were commonly used during the time period surrounding the adoption of Article 16. A passage appearing in a publication entitled *Appendix to Thoughts on Executive Justice* provides a concise definition of "sanguinary," when used to describe laws:

> The word *sanguinary* carries with it a very dreadful meaning, like its plain-English *synonym – bloody*: – it brings sensations into the mind of the most terrible nature; and, when applied to laws, it imports, that they are arbitrary and cruel, like the laws of *Draco*, which were calculated for the destruction and misery, not for the preservation and happiness of mankind.

Martin Madan, *Appendix to Thoughts on Executive Justice* (1785), *in* THE OPINIONS OF DIFFERENT AUTHORS UPON THE PUNISHMENT OF DEATH 123 (Basil Montagu ed. 1809) (italics in original).[18] Countless other words use the word "sanguinary" in a consistent manner.

Blackstone consistently used the term "sanguinary" to describe laws that imposed severe and grossly disproportionate punishment. Blackstone derided the Bloody Code of England for applying the same punishment to all persons regardless of their culpability. He supported reforming the criminal code such that the degree of punishment would correspond to the severity

---

[18] Draco is credited with providing the first written criminal code in ancient Athens. Under the Draconian code, virtually every infraction of the law was punishable by death. The code contained no sense of proportionality: a murderer would receive the same sentence as a person convicted of stealing a piece of fruit. *See* 1 ENCYCLOPEDIA OF CRIME AND PUNISHMENT, *supra*, at 152.

of the crime. It is in this context that Blackstone, in his famous Commentaries, used the term

"sanguinary laws":

> It is moreover absurd and impolitic to apply the same punishments to crimes of different malignity. A multitude of sanguinary laws . . . do likewise prove a manifest defect either in the wisdom of the legislature or the strength of the executive power. It is a kind of quackery in government, and argues a want of solid skill, to apply the same universal remedy, the *ultimum suplicium*, to every case of difficulty. . . . It has been therefore ingeniously proposed, that in every state a scale of crimes should be formed, with a corresponding scale of punishments . . .

4 BLACKSTONE, COMMENTARIES at 17-18. In another passage, Blacksone used "sanguinary laws"

to refer to cruel and severe laws:

> We may farther observe that sanguinary laws are a bad symptom of the distemper of any state, or at least of its weak constitution. The laws of the Roman kings . . . were full of cruel punishments: the Porcian law, which exempted all citizens from sentence of death, silently abrogated them all. In this period the republic flourished: under the emperors severe punishments were revived; and then the empire fell.

*Id.* Consistent with this usage, Blackstone described as a "sanguinary law" a statute that imposed

the death penalty, without the benefit of clergy, upon "all idle and wandering [Soldiers] or

[Mariners]" that refused to "settle themselves in some Service Laboure or other lawfull Course

of Lyfe." *Id.* at 165; 39 Eliz. c. 17 *in* 4 STATUTES OF THE REALM 915 1547-1624.[19] Blackstone

opined that this statute was so severe that it was a "disgrace to [England's] statute-book." *Id.*

---

[19] Blackstone specifically said, with reference to this law:

> A third species of felony against the good order and economy of the kingdom is by idle soldiers and mariners wandering about the realm, or persons pretending so to be, and abusing the name of that honorable profession. Such a one, not having a testimonial or pass from the justice of the peace limiting the time of his passage, or exceeding the time limited for fourteen days, unless he falls sick, or forging such testimonial, is, by statute 39 Eliz. c. 17, made guilty of felony without benefit of clergy. This sanguinary law, though in practice deservedly antiquated,

(continued . . .)

Many other authors use the phrase "sanguinary laws" to refer to the severe and barbaric punishments imposed by the Bloody Code. An 1805 treatise described as "sanguinary" the English practice of imposing capital punishment for persons convicted of grand larceny:

> Under the sanguinary laws of England, *grand larceny*, that is the felonious and fraudulent taking and carrying away of the mere personal goods of another of the value of THIRTEEN PENCE, is punishable with DEATH; but under the mild and benignant laws of New-Jersey every person so offending shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine not exceeding five hundred dollars, or imprisonment at hard labor not exceeding ten years, or both, at the discretion of the court by which they shall be tried, according to the circumstances and aggravation of the case.

