1        IN THE CIRCUIT COURT FOR QUEEN ANNE'S COUNTY

2

3    STATE OF MARYLAND         :

4        VS                    :        CRIMINAL NO. 4789

5    JODY LEE MILES            :

6        _____

7    BEFORE:  HON. JOHN W. SAUSE, JR, JUDGE AND A JURY

8        _____

9    APPEARANCES:

10             DAVIS R. RUARK, ESQUIRE and

11             SAM VINCENT, ESQUIRE

12                 ON BEHALF OF THE STATE

13             THOMAS SAUNDERS, ESQUIRE and

14             ARCHIBALD G. W. McFADDEN, ESQUIRE

15                 ON BEHALF OF THE DEFENDANT

16        _____

17

18             A SENTENCING HEARING WAS HELD IN THE

19    ABOVE-CAPTIONED CASE IN THE CIRCUIT COURT FOR QUEEN

20    ANNE'S COUNTY ON THE 17TH DAY OF MARCH OF 1998.  THE

21    TRANSCRIPT AS HEREINAFTER SET FORTH IS A VERBATIM

22    RECORD OF THE SAID PROCEEDINGS.

23        _____

24                 REPORTED BY:

25                 ANNE W. BOND



CRIMINAL APPEALS
DIVISION

RECEIVED
OCT 14 1999

OFFICE OF
THE ATTORNEY GENERAL



ENTERED
OCT 14 1999

```
 1                          INDEX

 2  WITNESS:  DOROTHY ATKINSON

 3                DIRECT EXAMINATION               37

 4  WITNESS:  DONALD STILL

 5                DIRECT EXAMINATION               44

 6                CROSS EXAMINATION                54

 7                REDIRECT EXAMINATION             58

 8  WITNESS:  LISA HOPKINS

 9                DIRECT EXAMINATION               60

10                CROSS EXAMINATION                66

11  WITNESS:  CARRIE COOPER

12                DIRECT EXAMINATION               69

13                CROSS EXAMINATION                72

14  WITNESS:  JIM COOPER

15                DIRECT EXAMINATION               74

16                CROSS EXAMINATION                76

17  WITNESS:  ANN STANFIELD HAGERT

18                DIRECT EXAMINATION               78

19                CROSS EXAMINATION               107

20

21

22

23

24

25
```

```
 1                    PROCEEDINGS

 2

 3                   (AT THE BENCH)

 4

 5           THE COURT:  Mr. Saunders indicated that he

 6    wanted to see me?

 7              MR. SAUNDERS:  Yes, Your Honor.

 8           THE COURT:  I suggest it would better in

 9    the courtroom out of session.

10              MR. SAUNDERS:  I think we can do this at

11    the Bench.

12              THE COURT:  All right.

13              MR. SAUNDERS:  Your Honor, this is

14    actually pretty straight forward.The mother of my

15    client, who is seated in the courtroom, is a mentally

16    ill woman, to be straight forward about it. She's is

17    been hospitalized previously for mental illness, and

18    her behavior has been very erratic.  She has

19    approached the victim's mother at the end of the

20    proceedings and indicated to her that the real killer

21    was one of the victims brothers.  This clearly was

22    not known, that this would be done, and I apologize

23    to all the parties that it actually happened.  We

24    have tried to speak with her about her behavior, we

25    have been unable to control her. Mr. McFadden was
```

1    present at a procedure at which her DAUGHTER was

2    sentenced, at which she interrupted the Court

3    proceedings and acted out.  She has previously

4    attempted to convince some of our witnesses not to

5    testify or speak with us.  And yesterday in preparing

6    for this case, we spoke with the social worker

7    between the guilt innocence phase and the sentencing

8    phase, and she conveyed that she has made threats of

9    physical violence against one of our investigators

10   and State's Attorney, indicating that she would punch

11   them out.  Especially in light of the fact we are

12   dealing with an individual we can not reason with

13   because of her mental illness, we've requested that

14   she been barred from the courthouse out of both the

15   fear of possible disruption, hostility or violence

16   against the State's Attorney or family members of the

17   victim.

18           THE COURT:  Well, let me ask you, did you

19   hear what Mr. Saunders said?

20           THE DEFENDANT:  Yes, sir.

21           THE COURT:  I will tell you now that I am

22   going to be very reluctant to go along with the

23   suggestion over your objection.

24           THE DEFENDANT:  I don't have any problem,

25   whatever that would involve.

1          THE COURT:  All right, but you understand

2    that it's largely your call?

3          THE DEFENDANT:  Yes.

4          THE COURT:  It will not been mentioned,

5    but this is a very serious situation, and I intend to

6    see that you are made as easy about your surroundings

7    as I can possibly do.

8          THE DEFENDANT:  Right, yes, sir.

9          MR. RUARK:  The State's position, on

10   behalf of myself, personally, I do express concern to

11   Court about the integrity of the process, itself, and

12   the integrity of the jury, and state would not object

13   to the request made by Mr. Saunders for that reason.

14         THE COURT:  Where is the person to whom

15   you refer.

16         MR. SAUNDERS:  She is seated on the -- as

17   you sit, on the left side of the courtroom, she is in

18   the second row, she's got whitish gray hair, in her

19   mid 60's.

20         THE COURT:  All right, let me talk to the

21   sheriff.

22         (Whereupon the sheriff approached the

23   Bench.)

24         THE COURT:  It has just been made known to

25   me that the mother of Mr. Miles has a past history of

```
 1    instability, let's let it go at that, and that she
 2    has done several things recently, including making
 3    some threats against an investigator, the Public
 4    Defender and the State's Attorney. A motion has been
 5    made that she been barred from the courtroom and from
 6    courthouse for the balance of the trial.  The motion
 7    has been concurred in by everyone, including the
 8    defendant, and that is my ruling.  Now, I don't care
 9    to have this be an occasion for a broo-ha-ha, my
10    strong suggestion would be, but I leave it up to you,
11    my expert on matters of security, my suggestion would
12    be I take a short recess and let you handle the
13    matter yourself.
14             THE DEFENDANT:  I think it might go best,
15    just for no embarrassment, maybe at least it be done
16    outside the courtroom.
17             THE COURT:  That is why I don't want to
18    make any big announcement about it or say anything
19    from the bench, but that is my ruling.
20             THE DEFENDANT:  That's okay.
21             THE COURT:  You don't want to be a party
22    to it, do you?
23             THE DEFENDANT:  No.
24             THE COURT:  Can you handle that?
25             THE SHERIFF:  Yes, sir.
```

```
 1              THE COURT:  Let me know when the matter is
 2   taken care of, that she not be in the building.
 3              THE SHERIFF:  Yes, sir.
 4              THE COURT:  Okay.  We'll reconvene,  let's
 5   do it that way.
 6              (Whereupon followed a brief recess in the
 7   proceedings during which the sheriff approached
 8   mother of the defendant and escorted her from the
 9   courtroom according to the Court's instructions.)
10   (Court resumes at ten o'clock.)
11              THE COURT:  All right, I think we are all
12   ready and the first thing we have to do is a number
13   of motions.
14              MR. SAUNDERS:  Your Honor I sent a letter
15   which was supposed to be hand delivered to you
16   yesterday by my office. I hope you received it.
17              THE COURT:  Certainly did, thank you so
18   much.
19              MR. SAUNDERS:  And the openly changes I
20   would indicate to the Court are on numbered paragraph
21   three where I made a request to argue that motion, I
22   would like to change that and submit it on motion in
23   memorandum.
24              THE COURT:  Okay.
25              MR. SAUNDERS:  With regard to the victim
```

1   impact motions, we have had a chance to review the

2   written impact submitted by the State and go over a

3   proffer of what the State intends to produce.  As a

4   result of which --

5               THE COURT:  Is that number 6?

6               MR. SAUNDERS:  Number 7, sir.

7               THE COURT:  I'm sorry.

8               MR. SAUNDERS:  Under number 7, I broke it

9   down into two sections, those that have to do with

10  content and those that have to do with victim impact

11  can come in.  As to content, the understanding  I'm

12  given by the State, I would consider at this point

13  that those content motions would be mooted, and that

14  we would submit on memorandum for what is 7 A, B and

15  C.  With regard to number 6, we have had a chance to

16  review the PSI report.  We have suggested to the

17  State that the only redaction we request is page two.

18  Page two has an introductory paragraph and then a

19  section describing the crime.  We would object to

20  that coming in, in that we feel that the jury has

21  heard evidence of the crime and made their decision

22  what facts to believe and we do not believe another

23  version of the facts should go to them.

24              THE COURT:  May I see that?

25              MR. SAUNDERS:  The PSI?

 1                    MR. SAUNDERS:  Here's a copy, Your Honor.

 2                    THE COURT:  You mean the description of

 3      the present offense?

 4                    MR. SAUNDERS:  Yes, Your Honor, and

 5      luckily it's on a single page, and I am requesting

 6      that page simply be removed and the remainder go to

 7      the jury.

 8                    THE COURT:  What do you think about that?

 9                    MR. RUARK:  The State has reviewed and

10      also had conversations with Mr. Saunders, the State

11      has no objection to the redaction of page two only

12      from presentence investigation and the submission of

13      the rest of the content to the jury.

14                    THE COURT:  You don't need the first part?

15                    MR. SAUNDERS:  Your Honor, I really

16      consider it superfluous, it doesn't matter to us if

17      it goes in but we feel it makes a better document

18      having a cover sheet and then starting with page

19      three.

20                    THE COURT:  My only thought was that it

21      might be helpful to the jury to know that the

22      defendant too had been represented in this process.

23                    MR. SAUNDERS:  Your Honor, I would have no

24      problem with the jury being told that.

25                    MR. RUARK:  If that's the case, the only

1   further request would be, obviously, that the date of

2   the interview be included in that proffer to the

3   jury, I believe it was November 14th 1997.

4           MR. SAUNDERS:  No problem, Your Honor.

5           THE COURT:  And all the rest, that is

6   eight through -- well, it seems to me that ten was

7   moot, eleven was in effect moot, as was nine and

8   eight.  Okay.

9           MR. SAUNDERS:  And twelve, Your Honor.

10          THE COURT:  And twelve.  So, in effect

11  what this means is you're submitting all of them on

12  memorandum, is that right?

13          MR. SAUNDERS:  That is correct.

14          THE COURT:  And four, it looks as though

15  four and five are also moot.

16          MR. SAUNDERS:  Yes, Your Honor.

17          THE COURT:  So that leaves, really, one,

18  two, three,

19          MR. SAUNDERS:  Correct.  And then 7 A, B

20  and C.

21          THE COURT:  7 A, B and C.  Let's proceed

22  at this time and I will take this up as we come to

23  it.

24          MR. SAUNDERS:  Yes, Your Honor.

25          THE COURT:  I looked forward to hearing

1    that argument on number 3, but it seems I shall be

2    deprived of that.

3            MR. RUARK:  The State -- my one ray of

4    glory today would have been to argue that motion on

5    behalf of the State.  I would just -- I have to as by

6    way of comment just refer the Court also to Oken

7    (phonetically) versus State, 343 Maryland, 256, which

8    is a 1996 case, which also addressed the issue in

9    some fashion, and some sub-issues as set forth in

10   number three, their motion to dismiss when a

11   defendant is convicted of felony murder.  Your Honor,

12   there is one brief matter. I had faxed to the State's

13   Attorney's Office for Queen Anne's County yesterday

14   the written victim impact statement with a request it

15   be delivered to your office and that was done after

16   the document from Mr. Saunders.  I do have the

17   original bearing the original signature of Dottie

18   Atkinson that I would ask to be affixed to the

19   presentence investigation and incorporated therein as

20   the victim impact statement, if I may approach.

21           THE COURT:  Mr. Stanley has located what

22   now appears to be the official original from the

23   Division of Parole and probation, which I will give

24   to the clerk, so it will be available to you.  As a

25   matter of routine, when it came in, it was stamped as

1   having been received by my office on the 27th of

2   January.  Does that is distress anyone?

3          MR. SAUNDERS:  No, Your Honor.

4          THE COURT:  What I will do then is,

5   Mrs. Peters, the second page, I will remove, but

6   we'll place it in the file.

7          THE CLERK:  Okay.

8          THE COURT:  So you can just make some sort

9   of an note that the second page was removed and

10  placed in the file separately.  This is not an

11  exhibit yet, but make it available to the attorneys

12  if they want to use it.

13         MR. RUARK:  Madam Clerk, if I may, the

14  State would ask that be marked State's Exhibit Number

15  1.

16         THE COURT:  All right.  Anything else?

17         MR. RUARK:  I believe that is all from the

18  State.

19         MR. SAUNDERS:  That would be all.

20         THE COURT:  I take it you want to make

21  opening statements to the jury?

22         MR. SAUNDERS:  Yes, Your Honor.

23         MR. RUARK:  Mr. Vincent will on behalf of

24  the State.

25         THE COURT:  My thought has been that a

1    brief statement from the Court, this morning, would

2    be quite sufficient.  I think it's really time to get

3    into the other matters.  I think to attempt to define

4    their job now is a mistake, just as it is ordinarily

5    at the beginning of the trial of the facts.  Is there

6    anything that anyone would particularly like me to

7    touch upon?

8              MR. SAUNDERS:  No, Your Honor.

9              MR. RUARK:  No, Your Honor.

10             THE COURT:  Besides you all can do it more

11   capably than I.

12             (Whereupon the jury was escorted to the

13   jury box at 10:15 a.m.)

14             THE COURT:  Good morning, I hope you all

15   had a pleasant weekend.

16             THE CLERK:  Jury is all present and

17   properly seated.

18             THE COURT:  Ladies and gentlemen, we are

19   now, as you know, at the sentencing phase of this

20   proceeding.  We'll proceed in much the same manner is

21   we did before, that is we'll have opening statements

22   from the lawyers, which again are not evidence.

23   We'll have live testimony.  We'll have exhibits.

24   We'll have arguments by the attorneys at the end,

25   following instructions by the Court.  So that

1    structurally this proceeding is going to be exactly

2    the same.  And all of the same admonitions apply that

3    applied at the outset of the case, that is to say you

4    should not discuss the case with anyone, even the

5    proceedings of last week, and certainly those that

6    you're about to hear.  Don't even discuss them among

7    yourselves until this case is over and you've heard

8    everything and the you've been given the instructions

9    and heard the arguments.  If anyone tries to discuss

10   the case with you, please let us know very promptly.

11   You will be relieved to know that when you retire to

12   the jury room, you will be very much aided by a very

13   detailed guideline of procedure, which is prescribed

14   by law.  That is, it will direct you to certain areas

15   which you must consider.  It doesn't tell you what

16   your answer is going to be, of course, but it does

17   require that you consider certain areas.  Loosely

18   referred to as aggravating circumstances and

19   mitigating circumstances.  In addition to considering

20   those factors, in some instances, you will be

21   permitted to consider things that maybe the law

22   didn't think of because obviously in some situations

23   the law can't cover every conceivable situation

24   because every situation is individual and contains a

25   very different mix of facts.  But the point is that

1    you will be instructed at the end of the case in

2    detail as to the manner in which you will proceed,

3    and as I said there's a very much more lengthy

4    document, much, much more lengthy document, than the

5    verdict sheet which you had before.  I am not going

6    to say more than that, at this time, because it

7    occurs to me that it would be best if the jury were

8    to hear the facts and what is presented and not make

9    a conscious or unconscious effort to try to plug

10   those facts into the very detailed legal frame work,

11   at this time.  That can, it seems to me, be most

12   successfully done after you have heard the evidence.

13   So, with that brief introduction I'm going to ask if

14   Mr. Ruark or Mr. Vincent would like to address the

15   jury.