JAMES EWING, A TREATISE ON THE OFFICE AND DUTY OF A JUSTICE OF THE PEACE, SHERIFF, CORONER, CONSTABLE, AND OF EXECUTORS, ADMINISTRATORS AND GUARDIANS 379 (Trenton, James Oram) (1805) (italics and capitalization in original). Similarly, another treatise described the Bloody Code as "sanguinary," considering the sheer number of offences for which capital punishment was available:

> The catalogue of offences, rendered capital in the last and present century, affords a melancholy proof of the sanguinary nature of our criminal code; exhibiting features of severity by no means reconcilable either to the genius of the people, the principles of humanity, or the true spirit of civil liberty.

P. COLQUHOUN, A TREATISE ON THE POLICE OF THE METROPOLIS: CONTAINING A DETAIL OF THE VARIOUS CRIMES AND MISDEMEANORS BY WHICH PUBLIC AND PRIVATE PROPERTY AND

---

still remains a disgrace to our statute-book, yet attended with this mitigation, that the offender may be delivered, if any honest freeholder or other person of substance will take him into his service, and he abides by the same for one year, unless licensed to depart by his employer, who in such case shall forfeit ten pounds.

4 BLACKSTONE, COMMENTARIES at 165. Blacksone called this law "sanguinary," even though a defendant could escape the death penalty if a person agreed to take the defendant as a servant for one year. *See 39 Eliz. c. 17 in 4* STATUTES OF THE REALM *915 1547-1624.*

SECURITY ARE, AT PRESENT, ENGANGERED 416 (London, J. Mawman 1805). That same treatise

further provides examples of sanguinary punishments in gruesome detail:

> In the course of the present century, several of the old sanguinary modes of punishment have been either, very properly, abolished by acts of parliament, or allowed, to the honour of humanity, to fall into disuse: - such as burning alive, (particularly women) cutting off hands or ears, slitting nostrils, or branding in the hand or face; and among lesser punishments, fallen into disuse, may be mentioned the ducking-pool.

*Id.* at 282-84. An analogous passage appears in an 1822 publication concerning the rise of the

penitentiary system in the United States following the reforms of the Enlightenment:

> It will be perceived that the [penitentiary] system has led to a change in the Criminal Codes of every state in the Union, as far as it has been adopted. They have been fundamentally reformed and sanguinary and ignominious punishments, renounced. Death, cropping the ears, burning the hand, exposure in the pillory, the public infliction of stripes, and confinement without labour in the county jails, for a term of years, have been abandoned, and confinement to hard labour substituted.

REPORT ON THE PENITENTIARY SYSTEM, *supra*, at 47.

A member of the British Parliament in 1793 described the laws of France as "sanguinary"

because they inflicted arbitrary and disproportionate punishments:

> It seems to be the only object of their criminal laws, to afflict and to destroy every individual who can, by any means, be brought within their reach. Indefinite and constructive crimes, summary modes of trial, arbitrary convictions, and disproportioned punishments, are the leading features of that sanguinary code. . . .

30 Parl. Deb. Eng. 874. The grossly disproportionate nature of "sanguinary" punishments was

also addressed in the following passage:

> For many centuries, after the revival of letters, Criminal Jurisprudence continued nearly stationary on the continent of Europe. The records of her criminal courts were deformed by cruel, rigorous, and impolitic sentences, and humanity was shocked and outraged, by awful and sanguinary punishments. Dungeons were multiplied and rendered the unmerited mansions of ignomity, sufferings and despair; torture and the rack were applied with little discrimination, and no just relation was preserved between the offence and the punishment.

REPORT ON THE PENITENTIARY SYSTEM, *supra*, at 228. Jeremy Bentham similarly highlighted the

barbarous nature of sanguinary laws:

> The first penal laws were dictated by anger and revenge. But when these
> barbarous laws, founded upon caprice and antipathies, begin to shock an
> enlightened public, the power to pardon, offering a protection against the rigour of
> sanguinary laws, becomes a comparative good; and is adopted without any
> examination of the evils entailed by this pretended remedy.

Jeremy Bentham, *Theory of Legislation* (E. Dumont ed., circa 1802) [20], *in* THE OPINIONS OF

DIFFERENT AUTHORS UPON THE PUNISHMENT OF DEATH 232 (Basil Montagu ed., 1809).

Prior to the Enlightenment, severe and extreme laws were thought to be necessary to

punish criminals and deter crime. *See* Sections III B 2 a-c, *supra*. An 1807 legal treatise

describes how legislatures made punishments more "sanguinary" in response to an increase in

crime:

> Forgery at common law . . . [is] punishable by fine and imprisonment, and such
> other corporal punishment as the court in discretion shall think proper. But the
> mischiefs of this kind increasing, it was found necessary to guard against them by
> more sanguinary laws. Hence we have several acts of parliament declaring what
> offences amount to forgery, and what inflict severer punishment than there were
> at the common law.