16             MR. VINCENT:  May it please the Court.

17   Ladies and gentlemen of the jury, going morning.  As

18   you know now, we are now in the second phase of the

19   trial of the State of Maryland versus Jody Lee Miles,

20   referred to as the sentencing phase, and as the Court

21   has indicated, it's almost like a second trial.

22   Complete with opening statements, presentation of

23   evidence, instructions from the Court and closing

24   arguments.  Now the phase of the trial last week

25   involved solely the issue of the guilt of the

1   defendant Jody Lee Miles, or more particularly as

2   conceded by the defendant, or defense counsel, of

3   which crime was the defendant guilty.  You found in

4   your verdict last week the defendant was not guilty

5   of first degree premeditated murder, but guilty of

6   first degree felony murder, guilty of robbery, guilty

7   of robbery with a deadly weapon and guilty of use of

8   a handgun in the commission of a crime of violence or

9   a felony. This phase this week involves solely one

10  issue, and that is the appropriate sentence for the

11  defendant Jody Lee Miles for the first degree felony

12  murder of Edward Joseph Atkinson.  The State has the

13  burden of proving to you that death is the

14  appropriate sentence, but as the Court indicated to

15  you you will not be simply sent to the jury room and

16  decide up or down whether death is the appropriate

17  sentence.  Rather the Legislature has enacted a

18  specific statute setting forth a specific series of

19  steps to follow and to assist you there is a form,

20  the Court has alluded to, the findings and

21  determination form, which sets forth, step by step,

22  particular procedures to follow in reaching that

23  ultimate determination of deciding the appropriate

24  sentence.  That procedure has been used in every

25  death penalty case and the form you have is used by

1   every jury.  I have no doubt that in following that

2   form and with close adherence to the form and the

3   Judge's instructions you will be able to follow the

4   procedure and complete the process successfully.

5           Now, the presentation of the evidence from

6   the State this morning will be relatively brief.  So,

7   let me tell you what we'll intend to show and briefly

8   refer to the form so that you no where we're going.

9   Upon the conclusion of the opening statements, we'll

10  simply reoffer to the Court my proffer, all of the

11  evidence that you heard last week in the guilt phase.

12  You will therefore be able to consider all of the

13  testimony and evidence that you heard last week in

14  reaching your determination in the sentencing phase.

15  Secondly we'll over into evidence a presentence

16  investigation report, which has been completed by the

17  Division of Parole and Probation.  That report

18  includes a summary of the defendants juvenile and

19  adult criminal record, a summary of his family

20  history, his work history, his employment history,

21  education history and references to his mental and

22  physical health.  Finally we'll call to the stand,

23  Mrs. Dorothy Atkinson, again, the mother of Edward

24  Joseph Atkinson, so that she may tell you a little

25  bit about the victim, Ed Atkinson, something about

1    his life and the impact that his untimely death has

2    had on the family.  At the conclusion of the

3    evidence, from both the State and the defense, the

4    Court will instruct you more fully and as we

5    indicated on the form that you will use and the form

6    you will follow.  Each of you I believe will be given

7    a form titled findings and sentencing determination,

8    which will outline each of the steps you need to

9    follow.

10              Let me tell you briefly the things you

11   need to look for in this case.  The first thing that

12   the State will have to prove is that the defendant

13   was the principal in the first degree of this crime.

14   You will consider all the evidence from last week,

15   make that determination relatively easily, because we

16   know from the evidence he participated in the crime

17   alone.  There is another section you're going to deal

18   with, aggravating circumstances.  Just as the form

19   indicates, there are certain findings you must make

20   to reach your sentencing determination.  As the Court

21   indicated one of those findings deals with

22   aggravating circumstances.  The Legislature has set

23   forth ten aggravating circumstances in the code, one

24   of which is required for any death penalty case.  The

25   State will concede now that only one of those

1    aggravating circumstances applies in this case, and

2    that is that the murder of Edward Joseph Atkinson was

3    committed by the defendant when this defendant

4    committed or attempted to commit a robbery.  We'll

5    concede that the other nine do not apply in this

6    case. In proceeding through the testimony and

7    reaching your determination you can refer to the

8    evidence presented in making that determination.

9    Another finding you must make is mitigating

10    circumstances.  The Legislature has also set forth

11    seven specific mitigating circumstances, but you are

12    open to consider any other mitigating circumstance

13    that the defense presents or that you yourself find

14    in considering those.  The defense has the burden of

15    producing those and proving by a preponderance of the

16    evidence they exist, but you twelve need not all

17    agree that they exist, some of you may find they

18    exist, some of you may find they do not.  But that is

19    okay, you take that into consideration.  Once you

20    have given fair and full consideration to mitigating

21    circumstances, you come to that most important

22    process, which is the weighing, because at that point

23    in time you as individuals determine in your own

24    minds will the aggravating circumstances presented by

25    the State outweigh the mitigating circumstances.  The

1    State has the burden of proving by a preponderance of

2    the evidence that the aggravating circumstances

3    outweigh the mitigating circumstances, and if you

4    find in your own minds that the State has persuaded

5    you the aggravating circumstance of robbery outweighs

6    any of the mitigating circumstances, the sentence by

7    law is then death.  I submit that when you simply

8    follow the process, set forth by the Legislature, as

9    instructed by the Court, you can go through this

10   procedure step by step, until you reach that ultimate

11   conclusion.  I thank you again for your

12   consideration.  I know you have been very attentive

13   and I know you will continue to do so through this

14   process.

15             THE COURT:  Mr. Saunders?

16             MR. SAUNDERS:  With the Court's

17   permission.  Mr. Vincent, Madam Forelady and ladies

18   and gentlemen of the jury, alternate jurors.  Let me

19   first thank you for the time and consideration you

20   spent before, and say at the outset that we honor

21   your decision, and nothing that we do here in

22   sentencing, in any way questions the wisdom and

23   common sense and judgment you brought to that.  We're

24   here now at a totally different stage, with a totally

25   different set of considerations.  The question now is

1    punishment.  The question now is values, the question

2    now is who is the person, and how do we judge, how do

3    we bring our values to bear.  And twelve of you will

4    retire and make a judgment on a man's life.  What a

5    very, very difficult decision, and we owe you, both

6    the State and the defense, a tremendous burden to

7    make sure that you know as much as you can about what

8    this Court says and what the courts have said are

9    important, the crime itself and the defendant, who is

10   in front of you.  The reason we do this is because

11   what the law does is says that there are a certain

12   group of cases, for which the death penalty can be

13   considered.  It is not a situation where it says

14   prove these facts, death follows.  Rather, what the

15   law recognizes, our Legislature and the wisdom of the

16   courts, says each of us when we're brought before the

17   bar is an individual.  Each crime is different, and

18   we must judge that, bring our values to it, in many

19   ways.  What we determine to be facts, what the facts

20   mean, and what's even more important, because in the

21   previous proceeding you were concerned with facts,

22   are they proven or not, you also now have to give

23   more weight and value to that, which is even a more

24   complicated procedure, so the Court has recognized

25   there are extreme differences.  On one extreme a

    1    death eligible individual would be a young man of 18,
    2    no criminal record, who stupidly follows the urging
    3    of some individuals, takes a gun to commit a robbery,
    4    becomes frightened, drops the gun on the floor, the
    5    person is shot and killed, that's an felony murder.
    6    That person would be eligible for the death penalty.
    7    On the other extreme, a 35 year old man who has
    8    always made his life with criminality, who's served
    9    time for second degree murder, who runs a drug
   10    organization, who orders the execution of
   11    individuals, is responsible for dozens of murders,
   12    who contracts for the murder of two federal
   13    witnesses, that person is eligible for the dealt
   14    penalty.  Do we put the same moral value and weight
   15    on those two ends of the spectrum?  Of course not,
   16    and that is what this proceeding is about.  The other
   17    thing this proceeding is about is punishment.  Jody
   18    Miles is not here -- you don't need to sit here in a
   19    death penalty case because you're a nice guy.  You
   20    only get to sit here if you're guilty of murder, and
   21    for that we do not, no matter what evidence you bring
   22    in, slap you on the wrists and say, be a good boy,
   23    don't do this again.  We don't do that.  Punishment
   24    is the issue, and the issue before us is not whether
   25    or not he is to be punished, but how Jody will be

```
 1    punished and that is the only issue.  The issue is
 2    whether he will die, if you will, in God's time, or
 3    at man's time.  We have the right and we have the
 4    power to execute him, and it's a moral judgment
 5    whether we do or we punish him in a different manner.
 6    You have two other choices.  The life sentence, or a
 7    life sentence without the possibility of parole.
 8    Now, there are some who argue that life sentence, is
 9    that really a punishment, three square meals a day,
10    day after day, think about that.  Think about your
11    life here, which is that when you are here, you like
12    me are required to be here, if we don't show up the
13    judge here would have something to say about our
14    liberty.  If I looked out there and said its a sunny
15    day, I don't want to show up, I would been introduced
16    to Queen Anne's County Detention Center.  I have to
17    be here.  I have no choice.  But that is a very small
18    limit on my liberty.  Like you, when this case was
19    over, I went home to my family.  And I made choices.
20    I was able to be with my wife and child, I was able
21    to talk to my daughter and grandson.  I decided
22    whether or not I was going to go to a movie, what I
23    was going to eat, what kind of dinner I wanted to
24    make, whether I wanted to clean something up or
25    repair something, whether my wife and I took a hike
```

1    up at the Gunpowder, all those things.  I interacted

2    with people that I love.  I went to church and heard

3    a powerful and wonderful sermon and met a principal

4    of a school who has dedicated her life to the

5    children in the inner city, and it was a marvelous

6    weekend, a weekend that, the way it's been described

7    as, our lives are tapestries, our interactions with

8    other human beings, the things we do, the people we

9    love.  Jody Miles has deprived Mr. Atkinson, who

10   died, of that, and he's deprived of it now, and will

11   be deprived of it for the rest of his life, if you

12   give a life sentence.  He will be told what he can

13   eat.  Not given choices.  Even a limited menu.  What

14   is put if front of him he eats.  He gets up when he

15   is told to get up, goes to bed when he is told to go

16   to bed.  He is told what to do the rest of his life.

17   He will have to consider and weigh the consequences

18   of what he did and reflect on his own

19   irresponsibility and his own lack of moral values

20   that came to the point where he went to that field

21   with a gun and killed Mr. Atkinson.  That will be a

22   punishment and a moral judgment on him that you can

23   deliver.  So bear in mind that we are not talking in

24   anything we offer you, about excuses, there are no

25   excuses.  Mitigation is a way for you to understand

1    and hear who Jody Miles is.   How did this young man

2    get to that place?   How did he get there?   Who was

3    he?   Why didn't he turn aside from that path earlier

4    in his life?   That's what we'll bring to you.   And in

5    doing so, we'll argue to you, at a later point, not

6    that this is an excuse, but it helps us understand

7    who this person is and differentiate him from the

8    other end of the spectrum that I indicated to you,

9    those who we might say, yes there's where we must

10   apply the death penalty and should.

11           This is not a case where we should.

12           Let me tell you a little bit about what

13   we'll present to you.   You will hear from the stand

14   and you will hear it from documents,   Jody is the

15   youngest of five children.   And when I talk about

16   this please bear in mind this, much of what I may say

17   here and later on and from the witness stand will not

18   been complimentary of his mother.   I have no doubt

19   that his mother loves him, loves him now, loved him

20   then, will always love him, but some love is

21   poisonous because of the mental health issues or the

22   problems or the self- centeredness of the individual

23   involved.   And regretfully for Jody that was the

24   case.   We have clear evidence that Jody's mom was a

25   very disturbed woman.   Jody lived a life of constant

1      confusion, movement and values.  His mother may have

2      married eight or more times.  A sort of a constant

3      attempt to please men, find men, move onto other men,

4      moving all over the country, California, Louisiana,

5      Maryland, Delaware, dozens of others.  She would find

6      a man, frequently abusive, alcoholic, move onto

7      another one and another one, moving her family,

8      bringing her children along and toward the end, even,

9      bringing her family into the situation, setting them

10     up an apartment, letting the older children take care

11     of the others, while she moved in with a man nearby

12     and showed up occasionally.  She frequently left them

13     in poverty.  She may have encouraged them to steal,

14     to find food and other necessities.  She was

15     described in juvenile records in Delaware as very

16     passive, almost totally concerned with watching

17     television only.  Despite her poverty, unwilling or

18     unable to do anything.  And we have juvenile records

19     there of Jody when he was 16, his first involvements

20     with the law, with burglaries and thefts, of -- well,

21     you'll see the records, of a young man on the verge

22     of very serious trouble, with no male role models, no

23     sense of who and what he should become and at that

24     time, probably already an alcoholic.  Started

25     drinking when he was 13, and has never stopped.

```
 1   You'll hear that he is a severe alcoholic.  That he
 2   drank -- what is called a maintenance drinker, drank
 3   constantly.  We have -- he hid it from people.  He
 4   knew how to do that, his mother taught him, like his
 5   mother's interaction is with men, she learned how to
 6   please men, attract men, keep men around to try to
 7   keep her life going, Jody learned how to please
 8   people also, and he learned how to hide his drinking.
 9   But we have medical records showing that he had
10   repeated motor vehicle accidents, and some of the
11   records indicate that he was intoxicated at the time.
12   We have people who observed his drinking and were
13   concerned about it.  But because he wasn't an binge
14   drinker, the kind of drinker who keeps going until he
15   passes out on the corner and gets picked up, it
16   wasn't necessarily as obvious to people.  And you'll
17   hear from someone who studies alcoholism and how that
18   affects development.  You start drinking at 13 and
19   you're already pretty severely troubled and
20   dysfunctional, how it keeps you from developing
21   normally, how it blunts you and keeps you from
22   finding ways to function, because not everyone coming
23   out of a dysfunctional family goes on to commit
24   crimes, and especially murder, but they're more
25   susceptible, they are more damaged, and Jody was
```

1    damaged.   But, despite all that, despite the fact
2    that he came out of a severely damaged family that
3    damaged him emotionally, intellectually, morally,
4    despite the fact at age 13 he became an alcoholic and
5    continued to be an alcoholic throughout his life,
6    take a look at his criminal record.   Up until now, he
7    was a petty thief.   He was irresponsible, and a
8    thief.   No one ever saw him with a weapon.   He's
9    never assaulted anyone.   Even when he got angry at a
10   girlfriend, you'll hear he backs off.   We have the
11   records from three institutions where he's been
12   incarcerated.   We've interviewed guards, or
13   corrections officers.   There's not been -- not only
14   has there not been a weapon, they call them shanks
15   inside the prison, has there never be an assault,
16   there have been zero infractions.   No infractions.
17   No out of bounds, no talking back, no contraband,
18   nothing.   So that we know despite his severe
19   problems, that this murder was totally out of
20   character.   Now I am not going to argue all this
21   stuff to you at a later point when I talk to you
22   about the values that are brought to bear in this.
23   What we're going to ask you to bring to bear is your
24   values and you are conscious about what is the right
25   and just thing to do.   Jody is different from those

```
 1   who perhaps we should execute if in fact we're going
 2   to have a death penalty, and what's different is that
 3   he was damaged early, and he was damaged severely.
 4   But in his own way he tried to at least within the
 5   frame work that he knew, to do somewhat the right
 6   thing.  He was a thief.  He makes no pretensions
 7   about that, he was irresponsible.  But he wasn't
 8   assaultive, and he didn't engage in the behavior that
 9   would lead one to believe, ah, I'm not surprised at
10   all that he ended up here.  Everyone who knows him,
11   is very surprised that he ended up here,  surprised
12   and shocked, because it was inconsistent.  Now, let
13   me also say this to you, that I hope you understand
14   that nothing that we say here in any way denigrates
15   or takes away from the sorrow that all of us feel as
16   human beings at the death of Mr. Atkinson.  Whatever
17   his issues were that brought him to that field,
18   whatever Mr. Miles's issues were that brought him to
19   the same place, we in no way want to take away from
20   that.  We honor and respect, legitimately, the sorrow
21   of the friends and family of Mr. Atkinson, we
22   understand they are in great pain and will go through
23   a lot of mourning and need a lot of healing.  If I
24   say anything that you feel reflects badly, what is
25   this guy doing, does he mean to say that Mr. Atkinson
```

1   deserved this or brought it on himself, absolutely

2   not.  That is not our intention and that is not our

3   purpose.  Mr. Atkinson had the right to life, no one

4   had the right to take his life, and Jody knows that,

5   just as well as anyone else.  Our issue now is what

6   is the appropriate and just punishment for us as a

7   society, how do we judge Jody.  The form you'll deal

8   with later on has been likened to a bit of an income

9   tax form, check one, check one and move on, but I

10  will come to you later and argue that it's much more

11  than that, it says in plain and almost antiseptic

12  words that you take certain things and weigh them

13  against this and that.  We are engaged in perhaps the

14  most profound ethical judgment we ever make.  As hard

15  of a judgment as we ever make and I know that you

16  will bring your attention to this, you'll listen

17  carefully.  At the end of the proceeding, I'll get a

18  chance, the State will get a chance to argue, I will

19  get a chance to argue and the State will get a chance

20  to argue again, that is the normal procedure.  There

21  are going to be a lot of documents that you will not

22  be hearing from, they won't speak to you and they're

23  rather lengthy.  When we come up to the sentencing I

24  may spend a great deal of time not trying to argue

25  with you, but many of these documents you've not

 1   heard from, so I will take some time then to read to

 2   you from the documents so when you go back you will

 3   have a framework to understand why we're indicating

 4   to you that certain mitigators exist and what is

 5   there to support what we pose to you.  I will also

 6   present to you, at that time, a list of mitigators

 7   that we've considered.  You can accept or reject any

 8   of them, except those that have to be considered by

 9   Court instruction.  For example, Mr. Jody Miles has

10   never been convicted of a crime of violence, and that

11   has to be considered.  Others, you may say, well, Mr.