BACON, A NEW ABRIDGEMENT 277 (1807).[21] By the time of the Enlightenment, however, the

practice of inflicting severe and disproportionate penalties for relatively minor crimes was

---

[20] The publication date of Bentham's *Theory of Legislation* is unclear. This treatise was based on
manuscripts composed by Bentham in the late 1700s. Swiss author E. Dumont compiled the
manuscripts and published them in the late 1700s or early 1800s.

[21] This treatise uses the phrase "sanguinary laws" in an analogous manner in the following
passage:

> Hence we have the reason of the distinction between the real and personal
> property, and why our law <u>does not punish</u> the stealing of corn or grass growing,
> or apples on a tree, or lead on a church or house <u>with death;</u> and therefore it was

(continued . . .)

viewed by many as being not just ineffective, but an incentive to commit more culpable offenses.

See Section III B 2 c, *supra*. Those charged with enforcing the laws would be so outraged at the

brutality of the potential punishment that they would simply refuse to convict. This argument

was made time and time again by writers who would use the word "sanguinary" to refer to the

extreme punishments that judges and juries refused to inflict. Jeremy Bentham, for example,

argued as follows:

> I should astonish my readers, if I were to expose to them the penal code of a
> nation, celebrated for its humanity and its intelligence; we might there expect to
> find the greatest proportion between offences and punishments; but, whatever
> may be our expectations, we should see this proportion continually violated, and
> the punishment of death inflicted upon the most trifling offences. The
> consequence is, that, the sweetness of the national character being in contradiction
> to the laws, the manners triumph and the laws are eluded: they multiply pardons,
> they shut their eyes upon offences, their ears to proofs; and the juries, to avoid an
> excess of severity, frequently fall into an excess of indulgence: the result is a
> penal system, which is incoherent and contradictory, which unites violence to
> feebleness, and, depending upon the humour of the judge, varies from circuit to
> circuit, being sanguinary in one part of the island, and merciful in another.

Jeremy Bentham, *Theory of Legislation* (E. Dumont ed., circa 1802), *in* THE OPINIONS OF

DIFFERENT AUTHORS UPON THE PUNISHMENT OF DEATH 230 (Basil Montagu ed. 1809).

Many other writers of the time criticized "sanguinary" criminal sanctions as being

ineffective. A 1775 treatise provides:

> [Severe punishments], with great plausibility, been ascribed to the increasing
> opulence of the kingdom; and indeed there seems sufficient reason to believe, that
> sanguinary laws are the probable consequence of national prosperity. Sensibility
> sleeps in the lap of luxury; and the legislature is contented to secure his own
> selfish enjoyments, by subjecting his fellow citizens to the miseries of a dungeon,
> and the horrors of an ignominious death. Still, however, he feels a tacit
> disapprobation of the laws, which he hath enacted; and even, when injured,
> hesitates to bring the offender to justice. He knows, that the punishment is

---

not necessary to guard this sort of property with such sanguinary laws, where the
redress might be by a civil action.

BACON, A NEW ABRIDGEMENT 228 (1807) (emphasis in original).

disproportionate to the offence; or, at least, if humanity be obliterated by interest, he foresees, that the punishment cannot be inflicted without raising the indignation of society against the accuser. The delinquent therefore is discharged without prosecution; he repeats the crime, under the expectation of repeated mercy; he becomes gradually familiar with dishonesty; and, at length, falls a victim to that preposterous severity of the law, which hath so long been the subject of his mockery.

Eden, *Principle of Penal Law*, in THE OPINIONS OF DIFFERENT AUTHORS UPON THE PUNISHMENT

OF DEATH 203 (Basil Montagu ed., 1809). An analogous argument is made in the following

publication:

> But there is another great evil in the accumulation of capital offences in England -
> . . . the laws are not executed. The injured will not complain, witnesses will not
> appear, Grand juries will not find indictments, Petit juries will not convict, and if
> they do convict, the sentence is often rendered inoperative. . . Hence we see that
> when sanguinary laws are executed, they fail to prevent crimes, and that when
> they are peculiarly severe, they remain a dead letter; and thus directly promote,
> instead of suppressing crimes.