12   Saunders, he didn't think of this thing here, or that

13   thing there.  That's why we have juries, that is why

14   the form has a number eight, other mitigators,

15   because the courts and the Legislature have

16   recognized that we all bring our own individual

17   values and perceptions to bear, and you may hear

18   something that is very important to you personally,

19   and not only can you rely on that personally, whether

20   or not you persuade the other members of the jury,

21   that is what the form and the law says, that you can

22   do that, we bring our individual conscience to bear

23   in this situation, it's more than a unanimous

24   situation, that is if you become divided on an issue,

25   some believe something is mitigating, some don't, you

1  can do so, and those finding it mitigating can weigh

2  that in the end and make their own decision whether

3  death is appropriate or life or life without parole

4  is appropriate.

5          I have talked long enough for the moment.

6  We have the evidence to present to you, I hope you

7  will be patient with us, we'll go through it as

8  carefully as possible to make sure you have in the

9  end what you need to make your decision, and I will

10 come to you at the end and argue to you, and I

11 believe you'll already know that a life sentence and

12 not a death sentence is the appropriate and just

13 decision in this case.  Thank you.

14          THE COURT:  All right.

15          MR. RUARK:  Your Honor, at this stage the

16 State would formally re-offer all of the evidence

17 presented during the course of the phase one or the

18 guilt and innocence phase of this trial, including

19 the testimony, the physical documentary objects and

20 also any stipulation, Your Honor.

21          MR. SAUNDERS:  Obviously we have no

22 objection.  Anything from the first phase can be

23 considered by the jury.

24          THE COURT:  All right.

25          MR. RUARK:  Thank you, Your Honor.  Your

1   Honor as the State's first exhibit for sentencing

2   only, the State would formally at this time move to

3   introduce as State's Exhibit Number 1 the pretrial

4   investigation report and would ask that the victim

5   impact statement be affixed thereto.

6           MR. SAUNDERS:  May counsel approach the

7   bench Your Honor?

8                   AT THE BENCH

9           MR. SAUNDERS:  Your Honor, at this time

10  since the State is introducing victim impact, I would

11  renew my concerns as to what I have in my letter of

12  March 14th referred to as 7 A, B and C, that is the

13  previously filed motions that victim impact can not

14  come in -- actually only A and B are relevant,

15  Article 27 section 781, if the defense would prevail,

16  then the attached victim impact is not constitutional

17  and can not come into evidence, and I would so argue.

18          THE COURT:  Want to be heard?

19          MR. RUARK:  The courts in this state have

20  held the victim impact statement both in written and

21  oral form is permissible and in fact should be

22  considered by a jury at this stage of the proceeding,

23  and for that reason the State would ask that the

24  defense motion be denied.

25          THE COURT:  Tell me, why is the victim

1    impact statement better than live testimony?

2              MR. RUARK:  Your Honor, I believe under

3    the statute -- of course I do not have it with me

4    here at the bench, which concerns the appropriateness

5    of whether presentence investigation is included, in

6    conjunction with Article 27 provides that in most

7    cases there shall be a victim impact statement

8    provided with crimes of violence.  I do not indicate

9    that it's better from the State's perspective, I do

10   indicate that in written form, there may be some

11   items expressed that, given the mother's, the State's

12   witness's, mental state, that are better expressed on

13   paper than orally.  In that regard I would say that

14   that is the only benefit over and above live victim

15   impact testimony.

16             THE COURT:  Well, she is, of course,

17   subject to cross-examination with respect to it.

18             MR. SAUNDERS:  Your Honor, perhaps we

19   could clarify one thing, is with respect to the issue

20   of the mother being called as a witness and this

21   being a redundancy, etc., we did have a motion filed

22   along those lines.  I am not pursuing that, I am not

23   concerned with any redundancy or such issues, my

24   issue only goes to the constitutionality per say of

25   any victim impact coming in at all.

1          THE COURT:  Of any testimony of the

2     victim?

3          MR. SAUNDERS:  Of any testimony or of

4     written statements, yes, Your Honor.

5          THE COURT:  Want to be heard further?

6          MR. RUARK:  No, Your Honor.

7          MR. SAUNDERS:  No, Your Honor.

8          THE COURT:  Overruled.

9          MR. SAUNDERS:  Yes, Your Honor, thank you.

10                ( IN OPEN COURT )

11          MR. RUARK:  Your Honor the State calls

12     Dottie Atkinson.

13          THE COURT:  Those two are admitted.

14     Ladies and gentlemen, you will see those documents,

15     very shortly.  Let me mention to you at this time

16     that you will notice that the report of the Division

17     of Parole and Probation, that is the report which was

18     prepared by the Division of Parole and Probation, by

19     agreement of everyone, was prepared sometime ago.  In

20     the event it would be needed to save time.  You will

21     note when you get it that it goes from page one to

22     page three, that is because page two contains

23     information that is really not necessary in this

24     proceeding, and, therefore, we have withdrawn it.

25     There is, however, one thing on that page that I do

1   think that you should know, and that is that, with

2   that exhibit, which is State's Exhibit Number 1, or

3   in connection with its preparation by the Division of

4   Parole and Probation, the defendant, Mr. Miles, was

5   interviewed, on November the 14th of 1997.   All

6   right.

7             MR. SAUNDERS:  Your Honor, I apologize,

8   may we approach the bench one more time.

9                   (AT THE BENCH)

10            MR. SAUNDERS:  I apologize Your Honor.   At

11  this point, the State is calling for live impact

12  testimony, we have a motion to deny that live impact

13  testimony and we asked to submit a motion in

14  memoranda.   At this point I ask that Your Honor rule

15  on that and to grant -- if you rule against us that

16  you grant a continuing objection to the live impact

17  testimony.   I certainly don't want to do this while

18  she is on the stand.

19            THE COURT:  Well, the others-- that motion

20  is obviously denied.

21            MR. SAUNDERS:  And will you grant a

22  continuing objection?

23            THE COURT:  To the extent I can.

24            MR. SAUNDERS:  Yes, Your Honor, I

25  appreciate that.

1           THE COURT:  I mean we can have our code

2    again.

3           MR. SAUNDERS:  At this point, she's been

4    called and this is sufficient as being noted for the

5    record I think.

6                    DOROTHY ATKINSON

7       (A WITNESS CALLED TO TESTIFY ON BEHALF OF THE

8    STATE, HAVING FIRST BEEN DULY SWORN, WAS THEREAFTER

9    EXAMINED UPON HER OATH AND TESTIFIED AS FOLLOWS)

10                   DIRECT EXAMINATION

11   BY MR. RUARK:

12      Q    Mrs. Atkinson, again, will you please tell

13   the ladies and gentlemen of the jury your full name?

14      A    Dorothy Atkinson.

15      Q    Where do you live Mrs. Atkinson?

16      A    In Mardela, Maryland.

17      Q    And as we've heard before your son was

18   Edward Joseph Atkinson is that correct?

19      A    That is correct.

20      Q    And I believe we have heard that he was 31

21   years of age on April 2nd of 1997?

22      A    That is correct.

23      Q    I believe we further heard that he resided

24   at your residence at that time is that correct?

25      A    That's correct.

```
 1          Q      Now during your testimony, earlier, you

 2     had also indicated that Edward's father,

 3     Mr. Parkinson, resided that as well, is that right --

 4     I mean, I'm sorry, Mr. Atkinson resided there as

 5     well?

 6          A      Yes, he does.

 7          Q      Does Mr. Atkinson suffer from any

 8     particular disease?

 9          A      Yes, he does.

10          Q      What is that disease?

11          A      Parkinson's disease.

12          Q      For what length of time has he suffered

13     from Parkinson's disease?

14          A      He was first diagnosed with it in 1991.

15          Q      During that time frame between 1991 and

16     April the 2nd of 1997, did Ed live with you for at

17     least most of that period of time?

18          A      Yes, he did.

19          Q      Could you please indicate to the ladies

20     and gentlemen of the jury the assistance that Ed

21     provided to you and to Mr. Atkinson with respect to

22     the particular medical condition that Mr. Atkinson

23     suffers from?

24          A      Well, there are times when you have

25     Parkinson's disease that you can not move, your
```

1    mobility, and you're stiff, he would always help me

2    with him,  he would be with him in the mornings while

3    I worked and stay with him.  He would be there in the

4    night, if I had to get him up in the night he would

5    be there.  He picked up prescriptions and groceries

6    and did all the errands that I needed and took all my

7    paperwork to the Board of Education for me.  He

8    really did more than I really knew he did until I

9    didn't have him.

10          Q    Mrs. Atkinson, you mentioned Board of

11   Education.  You drove a school bus?

12          A    I am a school bus driver, contractor.

13          Q    Now, Mrs. Atkinson, at the current time is

14   there anybody other than you and Mr. Atkinson

15   residing at your home?

16          A    No there isn't.

17          Q    Was Ed Atkinson employed back on April the

18   2nd of 1997?

19          A    Yes he worked for Alarm Guard.

20          Q    Did you and he and perhaps Mr. Atkinson

21   have other plans at that time for any other family

22   ventures?

23          A    Like in what?

24          Q    As in working together in any particular

25   area, Mrs. Atkinson?

1      A    Yes.  He had wanted to open a flower

2    design place, and he had gotten his license and I was

3    going to go into the business with him.  We were

4    going to do commercial business, like doing

5    Sheratons, and bed and breakfasts and that kind of

6    thing.

7      Q    Where was that business to be located?

8      A    In the back of our house, we were going to

9    put up a shed and get a van and work from the van.

10     Q    And as I believe we've all heard, Ed

11   Atkinson was very interested in theater, is that

12   correct?

13     A    Yes, he was.

14     Q    Based on your observations within the

15   household, with Ed Atkinson and his involvement with

16   the theater, did he have any particular interests

17   that he brought to you, any particular joys, with

18   respect to the theater?

19     A    Yes, he loved to work with children.  He

20   loved to bring out the best in children, give them an

21   opportunity in life to do the best they could.

22          MR. RUARK:  Your witness.

23          MR. SAUNDERS:  We have no questions, Your

24   Honor.

25          THE COURT:  All right.

1          MR. RUARK:  Your Honor, at this point the

2    State rests.

3          MR. SAUNDERS:  Yes, Your Honor.  If you

4    will bear with me, Your Honor, we would like to

5    produce a set of exhibits.  First, Exhibit Number 4,

6    which is the employment records from a radio station,

7    WDSD, which would be Exhibit Number 4.  We would like

8    to introduce in evidence, I believe it's agreed

9    between the State and the defense, without producing

10   the custodian of the records that this is in fact a

11   copy of the records from the radio station.

12         MR. RUARK:  With respect to all of these

13   exhibits Your Honor the State has agreed that the

14   production of the custodian of records will not be

15   necessary.  We have had the opportunity to review

16   them.

17         MR. SAUNDERS:  Defense Exhibit 5 is again

18   employment records of Mr. Miles, this time from

19   Purdue.  Exhibit Number 6 are the school records of

20   Mr. Jody Miles.  Exhibit Number 7 are the medical

21   records of Mr. Miles, Jody Miles, from Easton -- let

22   me get the exact name correct, Easton Memorial

23   Hospital.  That's Exhibit Number 7.  Exhibit Number 8

24   are the hospital records of Mr. Jody Miles from

25   Beebe, B-E-E-B-E, Medical Center.  Exhibit Number 9

1    are the medical records of Jody Miles from Kent

2    General Hospital.  Exhibit Number 10 are the medical

3    records of Jody Miles from Milford Memorial Hospital.

4    Exhibit number 11, is in response to a subpoena for

5    the Caroline County Detention Center medical records.

6    That is number 11.  Exhibit Number 12 is the response

7    to the subpoena for the records from the Wicomico

8    County Detention Center.  Exhibit Number 13 is the

9    response to the subpoena for the records of Queen

10   Anne's County Detention Center.  Exhibit Number 14 is

11   in response to a subpoena to the Caroline County

12   Detention Center.  Exhibit Number 15 is the response

13   of the State of Delaware to a written request for the

14   juvenile and family Court records of Jody L. Miles.

15           THE COURT:  Is that it?

16           MR. SAUNDERS:  That is it in terms of

17   documents.  May I request a brief maybe five to ten

18   minute recess.

19           THE COURT:  Well, you can, after you

20   answer my question.

21           MR. SAUNDERS:  Yes, Your Honor.

22           THE COURT:  One of these earlier exhibits,

23   you identified is being a request for the medical

24   records from Caroline County.

25           MR. SAUNDERS:  Yes, Your Honor.

```
 1              THE COURT:  I think you got it backwards.
 2              MR. SAUNDERS:  I mixed them up?
 3              THE COURT:  Yes, Number 14 says a doctor
 4    order sheet, and it has all the things, and the other
 5    one --
 6              MR. SAUNDERS:  I apologize.
 7              THE COURT:  When I got it I was a little
 8    bit confused by it, which is Number 11 is a jail
 9    record and has commitments.
10              MR. SAUNDERS:  My apologies, Your Honor, I
11    did confuse the two.
12              THE COURT:  That's okay.  Now we may have
13    a little recess.  Let's take until 11:30.
14              (Whereupon at 11:15 the Court took its
15    morning recess and the proceedings resumed at 11:30)
16              MR. SAUNDERS:  Your Honor before the jury
17    comes out, just to let the Court know, on scheduling,
18    we have one witness that we are prepared to call this
19    morning.  We weren't obviously sure on time here, I
20    expect him probably only to be about 30 minutes.
21    Then, our next witnesses are meeting us somewhere
22    between 12:30 and one o'clock and we'll be prepared
23    to put them on this afternoon and follow with our
24    social worker.  That should be it for the day.  Our
25    Dr. Davis, who is the expert in alcoholism, would be
```

1   our last witness, and he was able to only open up

2   tomorrow morning, so we have him scheduled for 9:30

3   tomorrow morning.