REPORT ON THE PENITENTIARY SYSTEM, *supra*, at 88-90.[22] Another treatise similarly uses the

term "sanguinary":

> I have professedly avoided entering upon the question, how far it might be
> expedient to revise our penal statutes, relative to capital offences? but, as a friend
> to examination and revisal of all kinds, I should not be sorry to hear that such a
> thing was in agitation, for, if any of the laws in being, fail of their execution, and

---

[22] See page eight of the appendix to this publication, where "sanguinary" is used in a similar manner:

> This brings me to a fourth cause of the failure of the system, viz: The indiscreet,
> thoughtless exercise of the power of pardoning. This strikes at the vital principle
> of the system. It was a capital argument with the friends of mild punishments, that
> you would gain by their *certainty* more than you would lose in *severity*; that laws
> cannot be executed which shock the good feelings and common sense of
> mankind; that juries would not convict when then could, by any possibility, evade
> the evidence; and that were convictions obtained, pardons must be constantly
> interposed to prevent the infliction of a sanguinary and disproportionate
> punishment.

Letter from Joseph Hopkinson (October 10, 1820), *in* REPORT ON THE PENITENTIARY SYSTEM 8 (appendix) (1822) (italics in original).

> consequently of their end and purpose, because they are thought too sanguinary,
> they had much better be altered into something less severe, than to let those
> offences, which are the objects of them, go without any punishment.

Martin Madan, *Thoughts on Executive Justice* (1785), *in Id.* at 110-111 (italics in original).

Finally, a British member of parliament, during a debate, used the term "sanguinary" in the

context of arguing that excessively harsh punishments do not work:

> Besides, it was a general maxim, that excess of punishment for a crime brings
> impunity along with it. It was to this we were to attribute so many acquittals of
> men tried upon sanguinary acts of parliament:   the jury seeing the vast
> disproportion between the offence and the punishment often acquitted, although
> they had no doubt of the commission of the act; and often judges, after conviction,
> were obliged to respite, and the king finally to pardon, for fear that by putting
> men to death for their trifles, the humanity of the public would be shocked.

30 Parl. Deb. Eng. 733.

### 4. Analysis

The overwhelming weight of evidence reveals that "sanguinary laws" are laws which

impose severe, inhumane, barbarous, cruel, and grossly disproportionate punishment. Sanguinary

laws are reminiscent of the extreme punishments instituted by the Bloody Code of England.

Through the Sanguinary Laws Clause, Maryland's founding fathers rejected the harsh

punishments characteristic of the Bloody Code and declared that criminal sanctions shall be both

humane and proportioned to the offence. The Sanguinary Laws Clause was a mandate to reform

the criminal law by bringing punishments in line with Enlightenment-era principles.

Defendant's assertion that the phrase "sanguinary laws" means laws that authorize the

death penalty is neither consistent with the common usage of the phrase, nor with the historical

context of Article 16. Certainly, if a statute made theft a capital crime, that law would be

sanguinary. Common founding-era usage of the term "sanguinary law," however, would not

encompass imposition of the death penalty for the most serious and heinous crimes, such as first

degree murder. This interpretation is consistent with history. Despite the reforms to criminal laws that followed the founding of the states whose constitutions limit "sanguinary laws," the death penalty was never abolished for first degree murder and other serious offenses.

Maryland's death penalty statute is not a sanguinary law under the circumstances of this case. The Defendant shot his victim in the back of the head during the course of a robbery, killing him. The Defendant was convicted of felony murder, one of the most heinous crimes recognized by Maryland law. Under these circumstances, Defendant's sentence is not extreme, severe, or inhumane. The death sentence in this case is not grossly-disproportionate to the underlying crime. Consequently, Defendant's sentence does not offend the Sanguinary Laws Clause of Article 16 and the Court shall DENY Defendant's Motion to Correct Illegal Sentence.

IN THE CIRCUIT COURT FOR QUEEN ANNE'S COUNTY

**JODY LEE MILES**

**v.**

**STATE OF MARYLAND**

**Criminal No. 4789**

---

## ORDER DENYING MOTION TO CORRECT ILLEGAL SENTENCE

For the reasons stated in the foregoing Memorandum Opinion, it is, this _3_ day of ___May___, 2012, by the Circuit Court for Queen Anne's County,

**ORDERED**, that Defendant's Motion to Correct Illegal Sentence is hereby, **DENIED**.

_____
Thomas G. Ross, Judge


**ENTERED**

MAY 3 – 2012

Clerk, Circuit Court
for Queen Anne's County