4            THE COURT:  All right, that's fine.

5   Anything else?

6            MR. SAUNDERS:  No, Your Honor.

7            (Whereupon the jury was escorted back to

8   the jury box by the jury bailiff at 11:32.)

9            THE CLERK:  The jury is all present and

10  properly seated.

11           MR. SAUNDERS:  Your Honor, the defense

12  would call Donald Still to the stand.

13                    DONALD STILL

14           (A witness called to testify by the

15  defense having first been duly sworn was thereafter

16  examined upon his oath and testified as follows.)

17                 DIRECT EXAMINATION

18  BY MR. SAUNDERS:

19       Q    Mr. Still, -- excuse me.  Were you

20  retained by my office for the purposes of conducting

21  an investigation in this matter before the Court here

22  today?

23       A    Yes, I was.

24       Q    And were you requested by me to conduct

25  interviews?

1        A     Yes.

2        Q     And as a result of that did you in fact

3   conduct interviews?

4        A     Yes, I did.

5        Q     And other than asking you to conduct the

6   interviews and convey that information to me, were

7   you given any other instructions with regard to what

8   you were to do?  Were you given any instructions in

9   terms of the content or in terms of anything else?

10       A     No.

11       Q     And did you in fact conduct a series of

12  interviews?

13       A     Yes, I did.

14       Q     Was one of those interviews with a Maurice

15  Lively?

16       A     That's correct, yes.

17       Q     And where was that interview conducted,

18  sir?

19       A     That was conducted at the Maryland House

20  of Correction -- excuse me, in Jessup Maryland.

21       Q     Was Mr. Lively a correctional officer or

22  an inmate?

23       A     Mr. Lively is an inmate, was and is an

24  inmate.

25       Q     What if any relationship does Maurice

1    Lively have to Jody Miles?

2        A    Maurice Lively, as he expresses it, is

3    currently married to Jody Miles's mother.

4        Q    And in conducting your interview with

5    Mr. Lively did Mr. Lively advise you how it came

6    about that he and Jody's mother become married, how

7    did they meet?

8        A    Light me start there.   According to

9    Mr. Lively, he met Jody's mother through an

10   advertisement that had been placed in a periodical, I

11   believe it's called the guide, which I believe --

12   which is available in various convenience stores on

13   the eastern shore, and at the time Mr. Lively was an

14   inmate at the Eastern Correctional Institution in

15   Princess Anne, and he noticed the advertisement that

16   Jody's mother had placed in the guide, not by its

17   content, but by the fact that the number for the

18   advertisement corresponded to his Department of

19   Corrections number.   And he thought that was a good

20   sign.

21       Q    Well subsequently after they met did there

22   come a time in which they were married?

23       A    According to Mr. Lively, yes, there did

24   come a time in which they were married.   I didn't

25   verify that, but according to him they were married

1   while he was an inmate at the Eastern Correctional

2   Institution.

3        Q    And did Mr. Lively indicate to you for

4   what reason he is presently incarcerated?

5        A    Mr. Lively is currently incarcerated for

6   assault with intent to murder.

7        Q    Did he describe to you what is it he's

8   alleged to have done and to whom?

9        A    Well, Mr. Lively denied the charges to me,

10  but what he did describe to me is that he is accused

11  of assaulting and in some manner setting fire to his

12  former wife.

13       Q    Now, sir, did there come a time that at my

14  request you interviewed an individual by the name of

15  Tom Corder?

16       A    Yes there did.

17       Q    And what relationship if any does Tom

18  Corder have to Jody Miles?

19       A    Tom Corder was married to Jody Miles's

20  mother, was Jody's stepfather, -- I don't know

21  whether you want me to give dates at this point.

22       Q    If you have those dates, approximately?

23       A    Approximately he was married to Jody's

24  mother approximately 1970 or 71, Jody would have been

25  a year to a year and a half old, at the time.

1       Q    And do you know for what approximate

2  period of time he was Jody's stepfather?

3       A    Probably about six and a half years.

4       Q    And does he indicate during that time

5  whether the family was stable, that is in one place,

6  or whether changes occurred?

7       A    He reported to me that he married Jody's

8  mother in St. Louis, Missouri, where she had worked

9  for him as a desk clerk.  He was managing a hotel in

10  St. Louis.  The hotel was sold and they were going to

11  convert it into an elderly residential center, so he

12  changed jobs, took an insurance job, and then

13  moved -- at least four times.  They were in

14  Louisiana, Pennsylvania, they ended up in California,

15  where they lived the longest period of time, about

16  two years, I believe.

17       Q    And does he describe anything with regard

18  to the reasons for their separation?

19       A    Well, he had discovered an adulterous

20  relationship on the part of Jody's mother.

21       Q    Does he describe how it came about that

22  then any movement of the family occurred?

23       A    At that time, evidently, according to Mr.

24  Corder, who is about fourteen years senior to Jody's

25  mother, the event in California was the second time

1    that he had caught Jody's mother in an adulterous

2    Rous situation.  At that point he moved out and moved

3    to a place in downtown San Diego.  They were living

4    in the San Diego area at the time.  He was under the

5    impression that the family would get back together.

6    Mrs. Miles for a few weeks would come by his house to

7    pick up money, which he was giving her for support of

8    the children, and, according to Mr. Corder, one

9    weekend Miss Miles had a yard sale and was gone.  He

10   didn't know where.

11        Q    Now, did Mr. Corder provide information

12   about his relationship with the family -- excuse me,

13   did Mr. Corder have any children by Mrs. Lively?

14        A    No, he did not.

15        Q    At the time that he was married to her,

16   did he recount to you how many children she had?

17        A    Five children.

18        Q    Was he aware of whether the children were

19   from one or more than one fathers?

20             MR. RUARK:  State respectfully objects on

21   the basis of relevancy, at this point.  The State has

22   tried to give a lot of latitude, given the nature of

23   this proceeding, but the State has difficulty

24   fathoming what that has to do with Mr. Corder

25   vis-a-vis this defendant in this proceeding.

1          MR. SAUNDERS:   I will withdraw the

2     question, Your Honor.

3          Q     Did Mr. Corder maintain any relationship,

4     financially or otherwise with the family after they

5     left?

6          A     Mr. Corder told me that he provided

7     support for all the children until they reached age

8     18.  He managed to find where the family was

9     residing, through contact with two of the girls, who

10    would write to him and maintain contact with him.

11         Q     And did there come a time that he

12    relocated anywhere near the family?

13         A     I believe about two years ago he moved up

14    to Delaware and is residing next door to one of

15    Jody's sisters.

16         Q     And once he came into Delaware, did he

17    recount to you whether or not he had any more contact

18    with Jody Miles?

19         A     He said he has seen Jody three or four

20    times since relocating to Delaware.

21         Q     And where would he usually see him?

22         A     At family gatherings, picnics, that sort

23    of thing.

24         Q     And what if anything did Mr. Corder advise

25    you about Jody's alcohol consumption?

```
 1        A     He told me that he thought Jody as he said

 2   drank more than Mr. Corder liked to see him drink.

 3   He said that once Jody took a beer, then he wanted

 4   another and then another and then another.  He said

 5   in my estimation he was drinking way too much.  He

 6   recalled once at a family gathering when they were

 7   playing horseshoes betting Jody that he couldn't go

 8   two hours without drinking a beer, and he said Jody

 9   managed to do that but then went right back to

10   drinking one after the other.

11        Q     Now, sir, at my request, did you attempt

12   to interview correction officers from Wicomico County

13   Detention Center?

14        A     I wasn't able to interview anyone.  I

15   attempted but I wasn't able to get back to interview

16   people at Wicomico County Detention Center.

17        Q     Were you able to interview correctional

18   officers from other correction centers?

19        A     Yes.

20        Q     Can you -- is it more than one?

21        A     I spoke with about three or four

22   correctional officers at Caroline County.

23        Q     Then, take one institution at a time, sir,

24   and I'd like you to give me the name of the

25   individual you had contact with, and the nature of
```

1    that contact -- let me -- excuse me.  At my request,

2    did you try to interview correction officers with

3    regard to their contact with and knowledge of Jody

4    Miles inside the institution?

5         A    Yes, that's correct.

6         Q    With regard to that issue, what if

7    anything did you learn from the correction officers

8    that you interviewed and if you would please indicate

9    who they are and which institution they are at?

10        A    Well, in summary, I can state that --

11        Q    No, sir --

12        A    -- all of them had the same thing to say.

13   You want individually?

14        Q    Yes, sir, no summary, I want what each of

15   them said and each by name?

16        A    I spoke with a Fayetta Downes, who is a

17   Master Sgt. at the Caroline County Detention Center,

18   and she said that she remembered him, but doesn't

19   remember much about him.  She said that what I can

20   say is I remember the bad ones.  So, he must not have

21   been a bad one, is what she told me.  Georgeanne

22   Potter, a sergeant at the Caroline County Detention

23   Center, said she remembered him, said for the most

24   part he was okay, he had a problem with his back, but

25   they straightened that out and after that he was

okay, I had no problems out of him, he was respectful

to me.  William Fish Brown, a corporal, at the

Caroline County Detention Center, told me, he said he

didn't cause me any problems, it was no problems with

the other inmates, he was always up front and

straight, was a stand up guy in here.  Cornelius

Potter, a corporal at the Caroline County Detention

Center was also a shift supervisor, and he told me,

he said, I never had any problem with him, nobody on

my shift had any problem with him.  There was no

problem with correctional officers or inmates.  And

he recalled that he was on medication at one time for

his back, is the only thing that he could recall of

any consequence.  At the Queen Anne's County

Detention Center, Sgt. Greenwood basically told me

when I asked him, he said you can see by the records

that he hasn't been written up.  He had been

cooperative, he said he got along with everybody,

and, Captain Eason, who I guess kind of runs the

Queen Anne's County Detention Center, at least she

arranges all the visits and I think oversees most of

the administration, she told me that he hasn't been a

problem and she would usually hear about it when

there's a problem.

            MR. SAUNDERS:  We have no other questions,

1    Your Honor.

2                          CROSS EXAMINATION

3    BY MR. RUARK:

4         Q    Is it Mr. Still?

5         A    That is correct.

6         Q    Mr. Still, are you on staff of the Public

7    Defender's Office or are you a private investigator?

8         A    I am privately contracted by them.

9         Q    By the Office of the Public Defender?

10        A    That's correct.

11        Q    And you are a licensed private

12   investigator?

13        A    I am not licensed.

14        Q    Now, starting with Mr. Lively, do you

15   recall the date that you spoke with him?

16        A    Yes, just bear with me, so I can look over

17   my notes.  I spoke to Mr. Lively on the 18th of

18   February, 1998.

19        Q    Do you recall when you spoke with Mr.

20   Corder?

21        A    On the 9th of February, 1998.

22        Q    How old is Mr. Corder?

23        A    76 years old.

24        Q    Is he in good health?

25        A    No he is not.

1      Q      What kind of physical problems does he

2      have?

3      A      He had a heart problem, and he may have a

4      diabetic problem, I'm not sure.  I can review the

5      notes.

6      Q      That is okay.  Was -- did he still reside

7      by himself and was able to take care of himself?

8      A      Yes.

9      Q      Now, with respect to the individuals at

10     the Caroline County Detention Center, when did you

11     meet with them, please?

12     A      I spoke with them at different times as I

13     was in and out, serving subpoenas.  Fayetta Downes,

14     26th of February, Georgeanne Potter the 26th of

15     February, William Brown on the 4th of March,

16     Cornelius Potter on the 12th of March.

17     Q      Just out of curiosity did you advise

18     them -- well, strike that.  Did they have the records

19     in front of them when you spoke with them?

20     A      No they did not.

21     Q      Was it more of an informal type of

22     contact?

23     A      Yes.

24     Q      Just on the way in and out?

25     A      As a matter of fact I asked specifically

1      from Fayetta Downes, who I was told, was given the

2      name warden, but I thought she was a warden and I

3      asked if I could see a few other people that might

4      have been working there, and I found out she was just

5      given that name by the inmates.

6          Q     So they call her warden?

7          A     The inmates call her warden.  A lot of the

8      correctional officers do too, she's been there a long

9      time.

10         Q     Do you recall when you talked with the

11     individuals at the Queen Anne's County Detention

12     Center?

13         A     Sgt. Greenwood on the 12th.

14         Q     Of February or March?

15         A     March.

16         Q     And Captain Eason?

17         A     Captain Eason, I believe, was on the 8th,

18     I think.  I'm not sure.

19         Q     If I could ask, what did you ask them?

20         A     I asked them if they were familiar with

21     Jody Miles and whether or not he had caused any

22     problems in the institution for them or with other

23     inmates.

24         Q     Did the individuals from the Queen Anne's

25     County Detention Center have any records in front of

1   them?

2        A     No they didn't.

3        Q     Now with respect to the three people in

4   Caroline County, how did you come up with these three

5   people?

6        A     These were various names that I had been

7   given.  I asked Mr. Miles if he could give me a

8   couple of names of people he knew.  He didn't know

9   any names other than one or two nicknames.  When I

10  spoke with Fayetta Downes, who I thought was the

11  warden, turned out it was her nickname, and she gave

12  me a few names.  It was kind of hit or miss because

13  it's very difficult to take time from correctional

14  officers, as you well know, to interview them.

15       Q     Just to clarify, with respect to

16  Mr. Lively, did he have any personal knowledge of

17  Jody Miles at all?

18       A     He had some knowledge.

19       Q     Let me ask you this, to the best of your

20  knowledge had he ever met him?

21       A     Yes, he said he had.

22       Q     When did he meet him?

23       A     When he was in the Eastern Correctional

24  Institution, Jody's mother brought him down, and he

25  had spoken to him on the phone several times.

1              MR. RUARK:   The State has nothing further,

2    Your Honor.

3                   REDIRECT EXAMINATION

4    BY MR. SAUNDERS:

5         Q    Mr. Still, before you began investigations

6    for me what was the nature of your employment?

7              THE WITNESS:   Well, I worked for the

8    Division of Parole and Probation for about 21, 22

9    years.

10        Q    And what was the nature of your employment

11   there, did you do investigations?

12        A    I was a supervisor of units doing

13   presentence investigations for about 8 years, I did

14   presentence investigations prior to that, myself.

15        Q    In your supervisory capacity, how many

16   people did you supervise doing presentence

17   investigations?

18        A    From seven to ten, it varied.

19        Q    And -- you said over a period of eight

20   years?

21        A    Approximately eight years, yes.

22        Q    And approximately how many investigations

23   have you done in that time period that you worked for

24   the State of Maryland with Parole and Probation?

25        A    Have I done personally?

1       Q      Yes, sir?

2       A      Hundreds.  It would take a while to put a

3  figure to it.  Hundreds, I can assure you.

4              MR. SAUNDERS:  I have no other questions

5  Mr. Still.

6              THE COURT:  Anything else?

7              MR. RUARK:  No, Your Honor, thank you.

8              THE COURT:  May the witness be excused?

9              MR. SAUNDERS:  Yes, Your Honor.

10             THE COURT:  You are excused.  Thank you

11  very much.

12             MR. SAUNDERS:  Your Honor I apologize for

13  stopping short today, but we're out of witnesses

14  until after lunch.

15             THE COURT:  What do you think is an

16  appropriate punishment for that.  All right, well see

17  everyone at 1:30.  Thank you.

18             (Whereupon at 11:55 Court recessed for

19  lunch, and the proceedings were resumed at 1:35)

20             THE COURT:  Any reason we can't have the

21  jury back.

22             MR. SAUNDERS:  No, Your Honor.

23             THE CLERK:  All jurors are present and

24  properly seated.

25             THE COURT:  All right.

1            MR. McFADDEN:  Your Honor, the defense

2       would call Lisa Hopkins.

3                      LISA HOPKINS

4            (a witness called to testify on behalf of the

5       defendant, having first been duly sworn, was

6       thereafter examined upon her oath and testified as

7       follows.)

8                      DIRECT EXAMINATION

9       BY MR. McFADDEN:

10           Q    Hello Miss Hopkins, how are you today?

11           A    Fine.

12           Q    Please state your name and address?

13           A    My name is Lisa Hopkins and I live in

14      Houston, Delaware.

15           Q    What is your relationship to Jody Miles?

16           A    I am his older sister.

17           Q    How much older are you than Jody?

18           A    Nine years.

19           Q    Do you have the same father or different

20      fathers?

21           A    Different.

22           Q    As children did you and Jody live in the

23      same house?

24           A    For a while we did.

25           Q    When did you move out of the house?

```
1        A      When I was 15 or 16, I left.

2        Q      And how old was Jody then?

3        A      He was about 7.

4        Q      Did you maintain a relationship with Jody

5  after you moved out of the house?

6        A      Yes.

7        Q      Could you describe that relationship?

8        A      I moved back in and left, off and on a

9  couple of times, and I always knew how they were

10 doing, when I wasn't there.

11       Q      Did there come a time when Jody was a

12 child that the family moved in where you were living?

13       A      Yeah, when I was 21, so that would make

14 him 12.

15       Q      Where were you living then?

16       A      I was living in Georgetown Delaware.

17       Q      How long did they live with you?

18       A      About a year.

19       Q      As an adult, have you had contact with

20 Jody?

21       A      Yes.

22       Q      Could you describe that to the ladies and

23 gentlemen of the jury?

24       A      When we had barbecues, birthdays, we would

25 make sure we got hold of Jody so he could bring the
```

1    kids and he'd be able to spend time with the family.

2         Q    How many times a year did you see Jody

3    over the last several years?

4         A    Between three and five.

5         Q    Can you describe for the jury what your

6    family life was like when you were living with Jody

7    as children?

8         A    It was bad.  There was abuse off and on.

9    There was men, quite a few different men, in and out

10   of the house, and there was never enough of anything.

11        Q    When you say abuse, can you elaborate a

12   little bit on that for us?

13        A    Depending on what kind of mood our mother

14   was in, we didn't know -- we couldn't tell when she

15   first come into the house if she was angry or she

16   wasn't angry, and depending on her mood, is usually

17   how things were in the house.  If things were -- if

18   she was angry, she would take it out on whoever was

19   usually in front of her.

20        Q    What was your financial situation?

21        A    We didn't have anything.  There was never

22   enough food and never enough clothes.  There wasn't

23   enough attention.

24        Q    Can you describe for the jury what your

25   observations of the relationship between Mr. Miles

1    and his mom were?

2         A    Um, Jody was always trying to get Mom's

3    approval, and that was hard to come by.  And he loved

4    Mom -- he loves her, but he -- nothing he ever did

5    was ever good enough.

6         Q    As an adult have you ever seen Jody drink

7    alcohol?

8         A    Yes, I have.

9         Q    How often?

10        A    If we had barbecues, he would drink there.

11   Or if we were shooting in pool tournaments, I'd see

12   him drink there.

13        Q    Have you made any observations regarding

14   Mr. Miles's drinking?

15        A    He's not the same person when he's

16   drinking.  His attitude changes.  He's just not the

17   same person.  He's not my brother.  He doesn't act

18   like the Jody I know.

19        Q    And have you ever known Jody to carry a

20   weapon?

21        A    No.  No.

22             MR. McFADDEN:  Court's indulgence.

23        Q    Let's go back in years to Jody's

24   childhood.  How were the children disciplined?  You

25   said your mother would come home in a bad mood and

1      take it out on you.   Could you describe for the jury

2      what you meant by that?

3            A      She'd usually hit you with something.

4      Whoever was in front of her was usually the one that

5      was going to get hit.

6            Q      Was it in terms of discipline or was it

7      random?

8            A      It was just random.   You didn't have to do

9      anything for something like that to happen.   You just

10     had to be the person in front of her.

11           Q      Did you ever see Mrs. Miles hit Jody?

12           A      Yeah.   Yeah.

13           Q      More than once?

14           A      Yes.   Yes.

15           Q      Did your mother ever discipline the

16     children?

17           A      I don't -- I don't know -- I don't think

18     that there was any difference between discipline and

19     her being angry.   It wasn't two different things.

20           Q      When the family, you had already moved to

21     the east coast, when the family moved here, did your

22     mother live with the family?

23           A      Her residence was with the three kids, but

24     sometimes she wouldn't be there and the kids were by

25     themselves.

1      Q    When you say she wouldn't be there, how

2  long a period of time would that be?

3      A    She would pop in and ought, but sometimes

4  a week, sometimes a week and a half, two weeks, and

5  then she would come back, maybe and stay a night and

6  then she would go back, she would leave again.

7      Q    Would she always leave money there?

8      A    Not always.  There wasn't that much.

9      Q    Would she always leave food in the house?

10      A    She tried to.  But there was never enough

11  of that either.

12      Q    Whether we met, you said that you sleep

13  with a pillow against your side.  Could you describe

14  for the jury --

15      A    Um, myself, my younger brother, Chris, and

16  my brother Jody, always, even to this day, sleep with

17  a pillow beside you.  It's -- that way you can't get

18  hit or you can't get hurt while you're sleeping, and

19  he would sleep with a pillow beside him and one foot

20  on the floor like he was getting ready to run all the

21  time.

22      Q    I know this is difficult.  Why would he do

23  that?  You said he's getting ready to run?

24      A    I guess if you're fast enough you don't

25  get hit.

1          MR. McFADDEN:  I have nothing further,

2    thank you.

3          MR. SAUNDERS:  Wait.

4          MR. McFADDEN:  No further questions, thank

5    you.

6                    CROSS EXAMINATION

7    BY MR. RUARK:

8          Q    Miss Hopkins, how old are you now?

9          A    I'm 37.

10         Q    Miss Hopkins, for the last, what, four or

11   five years, roughly, give or take, you say you've

12   seen the defendant three to five times a year?

13         A    Yeah.

14         Q    And that has been almost always at a

15   family barbecue or neighborhood barbecue?

16         A    It's family.

17         Q    And you said something about pool

18   tournaments or pool games?

19         A    We shoot with the APA and he would come in

20   to watch us shoot tournaments.

21         Q    And you said on those occasions you would

22   see him drink?

23         A    Right.

24         Q    Now, -- I know I asked you this, were you

25   ever at a party or one of these barbecues when this

1    defendant threatened to go get a gun?

2        A    Not that I recall.

3        Q    Or that he became exceedingly angry at a

4    family member?

5        A    Just angry.  Not to the point of violence.

6        Q    When the defendant would become angry at

7    these barbecues, how would he show his anger?

8        A    Yelling.

9        Q    Now, do you recall speaking with a lady by

10   the name of Ann Stanfield Hagert (phonetically)?

11       A    Yes.

12       Q    Did you ever indicate to her that the

13   defendant's behavior or his demeanor changed at all

14   between when he was drinking and when he was not

15   drinking?

16       A    Yes, sir.

17       Q    So you did indicate to her that his

18   demeanor would change?

19       A    You could tell when he drank he would

20   change.

21       Q    And did you indicate would he become more

22   aggressive?

23       A    He was -- he would argue.  It was easier

24   for him to argue when he was drinking.

25       Q    Now, there's been some testimony -- do you

```
 1   live anywhere in the vicinity of Tom Corder?

 2        A    Yes.

 3        Q    Where does he live with respect to you?

 4        A    In the mobile home right beside me.

 5        Q    Does he live by himself?

 6        A    My daughter lives with him.

 7        Q    And he is your stepfather?

 8        A    Yes.  Stepfather.

 9        Q    And if I could, you reside with your own

10   family at this point?

11        A    Yes, sir.

12        Q    Husband, children?

13        A    Yes.

14        Q    And one last question, do you work?

15        A    Yes.

16        Q    Where do you work?

17        A    At Bumper to Bumper, in Harrington.

18        Q    That's a food --

19        A    It's auto parts.

20             MR. RUARK:  I don't have anything further.

21             MR. McFADDEN:  No, Your Honor, thank you.

22             THE COURT:  May the witness be excused?

23             MR. McFADDEN:  Yes, Your Honor, thank you.

24             THE COURT:  You're excused.

25             THE WITNESS:  Thank you.
```

```
1                    MR. McFADDEN:  Your Honor, the defense

2    would call Carrie Cooper.

3                         CARRIE COOPER

4                    (A witness called to testify on behalf of

5    the defendant, having first been duly sworn, was

6    thereafter examined upon her oath and testified as

7    follows.)

8                         DIRECT EXAMINATION

9    BY MR. McFADDEN:

10        Q    Could you state your name and where you

11   reside?

12        A    Carrie Cooper, Ridgely Maryland.

13        Q    Can I get you to speak up into the

14   microphone so the jurors can hear you.

15        A    Carrie Cooper, Ridgely Maryland.

16        Q    Miss Cooper what is your relationship to

17   Jody?

18        A    Right now, we're friends.  We were going

19   out and we went out about a year and a half ago, we

20   were engaged.  We have a daughter together.

21        Q    You have a daughter?

22        A    Yes.

23        Q    What is your daughter's name?

24        A    Chelsea Miles.

25        Q    How old is she?
```

1      A    She's two.

2      Q    And you have another daughter isn't that

3 correct?

4      A    Yes, Ashley, she's six.

5      Q    Does Jody get along well with your

6 children?

7      A    Yes, very much.

8      Q    Both?

9      A    Yes.

10     Q    Have you ever seen Jody loose his temper?

11     A    No.  Just yelling.  He would yell.

12     Q    He would yell?

13     A    Yes.  I've never seen him acting in a

14 violent manner.

15     Q    You have never seen Jody violent?

16     A    No.  He would -- if we were arguing or

17 whatever, he would like to leave.  He would always

18 leave until he would cool down, when he was ready to

19 talk or whatever.

20     Q    So, if you got into an argument he would

21 leave until enough time had passed that he had cooled

22 down and then return to talk it over?

23     A    Right.

24     Q    Was that his pattern when there was an

25 argument?

1       A       Yes.

2       Q       Have you ever seen Jody drink alcohol?

3       A       Yes.

4       Q       Have you ever seen Jody drink a lot?

5       A       Yes, on a few occasions, on a weekend if

6    we were to go out, he would drink.

7       Q       Where would you go?

8       A       Maybe to the Legion, in Harrington, or to

9    a bar in Milford.

10      Q       What did he drink?

11      A       Most of the time it was beer or Kahlua, I

12   think he would drink it with vodka.

13      Q       Kahlua and vodka?

14      A       Yeah, I think so.

15      Q       Did Jody have a pretty high tolerance for

16   alcohol, in your opinion?

17      A       Yes.

18      Q       How many drinks would he have?

19      A       I'd say he could at least drink ten to

20   twelve beers.

21      Q       Ten or twelve beers?

22      A       Yes.

23      Q       In how long a time?  In an evening?

24      A       Probably.  In like a two or three hour

25   period, drinking -- I am not sure of the exact

1  amount, I wasn't counting or anything, but I know he

2  could drink a lot more than I could before he would

3  show any signs of --

4      Q    Have you ever seen Jody intoxicated?

5      A    Not that really sticks out in my mind.

6  I've seen him where he -- I could tell that he had

7  been -- probably had a little bit too much to drink,

8  but he could handle hisself well, you know, when he

9  was drinking, or like his body or, you know,

10  movements and walking and all that, wasn't really

11  noticeable to people who didn't know he had been

12  drinking.

13      Q    Ever known Jody to carry a weapon?

14      A    No.  Not anything.

15      Q    A knife?

16      A    No.

17      Q    Were you surprised when you learned that

18  Jody had been arrested?

19      A    Oh, yes, very much surprised.

20          MR. McFADDEN:  Court's indulgence.

21  (Pause)  We have no further questions.

22                    CROSS EXAMINATION

23  BY MR. RUARK:

24      Q    Miss Cooper you have said that you have

25  seen the defendant drink alcohol on a few occasions?

1      A     Right.

2      Q     Would you say a few is five, six, ten?

3      A     Um, probably more than that.

4      Q     But he certainly didn't drink every day?

5      A     No, not every day.

6      Q     And he was able to work, I believe in our

7  talks, he worked when he was in Tennessee?

8      A     Yes.

9      Q     He worked when he was in Georgia?

10     A     Yes.

11     Q     And he could hold down a job?

12     A     He switched jobs quite often.

13     Q     But was -- when he would drink would it

14  normally be an occasion when you and he would go out

15  for an evening, on a date or one of those evenings

16  just to have fun?

17     A     That is when he would normally drink a

18  larger amount.  He would, while we were home, he

19  might have a few drinks during the week.

20     Q     A beer or two?

21     A     Or kahlua, he liked to drink a lot of

22  that.

23           MR. RUARK:  Nothing further.

24           MR. McFADDEN:  Court's indulgence.

25                      (PAUSE)

1          MR. McFADDEN:   No further questions, Your

2     Honor, thank you.

3          THE COURT:  Next?

4          MR. McFADDEN:   Defense would call Jim

5     Cooper, Your Honor.

6                      JIM COOPER

7          (A witness called to testify on behalf of

8     the defendant, having first been duly sworn, was

9     thereafter examined upon his oath and testified as

10    follows.)

11                 DIRECT EXAMINATION

12    BY MR. McFADDEN:

13        Q    Hello Mr. Cooper, please state your name

14    and address?

15        A    Jim Cooper, Ridgely Maryland.

16        Q    What is your relationship to Jody?

17        A    Good friends and he's the father of my

18    granddaughter.

19        Q    So he has a daughter with Carrie and that

20    is your granddaughter?

21        A    Yes.

22        Q    Have you ever seen Jody drink alcohol?

23        A    Yeah.

24        Q    How often have you seen him drink --

25        A    Pretty much every time we got together.

1     Q     Every time you got together?

2     A     Yeah.

3     Q     Ever come a time he lived with you in the

4  house?

5     A     Yeah, full time.

6     Q     Would you say that Jody drank a lot?

7     A     He drank enough.

8     Q     Have you ever seen Jody act violent?

9     A     No.

10     Q     Have you ever seen Jody get upset?

11     A     Yeah, I've seen him get upset.

12     Q     And from your observations how did Jody

13  deal with his anger with he got upset?

14     A     He'd just take off walking down the road.

15     Q     Can you describe for the jury an instance

16  when he did this?

17     A     One time I remember specifically that he,

18  Carrie and my wife and Jody, we was off at Dover, and

19  he got to arguing, Jody just got out and started

20  walking down Route 13.

21     Q     How long was he gone?

22     A     Until he cooled down.  Until they both

23  cooled down.

24     Q     Have you ever known Jody to get into an

25  automobile accident?

 1      A      One time, yeah.

 2      Q      Could you describe for the jury what the

 3  accident was?

 4      A      He went across a ditch into I think it was

 5  soybean field on the road going from Oil City toward

 6  Harrington.   And I can't remember if I come home from

 7  work or what, Jody come in and I pulled him out.

 8      Q      Do you have a tractor or truck?

 9      A      I have got a four wheel drive truck.

10      Q      Had Jody been drinking at that time?

11      A      Pretty much, yeah.

12      Q

13             MR. McFADDEN:   No further questions.

14                        CROSS EXAMINATION

15  BY MR. RUARK:

16      Q      When did the defendant live with you in

17  your house?

18      A      I'm not sure the dates, but he come stay

19  with us while Carrie was pregnant with Chelsea, and

20  then full time after that.

21      Q      So, three or four years ago?  Just trying

22  to get an idea?

23      A      Yeah, I would say somewhere around that.

24      Q      For what length of time did he stay in

25  your house?

 1          A       You mean just straight staying there?

 2          Q       Or live there?

 3          A       Probably like a year or so.

 4          Q       Was this before he and Carrie left and

 5     went to Tennessee?

 6          A       That's right, yeah.  And then after they

 7     come back from Tennessee he stayed with -- no, wait a

 8     minute -- yeah, after he come back from Tennessee he

 9     stayed with us for a short time.

10          Q       By a short time is what?

11          A       I think like a month or so.

12          Q       And you said you'd seen him drink before,

13     would he normally drink beer?

14          A       Well, with me, I would drink vodka and

15     orange juice and he'd drink vodka and kahlua.

16          Q       Is there a name for that drink, vodka and

17     orange juice?

18          A       Vodka and orange juice?

19          Q       Ever heard the name fuzzy navel?

20          A       Yeah, but that's too sweet.

21          Q       When did this accident occur?

22          A       I can't remember the dates.  I don't

23     remember.

24          Q       Had he been at your house before this

25     accident took place or was he coming from anyplace

1    else -- first off, you weren't with him when it

2    happened?

3         A    No.  I think he had worked for me earlier

4    that day and he went somewheres else and was coming

5    back.

6         Q    While he was living in your house did he

7    work anywhere?

8         A    He did combining for me for a while until

9    he hurt his back.

10        Q    Did he work anywhere else that you can

11   remember?

12        A    Yeah, he worked for a gentlemen in

13   Greensboro, putting on roofs.

14             MR. RUARK:  I have nothing further.

15             MR. McFADDEN:  Nothing further, thank you

16   Mr. Cooper.

17             MR. SAUNDERS:  Your Honor, the defense

18   would call Ann Stanfield Hagert.

19                  ANN STANFIELD HAGERT

20             (a witness called to testify on behalf of

21   the defendant, having first been duly sworn, was

22   thereafter examined upon her oath and testified as

23   follows.)

24                  DIRECT EXAMINATION

25   BY MR. SAUNDERS:

```
 1        Q      Miss Stanfield Hagert, would you give your

 2   full name and professional address for to jury?

 3        A      My name is Ann Stanfield Hagert, I work in

 4   Cambridge Maryland.

 5        Q      Now, ma'am, what is your formal education?

 6        A      A Master's degree in clinical social work

 7   and a Bachelors degree in psychology.

 8        Q      The Master's is from where?

 9        A      Catholic University in Washington, D.C.

10               THE COURT:   And the Bachelors?

11               THE WITNESS:   Australian National

12   University in Australia.

13        Q      Between the time that you took your

14   Bachelor's degree and you took the Master's degree,

15   were you employed in any fashion?

16        A      I was employed by -- as a psychotherapist

17   in Fairfax County, Virginia.

18        Q      For what period of time?

19        A      I was hired, January, 74, and in September

20   76 I went to Catholic to do my Master's degree.  I

21   returned to that clinic in June, 78, as social

22   worker.

23        Q      Now, ma'am, as a social worker, are you

24   licensed in the State of Maryland?

25        A      Yes.
```

1      Q     Are you also licensed in any other

2  jurisdiction?

3      A     I am also licensed in the District of

4  Columbia.

5      Q     For the ladies and gentlemen of the jury,

6  ma'am, I believe Maryland has more than one level of

7  licensure, am I correct?

8      A     That is correct.

9      Q     Would you please describe what the three

10  levels are?

11      A     There are three levels of social worker.

12  The first is a case worker, this is an LGSW, this is

13  a social worker who works in case work.  Then is the

14  LCSW, this is a social worker who has a Master's

15  degree and has done two thousand hours -- has been

16  supervised for two thousand hours after their

17  Master's degree.  They have to be employed in an

18  organization or supervised.  The highest level is a

19  LCSWC, which is certified clinical social worker,

20  that is what my position is, that means that I can

21  supervise social workers who are in school or who

22  have just gotten their Master's degree.  It means

23  that I am allowed to function independently, to be in

24  private practice.  I do not have to work under the

25  supervision of a psychologist or a psychiatrist, and

1    I can do assessments and diagnoses and therapy in the

2    State of Maryland.

3         Q    Now, ma'am, you are presently in an

4    independent professional position, am I correct?

5         A    Correct.

6         Q    If I could take you between the time that

7    you received your Master's degree, what additional

8    employments have you had?

9         A    Before my Master's degree?

10        Q    No, after your Master's degree?

11        A    After my Master's degree I stayed at the

12   clinic, the mental health center from 78 until about

13   83, where I was a senior clinician and therapist on

14   the short term treatment team.  I also started a

15   private practice in D.C., where I saw adult clients

16   and I did supervision of students from Virginia

17   Commonwealth University, Howard University, Catholic

18   University.  I was also employed by the Northern

19   Virginia Police Academy to do training to their

20   cadets and officers in diagnosis and help with

21   mentally disordered individuals and also in crisis

22   intervention and rape crisis.  When I left -- in 1989

23   my family and I moved to Cambridge and since then I

24   have continued my private practice.  I am an adjunct

25   professor at Chesapeake College and Salisbury State.

1    I do EAP assessments for problem employees or

2    employees that need psychiatric assessment.  I do

3    assessments for the Post Office, and for a number of

4    private corporations, and I do therapy with adults.

5        Q    With regard to your teaching, what types

6    of courses do you teach?

7        A    I teach psychology at Chesapeake College,

8    I have taught general psychology, abnormal

9    psychology, advanced counseling.  I teach human

10   growth and development, which has to do with how --

11   what are the psychological influences on people as

12   they develop and grow.  At Salisbury State I teach

13   human growth and development one and two, which again

14   looks at the psycho- social work sort of problems

15   that people have as they I grow up.

16       Q    Now you mentioned a couple of situations

17   where you do assessments, EAP's, and also for the

18   State of Maryland and other groups.  Does this bear

19   any relationship to what is called psycho-social

20   history?

21       A    It depends.  Sometimes these assessments

22   are because an employee is a problem, or the

23   supervisor has sent them.  Sometimes the employee is

24   them self seeking care, and at that point I would do

25   a psycho-social history which is to look back over

1    their life and try to identify some of the factors

2    and influences that have caused the problems.

3        Q    Are you involved in any form of

4    supervision for other social workers?

5        A    I currently supervise social workers who

6    are in the process of getting there LCSWC license,

7    and I supervised a student last year from the

8    University of Maryland.

9        Q    Over this period of time, how many social

10   workers have you supervised and from what schools or

11   universities?

12       A    Probably fifteen or so.  Let's see,

13   Virginia Commonwealth University, Howard University,

14   Catholic University, University of Maryland, and now

15   actually one from Chesapeake college.

16       Q    Now, ma'am, have you also been involved in

17   any publications and or work shop presentations?

18       A    I have not published anything.  I do work

19   some presentations for various health and criminal

20   justice groups on the shore, and in the State of

21   Maryland.

22       Q    And in addition to your consulting work,

23   do you have any sort of active clinical practice?

24       A    Yes.

25       Q    What is the nature of that clinical

1    practice?

2         A    I see adult clients who are referred to me

3    by their friends or who are self referred or sent by

4    their doctors because they are experiencing

5    depression or marital difficulties or stress.

6         Q    If I could have you look at what's been

7    marked as defense Exhibit Number 16 for

8    identification, can you look at that and tell me if

9    you recognize that document?

10        A    That is three pages of my resume.

11        Q    Oh, I'm missing the fourth.

12        A    That is my resume.

13             MR. SAUNDERS:  If I could for a moment.

14    My apologies.

15        Q    If you would take a look at defense

16    Exhibit 4 and see if you recognize that?

17        A    Yes that's my resume.

18             MR. SAUNDERS:  Your Honor at this time I

19    would offer Miss Stanfield Hagert as an expert in

20    social work.

21             MR. RUARK:  No objection, Your Honor.

22             THE COURT:  All right.

23        Q    Ma'am, would you explain to the ladies and

24    gentlemen of the jury what a psycho-social history

25    is?

1          A      Psycho-social history is like a social

2     worker's tool box.   It was what I was trained in to

3     interview somebody and to get a sense of how they

4     dealt with the normal life processes, how they were

5     as a child, what happened in their family, how they

6     were in school, how their health was, what sort of

7     relationships they had, how they were successful and

8     how they were not successful, usually going back to

9     birth and working on up to the present day.   Often

10    times there is an assessment of the person in a

11    current situation and some sort of attempt to link

12    the two, that this is why this person is in front of

13    you as a client, this is what is going on with them

14    right now, they're presenting symptoms and here's the

15    history of how they got there.

16         Q     What if any training -- excuse me, in

17    terms of doing interviews and assessments from those

18    interviews, what if any training do you receive?

19         A      Training we get is both applied and

20    theoretical.   We learn very specifically how to ask

21    questions, how to remain objective, how not to lead

22    somebody, one way or another, how to elicit

23    information without being judgmental, how to, one,

24    take the facts of what the person is saying, and,

25    two, take sort of the feeling of them, the process

1    about how they answer questions, how they appear to

2    you, the style, so some of it is factual and some of

3    it is just an assessment of how they interact with

4    you, how they answer the questions, not just what

5    they say.

6        Q    Now, is it at all unusual for you to

7    receive contradictory information from a variety of

8    sources?

9        A    Yes, it is very usual for me to receive

10    contradictory information.

11        Q    And how do you arrive at an assessment

12    with contradictory information with how to use the

13    different information and give credence to one item

14    or another?

15        A    Sometimes by repeated interviews,

16    sometimes that is by talking to different people,

17    sometimes it's by phrasing the question in different

18    ways, sometimes by noticing as the person gives you

19    the answer if there's some expression or choice of

20    words that leads me to believe -- sometimes I will

21    point out to the person that I see some conflict in

22    what they're saying.  All of those were tools that I

23    learned, how to do an interview as opposed to just a

24    social chat.

25        Q    And what if anything about the therapy

1  skills that you developed in your practice are at all

2  useful in this psycho-social assessment process?

3        A    Well, assessment is not therapy, but

4  assessment is trying to get as much information from

5  somebody so that you can get a clear picture of that

6  person.  It is not my feeling, it is not my view,

7  it's not my judgment.  In both therapy and

8  assessment, my job is to get information of how this

9  person deals with life, and in one situation, a

10  therapy situation, I'm supposed to help them work

11  through that.  In an assessment situation I'm not.

12        Q    And how do you deal with a situation where

13  a person, either through their own memory issues or

14  their desire to not disclose certain things, is a

15  poor historian?

16        A    Well, most people when they are talking to

17  me are pretty nervous, so they become poor historians

18  or they do make mistakes.  It's very important for me

19  to try to understand why somebody is a poor

20  historian, are they not very bright, are they scared,

21  are they defensive, are they confused in some way.

22  If I want -- what I can do is I can take the

23  information that I get from them, sometimes I will

24  turn it back to them, other times I will verify it in

25  records, I will verify it in terms of how other

1    people would answer the question or get other

2    information out of the records or from other people.

3        Q    Now, ma'am, at my request, did you do the

4    work to do a psycho-social assessment of Jody Miles

5    the man seated here to my right?

6        A    Yes, I did.

7        Q    And at my request, did you reduce your

8    findings to writing?

9        A    Yes, I did.

10       Q    I am going to show you what's been marked

11   as Defense Exhibit for identification as Number 2,

12   and ask you to look through that, especially since I

13   left one page off something else, and make sure that

14   it's all there?

15       A    Page 11, yes.

16       Q    Is that in fact a copy of the report that

17   you submitted?

18       A    Yes.

19       Q    Now, ma'am, in doing your psycho-social

20   history, what if any interviews did you conduct?

21       A    I conducted a number of interviews.   I

22   interviewed Jody's mother, seven times.   I

23   interviewed each of his sisters one time.   I

24   interviewed a friend of his one time, and I

25   interviewed Jody, four times.   Also, since I handed

1   in this report I have interviewed Jody's first wife.

2       Q     What is her name?  His first wife?

3       A     I am blanking on it right now.  Beverly.

4       Q     Now, in addition to those interviews did

5   you also review a series of documents?

6       A     Yes I listed on my report a series of

7   documents and I have actually -- I have some that I

8   have reviewed since this report.

9       Q     If you will bear with me a moment.  May I

10  have the exhibits that -- this is a little bit

11  tedious, if you can bear with me one moment.  I am

12  going to show you what's be introduced as Defense

13  Exhibit 4, employment records of WDSD, have you had a

14  chance to see that before?

15      A     Yes.

16      Q     I am going to show you what's been marked

17  as Defense Exhibit 5, the records from Purdue's, have

18  you had a chance to review that?

19      A     Yes.

20      Q     I am going to show you what's been mark as

21  Defense Exhibit 6, the school records, have you had a

22  chance to review that?

23      A     Yes, I have.

24      Q     I am going to show you what's been marked

25  as Defense Exhibit 7, which is the records from

1   Easton Memorial Hospital, have you had a chance to

2   review that?

3          A    Mm-hmm, yes.

4          Q    I am going to show you what's been marked

5   as Defense Exhibit 8 the records from Beebe Medical

6   Center, have you had a chance to review that?

7          A    Yes.

8          Q    I am going to show you what's been marked

9   as Defense Exhibit 9 from Kent General Hospital, have

10  you had a chance to review that?

11         A    Yes, I have.

12         Q    I am going to show you what's been marked

13  as Defense Exhibit 10 the records from Milford

14  Memorial Hospital, have you had a chance to review

15  those?

16         A    Yes.

17         Q    I am going to show you what's been

18  marked -- excuse me -- -- marked as Defense Exhibit

19  11 the records from Caroline County Detention Center,

20  have you had a chance to review those?

21         A    Yes, I have.

22         Q    Now, we actually broke up Caroline County.

23  I am going to show you Defense Exhibit -- did I show

24  you 14 already?  No.  Fourteen, Caroline County

25  Detention Center records?

```
 1        A     Right.

 2        Q     I am going to show you what's been marked

 3   as Defense Exhibit 12, which is Wicomico County

 4   Detention Center records?

 5        A     Yes.

 6        Q     Now, they are not listed on your report?

 7        A     Right.

 8        Q     Why was that?

 9        A     Because I received them after I got the

10   report -- after I wrote the report.

11        Q     And I am going to show you the records

12   from the Queen Anne's County Detention Center, did

13   you also have a chance to review that?

14        A     Yes.

15        Q     Again that is not listed on your report,

16   did you receive that at a later point?

17        A     Yes, I did.

18        Q     And I am going to show you what's been

19   marked as Defense Exhibit 15, the records from

20   Delaware Juvenile Services, have you had a chance to

21   review all of those records?

22        A     Yes, I have those.

23        Q     And show you what is marked State's

24   Exhibit 1, the presentence report, have you had a

25   chance to review that?
```

1      A     Yes, I have.

2      Q     Now, based on all of that information,

3   interviews, and the material that was available to

4   you, were you able to make a psycho-social assessment

5   of Jody Miles?

6      A     Yes, I was.

7      Q     Would you for me describe for the ladies

8   and gentlemen of the jury what your conclusions were

9   of your psycho-social assessment, that is, what did

10  you find in your assessment?

11     A     There were two conclusions that I did, one

12  was the history of Jody and what his life was like

13  growing, up and the other was an assessment of his

14  current functioning or how I saw him now.

15     Q     Let's start with the history, and, at the

16  point that you consider appropriate professionally

17  for you, where is the starting point and what did you

18  conclude?

19     A     All the information that I used in my

20  report I gathered from not only Jody but from his

21  mother and from his sisters.  There was conflicts.

22  There was times that dates would be different and

23  times would be wrong.  There was a variety of reasons

24  why that happened.  It also to me reflected the

25  nature of what that family was like to grow up in.

1   What the information that I was given was -- though

2   it all melded together to describe a family life,

3   there was problems in terms of dates and problems in

4   terms of who was where and what was happening when.

5        Q    Well, in terms of your assessment, let's

6   start with -- from early childhood on.  Were you able

7   to arrive at an assessment of what the family life

8   was like and its impact on Jody?

9        A    Yes, I was.

10       Q    Would you describe that?

11       A    The family life as described to me was

12  chaotic.  Impoverished.  There was no organization.

13  There was sort of incessant crisis.  Usually in a

14  family of five kids, there's a lot going on.  What

15  was reported to me though with what was going on with

16  the mother, that it seemed to me that the mother's

17  crisises, her attempts to deal with her life, caused

18  difficulties for the children.  The numerous moves

19  meant that they didn't really have a lot materially,

20  and they didn't have a lot of friends in the

21  community or the schools, that they really were sort

22  of all stuck together, and kind of being accidentally

23  dragged long behind her, as she tried to solve some

24  of the problems if her life.  There wasn't a focus on

25  the children's needs.  There couldn't be.  This was a

 1  single mom who was very involved with finding someone

 2  who she could be attached to.  She was successful in

 3  attracting men and being able to be involved with

 4  them for a while, but she was not able to sustain

 5  that.  The children variously described these men as

 6  step fathers or uncles.  Some of them would be there

 7  a short time, some would be there a long time.  One

 8  of Jody's sisters said that, when I said where was

 9  your mother, she said my mother was wherever her

10  latest man was.  Consequently the children were left

11  to fend for themselves a lot.  When the children had

12  problems or difficulties or needs, oftentimes the

13  mother experienced that as unfair, as mean, as

14  hurtful, and it was very stressful for her.  She was

15  not able to cope with those sort of adult life

16  decisions that you have to make about how to raise

17  your children.  So the children were left to their

18  own devices, they were sort of cut off from the

19  community, they were afraid of her, they were afraid

20  of some of the men that were there, and they were

21  kind of going in and out of different schools.

22          Q     Let me ask you this, what if any

23  information did you derive and what significance did

24  you make of it in terms of violence in the family?

25          A     There was some -- there was some

```
 1   discussion about times that there was violence in the
 2   family.  The mother, the mother stated that she did
 3   not hurt the children.  This was not what the
 4   children said.  And the mother, when I asked her
 5   about it, very pointedly told me that I was hurting
 6   her, that I was being mean to her to ask her those
 7   questions.  There was one particular stepfather where
 8   the mother said he would hang my children up on
 9   nails.  She was not -- she would not elaborate on
10   that.  There was a couple of the men who drank
11   heavily, and any time -- my sense is any time
12   there's drinking there's usually going to be some
13   sort of behavioral acting out.  The children didn't
14   report violence between each other.  They didn't seem
15   to physically fight between each other.  They were
16   afraid of their mother, they were -- they reported
17   being emotionally abused by her.  She would say to
18   them, you want me dead.  I know that you want me
19   dead.  And what that left the children to do is to
20   try to reassure her that they didn't want her dead,
21   that they did need her and care about her, but when I
22   asked specifically about this, what Jody's first wife
23   had said was that the mother would play Jody more
24   than the other kids, that Jody was a little more soft
25   hearted and so was a little more inclined to try to
```

1    reassure the mother that he did love her, that he was

2    going to try to be good, and that would sort of go on

3    for a long time.  Those are some examples of some of

4    what the interactions we are like.

5         Q    Well, were you able to determine anything

6    factually in terms of its importance about the

7    transmission of values within the family?

8         A    Well, the values, again, as expressed by

9    the mother, were all there, theoretically.  She

10   talked about being a Christian, she talked about the

11   use of prayer.  Again what I would hear from the

12   children, and even as they would describe this to me

13   they would be sorry with what they were saying, but

14   what they would say is that the values were really

15   determined by whatever mother's needs were right

16   then, so that there wasn't a clear idea of what was

17   appropriate behavior and what wasn't.  Really,

18   whatever worked for mom was allowed.  There's three

19   different stories that sort of all tied together,

20   which was the mother saying to me as an example of

21   how Jody was her favorite child the mother said Jody

22   would go through the trash for me, he would take

23   things out of the trash and bring them to me as

24   gifts.  When I asked one of the sisters about that,

25   what she said is we stole so we could eat and again

1    it was the implication they would go out into the

2    trash and go places to steal to eat.  Another sister

3    said that the mother would say it's up to you to go

4    out and get whatever you need.  So that in spite of

5    the mother's attempt to present values of how a

6    family should be, her behavior and what her example

7    that she set for the children was, -- was that really

8    value is determined by whatever mother's needs are

9    right then.

10        Q    Was there anything unique or important to

11   you as a professional in the nature of the bonding of

12   the children, and especially Jody, around the mother?

13        A    Jody seemed to have a special place in the

14   family and everybody talked about that, fairly

15   consistently.  He was mother's favorite, mother said

16   he was the sweetest, he was the one who would try to

17   please her, he was the gentlest.  Mother identified

18   very strongly with Jody.  She and he both, when I

19   interviewed both of them I was struck by the

20   similarity in the way they sort of viewed the world

21   and themselves.  They both see themselves as people

22   reasonably able to attract members of the opposite

23   sex, that they could be congenial.  They both feel

24   that life has given them a hard turn and that

25   particularly the mother feels that she is unjustly

1    accused many times.  They both see themselves as sort

2    of oppressed, but special.  So, mother had a special

3    relationship with Jody.  I don't know if it was

4    because he was the baby or he was a boy or what.  I

5    don't know exactly why that is.

6         Q    Now, were there issues in the family

7    around accountability for behavior?

8         A    The mother was not very accountable for

9    her behavior and she was not able to hold her

10   children accountable.  Whether she felt it was

11   important or not it was hard to tell.  Regardless of

12   what she felt, she is not able to do that.  There was

13   an early incident where Jody took some checks out of

14   his mother's wallet and one sister turned him in, one

15   sister went to mother and said Jody has done this.

16   That was the only time that I heard where somebody

17   was called to task because of something they had

18   done.  Mother does not feel that she is accountable

19   for the difficulties that her children have had, and

20   that, I see, translated into the children, or at

21   least the ones that I have interviewed.  For example,

22   mother would say it was not my fault that this

23   happened.  Problems with the children.  It's somebody

24   else's fault.  I have always done the best I could

25   and it was very hard for her to say yes, I may have

1    made some mistakes.

2          Q      Were there any issues in the family around

3    abandonment?

4          A      Well, the children were continually

5    abandoned by men.  There wasn't any consistency of

6    men.  Perhaps the most consistent man was Mr. Corder,

7    who -- it was hard to say whether he abandoned them

8    or Jody's mom abandoned him, so the children were

9    constantly faced with abandonment, not only of men,

10   but then of the mother who would go away for periods

11   of time.  They were also moved around through a lot

12   of schools, so there was not a sense of constancy

13   there.

14         Q      Now, what if any information did you

15   discover about any onset of substance abuse by Jody?

16         A      Well, Jody stated pretty clearly that he

17   started drinking too much when he was like thirteen

18   or fourteen.  That was the time when they had moved

19   to Delaware and the mother was staying at another

20   house.  He said he would drink to get drunk.  He said

21   he would hide it from his mother.  He said he still

22   hides it from his mother.  He didn't like other

23   drugs.  He wasn't -- he denied using heroin, but it

24   seems as though alcohol was something that was used

25   fairly regularly, socially and otherwise, in the

1    family.

2        Q     Now, if you will, before we get to the

3    question of present assessment, can you deal with and

4    explain to the ladies and gentlemen of the jury the

5    developmental task you consider important for these

6    early stages in the family and how and why these were

7    interfered with, if at all, by this family pattern

8    that you observed?

9        A     Okay.  Before kids get into preschool, or

10   before they go into school one of the most important

11   things for them to have is a sense of trust and

12   constancy, especially with their mother or a parent

13   of some sort. If that step supposedly is not

14   achieved, it's difficult for them to move on.  What

15   any parent of a young child has to do is put aside

16   their own needs, constantly, and cater to the needs

17   of the child.  It just necessarily has to happen many

18   times, and it has to be fairly consistent.  This did

19   not happen in Jody's family.  Once they get into

20   school, a child's needs then have to do with

21   mastering and feeling good about themselves and

22   thinking that they're smart and they can do things

23   well and get their teacher's attention, and also that

24   they have a peer group of buddies that's good friends

25   and their group.  Again in Jody's case he had neither

1    of these.  There was an incident that was in the

2    school report when he was nine about how they

3    discovered that he couldn't see the blackboard, that

4    his vision was very poor.  In the records it reports

5    that he was given a pair of glasses and within two or

6    three weeks he lost the pair of glasses, which is

7    fairly standard behavior for a nine year old boy.

8    They were never replaced.  He never got glasses again

9    until he was an adult, so his ability to do well was

10   hampered, and he also, no one in this family talked

11   about friends.  No one ever talked about buddies or

12   pals or people that they did things with, other than

13   the family.  When you're a teen-ager, what is very

14   important for teen-agers is that they be able to test

15   out their identity and see who they are, but also

16   have pretty strong limits that are consistent and

17   learn the consequences of their behaviors.  At the

18   point that Jody was a teen-ager there was nobody

19   there more mature than him who was able to set limits

20   on his behavior, hold him accountable.  He ran away.

21   He was a petty thief.  And all of this, the mother

22   would complain about, and would be unhappy and would

23   say Jody you're doing to hurt me.  Again her

24   reference was her and not him, so in each of these

25   stages the things we would hope any child would have,

1    he didn't have.

2         Q     Now based on the information that you were

3    able to develop, is there any one person who is the

4    most significant person for Jody in his life?

5         A     Probably his mother.  And that is

6    ambivalent.  When I would talk with him about his

7    mother, one time that I saw him get emotional, the

8    one time that I saw him be a little bit upset was

9    when he was talking about a time his mother was

10   hitting him with a coat hanger, so that in some ways

11   he resents her and sees how she abused him or the

12   kids, or men.  On the other hand, he is still very

13   much wanting to please her, feels protective of her,

14   wants her acknowledgment and feels sort of bonded to

15   her.

16        Q     And what if anything significant did you

17   find in Jody's relationship with women in general?

18        A     Well, you mean then or now?

19        Q     Now?

20        A     Now.  Like I said, he is able to meet

21   women.  He is able to attract women and he likes to

22   be with women.  But he is not able to sustain a long

23   term relationship.  Most of his relationships with

24   women are based on some sort of notion of being taken

25   care of or he taking care of them and I am not sure

```
1    he has a clear idea of what that is.  He doesn't
2    report any relationships with male friends or
3    buddies.
4          Q    Now, were you able, as a result -- well,
5    excuse me, let me step back.  In all of your
6    interviews with everyone you talked to did anyone
7    report Jody being assaultive or violent?
8          A    No.  They would say he could be moody,
9    particularly if he had drank, but, no.  They said he
10   was probably the more gentle of the kids in the
11   family.
12         Q    And, ma'am, after reviewing everything,
13   and all of your interviews were you able to arrive at
14   a present assessment of Jody, as part of your
15   psycho-social assessment?
16         A    Yes.
17         Q    Would you please tell the ladies and
18   gentlemen of the jury what your present assessment
19   is?
20         A    Socially, Jody has a sort of impaired view
21   of himself.  In one regard he sees himself as a
22   loser, as someone who will never have much in life,
23   on the other hand he sees himself as fairly well
24   liked, which doesn't seem consistent.  His problem
25   solving doesn't seem real effective.  Like his mother
```

1    he responds in an crisis by trying to fix the

2    problem.  He appears easily swayed.  There is some

3    notion that he in the family was the one who would

4    sort of take the blame for things, and in trying to

5    please people would go along with stuff.  He has no

6    work skills.  I haven't -- didn't see too much of an

7    example of him being able to sustain real work

8    skills.  He tended to not work at places very long

9    and most of his work is menial.  His view of himself

10   is -- I don't know, he -- it's a sort of an inflated

11   sense of himself in some ways and in other ways a

12   sense of himself as being lost and kind of floating

13   around.  He doesn't have strong connections with

14   anybody, other than his sisters and his brother, and

15   even then he sees them for four to five times a year.

16   He does have relationships with women, but none of

17   them seem to be sustained either.  I'm not sure he

18   always knows what is the appropriate thing to do.  He

19   often times knows the appropriate thing to say.  He

20   knows how to be charming, but I am not sure he knows

21   about responsibility or how to have an effective

22   interaction with people.

23       Q    Do you find in any way that he is a mature

24   individual?

25       A    No, I feel that he is immature, if you use

1   the definition of maturity as being someone who can

2   delay gratification, who can make decisions based on

3   what is best for themselves, he is an immature

4   person.  His relationships appear shallow.  And his

5   problem solving or his focus and his goals seem

6   non-existent.

7          Q    Ma'am, were you able to discover anything

8   of significance in terms of any early tragedy in his

9   first marriage that might have had an effect on Jody?

10         A    He was married at 16.  Dropped out of high

11  school.  There was a couple things that happened.

12  There was a child that was born, and then there were

13  twins that were conceived and about the fifth or

14  sixth month in that pregnancy the twins were

15  miscarried.  When Jody reported this incident to me

16  he took the blame.  He felt -- well, what happened

17  was he felt that the miscarriage was caused because

18  that he was backing the van out of the driveway and

19  it was hit.  When I talked with his first wife she

20  said it wasn't Jody's fault that that had happened,

21  but his view was that it was his fault.  Those babies

22  were buried, they were given a burial, and he has

23  talked about that to me in interviews, about the

24  twins, what that meant to him.  He also, that first

25  child, he gave up for adoption, and he has expressed

1    regrets over that.  That was because he could not or

2    did not make the child support payments.

3         Q    And, Ma'am, have you been able to arrive

4    at any conclusions or assessments in terms of Jody's

5    response to structure imposed on him from outside?

6         A    I'm not sure Jody has ever had structure

7    imposed on him from the outside.  He appears a

8    relatively passive person, he was described at

9    fifteen as a follower, I think he still is a

10   follower.  No structural institution other than the

11   detention facilities that he's been in, has there

12   been external structure for him.  There wasn't in the

13   family, there wasn't in the school system.  I think

14   someone like Jody would find structure helpful.  He

15   would respond to it.  He wouldn't challenge it,

16   particularly.

17        Q    Ma'am, again, referencing Defense Exhibit

18   2 for identification, does that report fairly and

19   accurately represent your factual and assessment

20   findings?

21        A    Yes, it does.

22        Q    And is that report similar in scope and

23   concept to the kind of psycho-social assessments you

24   do professionally as a social worker?

25        A    Yes, it is.

```
 1        Q      And again, I may have asked before, but
 2   does Defense Exhibit 16 fairly and accurately
 3   represent your professional curriculum vitae?
 4        A      Yes, it does.
 5             MR. SAUNDERS:  At this point I would move
 6   in Defense Exhibit Number 2 and Defense Exhibit 16,
 7   Your Honor.
 8             MR. RUARK:  No objection, Your Honor.
 9             MR. SAUNDERS:  Your Honor, we have no
10   other questions.
11             MR. RUARK:  Thank you, Your Honor.
12                    CROSS EXAMINATION
13   BY MR. RUARK:
14        Q      I noticed when you were talking about
15   interviewing individuals that -- correct me if I am
16   wrong, you did not speak with Tom Corder directly?
17        A      No, I did not interview Tom Corder.
18        Q      Did you attempt to interview Mr. Corder
19   since he seemed to be the only male with significant
20   influence within the defendants life?
21        A      No, sir, I didn't.
22        Q      Did you interview Carrie Cooper for
23   preparation of this report?
24        A      No, I did not.
25        Q      Or her father, Mr. Cooper?
```

1          A     No, I did not.

2          Q     Now you had made mention of the

3    defendant's brother, did you interview the brother?

4          A     No.

5          Q     When was the last time that you

6    interviewed Jody Miles himself for the report that is

7    being presented to the Court, if you recall?

8          A     Can I look?

9          Q     Yes ma'am?

10         A     October, 97.

11         Q     Now I believe he graduated from Sussex

12   Central High School is that correct, or is that your

13   understanding?

14         A     It is unclear whether he graduated or not.

15         Q     Were there any attempts made to interview

16   any of his teachers?

17         A     No.

18         Q     For purposes of this assessment?

19         A     No.

20         Q     To clarify, I believe you made mention

21   that only time the defendant showed any emotion at

22   all was on an occasion he was speaking about his

23   mother?

24         A     Yes, sir.

25         Q     Other than that he presented himself as

1  very calm, matter of fact, that type of demeanor in

2  his discussions with you is that correct?

3      A    I wouldn't say matter of fact.  I mean he

4  would smile or he would be unhappy -- I mean he had

5  the sort of normal range of feelings.  But sometimes

6  when we were talking about things that to me sounded

7  fairly upsetting, he was not upset.

8      Q    I believe you went on to discuss that he

9  could be charming and he could seem to know what to

10 say, but there's a portion in here in your report

11 where you indicated that it's difficult to know what

12 he is actually thinking and feeling?

13     A    Mm-hmm.

14     Q    Is that your impression based on the four

15 or five occasions that you had to speak with him?

16     A    Yes, sir.  But, at the time he was saying

17 something, there were times I was not clear if he

18 really meant that or if that was how he wanted things

19 to appear.

20     Q    Now you further indicate in here that it

21 was your belief that his mother was manipulative is

22 that correct?

23     A    Yes.

24     Q    What does manipulative mean, please?

25     A    His mother -- he'll talk about it in terms

1  of particularly, with me, his mother wanted me to

2  like her.  She wanted me to see the dilemmas and the

3  hard times that she had and she would very much

4  present information to me presenting to me that

5  message.

6        Q    And as what you have characterized roughly

7  as the strongest force in his life, would you also --

8  would it be your belief as a result of his mother

9  that this defendant may also be manipulative in some

10 fashion?

11       A    Jody is not as good at it as his mother

12 is.  He, I would -- he didn't -- I did not feel that

13 he was consciously trying to manipulate me, sometimes

14 when I wasn't clear what he was thinking or feeling.

15       Q    It was just difficult for you to know what

16 he was thinking?

17       A    Right.

18       Q    Or what he was feeling about any topic?

19       A    Right.  Where the mother I felt it was

20 more conscious and focused and in an attempt to get

21 me to like her, to empathize with how hard it was for

22 her, and it was hard.

23       Q    Now you also indicated that the defendant,

24 as a result of I guess in lay terms, had a lack of

25 maturity, was unable to or was not willing to delay

1   gratification, is that correct?

2       A   Well, he doesn't see -- -- that to me is a

3   sort of generalized thing for immaturity, which is

4   someone who can not put somebody else's needs in

5   front of their own.  I'm trying to think of a

6   specific example where I felt that Jody was like

7   that.

8       Q   I don't want to put words in your mouth,

9   but essentially he puts himself first or what he

10  wants first, above what others may need, is that

11  correct?

12      A   I would -- I would say that he's probably

13  done that with the women he's been involved with.  He

14  does not do that with his mother.

15      Q   Let's put aside his mother and talk about

16  his other relationships?

17      A   Okay.

18      Q   In the issue of delayed gratification,

19  putting aside his mother, would the level of

20  immaturity that you see in this defendant lead you to

21  believe that he is either unable to or not willing to

22  delay gratification for himself?

23      A   The two places where I most see Jody going

24  after what he wants, are either in terms of alcohol,

25  or a relationship with a woman.

1      Q    Now, I believe one of the individuals that

2  you did interview for this report was Lisa Hopkins,

3      A    That is right.

4      Q    His sister, and there is one portion of

5  this report, I believe under the section dealing with

6  substance abuse history, where you indicated his mood

7  would become quiet and no one in the family reported

8  his behavior changing to aggression or violence.  I

9  believe that is as I indicated under substance abuse

10  history?

11      A    Right.

12      Q    Okay, my understanding from that, and you

13  please correct me if I am wrong, is that no member of

14  the family or any other person that you interviewed

15  indicated that he became more aggressive after he had

16  been drinking?

17      A    Right.  I didn't get any information

18  regarding that he was aggressive after drinking.

19      Q    That is, opposed to becoming argumentative

20  your information was that he would become quiet?

21      A    Moody.  Moody was one word that was used.

22  I think Missy, used that word.

23      Q    And Missy is?

24      A    One of his sisters.

25      Q    Do you know where Missy Burner

1   (phonetically) resides, please, or where did you meet

2   with her, let me ask you that?

3          A     I met with her where she works.

4                MR. RUARK:  Your Honor the State has

5   nothing further of this witness.

6                MR. SAUNDERS:  If I can have a moment,

7   Your Honor.  (Pause)  We have no questions, Your

8   Honor.

9                THE COURT:  I have one.  Where did you get

10  the report that he was -- his decisions were

11  disorganized and self destructive, he was described

12  as follower, one report commented on the state of

13  his --

14               THE WITNESS:  Yes, sir, that was in the

15  Middleton -- I'm sorry that was the juvenile

16  detention one, the Delaware Department of Social

17  Services for children.  Milton Medical Associates did

18  a psychological study of Jody for the Delaware

19  Department of Social Services.

20               THE COURT:  All right, thank you.  You may

21  step down.  Thank you very much.

22               MR. SAUNDERS:  Your Honor, our next

23  witness is unavailable until tomorrow morning.  My

24  apologies.

25               THE COURT:  All right.  That's fine.

1   9:30?

2           MR. SAUNDERS:  9:30, Your Honor, he's been

3   told to be here at 9:30.

4           THE COURT:  Anything else we can do?

5           MR. SAUNDERS:  Unless Your Honor wants to

6   discuss instructions.

7           THE COURT:  Tell me how many more

8   witnesses do you have?

9           MR. SAUNDERS:  I have one witness.

10          THE COURT:  I see.  Do you have any

11  rebuttal?

12          MR. RUARK:  There is only a very small

13  possibility of one rebuttal witness, and that would

14  be very brief.

15          THE COURT:  All right.  So this means

16  we'll finish tomorrow.  You are excused.  Thank you

17  very much.  No one leaves the jury room until the

18  jury has left the Courthouse, please.

19          (Whereupon at 2:55 the jury was excused

20  for the day.)

21          THE COURT:  Now, what does everyone have

22  if mind in the way of instructions?  The Micpel ones,

23  once again, seem pretty complete.  Without reading

24  these word for word, are they pretty much the Micpel

25  once or.

1          MR. SAUNDERS:  Your Honor, with regard to

2  that which was submitted by the State, our only

3  objection is to the State requesting instruction

4  number 2, we would simply request that the

5  instruction you gave on robbery before, the Micpel

6  instruction be given.

7          THE COURT:  Number 2?

8          MR. SAUNDERS:  Yes, Your Honor, number 2.

9  It's titled robbery.

10          THE COURT:  Why?  I mean is there any

11  dispute about that?

12          MR. SAUNDERS:  Your Honor I'm not arguing

13  one way or the other, I'm just asking for a Micpel

14  instruction as opposed to the one that is there.

15          THE COURT:  Well, the Micpel instruction I

16  think permits us to tell the jury to disregard all

17  except one, does it not?  I mean I don't even know

18  that there's really any doubt about it.

19          MR. VINCENT:  We included -- the robbery

20  instruction makes reference to notice of the death

21  penalty instruction and makes reference to the

22  specific crimes that are included in the aggravated

23  circumstances.  Or as a refresher --

24          THE COURT:  I certainly don't want to do

25  anyone a disservice, but I don't think that at this

1   point that the jury is going to have a really complex

2   time figuring out what robbery is.  Do you really

3   think we need to define it again?

4             MR. SAUNDERS:  Your Honor, in an abundance

5   of caution, I do believe we do in that, if you will,

6   in order to be consistent,  which I'm not always

7   consistent, is I have always argued that the trier of

8   fact at this stage must reconsider the issues and

9   it's still an open question to be decided.  The fact

10  that it's been determined before is not conclusive

11  per se.  For example, the standard of proof in a

12  sentencing is different, and conceivably evidence

13  that didn't come in in the guilt-innocence could come

14  in at sentencing and the jury could in fact find that

15  the State didn't prove the aggravator of robbery.

16  Even though there was a conviction.  Now I know

17  that's unusual, it hasn't happened yet in Maryland,

18  but it's conceivable that it could happen.  What I do

19  know --

20            THE COURT:  Impeach it's own verdict?

21            MR. SAUNDERS:  Not impeach its own

22  verdict, simply find an inconsistency with what it

23  found before with its finding here.  But we're

24  probably arguing a bit of esoteric a now, in that I

25  have not introduced evidence to impeach robbery, and

1     I recognize that.

2           THE COURT:  Well, if we do that, then, you

3     see, then we're going to have to put something in

4     about principal in the first and second degree.  I

5     mean this could take us on forever.  But, anyway --

6           MR. SAUNDERS:  Your Honor with regard

7     to -- I have three requests from the Micpel

8     instructions and I have two non-Micpel instructions.

9     From Micpel we request a definition of beyond a

10    reasonable doubt since that is one of the standards

11    used.  We would also ask for a definition of

12    preponderance of evidence, in that that is also a

13    definition used.  And finally we would ask for the

14    Micpel instruction on experts in that we will have

15    presented two experts in the course of our case.  And

16    finally, I believe Your Honor has a copy of it, I

17    have another copy I can provide Your Honor, which is

18    that we have requested two additional jury

19    instructions.  I have put them on one sheet titled

20    jury instructions mercy, and jury instruction

21    acquittal of premeditated, with citations to the case

22    law.  With the Court's permission, I'd ask that I

23    could give one copy of this to the clerk to mark for

24    the record, at this point.

25          THE COURT:  Of what, the instruction?

1              MR. SAUNDERS:  The requested non-Micpel

2    instructions.

3              THE COURT:  I'd already written on the

4    other one, your letter, that it was filed with me

5    yesterday.  I hadn't laid that on you.  Here you are.

6    But I've noted that it was filed.

7              MR. SAUNDERS:  Does Your Honor have this?

8              THE COURT:  What?

9              MR. SAUNDERS:  The two jury instructions?

10             THE COURT:  I do, indeed, and I even

11   have -- you don't want to introduce the case law, do

12   you?

13             MR. SAUNDERS:  No, Your Honor, the case

14   law was for your purposes and the State's.

15             THE COURT:  Otherwise, the Court of

16   Special Appeals or Court of Appeals might not like

17   it.  The Court of Special Appeals because the Court

18   of Appeals obviously won't like it.  Do you have any

19   problem with the mercy?

20             MR. VINCENT:  Judge, we're familiar with

21   the cases.  Based on that we have no objection.

22             THE COURT:  Didn't think it was going to

23   be that easy, did you?  How about the -- what do you

24   think about the other?

25             MR. VINCENT:  Unfortunately, we have

1      reviewed the case law which Mr. Saunders provided us

2      with, a copy of the Brooks --

3               THE COURT:  This isn't a binding question.

4               MR. VINCENT:  Well, that is true, it's not

5      a Court of Appeals decision, and actually the facts

6      in Brooks are different than the facts here, because

7      in Brooks the jury found the defendant not guilty of

8      premeditated and not guilty of first degree murder.

9      There's an difference clearly in the facts in this

10     case.  The Court of Special Appeals did say the

11     mitigating circumstance must include the fact of

12     acquittal.  I would say that I think perhaps the

13     wording, and I understand that the Court of Special

14     Appeals used the term must, I think it should be

15     clarified, is not a matter that they must count that

16     as a mitigating circumstance, but they need to

17     consider that a mitigating circumstance.  Because

18     actually it listed it under 8 on the form, they are

19     only listing it if it's unanimous or if at least one

20     of them finds it to be a mitigating circumstance,

21     they are required to make that finding.

22               THE COURT:  This really fails to take full

23     account of the human experience, which is that

24     confronted with a situation of felony murder, making

25     a decision with regard to that, which is relatively

1   simple, as compared to premeditated, and I think that

2   most judges would take that route, just for that

3   reason.   I mean I'm not sure that this -- that ipso

4   facto this means that there's no premeditation.   From

5   time immemorial, jury compromises and various things

6   that juries do have been upheld by the Court, so,

7   anyway, I'm not terribly enamored of this opinion,

8   which probably means it's dead right.   Well, in the

9   context of that opinion, wouldn't it be more likely,

10  wouldn't it be more appropriate to say that if you

11  find the killing was not premeditated or was not

12  committed with a specific intent to kill or inflict

13  grievous bodily harm, then you must consider that to

14  be a mitigating factor.   Now, let me also tell you

15  that this is -- indeed, but an extension of Mr.

16  Saunders's statement, that the whole issue can be

17  revisited.   Just as they might find that there is no

18  felony murder, they might well find, after they hear

19  the rest of it, that it was indeed premeditated.

20          MR. SAUNDERS:  Obviously, a point I had

21  not considered.

22          THE COURT:  Well, let's think about that

23  overnight and we'll discuss it in the morning,

24  because I dare not go further.   I have gone much too

25  far without my law clerk having told me what I am

1   supposed to think, and he's going to chastise me, I

2   can see his head bobbing down there, right now.   How

3   am I doing so far?   The county pays him to save me

4   from myself.   Isn't that what you have told me?

5          MR. STANLEY:   No, sir.

6          THE COURT:   Anything else we can do

7   tonight, my friends?

8          MR. SAUNDERS:   No, Your Honor.

9          (Whereupon, at 3:15 p.m., the proceedings.

10  were recessed.)

11

12

13

14                  CONCLUSION

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2                         CERTIFICATE

 3

 4        I, ANNE W. BOND, COURT REPORTER TO THE CIRCUIT

 5   COURT FOR QUEEN ANNE'S COUNTY, DO HEREBY CERTIFY THAT

 6   THE FOREGOING TRANSCRIPT IS A TRUE AND ACCURATE

 7   RECORD OF THE PROCEEDINGS CONDUCTED IN THE CAPTIONED

 8   CASE IN THE CIRCUIT COURT FOR QUEEN ANNE'S COUNTY

 9   THE 17TH DAY OF MARCH OF 1998, HAVING BEEN REDUCED

10   TO WRITING FROM MY STENOGRAPHIC NOTES.

11

12

13

14

15                         _____

16

17                              ANNE W. BOND

18

19

20

21

22

23

24

25
```