JODY LEE MILES                    *    IN THE CIRCUIT COURT FOR

                                    *

VS.                               *    QUEEN ANNE'S COUNTY,

                                    *    MARYLAND

STATE                             *    CRIMINAL CASE NO. 4789PC

                      *    *    *    *    *    *    *

        The following is a transcript of the Post-conviction Hearing in the above matter held on June 22, 2006 in the Circuit Court for Queen Anne's County, Maryland before The Honorable J. Frederick Price.

                    VOLUME I

       APPEARANCES:

       For the Petitioner:

             Fred Warren Bennett

             Erika Alsid Short

             Ranak K. Jasani

       For the State:

             Davis R. Ruark

             Sampson G. Vincent

             Ann Bosse

Melinda S. Kelley
Official Court Reporter
Kent County Circuit Court
103 N. Cross Street
Chestertown, MD 21620



COPY

PENGAD • 1-800-631-6989 • www.pengad.com

LASER BOND FORM B

1-2

# TABLE OF CONTENTS

Opening Statements:

        By Mr. Bennett                          1-7

        By Mr. Vincent                         1-23

        By Mr. Bennett                         1-33


PETITIONER'S WITNESSES:

| | | |
|---|---|---|
| Levin Pennewell | Direct-Mr. Bennett | 1-35 |
| | Cross-Mr. Vincent | 1-39 |
| | Redirect-Mr. Bennett | 1-41 |
| Robert Johnson | Direct-Bennett | 1-42 |
| | Cross-Ms. Bosse | 1-55 |
| | Redirect-Mr. Bennett | 1-63 |
| | Recross-Ms. Bosse | 1-66 |
| | Examination-The Court | 1-66 |
| Fayetta Downes | Direct-Ms. Jasani | 1-68 |
| | Cross-Mr. Ruark | 1-74 |
| | Redirect-Ms. Jasani | 1-80 |
| | Recross-Mr. Ruark | 1-81 |
| Steven Bailey | Direct-Ms. Jasani | 1-83 |
| | Cross-Mr. Vincent | 1-89 |
| | Redirect-Ms. Jasani | 1-102 |

PENGAD • 1-800-631-6989 • www.pengad.com

LASER BOND FORM B

1-3

TABLE OF CONTENTS

(Continued)

PETITIONER'S WITNESSES(continued):

| | | | |
|---|---|---|---|
| Thomas Saunders | Direct-Mr. Bennett | 1-104 |
| | Cross-Mr. Vincent | 1-200 |
| | Redirect-Mr. Bennett | 1-214 |
| Archibald McFadden | Direct-Mr. Bennett | 1-231 |
| | Cross-Mr. Vincent | 1-248 |
| David Wood | Direct-Ms. Jasani | 1-250 |
| | Cross-Mr. Vincent | 1-259 |
| | Redirect-Ms. Jasani | 1-264 |

PETITIONER'S EXHIBITS:          ID                    EV

| | | ID | EV |
|---|---|---|---|
| 1 | Detention Center records | -- | 1-7 |
| 2 | Curricula Vitae Dr. Johnson | 1-43 | 1-43 |
| 3 | Certified copy of docket | 1-130 | 1-131 |
| 4 | Partial transcript | 1-164 | 1-181 |
| 5A&B | Phone records | 1-178 | 1-181 |

STATE'S EXHIBITS:             ID                    EV

| | | ID | EV |
|---|---|---|---|
| 1 | Photograph | 1-94 | 1-99 |
| 2 | Diagram | 1-96 | 1-99 |
| 3 | Photograph | 1-96 | 1-98 |
| 4 | (w/drawn) | | |
| 5 | List of witnesses | -- | 1-210 |

1-4

1   PROCEEDINGS

2       THE COURT:  We have before us today the case of

3   Jody Lee Miles versus the State of Maryland.  This is

4   actually in the Circuit Court for Queen Anne's County.  It's

5   being heard in Kent County because it was assigned to this

6   Judge, and it's easier, quite simply, to schedule matters

7   here than it is to schedule in another county.  So it is

8   Queen Anne's County Criminal Case 4789, a Petition for

9   Post-conviction Relief.  And Mr. Bennett, you represent the

10  Petitioner?

11      MR. BENNETT:  Well, I do, along with two other

12  attorneys.

13      THE COURT:  Very well then.

14      MR. BENNETT:  Want to identify yourself for the

15  record?

16      MS. JASANI:  Sure.

17      Good morning Your Honor.  Ranak Jasani representing

18  Mr. Miles.

19      MS. SHORT:  Good morning Your Honor.  Erika Short.

20      MR. BENNETT:  And, of course, the Petitioner is

21  present.  Let...let...let me indicate, Your Honor, that the

22  other two attorneys were appointed both by the Capital

23  Defense Division and the United States District Court from

24  the District of Maryland because the practice now is you

PENGAD • 1-800-631-6989 • www.pengad.com

LASER BOND FORM B

1-5

1    appoint counsel, so to speak, for the long haul if relief is

2    not granted at the Circuit Court level, which would mean...

3    long haul meaning Federal Court, too.

4             THE COURT:  Okay.  Mr. Ruark.

5             MR. RUARK:  Your Honor, if I might, Davis R. Ruark,

6    State's Attorney for Wicomico County, along with Sam Vincent,

7    Deputy State's Attorney for Wicomico County.  And with us

8    today is Ann Bosse, who is an Assistant State's Attorney for

9    Prince George's County.  And if I might approach the bench,

10   by order of The Honorable Donald Davis of the Circuit Court

11   for Wicomico County, she has been appointed Assistant Counsel

12   for the State of Maryland for Wicomico County for this

13   hearing.  May I approach?

14             THE COURT:  You may.

15             Mr. Bennett, has Counsel for the Petitioner seen

16   everything?

17             MR. BENNETT:  Yeah, we have seen it.  We have no

18   objection.

19             THE COURT:  Very well then.

20             MR. RUARK:  Thank you, Your Honor.

21             THE COURT:  Thank you.

22             Very well.  Are we ready to proceed today?  This

23   matter has been before the Court on previous occasions and,

24   for various reasons, has been continued, partly to...part of

1-6

1   it has been for...counsel has been required to withdraw at

2   times, and we have had new counsel come in.  Everybody has

3   been brought to speed.

4         Are we ready to proceed with the hearing today?

5         MR. BENNETT:  Yes, we are.

6         THE COURT:  I am going to address you, Mr. Bennett.

7   You are the lead chair.  So, I mean, I am not going to --

8         MR. BENNETT:  That's...yes.  Yes.  Yes.  We are

9   ready.

10        THE COURT:  Okay.  Mr. Vincent.

11        MR. VINCENT:  State is ready, sir.

12        THE COURT:  Very well then.

13        MR. VINCENT:  Thank you, sir.

14        MR. BENNETT:  Brief opening statement, please.

15        THE COURT:  Any...any preliminary matters prior to

16  opening statements?

17        MR. BENNETT:  We just want to have one document

18  marked at this time - we have already checked with the State

19  - for identification, because we are going to use it on our

20  second witness, but it will be out of sequence.

21        THE COURT:  Okay.

22        MS. JASANI:  Your Honor, may I approach?

23        THE COURT:  You may.

24        MS. JASANI:  I would like to...wish to introduce

1-7

1    this at this time as Defense's Exhibit 1.

2            THE COURT:  Any objection?

3            MR. VINCENT:  Is that the Caroline County --

4            MS. JASANI:  Yes, it is.

5            MR. VINCENT:  We have no objection.  We received a

6    copy, sir.  Thank you.

7            MS. JASANI:  Thank you, Your Honor.

8            THE COURT:  It's...we are going to refer to

9    Defendant...with the exhibits, the Defendant is the

10   Petitioner.

11           MR. BENNETT:  Right.

12           THE COURT:  So --

13           MR. BENNETT:  That's really what he is in a

14   post-conviction case.

15           THE COURT:  So that's admitted.  That's Number 1.

16                               (Detention Center records

17                               were marked as Petitioner's

18                               Exhibit No. 1 and received

19                               into evidence.)

20           MR. BENNETT:  Alright.  Thank you, Your Honor.

21           I am sure Your Honor has reviewed this case

22   thoroughly.  We have...you have in front of you a total of

23   actually four different pleadings on behalf of the

24   Petitioner.  That would be the original petition filed by Mr.

1-8

1    Kanwisher before I got into the case after he had heart

2    problems.   The second pleading is a supplement to the

3    Petition for Post-conviction Relief that we filed on or about

4    December 23, 2005 after I got into the case.   And the last is

5    a single additional issue second supplement to petition which

6    I filed in early January of 2006.   And last is a pro se

7    addendum to the Petition for Post-conviction Relief, which

8    raises a single issue, a <u>Brady</u> claim, in regards to certain

9    documents in the possession of the brother of the deceased

10   involving toll records where the brother allegedly changed

11   the billing address and records from the Defendant's home

12   address to the petition...to the brother of the victim's

13   business address.   And so, for a number of months thereafter,

14   the Defendant's toll records went not to the Defendant but to

15   the brother of the victim at the brother's business address

16   called Atkinson Trucking Company.   And the proffer on that

17   would be that Mr. Saunders and Mr. McFadden did not have

18   those records prior to trial, and they would have, at a

19   minimum, been able to be used for impeachment of the brother

20   as to what he had done without the consent of the Petitioner

21   and, really, without the knowledge of the State.

22           Now, in the first petition, which is the lengthiest

23   pleading, I indicated to you, and I reviewed it with my

24   client, and so we can perhaps take up briefly some

1-9

1  housekeeping work, and that is, I think - I assume you

2  received my fax?

3          THE COURT:  Correct.

4          MR. BENNETT:  Very good.  And I wanted to do that

5  so we could narrow the issues in the hearing and...hearing

6  here today.  We will not be proceeding on Count 1, Paragraph

7  27, Issues E and F.  They are abandoned and withdrawn.

8          THE COURT:  Those are the failure to investigate

9  and present exculpatory facts and --

10          MR. BENNETT:  Well, failure to investigate physical

11  evidence.

12          THE COURT:  Okay.  And alternate suspects.

13          MR. BENNETT:  Yes.

14          THE COURT:  Okay.

15          MR. BENNETT:  Alright.  Count 3, the notation

16  should be...and we would ask it be as part of any opinion

17  that that's preserve for federal habeas but not basis for

18  relief in State court under Borchard v. State and Oaken

19  versus State.  In other words the highest courts of our...our

20  state, which you would be bound by, have ruled against the

21  Petitioner on that, but that he has raised it and has

22  preserved it for federal habeas.  Count 4, Count 5, preserved

23  for federal habeas but raised on direct appeal and so,

24  obviously, Your Honor can't re-litigate, or we can't

1-10

1    re-litigate that.  And Count 6 through 12, the same thing.

2    Counts 6 through 12, which would go from Page 15 through 22

3    of the Petition, preserve for federal habeas but raised on

4    direct appeal.  Count 13 remains.

5         Alright.  Now, addressing those issues that remain

6    - and the issues begin on Paragraph 27 on Page 7 of the

7    Petition - our evidence will show, Your Honor, that, of the

8    total number of veniremen in this case, the vast majority

9    were asked questions that had been granted by the court and,

10   actually, was a question submitted by the Defense, "Would any

11   of you give more weight to the testimony of a police officer

12   than that of an ordinary citizen?"  However, one group of

13   eleven were not asked that question.  The trial court

14   specifically called Mr. Saunders' attention to that, and Mr.

15   Saunders said, on the record, "We don't care or want that

16   question to be asked."  This was after all of the other

17   jurors had been asked that question.  Four of the jurors...

18   prospective jurors that were not asked that question sat on

19   this jury, and the evidence that we will present will

20   indicate that there was no downside risk in having that

21   question asked, because it is a pro-defendant-type question

22   to the extent that an answer would indicate that they would

23   in fact favor the testimony of a law enforcement witness,

24   especially in a case in which there is a statement by the

1-11

1   defendant taken by law enforcement witnesses and a number of

2   other law enforcement witnesses dealing with physical

3   evidence.  If Mr. Saunders testifies that that was a tactic,

4   our request to the Court will be that it was unreasonable

5   tactic.  If it was an oversight, our argument will be that it

6   was an egregious oversight to do that on a...in a death

7   penalty case on a voir dire.  It's one of the standard most

8   important questions, sanctioned directly by Maryland Law,

9   <u>Langley versus State</u>.

10         Number B deals with voir dire, also.  You will have

11   an opportunity to read about eleven pages of a voir dire of

12   Lynn Benjamin.  She was one of the jurors who was asked that

13   question, and was asked a number of questions in the area of

14   the death penalty.  Mr. Saunders did challenge her for cause

15   and it was denied.  Your Honor will have an opportunity to

16   read those eleven pages yourself.  And our position on that

17   would be that no reasonably competent, well, that no trial

18   court reading that transcript could come to the conclusion

19   that she was not a biased witness in favor of the State, or

20   biased juror.  I am not...we are not arguing here that Mr.

21   Saunders failed to protect the record on that, but what he

22   did then later was he only used eighteen challenges and not

23   twenty, thereby not protecting the record for appellate

24   review, because you have to use all twenty peremptory

1-12

1   challenges to raise on appeal the denial of a challenge for

2   cause.  He used eighteen.  And the record will show that the

3   State had used eight at the very time.  So the most that he

4   had to lose was that the jury could - excuse me - that the

5   State could get two...two additional, so to speak, peremptory

6   challenges if he used his other two. The State would have two

7   more.

8          The third is his cross examination of Jonah Miles.

9   We will show you from the cross examination that he

10  conducted, which is all of one page of the trial transcript -

11  this is Number C - a one page cross examination of one of the

12  key State's witnesses, what he did ask and what he failed to

13  ask, including the failure to use the docket entries in her

14  case in Wicomico County to show bias in front of the jury and

15  ask her any questions on cross in regard to the fact that she

16  waived her marital privilege and voluntarily testified

17  against the Defendant so that she could ingratiate herself to

18  the State for a later negotiated plea bargain, for which she

19  received probation.  She had an outstanding charge at the

20  time as a...of accessory after the fact to murder.

21          Issue D deals with the leg irons and shackles.  He

22  did bring it to the attention of the court.  He did move for

23  a mistrial.  When the mistrial was denied, he asked the court

24  ...did not ask the court to voir dire the individual members

1-13

1  of the juror...jury.  And the evidence suggests that a large

2  majority, if not all twelve, saw it.  No individual voir dire

3  requested.

4        G, which is on Page 9, inconsistent theory of the

5  case.  Well, we will point Your Honor to his opening

6  statement and contrast that with his close.  His opening

7  statement is six pages, the record will show, of nothing.

8  There is not one fact that he utters in his opening

9  statement.  It's all about the jury system.  Nothing about

10 the case or about a theory of the Defense.  I believe he is

11 going to testify that he was trying to leave his options

12 open, but this was a statement/confession case.  He knew what

13 the State's case was.  He knew what his theory of the case

14 was. He didn't even have to indicate, we will show, that the

15 Defendant was or was not going to testify.  To give an

16 opening statement with utterly no content, we have case law,

17 is ineffective assistance of counsel by itself.  Then, on

18 closing, he did give an argument in regards to second degree

19 murder and robbery afterthought, which would mean no felony

20 murder - second degree murder separately and robbery

21 afterthought, under the new <u>Allen</u> case, which would have also

22 gotten second degree murder by a different route.  But

23 neither of those were mentioned in opening.

24        During the...under H, the State did not call Steve

1-14

1    Bailey to the stand, even though he was subpoenaed.  And the

2    record will show that he was here at least two or three days

3    - well, at the trial, not here.  Steve Bailey lived near the

4    scene of the crime.  Steve Bailey had facts and evidence that

5    a second person was present, a woman.  The State never

6    presented that.  The Defendant didn't present it in their

7    case in chief.  And more importantly, after he was convicted,

8    for sentencing purposes, the State never presented it, which

9    would have been at least a showing to the jury that the case

10   ...that the presence of that other female was inconsistent

11   with the State's theory of the case that it was a cold

12   blooded murder only by the Defendant with nobody aiding and

13   abetting him.  And he wasn't called.

14         I, this is sentencing phase, mitigating evidence,

15   failure to provide.  That's I and J really together.  It

16   deals with correctional officers, correctional records, and a

17   number of family members were never called.  Many of the

18   family members were never interviewed.  There, we will invoke

19   Wigging versus Smith and other Supreme Court cases that say

20   you cannot hide behind a so-called tactic if you have not

21   interviewed or investigated witnesses.  Flat holdings by the

22   Supreme Court.  That's what we have here.  You will hear

23   these witnesses testify, "We were never contacted by the

24   Defense team."

1-15

1        Next deals with closing argument by the State where

2   they went beyond, the argument would be, or the evidence

3   would be, the mere mitigator, or aggravator, which was felony

4   murder and argued, in effect, deliberate, premeditated,

5   willful murder by saying Defendant didn't want to look into

6   the eyes of Mr. Atkinson when he stuck that gun in the back

7   of his head.  That's on Page 10.

8        I is sentencing phase, failure to instruct the...

9   failure to object when the Court instructed the jury after

10  deliberations had begun when they sent out a note --

11        THE COURT:  You said I, but I think you mean M.

12        MR. BENNETT:  I mean L.  Excuse me.

13        THE COURT:  L.

14        MR. BENNETT:  My...my...my fault.  L on Page 10.

15        THE COURT:   L is the aggravating factor.

16        MR. BENNETT:  J is the improper closing argument.

17        THE COURT:  Uh-huh.

18        MR. BENNETT:  L is the...on Page 10 is the

19  unanimity instruction.

20        THE COURT:  Uh-huh.

21        MR. BENNETT:  Counsel failed to object when the

22  court instructed the jury, after deliberations had begun,

23  that unanimity...unanimity --

24        THE COURT:  Okay.

1-16

1      MR. BENNETT:  -- is absolutely required for a

2  verdict when, in fact, Maryland law provides for a hung

3  sentencing jury and, at a minimum, since they had been out so

4  long, the court should have given a modified Allen charge.

5  The jury went out at approximately 3:30 and didn't reach a

6  verdict until 1 to 1:30 the next day.

7      Next is M.  During the sentencing phase, Mr.

8  Saunders failed to object when the court instructed the jury

9  that their decision must be based on the evidence, which is

10  true, but omitting the fact that, in fact, the evidence

11  included the Defendant's allocution.  Trial counsel never

12  sought an instruction that evidence in this case includes the

13  Defendant's allocution, especially important since one, but

14  less than twelve jurors found as a mitigating factor that the

15  Defendant had shown remorse.  The only way they could have

16  concluded that is from the Defendant's allocution since he

17  didn't testify at trial.  If in fact the court had instructed

18  the entire jury of that, the argument would be more than one,

19  or more than the number that did find that find...that...make

20  that finding would have been so persuaded.

21      Number N is a...an issue dealing with what the

22  attorney didn't do once the verdict came in.  Before the

23  jurors were discharged, the verdict was returned and there

24  was a verdict form.  And one of the mitigators found on it is

1-17

1    "life imprisonment without parole is sufficient".  Now, a

2    strong argument could have been made, and a reasonably

3    competent attorney would have done the following.  "Your

4    Honor, I would like to have the jury voir dired individually

5    as to who made that mitigating finding, who among the twelve,

6    outside each other."  One...each one is brought in

7    separately.  And then each one of those jurors is voir dired

8    and asked, "Is that your verdict in the case, or a verdict in

9    the case by you in light of that language, or you were saying

10   that, notwithstanding that statement, your overall verdict is

11   that the aggravator outweighs the mitigator?"  There's a huge

12   difference, because, literally read, life in prison without

13   parole is sufficient, is a finding that that...by that juror

14   that, in fact, death should not be imposed.  He didn't do

15   anything in that regard.

16        O on Page 11.  This is the jury form, or – excuse

17   me – this is the note that was not shown to the defense

18   attorney by the judge who summarized what it contained but

19   did not in effect allow – excuse me, he would have allowed

20   had it been requested – did not show it to the defense

21   attorney on his own volition.  And the defense attorney, Mr.

22   Saunders, the evidence will show, inexplicably never asked to

23   see the note from the jury.  Mr....Mr. Saunders will testify,

24   had he seen the note, he would have requested a modified

1-18

1    Allen charge rather than let...allow the jury to be

2    instructed "Your verdict must be unanimous.  Go back.", which

3    is really, literally all that happened, which is different

4    than, as Your Honor is aware, the Allen charge, under

5    Maryland law, which also has a statement to keep your own

6    individual judgement if you are not persuaded by the others.

7    Mr. Saunders will also testify that he was...because it's a

8    defense win, a hung jury in deliberations in a capital case

9    and a verdict of a hung jury is life without parole or life.

10            The last one is Number P on the top of Page 12, and

11   this is just a little different as opposed to arguing that

12   allocution could be considered existence of a mitigating

13   circumstance.  He never asked for an instruction.  One of

14   them is in the form of ineffective assistance of counsel for

15   ...for failure to argue it.  And the other is failure to

16   request an instruction.

17            Counts 2, 3, 4, 5, I have already covered.  The

18   only one remaining in terms that we are leaving is Count 13,

19   which is near the end and deals with insufficiency of the

20   evidence to support a finding that the murder was committed

21   while committing or attempting to commit a robbery.  And I

22   raised that in another way in one of my subsequent pleadings,

23   so it's in effect been raised twice.

24            Alright.  On the first supplement, the first issue

1-19

1   under A1, Page 1, 2, 3, is failure to object to the

2   prosecutor's opening and closing arguments.

3           THE COURT:  Give me just a minute.

4           MR. BENNETT:  Yeah.  If they are in chronological

5   shape, Your Honor, it's December 23rd.

6           THE COURT:  Okay.  I have it.

7           MR. BENNETT:  Thank you.

8           Alright.  Page 1, bottom, and Page 2 at the top,

9   the statement by Mr. Ruark, same statement literally on both

10  opening statement and closing, "I took an oath of office to

11  protect the people of Wicomico County."  Our argument is that

12  it was...first, it was irrelevant; second, that it was an

13  improper appeal to passion and emotions; and it's a form of

14  vouching for his own credibility.  They should have been

15  objected to by trial counsel, and they weren't.

16          Second was the introduction into evidence of

17  hearsay by what we would call a...not a statement, but verbal

18  conduct intended as an assertion by Jonah Miles in the act of

19  pointing out to the troopers where a handgun was in the

20  Choptank River.  It's not different that, Your Honor, the act

21  at a lineup of pointing out a witness.  That would be a

22  verbal assertion...a non-verbal assertion by a person

23  intended for the truth of the matter asserted.  That's Number

24  2 on Page 2.  No objection.

1-20

1      Three.  Three is one of our most important

2  allegations.  In this case, in his closing argument, Mr.

3  Saunders did argue to the jury - transcript 3/12/98 at 62 to

4  65 - felony - excuse me - robbery afterthought.  He, in

5  effect, was a...a prophet to this extent.  _Allen_ came down

6  four or five years later in effect indicating that that is a

7  defense to felony murder.  The problem was, although he

8  argued it, he didn't...he wasn't wearing, that day, black

9  robes, and he did not seek an instruction from the court.  So

10  all he had was an argument.  He had nothing perfected for

11  appeal.  Had he appealed...had he made the request for the

12  instruction and had it been denied, which it probably would

13  have been based upon the State's argument that _Stebbing_

14  would have controlled, or another case.  This case is _Allen_

15  in fact, but it's titled State versus Miles and replaced

16  _State versus Allen_, because the votes would have been the

17  same, and _Allen_ is not a four/three decision.

18      Sentencing issues on Page 3 and...on Page 3 deals

19  with _Wiggins versus Smith_.  It's a capstone mitigation case.

20  And that deals with the large number of mitigation witnesses

21  not called...inter-...interviewed or called, including family

22  members, a witness on lack of future dangerousness, or

23  anybody from the Parole Commission.  They are all set forth

24  in B1, 2 and 3.

1-21

1    On the second supplement, we raise the Metheny case

2    again.  Here --  That was filed just a couple of weeks after

3    that, Your Honor.  Do you have that pleading?

4        THE COURT:  I do.  I am sorry.

5        MR. BENNETT:  Alright.  On Page 1, we are just

6    citing trial counsel ineffective in failing to move for a

7    judgement of acquittal on the felony murder count based on

8    Metheny since the evidence was insufficient to show true

9    felony murder.

10    And one of the things we will be arguing when all

11    is done, and you will see it from the evidence, is the

12    State's case on criminal agency against the Defendant was his

13    confession.  They used it to their favor.  In his own

14    statement/confession, he said he took his property after he

15    shot the decedent once...he said the decedent went into his

16    jacket and he thought he was going to be bringing out a gun.

17    To truly defeat the robbery afterthought argument, the State

18    would have had to in effect ask you to buy his confession in

19    regard to criminal agency but not believe the confession in

20    regard to other details.  So there would have been a powerful

21    argument for an MJOA on felony murder based on their own

22    evidence.

23    And the last is the Brady point.  And the only

24    thing I will say there that the evidence will show through

1-22

1  Mr. Saunders and others that he never had those records,

2  therefore, he couldn't have cross examined the brother and

3  raised the serious credibility issue as to the brother of the

4  decedent taking the Defendant's - not taking them - changing

5  the Defendant's cell phone records without an order of court,

6  without even the knowledge of the State's Attorney's Office

7  and having them mailed to his office.  That, we submit, would

8  have reflected on his credibility in front of the jury.

9          That would be our case, Your Honor.

10         MR. VINCENT:  Good morning sir.

11         THE COURT:  Give me just a minute.

12         MR. VINCENT:  Yes, sir.

13         THE COURT:  Did you file the pleading in regard to

14  the Brady issue?

15         MR. BENNETT:  Yeah.

16         THE COURT:  Or when did you file it, I suppose?

17         MR. BENNETT:  He filed it, and it was --

18         MR. VINCENT:  Is that the addendum you are

19  referring to, I think?

20         MR. BENNETT:  Huh?

21         MR. VINCENT:  The addendum I think is the addendum

22  to the petition.

23         MR. BENNETT:  The addendum is the Brady issue.

24  Just...that was way back.

1-23

1          THE COURT:  Oh, okay.

2          MR. BENNETT:  Here we go.  No date on that copy.  I

3    thought my copy was dated.

4          MR. VINCENT:  We --

5          MR. BENNETT:  2004.

6          MR. VINCENT:  April of 2004, I believe.

7          MR. BENNETT:  April of 2004, Your Honor.  Here you

8    go.  I have got the actual date.  Excuse me.  Received Clerk

9    of Court Queen Anne's County July 13th, called Addendum to

10   Petition --

11         THE COURT:  I...I have it.

12         MR. BENNETT:  Very good.

13         THE COURT:  Thank you.

14         MR. BENNETT:  Sorry.

15         THE COURT:  It's Number 22 on the docket.

16         MR. BENNETT:  Alright.

17         THE COURT:  Mr. Vincent.

18         MR. VINCENT:  Yes, sir.  Good morning sir.

19         Your Honor, of course, as the Court is well aware

20   in these proceedings, the Petitioner has the burden of proof.

21   Most of the allegations go against counsel and his

22   representation.  And so the Court obviously needs to follow

23   Strickland in determining the...utilizing the two prong test,

24   but finding first the counsel's performance was deficient

1-24

1    using the objectively...objective reasonable...reasonableness

2    standard, and then, finding that it was deficient, whether it

3    was the deficient performance prejudiced the Defendant.

4    Basically, the Court has to find a reasonable probability of

5    a different result.  As the Court will hear from Mr. Saunders

6    when he testifies, he was the head at the time of the Capital

7    Defense Unit at the Public Defenders Office, the most

8    experienced and seasoned death penalty litigator in the

9    state, perhaps, assisted by Arch McFadden, who was...

10   actually, he was an attorney at the time, but had formerly

11   been an investigator with the unit.  A number of issues that

12   have been raised and are still raised were litigated before

13   the Court of Appeals and thus had been finally litigated and

14   are not available under the Post-conviction Act.  The State's

15   position will be that Mr. Saunders was completely effective.

16   He, in the guilt phase, had the jury find the Defendant not -

17   excuse me - the Petitioner not guilty of first degree

18   premeditated murder.  At sentencing, offered a number of

19   records from institutions, medical records and other records

20   that were offered in without objections from the State.  He

21   had two witnesses - a social worker and a investigator - talk

22   about interviews that they had of a number of individuals.

23   The Petitioner's attorney raises now witnesses that he...Mr.

24   Saunders did not call, but Mr. Saunders will tell you that

PENGAD • 1-800-631-6989 • www.pengad.com

LASER BOND FORM B

1-25

1  there was difficulty dealing with the family at the time,

2  many didn't want to cooperate, didn't want to testify.  It

3  was...as Mr. Bennett referred to, the mother was actually

4  barred at one point from the proceedings, and that created

5  some problems with some of the family witnesses further

6  testifying.

7          As to some of the specific issues we addressed in

8  our answer and have been raised, I will address those

9  briefly.  In terms of what's referred to as A, as far as

10  re-asking the question on voir dire, that was a determination

11  by Mr. Saunders, based on his theory of the case, that

12  credibility of police officers was not an issue in the case,

13  and he affirmatively decided not to take the court up on

14  re-asking the question.

15          In terms of challenges for cause and using all of

16  his peremptory challenges, Mr. Saunders will tell you that

17  the jury that he had at that point was a jury he thought

18  would be the best that he would have.  Exercising the other

19  strikes would have allowed for additional people on the list

20  that he did not want.  He felt he had the best possible jury

21  at that point and...and decided not to use the rest of his

22  strikes.

23          In terms of Jonah Miles and cross examination, he

24  was...utilized her as best he could, given the situation that

1-26

1   ...that was presented.  The case dealt not with

2   identification or additional facts, because, subsequent to

3   Jonah, other witnesses testified about the evidence that was

4   in fact recovered.

5           As terms of shackles...the Defendant being

6   shackling...shackled and handcuffed - that's D - that was

7   decided on appeal.  That has been fully and fairly litigated.

8           In terms of the theory under G, the...the...the

9   theory of the case, Mr. Saunders will tell you that it was

10  his hope to knock out the premeditated murder and hope that

11  the jury found that this was simply a robbery that had gone

12  bad, and that was his theory of the case.

13          In terms of Steve Bailey's testimony, that was

14  inconsistent with the information, including the Defendant's

15  own confession, and would not have helped the Defense case.

16          In the...presenting evidence regarding the records

17  and family testimony, covered that due to problems with the

18  family.  Parole experts - excuse me - representative from the

19  Parole Commission would not have added anything else to the

20  case.

21          Parole...life without parole is exactly what it

22  says.  It's a simple concept, which we didn't require...he

23  did not require an expert to proceed with.

24          In terms of allocution instruction under K, the

1-27

1  court gave the approved MICPEL instructions.  The jury

2  subsequently found the existence of...one, but not all

3  twelve, found, as reflected on the verdict sheet, mitigating

4  circumstances that were presented by the Defendant at

5  allocution, including that it's extended mercy, that he

6  showed remorse.  Those were set forth by Mr. Miles in his

7  allocution.  So, clearly, the jurors followed, and listened

8  to, and considered Petitioner's allocution.

9      In...in the sentencing phase dealing with the

10  instruction after the note was passed, that was also covered

11  on appeal and decided by the Court of Appeals that counsel's

12  failure to...if he had objected, the court would have done

13  the same thing.  That has been fully and fairly litigated.

14      In sentencing arguing inconsistent verdict, life

15  without parole, Counsel hasn't cited any authority for

16  individual voir dire of...of the jury after delivering a

17  verdict. A jury can't be heard to challenge its own verdict.

18  The Court of Appeals, in its decision, considered the same

19  argument, and that has been fully and fairly litigated.

20      In...again in terms of the note, while we will

21  concede trial counsel didn't ask to see the note, he, in

22  hindsight, now would, I think testify that he should have,

23  and that was considered by the Court of Appeals and

24  determined that he wasn't prejudiced...Petitioner wasn't

1-28

1   prejudiced by the court's action by not providing the note to

2   counsel.   The same response would have been received if he

3   had requested to review the contents of the note presented.

4   It has been fully and fairly litigated.

5           In terms of the addendum, we will concede, at some

6   point, that the address was changed on the phone bill by the

7   victim's brother unbeknownst to the State.   Mr. Saunders will

8   testify that identification was never an issue in the case.

9   The significance I guess from the Petitioner's standpoint is

10  that Mr. Atkinson...Robert Wayne Atkinson...the brother,

11  Wayne Atkinson, identified the Defendant as driving by the

12  scene of the crime the same day the body was found.   Another

13  witness also identified Mr. At-...Mr. Miles as driving by.

14  Troopers described his vehicle.   In the Defendant's

15  statement, he admitted driving by, seeing...being seen by

16  police officers, acting as if he was on his cell phone.   So

17  the significance of the records being changed to Wayne

18  Atkinson's address was not significant.   The identification

19  of the Defendant driving through was not an issue for Mr.

20  Saunders, and the outcome would not have been any different.

21          In the addendum - excuse me - first supplement

22  raised issue regarding Mr. Ruark's argument about using the

23  term he took an oath of office, he has not...in the State's

24  view is not vouching for his credibility.   He's stating a

1-29

1   fact.   In...in reading the argument in context, he refers to

2   the jury's oath, and it was not an improper argument and we

3   think that Mr. Saunders was not incorrect in not objecting to

4   that.

5            In terms of Corporal Fisher's testimony regarding

6   Jonah Miles pointing out to Corporal Fisher where she had

7   dumped the gun in the Choptank River in Denton, I believe

8   Trooper Fisher testified at a point after Jonah Miles.   Jonah

9   Miles was already subject to cross examination about what she

10  had done.   Jonah Miles was already subject to cross

11  examination about having thrown...not only thrown the gun in

12  the river but directing Corporal Fisher to that location.

13  The State's position is the act of, or the testimony by

14  Corporal Fisher about what Jonah Miles did is not hearsay.

15  It is not being offered for the truth of the matter asserted

16  but being...was being offered for purposes of what Lee Fisher

17  did in response to Jonah Miles directing her to that

18  particular location, which was directing the dive team to

19  that location and recovering the gun.   And even if the court

20  viewed it as a non-verbal assertion, it...it was not a...a

21  assertion that Counsel would have you believe that "This is

22  the weapon used by my husband.", but rather an assertion that

23  "This is where I threw the gun.", where it was subsequently

24  recovered.

1-30

1    In the...also in the supplement petition, they

2    dealt with the issue of requesting an instruction regarding

3    both the <u>Allen</u> and...and the <u>Metheny</u> cases, the State's view

4    in this is the evidence did not support an afterthought

5    robbery, and I guess this goes to a number of the arguments

6    in...in the other allegations, or it should be the other

7    petition also.  The facts supported clearly that the

8    Defendant committed a robbery.  The Defendant's version,

9    which came in both through tape and through transcript, is

10   that the Defendant worked for a loan shark; that he was there

11   to pick up a package; that he had a handgun; the victim knew

12   he had a handgun; that the victim was walked into the woods

13   180 feet down a lane and then approximately 150 feet into the

14   woods; at the position where the victim was moved into the

15   woods, there was a scuff mark seen at the location of boot

16   prints as testified to by Sergeant Danna, who was a crime

17   scene tech, that would indicate...would be indicative of a

18   scuffle, which would be indicative of the victim being forced

19   into the woods at gunpoint.  Collecting a debt at the point

20   of a gun is in fact robbery.  The jury found that it was

21   completed robbery.  The evidence here clearly supported that

22   it was robbery.  And an instruction consistent with <u>Allen</u>

23   would not have been given, was not consistent with the

24   evidence.  And, in fact, at the point of arguing the motion

1-31

1   for judgement of acquittal, Mr. Saunders argued no evidence

2   of premeditation, and the court, without hearing any

3   argument, found that the facts supported both...motion...

4   supported both felony murder as well as first degree

5   premeditated murder.

6           In sentencing, the...as I pointed out earlier, the

7   ...Mr. Saunders relied on the number of witnesses that would

8   cooperate.  Institutional records were offered.  Live

9   witnesses were offered regarding the Petitioner's actions,

10  and that was sufficient for purposes of future dangerousness.

11  The investigator, or the expert would not have offered any

12  additional information in that regard.  This is not a

13  situation where...like Wiggins where counsel did not

14  investigate the case, didn't contact witnesses regarding

15  mitigating and sentencing issues.  They had an expert, or -

16  excuse me - they had a social worker who interviewed a number

17  of people, an investigator who number...interviewed a number

18  of people, and the evidence was set forth unlike in Wiggins.

19          And as far as life...offering an expert or someone

20  from the Parole Commission, life without the possibility of

21  parole is...is what it says.  All due respect to our friend

22  from the Parole Commission, that's a fairly easy concept, and

23  an additional witness would not be sufficient to add anything

24  to the argument.

PENGAD • 1-800-631-6989 • www.pengad.com

LASER BOND FORM B

1-32

1    Finally, again, in...in the...addressing the second

2    supplement, while he did not specifically address...raise the

3    motion for judgement of acquittal as to felony murder, the

4    court found clearly that that was sufficient evidence to

5    support felony murder.  It is not a...the factual scenario

6    here, as I set forth, is not similar at all to <u>Metheny</u> or

7    <u>Allen</u>.  The court would have found that there was sufficient

8    evidence to send the case to the jury and in fact did so and

9    in fact considered it based on the evidence at the time.

10    In terms of the State's rebuttal argument, counsel

11    argued and requested an instruction.  We, in response, argued

12    regarding premedi-...the finding by the jury of not guilty

13    premeditated murder.  To argue that this was an intention-...

14    still an intentional killing was proper in...given the fact

15    that the evidence supported an intentional killing, just

16    simply not premeditated, would be in response to Counsel's

17    argument that the fact that the jury had found that it was

18    not premeditated but, in fact, he argued second degree murder

19    at trial.  That the argument at sentencing that it was still

20    an intentional murder was supported by the evidence and was

21    proper.

22    In terms of the afterthought robbery, again, the

23    facts did not support this.  Clearly not an afterthought

24    robbery.  The facts were well sufficient in that it was in

1-33

1   fact done with an intent to rob.  The jury certainly was free

2   to disregard the Defendant's...Petitioner's version that he

3   was simply there collecting a package.  His attempt to

4   minimize his role that he was there all along, based on the

5   evidence, to rob the victim, there was sufficient evidence.

6   Therefore, the...it was not ineffective for counsel to ask

7   for specific instructions or argue any differently than he

8   did.  And I think, when Mr. Saunders testifies, it will be

9   clear.  And...and, of course, the Court's review of the

10  transcript and record, it will support the fact that Mr.

11  Saunders did an excellent job and that relief should be

12  denied, sir.

13          Thank you.

14          MR. BENNETT:  Your Honor, could I have forty-five

15  seconds just to correct three things, and (unclear) my first

16  witness is ready?

17          He made a statement that two of the issues are not

18  properly before you because they were raised in front of the

19  Court of Appeals - the shackles issue and the note dealing

20  with the unanimity issue.  They were before the Court of

21  Appeals but for a direct appeal based on the record

22  determination, not on IAC, and not on a claim that counsel

23  never made a record for the Court of Appeals both in regard

24  to the shackle, voir diring the jury, and on the note

1-34

1   requesting a...a modified Allen charge.  So you can always

2   raise, Your Honor's aware, IAC on post-conviction in regard

3   to what the attorney didn't do at trial.

4          The third is on the instruction on the <u>Allen</u> issue.

5   <u>Allen</u> wasn't decided by the Court of Appeals - as Your Honor

6   will know when you review it - on a sufficiency of the

7   evidence issue, which is not what we are claiming here.  We

8   are claiming IAC in failing to seek an instruction under

9   <u>Allen</u>, in failing to get it to the jury, in failing to

10  preserve them for an appeal if the trial judge had not given

11  the instruction, which is what the posture was for <u>Allen</u>.

12  And of course Your Honor knows that the defendant in a

13  criminal case is entitled to an instruction on his theory of

14  the case if there is any evidence in the record to support

15  it.  It's a very pro-defendant liberal standard as to when I

16  am entitled to an instruction on my theory of the case.

17          Call Mr. Pennewell.

18          THE COURT:  You may proceed.

19          MR. BENNETT:  Can I examine the witness while

20  seated?

21          THE COURT:  You may.

22          MR. BENNETT:  Thank you, Your Honor.

23                  LEVIN PENNEWELL,

24  a witness produced on call of the Petitioner, having first

1-35

1  been duly sworn, was examined and testified as follows:

2                    DIRECT EXAMINATION

3          BY MR. BENNETT:

4      Q    Please state your full name and your business

5  address for the record.

6      A    Levin Thomas Pennewell, L-e-v-I-n, Pennewell,

7  P-e-n-n-e-w-e-l-l, the Maryland Parole Commission, 6776

8  Reisterstown Road, Baltimore.

9      Q    And how are you employed?

10     A    I am the program manager for parole hearings.

11     Q    How long have you been employed by the Maryland

12  Parole Commission?

13     A    Some twenty-eight years.

14     Q    So you would have started in the '70's?

15     A    Yes.

16     Q    Alright.  Are you familiar with the procedure

17  followed by the Maryland Parole Commission in connection with

18  parole eligibility for persons convicted of a form, or

19  convicted of first degree murder?

20     A    Yes, I am.

21     Q    Are you familiar with the three forms of - excuse

22  me - the three possible sentences for first degree murder?

23     A    Yes.

24     Q    What are they?

1-36

1  A  The life, life without parole.  There is also a

2 failed death penalty sentence, which includes a restriction

3 on parole eligibility of twenty-five years.

4  Q  On a - ?

5  A  Restriction of parole eligibility to a minimum of

6 twenty-five years on a failed death penalty case.

7  Q  On a failed death penalty case?  Alright.  So in a

8 case in which the State files a proper and timely notice to

9 seek, or notice of intent to seek the death penalty, tell the

10 Court what would happen in regard to the Parole Commission

11 considering the case ever for parole eligibility if a

12 sentence of death is imposed.

13  A  If they filed the proper proce-...pleadings and the

14 sentence was...death was rejected, the eligibility is

15 twenty-five years less diminution.

16  Q  No, I had it the other way.

17  A  Okay.

18  Q  If a sentence of death was imposed by the jury --

19  A  Right.

20  Q  -- or the court after the jury returned a verdict.

21  A  Sentence of death, there is no parole.  There is no

22 parole eligibility by statute.

23  Q  So will that individual ever come before the

24 Commission for a hearing?

1-37

1    A    No.

2    Q    Alright.

3    A    Not with that sentence.

4    Q    Now, if there was either a jury finding or a court

5    finding, if a jury was waived, on a first degree murder...

6    murder case of life without parole, tell the Court what the

7    procedure would be in connection with a defendant ever coming

8    before the Parole Commission.

9    A    That person would never see the Maryland Parole

10   Commission on life without parole.

11   Q    And, finally, on a person who received a sentence

12   of life, what was...what would his or her eligibility be in a

13   case in which a notice of intent to seek the death penalty

14   was filed?

15   A    If a notice was filed and the death penalty was not

16   granted, then the eligibility is twenty-five years less

17   diminution.  That's to be...minimum eligibility to be

18   paroled.

19   Q    Now, over the years, do you have direct personal

20   knowledge as to whether or not Parole Commissioners have been

21   subpoenaed and called as witnesses in death penalty cases to

22   testify?

23   A    I do.

24   Q    Before the change in administration when Er-...Mr.

1-38

1  Ehrlich became the Governor, who was the Parole Commissioner

2  that regularly performed that function?

3      A    Most regularly was Commissioner Macy O. Williams.

4      Q    Was he working during 1998?

5      A    I believe he was.

6      Q    Could have been under a Democratic administration,

7  correct?

8      A    Yes, that's correct.

9      Q    Alright.  Now, to your knowledge, were subpoenas

10  issued by defense attorneys for the testimony of a

11  commissioner always honored?

12      A    Yes.

13      Q    The testimony that Macy O. Williams could have

14  given would have been the same in substance as you gave here

15  today?

16      A    As to policy and procedures, yes.

17      Q    Did you check your records to determine whether or

18  not a subpoena was ever issued for a person from the

19  Commission to testify in the Jody Lee Miles case?

20      A    No, sir, I did not.

21      Q    So you have no personal knowledge on that?

22      A    No, sir.

23      Q    Alright.

24          MR. BENNETT:  No further questions.

1-39

1    CROSS EXAMINATION

2        BY MR. VINCENT:

3        Q    In 1998 when this sentence was imposed, did the

4    statute require a person who received a sentence of life not

5    ...would not be eligible for parole 'til...for twenty-five

6    years?

7        A    The statute, I think, was...was of two parts.  A

8    regular life sentence in a non-failed death penalty case,

9    eligibility is set by statute at fifteen years less

10   diminution credits.  In a failed death penalty case, it's

11   twenty-five years less diminution.

12       Q    But was that in effect in 1998?

13       A    Yes.

14       Q    So, basically, life without parole means exactly

15   what it says?

16       A    That is correct.

17       Q    Truth in sentence?

18       A    Yes.

19       Q    Someone who is sentenced to death does not get

20   diminution credits, correct?

21       A    That's correct.

22       Q    Someone with life without parole does not get

23   diminution credits, I presume?

24       A    That's correct.

PENGAD • 1-800-631-6989 • www.pengad.com

LASER BOND FORM B

1-40

1    Q    What are diminution credits?

2    A    Diminution credits are commonly known as good time

3    credits.  A person serving time for a felony, a violent crime

4    under 14.101 of the Criminal Law Article, may get a maximum

5    of fifteen days a month credit for various institutional

6    assignments and for good behavior.  That's broken down into

7    five days per month for good behavior and five to ten days

8    per month for either participating in vocational or

9    educational training or performing an institutional job.

10   Misbehavior may result in a penalty and forfeiture of certain

11   of those credits.

12   Q    He...does he get diminution credits for life

13   without parole?

14   A    No.

15   Q    No.  Thank you.

16        MR. VINCENT:  That's all I have.

17        THE COURT:  Mr. Bennett, anything further?

18        MR. BENNETT:  I do have about two questions, but I

19   gotta confess it's beyond the scope of cross.  I am being

20   candid with the Court.

21        THE COURT:  Thank you.

22        MR. BENNETT:  But while...while he's here and they

23   will have a chance to --

24        MR. VINCENT:  No objection.

1-41

1     MR. BENNETT:  Alright.

2                  REDIRECT EXAMINATION

3     BY MR. BENNETT:

4     Q     You may not know the answer to this.  Do you have

5     direct personal knowledge of where persons who receive the

6     death penalty serve their sentences?

7     A     I believe they are now sent to the Maryland House

8     of Corrections Annex, but I am not certain.  They, at one

9     point, were in Super Max, which was the Maryland Correctional

10    Adjustment Center.  I believe they are not in MACX, House of

11    Corrections Annex in Jessup.

12    Q     Those serving a death sentence?

13    A     Yes.  I believe so.

14    MR. BENNETT:  Nothing further.

15    MR. VINCENT:  No, sir.  Thank you, sir.

16    THE COURT:  Witness excused or do you need him to

17    remain?

18    MR. BENNETT:  Call Dr. Johnson.

19    THE COURT:  Is the witness excused or do you need

20    him to remain?

21    MR. BENNETT:  Oh, I am sorry.  No.  Yes.

22    THE COURT:  You are free to leave, sir.

23    THE WITNESS:  Thank you, Your Honor.

24                     ROBERT JOHNSON,

1-42

1    a witness produced on call of the Petitioner, having first

2    been duly sworn, was examined and testified as follows:

3                        DIRECT EXAMINATION

4            BY MR. BENNETT

5        Q    Dr. Johnson, please speak up and direct your

6    answers to the Court.

7        A    Yes.

8        Q    Please state your full name.

9        A    Robert Johnson, J-o-h-n-s-o-n.

10       Q    And by whom are you employed?

11       A    I am employed by the Department of Justice, Law and

12   Society at American University.

13       Q    And what is your position there?

14       A    I am a professor of justice, law and society there.

15       Q    Are you a full professor?

16       A    Yes, I am.

17       Q    What was your former employment at American

18   University?

19       A    Well, I...I was hired in 1977 as an assistant

20   professor, and I worked my way up to full professor.  So I

21   have been there for twenty-nine years roughly.

22       Q    Have you received training and education in your

23   background?

24       A    Yes, I have.

1-43

1    Q    And what is your educational background?

2    A    I have a Bachelor's and a Master...a Bachelor's in

3    Psychology and a Master's and a PhD in Criminal Justice.

4    Q    Did you provide to me --

5         MR. BENNETT:  I would like to have this marked as

6    Defendant's Exhibit Number...Petitioner's Number 2, his

7    curriculum vitae.

8                                    (A curriculum vitae was

9                                    marked for identification

10                                   as Petitioner's Exhibit

11                                   No. 2.)

12   Q    I think I asked you whether you provided me with

13   your curriculum vitae.  And is this that document and is it

14   current?

15   A    Yes, this is correct.

16   Q    And does it outline your education, your academic

17   appointments, honors and awards and articles?

18   A    Yes, it does.

19        MR. BENNETT:  Your Honor, I would like to move the

20   document into evidence.

21        THE COURT:  Any objection?

22        MS. BOSSE:  No, Your Honor.

23        THE COURT:  It's admitted.

24                                   (Petitioner's Exhibit

1-44

1                              No. 2, previously marked

2                              for identification, was

3                              received into evidence.)

4          BY MR. BENNETT:

5          Q    Alright.  Now, I think you gave us your education.

6    Do you have any special expertise that would be pertinent to

7    this case?

8          A    Yes, I do.

9          Q    And what is that?

10         A    That would be the social psychology of life and

11   adjustment in prison.  I have been qualified as an expert on

12   many occasions on that...in that field.

13         Q    Does that pertain to people with short sentences or

14   long term inmates?

15         A    Well, it pertains to all inmates, but...but one

16   body of expertise that's relevant in this case is that with

17   respect to long terms - life sentence inmates, prisoners

18   serving life without parole, and prisoners condemned to die.

19         Q    Alright.  You indicated that you have testified

20   before.

21         A    I have.

22         Q    Can you tell the types of court...courts that you

23   have testified in before?

24         A    Well, I testified in several Maryland courts in

1-45

1  capital cases.  I have testified in Pennsylvania courts, in

2  the Federal Fifth District...Fifth Circuit - rather - which

3  is Alexandria, I believe.

4      Q    Which is in the --

5      A    And I have testified, well, on this particular

6  topic, those would be the main areas that I have testified.

7  I have also been involved, at times, in cases on behavior of

8  officers...correctional officers, such as use of force and so

9  on.  But that's a separate area.  Part of the general

10 expertise with respect to life and adjustment in prison, but

11 it's not pertinent to this case.

12     Q    Would the vast majority of the cases in which you

13 have testified been dealing with cases where a person has

14 received a death sentence?

15     A    The person has been convicted of a capital crime

16 and has been facing sentencing.  Most have been at...my

17 testimony has been in mitigation at the sentencing phase.

18 Some of those case have been re-sentencing after people have

19 been on death row for a period of time and then are

20 re-sentenced.

21     Q    Alright.  Now, approximately totaled, how many

22 cases have you testified would you say?

23     A    In mitigation with respect to the death penalty?

24     Q    Yes.

1-46

1    A    Fifteen, I would say.

2    Q    In those cases in which you have testified, were

3    you qualified, or did you become qualified as an expert?

4    A    Yes.

5    Q    Has there ever been a case in which you were

6    rejected by the court as an expert?

7    A    No.

8    Q    Alright.

9         MR. BENNETT:  Your Honor, we would offer him,

10   subject to voir dire, if the State wants to, as an expert in

11   the area of social psychology as to the life and adjustment

12   in prison, especially in regards to long term inmates.

13        MS. BOSSE:  No objection.

14        BY MR. BENNETT:

15   Q    Alright.  Did there come a time --

16        THE COURT:  He is qualified as such an expert.

17        MR. BENNETT:  Thank you.

18        THE COURT:  Thank you.

19        BY MR. BENNETT:

20   Q    Did there come a time that you were engaged

21   actually by the Capital Defense Division to assist me in this

22   post-conviction case?

23   A    Yes.

24   Q    And is that who you ultimately will be paid by?

1-47

1    A    Yes.

2    Q    As a result of your engagement, did I provide you

3    with certain information for you to review before you

4    testified?

5    A    Yes, you did.  You provided me with Mr. Miles' base

6    file.

7    Q    Alright.  And his base file is located where?

8    A    You mean where did you get it?  I assume you got it

9    from the Department of Corrections.

10    Q    Alright.

11    A    And it was --

12    Q    You are saying that you received by mail from me a

13    lengthy document --

14    A    Yes.

15    Q    -- that, on its face, indicated it was his base

16    file?

17    A    Correct.

18    Q    Did you review that?

19    A    I did.

20    Q    Did you also receive from me his pre-sentence

21    investigation report?

22    A    I did.

23    Q    Did you also receive from me a brief memorandum

24    outlining the procedural background of the case?

1-48

1    A    Yes, I did.

2    Q    As a result of receiving those documents, did you

3    then meet with and interview Jody Miles?

4    A    I did.

5    Q    On how many occasions?

6    A    On three occasions.

7    Q    Where at?

8    A    At the Maryland Correctional Adjustment Center,

9    which is colloquially called Super Max Prison, which is where

10   death row prisoners are held.  It's in Baltimore.

11   Q    And did you, for your last time, meet him as early

12   as two days ago or three days ago this week?

13   A    Yes.  I saw him Monday of this week.

14   Q    Alright.  Now, can you...as a --  Let me ask you

15   this.  Are you familiar with the Maryland Criminal Law

16   section dealing with a statutory mitigator on future

17   dangerousness?

18   A    Yes.

19       MR. BENNETT:  I am, Your Honor, referring to the

20   Criminal Law Section 2-303 Subsection (h)(2)(VII), which

21   reads as follows: as a mitigator, "It is unlikely that the

22   Defendant will engage in further criminal activity that will

23   be a continuing threat to society."

24   Q  Now, in the context of per-...of a person serving a

1-49

1    sentence of life without parole as opposed to the death

2    penalty --

3        A    Uh-huh.

4        Q    -- do  you have an opinion in this case to a

5    reasonable degree of social science as to whether or not Jody

6    Miles would...that it would be unlikely that Jody Miles would

7    engage in a further criminal activity that would be a

8    continuing threat to society if he had a sentence of life

9    without parole as opposed to the death penalty?

10       A    I do have an opinion.

11       Q    What is that opinion?

12       A    My opinion is that he would not pose a danger to

13   others in the prison community, the prison society.  That is

14   the world in which he will live and has lived for

15   approximately eight years.

16       Q    And what do you base that on?

17       A    I base that on a body of knowledge on the

18   adjustment to prisoners sentenced to life and life without

19   parole.  I base it on my own interviews with Mr. Miles in

20   which I was able to establish that his adjustments fit the

21   general pattern. And I would say that, as a...as a...as a

22   general understanding in the area of corrections, it is, I

23   believe, common knowledge that life sentence inmates,

24   including life sentence without parole inmates, are among the

1-50

1    best behaved inmates in prison.  They have the lowest rates

2    of rule violations of any group.

3    Q    And why is that from your...from your knowledge and

4    research?

5    A    The research shows, including studies I have done

6    myself, that lifers tend to, sometimes immediately, sometimes

7    after a few weeks, or months, or years, but come to see the

8    prison as home.  They come to see prison as the only life

9    they will ever have.  And as a result, they reconcile

10   themselves to this and attempt to live as decently as they

11   can there.  Now, prisons are very structured environments.

12   They are well organized.  It's very clear what the

13   consequences of one's behavior are.  So they quickly catch

14   onto the fact that, if they keep out of trouble, they will be

15   able to maintain whatever minor privileges they can get

16   inside the prison.  So if you want to have a decent life in

17   what is really a very impoverished setting, you have to avoid

18   trouble.  And lifers do avoid trouble.  When I try to explain

19   this to my students, I say that lifers are like the long term

20   residents of a beach town as opposed to the summer tourists.

21   They care about the place.  This is their home.  They have to

22   get along with these officers.  They have to get along with

23   other inmates.  They have to find whatever means they are

24   going to find in their lives behind bars.  So their behavior

1-51

1  tends to be very good and even exemplary.  When...when you

2  find model inmates, they tend to be lifers.  One research

3  study found that life without parole inmates were even better

4  behaved in terms of avoiding rule violations than life with

5  parole inmates.  In other words, those who have had no

6  possibility of parole realized even more clearly than others

7  that this was home.

8       Q    Now, combining those findings, and your own

9  research, and the research of others that you have reviewed,

10  did you then that...apply that to the base file of Jody

11  Miles?

12       A    Yes.  I examined his base file with those issues in

13  mind.

14       Q    Now, from the period of time that he was arrested,

15  the period of time in which the death sentences...death

16  sentence was imposed, --

17       A    Uh-huh.

18       Q    -- what did you find in regards to his adjustment

19  to either correctional center or --

20       A    Uh-huh.

21       Q    -- county correctional center life?

22       A    Well, his behavior was flawless in the sense that

23  he had no rule violations whatsoever during that period.

24       Q    I want to show you a document which is the

1-52

1    Petitioner's Exhibit Number 1, which covers a period of time

2    from 7/96 to 11/96 at the Caroline County Department of

3    Corrections, --

4        A    Okay.

5        Q    -- and deals with possible problem areas for an

6    inmate.  I especially would like you to look at 3 and 4 and

7    see if the action taken in connection with filling out that

8    form by a correctional officer is consistent with your

9    findings?  3 and 4.

10       A    It is consistent.

11            MR. BENNETT:  If the Court will indulge me one

12   moment.

13       Q    You say you had an opportunity to interview Mr.

14   Miles?

15       A    Yes, I did.

16       Q    In addition to the review of the base file, which

17   would be documents --  Well, let me correct.  On Petitioner's

18   Exhibit Number 1, you had never seen that document until

19   today, had you?

20       A    Correct.

21       Q    The local correctional center documents as opposed

22   to a base file from the Division of Corrections?

23       A    Correct.

24       Q    Alright.  You did discuss, on three occasions, with

1-53

1    Mr. Miles the facts that you thought you needed to be able to

2    render an opinion?

3          A    Correct.

4          Q    Anything inconsistent with your interviews...your

5    personal interviews with Mr. Miles as opposed to your opinion

6    that you have given today?

7          A    No.  Over his...he has been on death row

8    approximately eight years, and he has had one rule violation

9    over that period of time.  That's a very good record of

10   adjustment.  It's, you know, people do occasionally get rule

11   violations, but that's not the same as saying that's a crime

12   or a danger.  So his record is quite good.  He had one rule

13   violation, which we discussed.

14         Q    And even in connection with that rule violation, he

15   wasn't transferred from Super Max to some other institution?

16         A    No, he had been on death, I guess, almost seven

17   years  at that point, and he wasn't...for a few weeks, he

18   wasn't even removed from the immediate death row pod.  I

19   think, nineteen days after the incident, he was removed for a

20   period of time, twenty-six days, and then came back and has

21   been living again in that environment incident-free for the

22   last year.

23         Q    So this was about in that last year to fifteen

24   months?

1-54

1    A    I think so, yes.

2    Q    At any rate, had you been contacted by an attorney,

3    that alleged, or rule infraction would not have been on his

4    record at that time, would it?

5    A    Correct.

6    Q    So if you had been testifying in 1998 in March, --

7    A    Uh-huh.

8    Q    -- you could have testified based on the review of

9    a base file --

10   A    Yes.

11   Q    -- that he had no infractions?

12   A    That's right.  The base file would have indicated

13   that he had no infraction.  The body of knowledge would have

14   indicated that he was entering, or potentially entering a

15   category which included people, the vast majority of whom

16   behaved decently in prison and were not a danger to others.

17   So those would have been matters of fact as I would have seen

18   them.  Or matters of expert opinion as I would have rendered

19   them.

20   Q    Now, prior to the trial in this case, --

21   A    Uh-huh.

22   Q    -- were you ever contacted by Thomas Saunders,

23   Esquire?

24   A    I don't believe so, no.

1-55

1    Q    Well, did you testify in this case?

2    A    No.  No.

3    Q    Were you ever contacted by an Archibald McFadden,

4    Esquire?

5    A    No.

6    Q    Were you ever contacted by any investi-...a person

7    purporting to be an investigator for Jody Miles?

8    A    I was not contacted by anybody associated with this

9    case back then.

10   Q    Alright.  Had you been contacted and done the same

11   investigation you have now done, would you have been willing

12   and able to testify in this particular case?

13   A    Certainly.

14   Q    And would your testimony be the same...would have

15   been the same then other than the addition of institutional

16   adjustment while at MCAC that it would be here today?

17   A    It would be substantially the same, yes.

18        MR. BENNETT:  Nothing further.

19                    CROSS EXAMINATION

20        BY MS. BOSSE:

21   Q    Dr. Johnson, you said you testified in fifteen...

22   you were consulted in fifteen cases?

23   A    I believe I have testified in fifteen cases.  I

24   could check that on my resume, but --

1-56

1    Q    Was that here in Maryland?

2    A    I believe so.  I testified in other cases, as well,

3    but I believe it's about fifteen in Maryland.

4    Q    Here in Maryland?  And do you recall who hired you

5    for those cases?

6    A    Generally, the hiring comes through the Death

7    Penalty Defense Unit.  In other words, I get a letter from

8    them indicating that I have been retained in a given case.

9    Q    And when you say the Death Penalty Litigation Unit,

10   you mean of the Office of the Public Defender.  Am I correct?

11   A    Yes.  I believe it's called the Death Penalty

12   Defense Unit within the Public Defender's, but I could be

13   wrong.

14   Q    So...so the Public Defender's Office has hired you

15   in the past in approximately fifteen cases?

16   A    Yes.  I believe, some...I think, sometimes,

17   attorneys go to them, perhaps, to have me hired.  I don't

18   know the sequence necessarily.  I just know the letter comes

19   from them.

20   Q    A letter comes from the Public Defender's Office?

21   A    Right.  Right.  In this case as well, the letter

22   came from the...that office.

23   Q    Okay.  And during what...over what number of years?

24   I mean, what's the span?

1-57

1    A    It's been quite a while.  I...I...I think I have

2    been available since the late '80's, maybe early '90's

3    through to today.

4    Q    And that would have been during a time when Mr.

5    Saunders was the head of that capital defense unit?

6    A    Well, that could be.  I don't...I don't really

7    remember.

8    Q    In fact, some of the letters you have gotten may

9    have actually been signed by him?

10    A    Quite possibly.

11    Q    What, in your view, is the best predictor of an

12    inmate's adjustment?

13    A    Well, the best predictor we know of is one --

14    Well, certainly, one of them is length of sentence.  We know

15    that, the longer the sentences are, when you get to life

16    without...life without parole, those are the longest, but

17    those are very well behaved inmates.  A second predictor is

18    age.  As inmates age in prison, they tend to adjust better.

19    Those would be the two strongest predictors.

20    Q    What about past institutional history?  Is that a

21    significant --

22    A    If you have institutional history and you see a

23    pattern of adjustment that has been problematic and you talk

24    to the person, and you learn, for example, that they carry

1-58

1  with them certain attitudes that are going to get them into

2  trouble, right.  That would be a...that would be relevant.

3  But that's generally not available unless you do research.

4      Q    Is that why you spoke with Jody Miles in this case?

5  Your purpose for your interviews was?

6      A    It's always very helpful to understand how people

7  are adjusting, and that gives you some sense as to whether or

8  not that adjustment will be stable.  Now, keep in mind you

9  are always adjusting in a context, which is a prison context,

10  but also in a context of a sentence.  So, for example - this

11  is a hypothetical - if Miles had been subject to a five year

12  sentence earlier in his life, he might have behaved badly,

13  but that wouldn't predict how he would behave as a lifer.

14  Because, when you are a life sentence inmate, prison becomes

15  a different place for you.  It becomes your involuntary home.

16  As a short term sentence, you are kind of a tourist, so you

17  might be a very bad short term inmate and yet still become a

18  model lifer.

19      Q    Petitioner's Exhibit 1, have you had an opportunity

20  to look at this?

21      A    I just looked at it briefly, yeah.

22      Q    Do you think that's a significant document for

23  purposes of your --

24      A    Well, I would...I would look at many documents, and

PENGAD • 1-800-631-6989 • www.pengad.com

LASER BOND FORM B

1-59

1    I would try to form a package, or a picture in relationship

2    to the entire body of knowledge.  I wouldn't...I don't think

3    any one document would make my opinion rise or fall.

4        Q    But the fact that he had no institutional --

5        A    Well, it...it's certainly --

6        Q    -- adjustments --

7        A    It's helpful, but he could have had problems before

8    facing this sentence, which would not disqualify us, or him

9    from taking the adjustment of a lifer when given a long

10   sentence.  When you are condemned to die, that's another kind

11   of life sentence.  That's saying the rest of your life is

12   going to be spent behind bars.  So, by the same token then,

13   you are going to see people adjusting in a much more settled

14   way.  Death row inmates as a class have very low rates of

15   infractions.

16       Q    So whether they have a number of infractions or no

17   infractions, your view is that lifers are more amenable to

18   adjustment?

19       A    Lifers, as a class, are more amenable to adjustment

20   ...to good adjustment, right.

21       Q    Okay.  Thank you.

22            MR. BENNETT:  Can he finish his answer?

23            MS. BOSSE:  I think he did.

24            THE COURT:  I think he did.

1-60

1           THE WITNESS:  That's essentially my point.

2           MR. BENNETT:  Alright.

3           BY MS. BOSSE:

4      Q    When you testified in these other cases in

5    Maryland, have you been subject to cross examination?

6      A    Certainly.

7      Q    And have you been asked about particular prisoners

8    in the past who you have testified about --

9      A    Uh-huh.

10     Q    -- in their mitigation?

11     A    Yes.

12     Q    And you have been confronted with incidents of

13   violence in their cases?

14     A    In some cases, yes.

15     Q    In some cases?  Do you have a view on the death

16   penalty, Doctor?

17     A    Personal or professional?

18     Q    Personal.

19     A    Oh, personally, I oppose the death penalty.

20     Q    And professionally?

21     A    Professionally, I think it's an unwise choice for

22   the justice system, but it's...it's certainly a legal choice,

23   and, therefore, it's one that, as a, you know, so, in the

24   field, I would have no problem with people supporting it or

1-61

1    opposing it.  When I teach, I don't advocate for or against

2    the death penalty for example.

3        Q    In connection with your review of documents --

4        A    Uh-huh.

5        Q    -- in this, you said you looked at the base file

6    and you spoke with Jody Miles.  Did you also look at exhibits

7    from the sentencing proceeding in this case?

8        A    I believe they were in the base file.  I would have

9    to...I would have to go back and check my file, but I had

10   a --

11       Q    Well, when you say base file, do you mean the...

12   that's the DOC file?

13       A    The DOC file, right.  I had the DOC file and I had

14   some materials beyond that.  I believe I had the testimony of

15   the social worker in this case.

16       Q    Did you have any other...did you have the testimony

17   of the correctional officers from the Caroline County

18   Detention Center?

19       A    I don't believe that I did.

20       Q    Did you review the records from the Queen Anne's

21   County Detention Center?

22       A    I did not have those records.  They were not in the

23   base file.

24       Q    Okay.  Or...so you did not...you did not see the

1-62

1    exhibits that were introduced at sentencing and would be in

2    the court file?

3        A    I don't believe I did.  I would have to go back and

4    check the file I assembled.  My understanding was it was the

5    DOC base file with selected attachments from the testimony of

6    the first trial.

7        Q    Okay.  So then you didn't see the exhibits related

8    to the State of Delaware's correctional records when Mr.

9    Miles was there?

10       A    No, I did not.

11       Q    Have you published or spoken publically advocating

12   annihilation of the death penalty...outside the class room?

13       A    I have argued that death row confinement, under

14   certain conditions, is a violation of the Eighth Amendment.

15   I have argued that.  I have tried to argue that.  But that's

16   a professional position that I have taken based on a research

17   on what I would call solitary confinement death row, which

18   exists in some states.  So, based on that body of work, which

19   is a social science body of work, I have advocated a penal

20   reform I would say.  Yes, I have.  Maryland's death row is

21   quite different however.  Maryland has a different format.

22       Q    Have you advocated annihilation of the death

23   penalty in your private capacity...in a private...private --

24       A    You mean in a conversation?

1-63

1     Q    Yeah.

2     A    Oh, if I had a conversation, I would certainly

3 argue the world would be a better place without the death

4 penalty, yes.

5         MS. BOSSE:  No further questions.

6              REDIRECT EXAMINATION

7        BY MR. BENNETT:

8     Q    Now, Dr. Johnson, aside from your personal views on

9 the death penalty, --

10    A    Uh-huh.

11    Q    -- would your opinion still have been and today be

12 as to what you have testified to?

13    A    Oh, of course.  That's based on a body of objective

14 social science knowledge, a combination of statistics and

15 interviews involving research not only by myself but by

16 several other criminologists of different points of view.  I

17 think that work stands on its own.  Much of it has been

18 published in peer review journals, which means that

19 professionals would review this work not knowing who wrote it

20 and make an independent assessment that this was a valid

21 contribution to social science.  So that is the...those are

22 the points of information upon which I based my professional

23 opinions.

24    Q    If, hypothetically, the defense attorneys in this

1-64

1    case introduced documents from a correctional facility in

2    Delaware and from Queen Anne's County in behalf of the

3    Petitioner at the sentencing phase of the trial, would you

4    assume that they would have been favorable to the Petitioner?

5        A    I assume they would have been, certainly.  But I

6    think I want to reiterate that the key issue with respect to

7    life and life without parole sentences, it's the sentence

8    that shapes the perceptions and then the adjustments.  So I

9    don't care what kind of inmate you were in a county jail.

10   You might have been a very bad inmate.  You still might

11   become a...a model inmate down the road.  The question would

12   be, if you had problems there, what were the nature of those

13   problems, how did you handle them, and are they likely to

14   resurface in the context of a life sentence?  What we

15   discovered is, once people recognize that their self interest

16   is served by decent adjustment and by following the rules,

17   they behave in a self interested way.  We are not saying they

18   are rehabilitated.  We are saying that their self interest

19   leads them to be decent inmates who are not a danger to

20   others in the prison community.

21       Q    Would it be more or less than a negative factor if

22   a person, prior to the imposition of the death penalty, had a

23   record of violent prior convictions?

24       A    It would certainly make the people making the

1-65

1    decision...give them pause, and they would have to weigh that

2    information against the other body of knowledge that exists,

3    and they would have to make that judgement.

4        Q    Alright. A couple more questions.  You testified

5    that you were contacted by and may have testified as many as

6    fifteen times in the State of Maryland through the Capital

7    Defense decision?

8        A    Yes.

9        Q    Alright.  When you are first engaged by the Capital

10   Defense decision...Division, you have not reviewed the

11   material or information on behalf of that particular client

12   yet, have you?

13       A    Correct.

14       Q    If in fact you later review and enter...reviewed

15   the material and met with the client however many times you

16   deemed appropriate, --

17       A    Uh-huh.

18       Q    -- you did not feel that you could render an

19   opinion in favor of the defendant, what would you do?

20       A    I would not render an opinion in his favor.  That

21   would be a clear call.

22       Q    Clear what?

23       A    A clear call on my part professionally.

24       Q    Alright.  Now, has any assistant deputy or state's

1-66

1    attorney ever contacted you to seek your opinion in a

2    particular case involving a possible imposition of the death

3    penalty to defeat a possible mitigating argument that a

4    person wouldn't be dangerous?

5        A    No, they have not.

6        Q    Would you have, had you been contacted and engaged,

7    been willing to serve?

8        A    Certainly.

9        MR. BENNETT:   Nothing further.

10                       RECROSS EXAMINATION

11        BY MS. BOSSE:

12        Q    Have you ever declined to represent a Maryland

13    client.

14        A    No, I have not.  I take the files and review them

15    and come to an opinion.

16        MS. BOSSE:  No further questions.

17        THE COURT: The Court has one or two.

18                         EXAMINATION

19        BY THE COURT:

20        Q    You have testified in approximately fifteen death

21    penalty cases in Maryland?

22        A    I believe that's true, sir, yes, sir.

23        Q    Out of those fifteen approximately, how many were

24    being sentenced for the first original sentence?

1-67

1    A    I am going to guess half.  I would really have to

2    check.  But I would think half or maybe two-thirds the first

3    time and maybe one-third were re-sentencings.

4            THE COURT:  Any questions in view of the Court's

5    questions?

6            MR. BENNETT:  No.

7            THE COURT:  Okay.  You may --

8            Is he excused?

9            MR. BENNETT:  Yes.

10           THE WITNESS:  Those are just estimates, Your Honor.

11           THE COURT:  Any reason the witness shouldn't be

12    excused?

13           MS. BOSSE:  No, Your Honor.

14           THE WITNESS:  Thank you.

15           THE COURT:  You may step down.  You are free to

16    leave.  Watch your step.

17           I'm going to take about ten minutes...ten minute

18    morning...mid-morning recess.

19           (Brief recess.)

20           THE COURT:  You may call your next witness.

21           MS. JASANI:  Yes, Your Honor.  I would like to call

22    Lieutenant Fayetta Downes.

23                   FAYETTA DOWNES,

24    a witness produced on call of the Petitioner, having first

1-68

1    been duly sworn, was examined and testified as follows:

2                          DIRECT EXAMINATION

3              BY MS. JASANI:

4         Q    Good morning.

5         A    Good morning.

6         Q    Would you please state your name and spell it for

7    the record?

8         A    Lieutenant Fayetta Downes, F-a-y-e-t-t-a

9    D-o-w-n-e-s.

10        Q    And what is your address, Lieutenant?

11        A    403 Lincoln Street, Denton, Maryland.

12        Q    Okay.  And what is your occupation?

13        A    I am a...a correctional officer.

14        Q    And where are you a correctional officer?

15        A    At the Caroline County Detention Center.

16        Q    How long have you been employed with the Caroline

17   County Detention Center?

18        A    This will be twenty-five years.

19        Q    Okay.  And what is your current title?

20        A    Lieutenant.

21        Q    And how long have you been a Lieutenant for?

22        A    At least six years.

23        Q    And prior to becoming Lieutenant, what position did

24   you hold?

1-69

1    A    Floor Supervisor.

2    Q    Okay.  And how long were you a Supervisor for?

3    A    From '82 up until I was made Lieutenant.

4    Q    Okay.  Lieutenant, are you familiar with Jody

5    Miles?

6    A    Yes, I am.

7    Q    How do you know him?

8    A    From being incarcerated at...at the Detention

9    Center.

10    Q    Okay.  Do you know when, or remember when he was

11    incarcerated at the Caroline County Detention Center?

12    A    Yeah.  According to our records, he came in July

13    the 10th of 1996 --

14    Q    Okay.

15    A    -- until 11/26/1996.

16    Q    Okay.  And what was your title in 1996?

17    A    I was a Supervisor.

18    Q    Okay.  And what were your duties as Supervisor?

19    A    At...in '96, I was working the floors part-time and

20    administrative duty the other part-time.  So my duty was to

21    see the overhaul...overall duties of the Detention Center,

22    anything that needed, you know, that...that come...anything

23    that needed, you know, that was pertaining to the inmates.

24    Q    Did you ever directly observe Mr. Miles while he

1-70

1    was at the Caroline County Detention Center in 1996?

2        A    Yes, I did.

3        Q    Okay.

4        A    Yeah.

5        Q    And how often did you observe him?

6        A    I can't actually say, because, like I say, by doing

7    both duties, sometime, I was on the floor, some...and,

8    sometime, I wasn't.

9        Q    Okay.  Would you say it was more than four or five

10   times?

11       A    Oh, yes.

12       Q    Okay.  Maybe ten times?  Fifteen times?

13       A    Maybe, yes.

14       Q    Approximately?

15       A    Uh-huh.

16       Q    Okay.  And what do you recall about Mr. Miles'

17   behavior?

18       A    Very quiet, no problem at all.

19       Q    By no problem at all, what do you mean?

20       A    He never had any infractions, you know, never got

21   into any fights or anything like that.

22       Q    And if he had had any fights or infractions, would

23   you have had knowledge of this?

24       A    Yes, I would have.

1-71

1     Q    And how is that?

2     A    Because, number one, it would have been an

3  infraction.  It would have been wrote up.  Then it would...

4  would have gone to an officer to be reviewed and...and all.

5  And then once it's reviewed and everything is over with, it

6  comes to me.  I have to sign it.  Then, from there, I take it

7  to the warden.

8     Q    So then, in your capacity as...in your

9  administrative capacity as you testified, you...you would

10  take a look at any write ups of any infractions?

11     A    That's correct.

12     Q    Okay.  Lt. Downes, I am handing you what's been

13  admitted as Petitioner's Exhibit 1.  Would you take a look at

14  that, please?

15     A    Uh-huh.

16     Q    And do you recognize that document?

17     A    Yes, I do.

18     Q    And what is it?

19     A    This is the document that goes with...with an

20  inmate to any other institution to let them know exactly how

21  he acted or, you know, or if anything was wrong while he was

22  there.

23     Q    Okay.  And does it in fact list the dates of his

24  incarceration at Caroline County Detention Center?

1-72

1    A    Yes, it does.

2    Q    And what does it state?

3    A    7/10/96 to 11/26/96.

4    Q    Do you see a note under a column of potential

5    problem areas listing escape risks?  I believe it's Number 3?

6    A    Yeah.  No.  None or unknown, uh-huh.

7    Q    Okay.  But you...you see that there's a column for

8    it?

9    A    Uh-huh.

10   Q    And it...and it - I am sorry - what does it say

11   under that column?

12   A    It says none or unknown.

13   Q    Okay.  And how about do you see a column that says

14   Institutional Conduct?

15   A    Uh-huh.

16   Q    And does it describe institutional conduct

17   underneath there?

18   A    The same thing - none or...none or unknown.

19   Q    Can you read underneath the title Institutional

20   Conduct whether it describes in parenthesis what it says?

21   A    For which one?  In- --

22        MR. RUARK:  Your Honor, if I might.  The State will

23   stipulate.  The document has been introduced into evidence.

24   It says what it says.

1-73

1      MS. JASANI: Okay. That's fine. Thank you.

2      BY MS. JASANI:

3    Q  Lt. Downes, based on your personal recollection of

4  Mr. Miles and his conduct while he was at the Detention

5  Center, do you recall observing anything while he was there

6  that would lead you to believe that he would present a threat

7  to any prisoners or correctional officers in any prison

8  institution?

9    A  Not while he was there. And if he is the same

10 person as he was...if he is the same person now as he was

11 then, no, I don't see where he would be a threat to anyone.

12   Q  Lieutenant, were you contacted prior to March of

13 1998 by attorneys for Mr. Miles?

14   A  I have been contacted three times. I don't

15 remember what year. The first time, I know an investigator

16 came up and talked to me. That was some years ago. Then I

17 was contacted again. I don't know if that was the early part

18 of this year or last year. Never heard anything from neither

19 one until I heard from you again...from you all.

20   Q  Okay. Do you recall whether you were contacted

21 before 1988 specifically by Archibald McFadden or Tom

22 Saunders? Two attorneys?

23   A  I...I don't think so, unh-unh.

24   Q  Okay. If you had been contacted by them and

1-74

1    subpoenaed to testify at the trial in 1998, would your

2    testimony...what would your testimony have been regarding Mr.

3    Miles' conduct at CCDC?

4        A    Just like it is today.  The same.

5        Q    Okay.

6            MS. JASANI:  Court's indulgence, please.

7        Q    Lieutenant, did you ever, prior to today, or for

8    today's proceeding, receive a subpoena to testify in this

9    matter for Mr. Miles?

10       A    Just the one I got from ya'll.

11       Q    Okay.  Thank you.

12           MS. JASANI:  No further questions.

13           MR. RUARK:  Your Honor, if I might.

14                    CROSS EXAMINATION

15           BY MR. RUARK:

16       Q    Lieutenant, I believe, back in 1998, your position

17   was Master Sergeant with the Caroline.  Is that correct?

18       A    Uh-huh.

19       Q    Okay.  And, Lieutenant, on the form that you were

20   shown and that's been introduced as Petitioner's Exhibit 1,

21   the block that's marked escape risk is known or unknown.  Is

22   that correct?

23       A    That's correct.

24       Q    So it's just as likely that you don't know anything

1-75

1    about whether or not he's an escape risk or not during that

2    timeframe.  Is that correct?

3        A    Yeah.  At that time, that document that ya'll have,

4    I did not fill that out.  That is done by the records

5    department before he is transferred to another facility.

6        Q    Okay.  Thank you.  So you weren't really familiar

7    with this document?

8        A    No.

9        Q    Okay.  When he was received by the Caroline County

10   Detention Center, were you aware that he was also wanted for

11   a criminal case in the State of Tennessee?

12       A    No, I was not aware of it.

13       Q    Okay.  Now, during your contact with him between I

14   believe July of 1996 and 11/199-, or November of 1996, I

15   believe you testified that you don't really recall how many

16   times you had personal contact with him.  Is that correct?

17       A    That's correct.

18       Q    Five times would be fair?  Or you just don't

19   remember?

20       A    I really don't remember.  But it would have been

21   more than five times in...within them months.

22       Q    Okay.  And I believe your time is also split with

23   being an administrator.  Is that correct?

24       A    Uh-huh.

1-76

1    Q    So, a lot of times, you were not on the floor of

2    the Detention Center?

3    A    Right.

4    Q    Okay.  And if you weren't on the floor of the

5    Detention Center during that time, obviously, you would not

6    be able to have contact with Mr. Miles?

7    A    No.  But if anything had happened, it would have

8    came down to my office.

9    Q    Yes, ma'am, based upon reports of other people.  Is

10   that correct?

11   A    Uh-huh.  That's correct.

12   Q    Do you recall having any personal conversations

13   with Mr. Miles at all during that timeframe?

14   A    Uh-huh.  That was a long while ago.  I can't --

15   Q    I know.  It's been a long time.

16   A    -- remember.  I can't remember.

17   Q    I understand.  Okay.  Do you recall him ever asking

18   to speak with you directly?

19   A    He may have.  I don't...I don't recall.  He may

20   have.

21   Q    Do you recall in exactly what cell he was housed?

22   A    I think he was housed in the wing.

23   Q    And does that have any special significance?

24   A    Not really.

1-77

1    Q    Just the general population?

2    A    Uh-huh.

3    Q    And do you recall why he was incarcerated in

4    Caroline County in 1996?

5    A    Repeat that, please.

6    Q    Do you recall why he was incarcerated in Caroline

7    County between July and November of 1996?

8    A    If I am not mistaken, according to the records, it

9    was failure to appear.

10    Q    Okay.  Failure to appear?

11    A    Uh-huh.

12    Q    And was that in the Circuit Court for Caroline

13    County if you recall?

14    A    I have no idea.

15    Q    Okay.  Now, based on the failure to appear, based

16    upon the criteria, would that have any impact upon whether or

17    not the Defendant was an escape risk?

18    A    Not necessarily, because he wasn't there with us

19    when he failed to appear.  That was meant that he...he...he

20    had failed to appear in court.

21    Q    Yes, ma'am.  Okay.  But that would not impact your

22    assessment about whether or not an individual was an escape

23    risk?  The fact that he failed to appear for court?

24    A    No.

1-78

1    Q    Okay.  Now, I believe you indicated you didn't know

2    that he was wanted in the State of Tennessee at the time.  Is

3    that correct?

4    A    Yeah.  I didn't book him.  And like I said,

5    whatever officer, you know, booked him in would know that.

6    Q    Yes, ma'am.

7    A    And the records goes from the book...from the

8    booking officer over to the record department.

9    Q    Okay.  And you do not have the records of the

10   Caroline County Detention Center with you here today.  Is

11   that correct?

12   A    No, I do not.

13   Q    Now, did you review them prior to coming to court

14   to testify here today?

15   A    Yes, I glanced over them.

16   Q    Okay.  But you don't recall anything about any

17   pending charges in Tennessee in 1996?

18   A    I did not really look at 'em that well.

19   Q    That's fine.  I am just asking.  Okay.  Now,

20   Defense Counsel asked you a couple of questions about your

21   contact with attorneys or representatives from the Public

22   Defender's Office.  Is that correct?

23   A    Uh-huh.

24   Q    Prior to March 17, 1998, do you recall meeting with

1-79

1   an individual by the name of Donald Still?

2       A    I met with a gentleman.  Now, I could not tell you

3   what his name is now.

4       Q    And he...did he discuss with you your contact with

5   the Petitioner in this case, Jody Miles?

6       A    Yes, he did.

7       Q    And do you recall exactly what you told him?

8       A    Probably what I said right now.

9       Q    Okay.  Let me just, if I could, read a passage from

10  March 17, 1998 trial transcript page 52 where Mr. Still says

11  that he spoke with you.  You were Master Sergeant at the

12  Caroline County Detention Center.  And you indicated that you

13  remembered him but doesn't remember much...but you don't

14  remember much about him.  What you could say is that you

15  remember the bad ones.  Does that sound familiar to you?

16      A    Yes.

17      Q    Does that sound like something you would say about

18  Mr. Miles?

19      A    Oh, yes, because you do remember the bad ones.  The

20  ones that's quiet, you don't remember them quite as well.

21      Q    Do you recall telling anything else to the

22  investigator, Mr. Still?  Or would that have been about it?

23      A    I don't remember.

24      Q    Okay.  Thank you very much.

1-80

1      A     Uh-huh.

2            MR. RUARK:   I don't believe I have anything

3      further, Your Honor.

4            MS. JASANI:   Yes, Your Honor.

5                   REDIRECT EXAMINATION

6            BY MS. JASANI:

7      Q     Lt. Downes, despite your general comment in that

8      past that you only remember the bad ones, do you recall the

9      behavior of Jody Miles?

10     A     Like I say, Jody, during the time that he was in

11     there, when I was on the floors walking through or whatever I

12     may have been doing in my duties, he, at...at that time, was

13     never any problem.

14     Q     Okay.  And you also testified that you remember his

15     being quiet.  So is it correct that you do have a

16     recollection of his behavior?

17     A     Yes, that he was on the quiet side.

18     Q     And if you had been asked to testify in the trial,

19     would you have testified as you testified here regarding his

20     behavior in your recollection?

21     A     Yes, I would have.

22     Q     Thank you.

23           MS. JASANI:   No further questions, Your Honor.

24           THE COURT:   Anything further?

1-81

1          RECROSS EXAMINATION

2               BY MR. RUARK:

3          Q    Lieutenant, if you were called to testify, would

4     your testimony be any different than that excerpt that I just

5     read to you that you didn't really know him, he was quiet,

6     you would have remembered the bad ones?  Would it have been

7     any different?

8          A    No.

9               MR. BENNETT:  Objection.

10              MS. JASANI:  Objection.

11              MR. BENNETT:  Can we consult?  Because it's her

12     witness.

13              THE COURT:  Okay.

14              MS. JASANI:  Your Honor, that is an improper

15     premise.  No further questions were put to her.  And the

16     record did not state that.

17              THE COURT:  I'll sustain, Mr. Ruark.

18              MS. JASANI:  He is simply testimony...he's putting

19     testimony in the words of the witness, Your Honor.

20              THE COURT:  I'll sustain.

21              MR. RUARK:  Thank you.

22              MS. JASANI:  Thank you, Your Honor.

23              MR. BENNETT:  Can she be excused?

24              MR. RUARK:  I...I have one question, Mr. Bennett,

1-82

1    please.

2            MR. BENNETT:  Oh, I am sorry.

3            BY MR. RUARK:

4    Q    If I might, Lieutenant, I just want to clarify one

5    thing based upon redirect.  Your contact with him, was it

6    detailed conversation or was it just in passing?

7    A    I really don't re- --  Well, I am quite sure I had

8    talked to him sometime, because like it's different things

9    that we do.  We serve up food.  We serve medication.

10    Q    Yes, ma'am.

11    A    We...we did head counts.  So, you know, in doing

12    that, I talk to everyone that was in there.

13    Q    Sure.  I...I understand that.  But that...that's

14    just a matter of routine.  You do that with every inmate.  Is

15    that correct?

16    A    Right.

17    Q    Okay.  Thank you.

18            MR. RUARK:  I have nothing further.

19            THE WITNESS:  Okay.

20            THE COURT:  Is she excused?

21            MS. JASANI:  Yes.  Thank you,  Your Honor.

22            MR. RUARK:  Yes.

23            THE COURT:  You may step down.  Watch your step,

24    please.  You are free to leave.

1-83

1          THE WITNESS:  Thank you.

2          MS. JASANI:  Your Honor, I would like to call our

3     next witness, Mr. Steven Bailey.

4                         STEVEN BAILEY,

5     a witness produced on call of the Petitioner, having first

6     been duly sworn, was examined and testified as follows:

7                       DIRECT EXAMINATION

8          BY MS. JASANI:

9      Q    Good morning.  Could you please state your name and

10    spell your name for the Court?

11     A    Steven Bailey, S-t-e-v-e-n B-a-I-l-e-y.

12     Q    And what is your address, Mr. Bailey?

13     A    106 Bacon Street, Mardela.

14     Q    And how long have you lived in Mardela?

15     A    All my life.

16     Q    Okay.  And what is your occupation?

17     A    I am steam fitter at Holly Center.

18     Q    And how long have you been with the Holly Center

19    for?

20     A    Twenty-one years.

21     Q    One year.  And what did you do prior to that?

22          MR. BENNETT:  Twenty-one years.

23     Q    Twenty-one years.  Sorry.

24     A    Twenty-one years, yes.

1-84

1     Q    My hearing is not so good.  Mr. Bailey, do you know

2   Jody Miles?

3     A    No.

4     Q    Okay.  Did you know the victim Mr. Edward Atkinson?

5     A    Yes.

6     Q    And were you related to Mr. Atkinson?

7     A    No.

8     Q    When did you first learn that Mr. Atkinson had been

9   murdered?

10    A    About two days after...after I drove by.

11    Q    And how did you come to hear of this?

12    A    I was at work.

13    Q    Okay.  And you were at work?

14    A    Yes.

15    Q    And who did you hear it from?

16    A    Just in passing, the people...the...the switchboard

17  operator, actually.

18    Q    Okay.  And what did you learn specifically on that

19  date?  What did you hear?

20    A    That he had been murdered.

21    Q    Did you hear where he had been murdered?

22    A    Yes.

23    Q    And where was that?

24    A    On Old Bradley Road.

PENGAD • 1-800-631-6989 • www.pengad.com

LASER BOND FORM B

1-85

1    Q    Okay.  Mr. Bailey, were you in the proximity of Old

2   Bradley Road on April 2, 1997, the same day the victim was

3   murdered?

4    A    Yes, ma'am.

5    Q    And where were you precisely?

6    A    I was heading north on Old Bradley Road going to my

7   mother and father's old farm.  It's probably three-quarters

8   of a mile from Route 50 up the road to where I saw the cars.

9    Q    Okay.  And what was your purpose for being there?

10    A    I was just leaving the Delmarva Sporting Clays

11   Range, and I was going out to the farm just to look around

12   like I usually do.

13    Q    Okay.  And can you please describe for the Court

14   what, specifically, you observed on that date?

15    A    As I came down Old Bradley Road, I saw the two cars

16   and one woman.  That was it.

17    Q    What did the two cars look like?

18    A    One black.  One red.

19    Q    Okay.  And do you recall the direction...which way

20   they were facing?

21    A    The red car was facing toward the road, and the

22   black car was sitting behind it facing, or back behind the

23   red car facing the road also.

24    Q    And you testified that you saw one woman?

1-86

1      A   Yes.

2      Q   Can you describe, physically, what the woman looked

3 like?

4      A   About 5-4, stocky, short dark hair.

5      Q   And what was the woman doing?

6      A   Walking away from me.

7      Q   Walking away from?

8      A   Me.

9      Q   From you?

10     A   Yes.

11     Q   Okay. So in what direction was...where was she

12 walking from and where was she walking to?

13     A   I was going north on Old Bradley.  She would be

14 walking southwest.  She was turned three-...when I saw her

15 and she saw me, she turned three-quarter away from me and

16 walked away.

17     Q   Okay.  Did that strike you as unusual?

18     A   Well, not 'til I thought about it when I saw, you

19 know, two cars and one woman, and I am thinking "Why are you

20 back here and who else is here?"

21     Q   Mr. Bailey, what did you do with this information?

22     A   Nothing.

23     Q   Okay.  Did you...after you heard about the...the

24 murder, did you do anything with this information?

1-87

1    A    Yes, ma'am.

2    Q    And what was that?

3    A    Called the State Police.

4    Q    Okay.  And when exactly did you call the State

5    Police?

6    A    Let's see.  It happened on Wednesday.

7    Q    Okay.  Was it on the 2nd?

8    A    So I guess it would have been that Friday.

9    Q    Okay.

10    A    Well, no, wait a minute.  It could have been...it

11    could have been late...late Thursday or Friday.

12    Q    Okay. Would that have been a couple of days after?

13    A    Yes.

14    Q    Within a couple of days of your observation?

15    A    Yes, ma'am.

16    Q    Okay.  And what specifically did you report to the

17    police?

18    A    Just what I just told you.

19    Q    Okay.  Mr. Bailey, did you receive a summons from

20    the State to come to the court house at any time --

21    A    Yes, ma'am.

22    Q    -- in this proceeding?  Okay.  And did you in fact

23    appear?

24    A    No, ma'am.

1-88

1     Q    You did not come to the...did you come to the court

2  house?

3     A    Oh, yeah.

4     Q    Okay.  And how many days were you...were you at the

5  court house?

6     A    I believe only one.

7     Q    Okay.  And this...and just to clarify, this was in

8  the trial of...of Jody Miles?

9     A    Yes, ma'am.

10     Q    Okay.  Were you ever called to testify?

11     A    No, ma'am.

12     Q    Were you ever informed by the State as to why you

13  weren't called?

14     A    No, ma'am.

15     Q    Okay.  How many days were you present for, if I

16  didn't ask you already?

17     A    Just the one.

18     Q    Just the one day?

19     A    Yes.

20     Q    Okay.  Mr. Bailey, were you ever contacted by the

21  attorneys for Mr. Miles?

22     A    I don't believe so.

23     Q    Okay.  Had you been contacted by Mr....by Mr.

24  Miles' attorneys to testify to your observations on April 2,

1-89

1    1997, would you have done so willingly?

2        A    Yes.

3        Q    And would you have testified to the observations as

4    you have testified here today?

5        A    Yes.

6            MS. JASANI:   Court's indulgence, please.

7        Q    Mr. Bailey, do you recall whether you were ever

8    contacted by an investigator for the Defense prior to March

9    1998?

10        A    Don't think so.

11        Q    Okay.   Thank you.

12            MS. JASANI:   No further questions.

13                    CROSS EXAMINATION

14            BY MR. VINCENT:

15        Q    Mr. Bailey, you spoke to...do you remember speaking

16    to - I believe it was at that time Corporal Willy Benton --

17        A    Yes.

18        Q    -- of the Maryland State Police?

19        A    Yes.

20        Q    Did he meet you back out there at the scene?

21        A    We went out there one time, and he met me at my

22    house one time.

23        Q    Okay.

24        A    That...as I remember.

1-90

1    Q    For...for the benefit of the...the Judge, this part

2    of Old Bradley road was a dirt road?

3    A    Yes.

4    Q    The area where you saw the car, it was off of the

5    road I guess on the Vienna River side of Old Bradley Road?

6    A    Yes.

7    Q    And as I recall, was it an area that was enough to

8    turn...car turn around in?

9    A    Yes.  It's actually where the hunters park when

10   they would hunt on the property there.  There's probably

11   thirty or forty feet, you know, square.  Plenty of room to

12   park, you know, more than one car.

13   Q    Did you go back with...so you went back with

14   Corporal Benton and showed him where you saw the vehicles?

15   A    Yes.

16   Q    And that was the area where Mr. Atkinson's vehicle

17   was found and his body was found in the woods?

18   A    Yes.

19   Q    Did you recognize either of the vehicles?

20   A    No.

21   Q    Either the black and red?

22   A    No.

23   Q    Okay.  And what...what time was it?

24   A    It had to be after 4:00, because I, well, actually,

1-91

1    after...after 4:30, because I don't get off work until 4:00,

2    and I had gone right to the sporting clays range, and I was

3    there for awhile, and then I went on out on the farm.

4         Q    Okay.  And the female that you saw was white?

5         A    Yes.

6         Q    Do you remember anything about the red car?

7         A    No.

8         Q    How about the black --  Other than being red?

9         A    No.

10        Q    The black vehicle?  Anything about it other than

11   being black?

12        A    No.

13        Q    Were these vehicles facing the same direction?

14        A    Yes.

15        Q    And which way?

16        A    Facing the road.  It would be facing east.

17        Q    Okay.  So was that back toward...down Old Bradley

18   Road or back toward Rt. 50?

19        A    Across Old Bradley Road.  The road's setting this

20   way north and south.  The car's one parked here and one

21   parked here.

22        Q    Okay.  Side by side?

23        A    No, one behind the other.

24        Q    Okay.  Okay.  I don't think I have got any of the

1-92

1    pictures.  If I could get you to draw a diagram.

2                (Witness went to the board and drew a diagram.)

3        Q    You can draw on that.  Artistic ability doesn't

4    count, so....

5        A    Okay.

6        Q    Draw me Old Bradley Road and that area up to the...

7    off of that...the dirt lane.

8        A    Okay.  Old Bradley Road.  That's north.  That's

9    south.  Coming up Old Bradley --

10       Q    And Rt. 50 is...would be the southern, right?

11       A    Back here, yes.  This area is like this.   And I

12   noticed there's a big tree.  The car...one was sitting here,

13   and one sitting here.

14       Q    Okay.

15       A    She was heading this way.

16       Q    Alright.  Which one was the black one, which one

17   was the red one?

18       A    The red one, the black one.

19       Q    Okay.  So the red one was pulled up behind the

20   black one?

21       A    No.  The red one was first next to the road.

22       Q    Okay.

23       A    The black one was behind it.

24       Q    But they were both facing the chain?

1-93

1    A    The road, yes.

2    Q    Okay.

3    A    There was no chain.

4    Q    Alright.  Now, I...you have got me confused.

5    A    You are on the wrong road.  This is the second

6    little parking lot.  There's another road here that goes all

7    of the way back to the pond.  They were not here.  They were

8    here.

9    Q    Okay.  So the two cars that you saw were not at the

10    area where the chain --

11    A    No.

12    Q    -- was?

13    A    No.

14    Q    Okay.  So did --

15    A    Now, wait a minute.  Now, you...there's two chains.

16    There's no chain here, but there is a chain going back to the

17    road that goes back here.  You are correct.

18    Q    Okay.  And you met with Willy Benton - excuse me -

19    Corporal Willy Benton at that area?

20    A    Uh-huh.  Yes.

21    Q    Where...where you had told him you had seen the

22    vehicle?

23    A    Yes.

24    Q    And did he indicate to you that was the same place

PENGAD • 1-800-631-6989 • www.pengad.com

LASER BOND FORM B

1-94

1  the vehicles had been found or was it at the other place?

2      A    No, this place.

3      Q    This place here.  Okay.

4           (Witness resumed the stand.)

5      Q    Alright.  Let's see.  I got a couple of aerial

6  photos.  Get my bearings, also.  Your family owns a farm down

7  Old Bradley Road from the --

8      A    No, it's up further, and you have to go through a

9  dirt road to get to it.  It's between Gladfelder Corporation

10 and Lewes Kelly's farm.

11     Q    Okay.

12     A    There's a dirt road that goes back, and then our

13 farm is behind that.

14     Q    You travel that passage through I guess from time

15 to time?

16     A    Oh, yeah.

17     Q    From off of Old Bradley Road?

18     A    A couple times...two or three times a week.

19                              (Photograph was marked for

20                              identification as State's

21                              Exhibit No. 1.)

22     Q    Alright.  Let me let you take a look at...I guess

23 this will be Respondent's 1.  See if you can tell if the area

24 of the dirt road is depicted in that photograph?

1-95

1      A     Here.

2      Q     Where those cars are there now?

3      A     Yes.  This is the road that goes...there's a chain,

4   well, actually, there's a chain further back here off of this

5   road.  This chain here is here because they don't want them

6   driving back because their road goes all of the way around

7   this pond.

8            THE COURT:  Speak up if you would.

9            THE WITNESS:  Yes, sir.

10           BY MR. VINCENT:

11     Q     So that's...that's the same area?  That's the road

12  where you had seen the...the vehicles?

13     A     Yes, sir.

14     Q     And there's a chain I guess up...up somewhat off of

15  the road?

16     A     Yes.

17     Q     Okay.  Do you remember anything...anything about

18  the style of the vehicle?

19     A     No.

20     Q     When...when I say vehicle, black vehicle?

21     A     No.

22     Q     Four door?  Two door?

23     A     No.

24           MR. VINCENT:  I am sorry.  I had that photograph as

1-96

1    1, or referred to that as 1.  I guess make this little

2    diagram as 2.

3                                    (Diagram was marked for

4                                    identification as State's

5                                    Exhibit No. 2.)

6        Q    For purposes of your diagram, the...the red line

7    down the paper is --

8        A    Old Bradley Road, yes.

9        Q    -- Old Bradley Road, right?  And make sure I am

10   clear.  The...the black car was the closest of the two to

11   the --

12       A    Chain, yes.

13       Q    -- chain?  Okay.

14                                   (Photograph was marked for

15                                   identification as State's

16                                   Exhibit No. 3.)

17       Q    Let me show you a photograph that's marked as 3.

18   Show you what's marked as 3, Mr. Bailey.  Can you tell

19   whether that looks anything like the vehicle that you saw and

20   the location that you saw it?

21       A    It's black.

22       Q    Okay.  How about the location in terms of the

23   cable?

24       A    Yes.  Yeah.

1-97

1     Q    Okay.  The...the person that you saw --

2          MR. BENNETT:  Your Honor, can the..can the record

3     reflect he nodded?

4     A    Yes.  And...and the one thing I...I do realize

5     there is the car was parked heading back toward the cable and

6     not out toward the road.  That's something I just...I knew

7     the car was there and what position it was in, which way it

8     was heading.

9     Q    Okay.

10         THE COURT:  What was his affirmative response or...

11    or response to your last question?  Because I didn't pick one

12    up at all.  I didn't --

13         BY MR. VINCENT:

14    Q    I think my last question in regard --

15         MR. VINCENT:  I didn't mean to cut you off, sir.  I

16    am sorry.

17         THE COURT:  Okay.

18         BY MR. VINCENT:

19    Q    I think my last question was regarding the cable,

20    does that appear to be the --

21    A    Yes.

22    Q    -- general location?

23    A    Yes.

24    Q    Also, the direction of the vehicle?

1-98

1     A    No.

2     Q    This vehicle is facing?

3     A    You know, I thought it was facing the road, but,

4     obviously, it wasn't.

5     Q    Okay.  So could it have been a different vehicle

6     that you saw?

7     A    If it was black.

8     Q    Okay.

9     A    Because the vehicle like I saw was black.

10    Q    But the vehicle you saw was facing Bradley Road as

11    opposed to the cable?

12    A    I could be wrong.  Like I say, the car was parked

13    in that vicinity.  Right now, which way it was facing, I

14    really couldn't tell you now.

15    Q    Okay.  What was your point of reference as to the

16    date that you saw the vehicle?

17         MR. VINCENT:  I am sorry.  For purposes, if we

18    didn't move in the exhibit into evidence as Exhibit 3, Madame

19    Clerk.

20         MR. BENNETT:  No objection.

21         MS. JASANI:  No objection, Your Honor.

22         THE COURT:  3 is...3 is admitted.

23                              (State's Exhibit No. 3,

24                               previously marked for

1-99

1                                    identification, was

2                                    received into evidence.)

3          BY MR. VINCENT:

4      Q     What was your point of reference --

5          THE COURT:  Have 1 and 2 been offered?

6          MR. VINCENT:  I believe I did.  But, if I didn't, I

7    will offer those in.

8          THE COURT:  Any objection?

9          MR. BENNETT:  No.

10          BY MR. VINCENT:

11      Q     When you --

12          THE COURT:  1 and 2 are admitted.

13          MR. VINCENT:  I am sorry, Judge.

14                                    (State's Exhibit Nos. 1

15                                    and 2, previously marked

16                                    for identification, were

17                                    received into evidence.)

18          BY MR. VINCENT:

19      Q     When you saw this on a particular day, what was

20    your point of reference to knowing that it was the 2nd of

21    April...the 2nd of April of '97 that you saw it?  Do you

22    remember why you made note that it was that particular day

23    and not the...not the 1st of April or the Monday?

24          A     Only the next day when I heard that Eddie was

1-100

1   missing.

2       Q     Okay.   The day after you saw it was the day that

3   you heard Eddie was missing?

4       A     Yes.

5       Q     The person that you saw, could you tell for sure it

6   was a female?

7       A     Pretty much, yeah.

8       Q     What was it about it that...that --   You...you

9   describe her as stocky build?

10      A     Yeah.

11      Q     But you...if she was facing you...was she facing

12  you initially and then turned away from you?

13      A     No.   The minute I cleared the woods, I saw her

14  through the...the trees.   I saw a person.   The minute I

15  cleared the...the trees, she immediately turned and walked

16  three-quarters away from me.

17      Q     But you...you could tell for sure it was a female?

18      A     Yes.

19      Q     You...according to the report of Willy Benton, it

20  indicates that the black car was behind the red car with the

21  bumper near the intersection of Old Bradley Road.   Do...do

22  you remember indicating that to the --

23      A     I don't...I couldn't remember what I told him right

24  now.

1-101

1     Q    Okay.

2     A    That's been ten years ago.

3     Q    Yes, sir.  I understand.  What you indicated was

4   the red - I am reading from the report that's part of our

5   answer - that the red car was in front of the black car and

6   it was parked diagonally facing towards US Rt. 50 on the dirt

7   road in the turn around area.  The black car and, in

8   parenthesis, the Corporal wrote "victim's vehicle was behind

9   the red car with its bumper near the intersection of Old

10   Bradley Road".

11    A    Yes.

12    Q    Is...is that what you told him?

13    A    Sounds right.

14    Q    Okay.

15       MR. VINCENT:  Court's indulgence.

16    Q    Other than Willy Benton, do you remember speaking

17   to any other investigator...any...any other police

18   investigator?

19    A    At that time?

20    Q    Yes, sir.

21    A    No.

22    Q    Okay.  Subsequent prior to trial, do you recall

23   meeting with or talking to the Public Defender's investigator

24   or one of the attorneys?

1-102

1     A     And who would that be?

2     Q     Either Mr. McFadden, Mr. Saunders or Mr. Steil, or

3     Still?

4     A     Steil sounds familiar, but --

5     Q     Don...Donald --

6     A     --  I am not...I am not sure.  I know...might know

7     him by face, but, by the name, it sounds familiar, but that's

8     all.

9     Q     Okay.  Alright, sir.  Would you have met somebody

10    at the house...up to your house or where would you have met

11    them?

12    A     Yes.

13    Q     Your house?  Do you recall meeting with somebody

14    other than Willy Benton regarding this?  I know it's been a

15    while, Mr. Bailey.

16    A     It...it seems to me, yes, I did.  But I, like I

17    say, I couldn't tell you who it was.

18    Q     Okay.  That's all we have, Mr. Bailey.  Thank you,

19    sir.

20                    REDIRECT EXAMINATION

21         BY MS. JASANI:

22    Q     One last question, Mr. Bailey.  Were you ever asked

23    by counsel from...for Jody Miles to testify at the...at the

24    trial, the sentencing phase?

1-103

1    A    No, ma'am.

2         MS. JASANI:   Court's indulgence.

3    Q    Mr. Bailey, you said you couldn't remember exactly

4    who interviewed you.   Isn't it possible you could have been

5    interviewed a second time by another member of the Maryland

6    State Police?

7    A    Don't think so.

8    Q    Okay.

9    A    I remember...I remember Officer Benton.

10   Q    Okay.

11   A    But anybody else from the State Police?  No, I

12   don't think so.

13   Q    Okay.   But would you have remembered if you had

14   been interviewed by the attorneys for the Defense and if they

15   had asked you to testify?

16   A    Yes, I would probably remember it.   Yes.

17   Q    Thank you.   Thank you.

18        MS. JASANI:  No more questions, Your Honor.

19        THE COURT:  Anything further?

20        MR. VINCENT:  No, sir.

21        THE COURT:  Is the witness excused?

22        MS. JASANI:  Yes,  Your Honor.

23        THE COURT:  You may step down.  You are free to

24   stay.  You are free to leave.

1-104

1    MR. BENNETT:  Mr. Saunders.

2                THOMAS SAUNDERS,

3    a witness produced on call of the Petitioner, having first

4    been duly sworn, was examined and testified as follows:

5                DIRECT EXAMINATION

6        BY MR. BENNETT:

7        Q    Mr. Saunders, please speak up and direct your

8    answers to the Court.  Please give your full name and your

9    professional address.

10       A    Thomas Saunders.  My office address is 3600

11   Clifford Mill Road, Suite 201, Baltimore, Maryland 21211.

12       Q    Are you a member of the bar of the State of

13   Maryland?

14       A    Yes, sir, I am.

15       Q    When were you admitted to practice?

16       A    1978 in December.

17       Q    So it will be thirty years two years from now?

18       A    Yes, sir.

19       Q    Alright.  Can you, for the benefit of the Court,

20   outline your professional career, that is jobs that you held?

21       A    Yes, sir.  Immediately out of law school, I was

22   hired by the Office of Public Defender, the Appellate

23   Division, spent a year and a half there.  Then, I transferred

24   to the Trial Division in Baltimore City, Felony...the Felony

1-105

1    Trial Unit.  I think there were twelve of us.  I stayed there

2    two years, at which point I was designated by Allan Merrill,

3    who was Public Defender at that time, to write a death

4    penalty litigation manual and set up a death penalty unit to

5    supervise death penalty work in the State of Maryland.  In

6    1984, I was appointed by Mr. Merrill as District Public

7    Defender for Baltimore County and served in that capacity for

8    seven years.  I then was requested by Mr. Harris to transfer

9    to what was now a division, the Death Capital Defense

10   Division.  I served there seven years.  That would be '91 to

11   '98.  Then I went into private practice specializing in,

12   well, limiting my practice to criminal trial work, which is

13   now almost exclusively federal from that time till now.

14        Q    Did there come a time that you either assigned

15   yourself or were assigned by the Capital Defense Division to

16   the death penalty case of Jody Miles?

17        A    I assigned myself.  Yes, sir, I did.

18        Q    You were still in the Capital Defense Division?

19        A    Yes, sir.

20        Q    The head of it?

21        A    Yes, sir.

22        Q    Okay.  And the person that second chaired the case

23   was Archibald McFadden.

24        A    Correct.

PENGAD • 1-800-631-6989 • www.pengad.com

LASER BOND FORM B

1-106

1      Q      Is that correct?

2      A      Correct.

3      Q      You also had a third person who was just graduating

4    from law school, Franklin Draper?

5      A      No, sir.  He --

6      Q      He --

7      A      He actually had practiced in the south.

8      Q      Alright.

9      A      And he...I hired him into my unit.  I brought him

10    on as third counsel to familiarize him with Maryland

11    procedure in capital litigation.

12     Q      He was not...is it accurate to say he was not yet a

13    member of the Maryland Bar?

14     A      I believe you are correct.  I don't recall.

15     Q      Alright.  Did you represent Mr. Miles at both the

16    trial and the sentencing hearing?

17     A      Yes, sir.

18     Q      And prior to trial, the case was removed out of

19    Wicomico County, correct?

20     A      Yes, sir.

21     Q      And where was it moved to?

22     A      You are testing my memory.  I believe this

23    jurisdiction is from Judge Sause, but --

24     Q      Queen Anne?

1-107

1     A     Queen Anne's.

2     Q     Alright.  Who was the presiding judge?

3     A     I believe Judge Sause.

4     Q     Alright.  Have you, since this litigation has been

5 filed, received from me or from Mr. Kanwisher, all relevant

6 pleadings, that is all of the pleadings that are in this

7 case?

8     A     I received the initial pleading from Mr. Kanwisher,

9 and I believe I received two supplemental pleadings filed by

10 you if I...if my memory serves me.

11     Q     Alright.  Now, have you looked at those and had an

12 opportunity to review them?

13     A     I had in the past.  I haven't in the last, you

14 know, week or two.

15     Q     Alright.  Did you meet with me?

16     A     Yes, sir.

17     Q     At your office?

18     A     Yes, sir.  And I previously met with Mr. Kanwisher

19 in the past, as well.

20     Q     Alright.  Of course, when you met with me, he no

21 longer was on the case, sir, correct?

22     A     Correct.

23     Q     And you also met with a representative of the

24 State.  Is that correct?

1-108

1    A    Yes.

2    Q    Mr. Vincent?

3    A    Yes, after a judicial order was signed that there

4  was no longer an attorney/client privilege as to these

5  matters.

6    Q    Alright.  Now, I want to go into the issues one by

7  one, and I am going to do it in regard to both facts and

8  references to the transcript.  Is that --

9    A    Yes, sir.  Fine.

10    Q    -- okay with you?  Alright.  The first one - Your

11  Honor and Mr. Saunders - is 27A dealing with the failure to

12  propound...your failure to request the Court to propound, to

13  eleven prospective jurors, a question dealing with whether

14  they would give more or less weight to the testimony of a

15  police officer than any other witness.  Are you aware of what

16  happened that led to that factual scenario?  That is why

17  those eleven had not been asked the question previously?

18    A    Well, quite honestly, it was an oversight on our

19  part.  For the first eleven, the judge...I believe it was the

20  judge who realized that we left that question out, and he

21  asked us whether or not we wanted to ask that question of the

22  eleven jurors.  And after discussing it with the other

23  attorneys involved, we decided not to.

24    Q    Let me ask you a question.  You submitted prior to

1-109

1    trial, did you not, a voir dire, or a request for voir dire

2    questions?

3         A    Yes, sir.

4         Q    You included that question yourself on the voir

5    dire, didn't you?

6         A    I probably did.

7         Q    That's a standard question that a defense attorney

8    would request on voir dire in a death case or in any case

9    where police officers could be considered to be witnesses on

10   relevant matters?

11        A    Yes, it is.

12        Q    Alright.  You did get that question in regards to,

13   or asked in regards to every other prospective juror other

14   than the eleven?

15        A    That's true.

16        Q    You never prior to the eleven person issue coming

17   up, asked the court not to ask it at all?

18        A    That's true.

19        Q    Never asked the court to strike it from your

20   prospective pro-...proposed voir dire questions?

21        A    Yes.

22        Q    Okay.  Is it fair to say that, when the trial

23   began, you wanted that question asked?

24        A    It wasn't high on my list, but yes.

1-110

1    Q    Alright.  Now, would you agree that there is no

2  downside risk whatsoever in having that question included

3  among the questions to be asked of a jury...juror?

4    A    There's no downside, correct.

5    Q    Alright.  Would you indicate whether or not one of

6  the goals of a defense attorney in picking a jury is to learn

7  information that might lead to a challenge for cause?

8    A    That's one of the purposes, yes.

9    Q    And a second would be, would it not, to give you

10  information that would help you better exercise your

11  peremptory challenge, correct?

12    A    Obviously.

13    Q    If a question is not asked that could lead to a

14  challenge for cause, you would never be able to make that

15  motion, correct?

16    A    Obviously, yes, sir.

17    Q    Nor would you have that fund of information for use

18  on a peremptory challenge, correct?  If you didn't have that

19  question asked?  The fund of information dealing with that

20  question?

21    A    Assuming I would have exercised a peremptory on

22  that basis.

23    Q    Now, when you got down to those last eleven

24  witnesses, or the prospective jurors and the court called it

1-111

1  to your attention, I am going to direct your attention to the

2  transcript dated March 9, 1998 on the guilt/innocence phase

3  of the trial, obviously, pages 4 to 5, and this is what you

4  said after the court called it to your attention, 10 through

5  12, "Just a minute, Your Honor.  We are going to waive any

6  objection with regard to that."  You then conferred with the

7  Defendant and said, on page 5, asking Mr. Miles, "You have

8  had a chance to confer with us, and you understand what we

9  are doing, and you understand it and agree with it?", "Yes, I

10  do."  So you in fact authorized the court by saying that you

11  were waiving any objection to...to proceed with the swearing

12  of the jury without those questions...without that question

13  being asked of eleven people?

14        A    I don't have the transcript in front of me.  Are

15  you referring to when the judge pointed it out and we made

16  the decision not to ask those questions of them?

17        Q    Yes.  And then right after that, the jury began

18  being sworn...chosen on page 6 right after with the start of

19  peremptory challenges back and forth.

20        A    Okay.

21        Q    Alright.  Now, the record shows --

22        MR. VINCENT:  May we show the transcript to Mr.

23  Saunders so he can see what was Mr. Bennett is asking him

24  about?

1-112

1          THE COURT:  Which...which volume do you have?

2          MR. BENNETT:  March 9, 1998, guilt/innocence.  Page

3    4, what's underlined in yellow and, page 5, it ends on that

4    issue.

5          BY MR. BENNETT:

6      A    I have had a chance to review it.  Thank you, sir.

7      Q    Alright.  Does that accurately summarize basically

8    what I went through with you a minute ago?

9      A    Yeah.  The record speaks quite clearly as to what I

10   said.

11     Q    Alright.  Now, the record then continues with the

12   exercise of peremptory challenges and the seating of the

13   jury.  And the record reflects that four jurors, Ann Johnson,

14   William Youngman, Treba Wallender, and James Taylor, were

15   among that group of eleven that were not asked that question

16   and then were chosen, so they sat on the jury.

17     A    Yes, sir.

18     Q    So, in exercising your peremptory challenges, you

19   would not have that fund of information for those four

20   jurors, correct?

21     A    Yes.  We elected not to do that.

22     Q    There were, from your own memory, correct, during

23   the individual voir dire of jurors, times when you made a

24   challenge for cause that were sustained?

1-113

1    A    Yes, sir.

2    Q    These four jurors obviously were at the beginning

3    of the list because they sat on the jury and the court went

4    from top to bottom, right?

5    A    Yes, sir.

6    Q    By not having the questions asked, you don't know

7    what their answer would have been in regard to law

8    enforcement --

9    A    That's correct.

10    Q    -- views?  And so you were unable to make a

11    challenge for cause on that ground?

12    A    Unable to make it if in fact an answer would have

13    given me cause, yes, sir.

14    Q    You were aware of the law in Maryland, Langley

15    versus State, that you had that...a right to have that

16    question put to each juror?

17    A    Absolutely.

18    Q    Are you telling the Court here today that your

19    strategy or reason for not asking those eleven...to have

20    those eleven asked that question was because you concluded

21    that law enforcement officers were really not a central part

22    of this case?

23    A    Actually, it's twofold, and that is part of it.  I

24    was not terribly concerned with that question because we were

1-114

1  not challenging the credibility of any police officers.  It

2  was not central to our case in any level.  Secondly, I

3  obviously, as you can see from the record, and it helps - I

4  had not seen that particular transcript before today - and it

5  helps me remember that we did make a conscious decision.  We

6  liked the jurors that we were seeing.  In fact, one of those

7  names that you read off, if my memory is correct, is one of

8  the three jurors who was hanging for life.  So all I can say

9  is, whether right or wrong, that's what we did.

10      Q    Well, one of the four, or - excuse me - you are

11  saying of those four that say, one of them was hanging for

12  life but eventually caved in and voted death?

13      A    Yes, sir.  It was a nine to three in terms of how

14  the jury was at the end.

15      Q    Initially?

16      A    Well, for many, many hours until early in the

17  morning hours when the three caved in.

18      Q    Alright.  As to the first part of your reason, that

19  law enforcement officers were not especially important in

20  that case, you still would have wanted, would you have not,

21  if a person, if they were going to only play minor roles, if

22  a juror was going to automatically credit the testimony of a

23  law enforcement officer over the testimony of a lay witness,

24  wanted to have know that, one, and, two, if they were

1-115

1  dogmatic in that belief, use it for peremptory...a challenge

2  for cause?

3      A    The short answer is this was a death penalty case

4  where my major concern was getting a jury that would vote

5  life.  And if I had people who believed police officers over

6  others who have Witherspooned out of cases.  So my concern

7  was the jurors' views and openness toward life as opposed to

8  whether they would believe a police officer over another

9  person.

10     Q    Except that - correct me if I am wrong - the

11 individual voir dire of every other juror other than these

12 eleven dealt primarily with two areas - the death

13 qualification, Witherspoon/Morgan, --

14     A    Yes, sir.

15     Q    -- and police officers' testimony being less or

16 more weight than an ordinary citizen?  Isn't that right?

17     A    That wasn't the full extent of the voir dire.

18     Q    Talking about the individual voir dire...voir dire,

19 not the ones that...not the one...not the general voir dire.

20     A    Okay.  Alright.  I haven't reviewed that

21 transcript, and so I don't know.  I can't recall.  But if --

22     Q    Did you review this morning the eleven pages on

23 Lynn Benjamin?

24     A    Yes, sir.

1-116

1    Q    The two areas in there on her entire individual

2  voir dire dealt with those two areas, didn't it?

3    A    Yes, but that's the only --  All I am saying is the

4  record speaks for itself, whatever it is.  And I haven't

5  reviewed it.  That's all I am saying.

6    Q    Alright.  But what you reviewed this morning, about

7  eleven pages dealing with...on a separate issue, Lynn

8  Benjamin, --

9    A    Yes, sir.

10    Q    -- which was individual voir dire of her, there

11  were two topic matters?

12    A    That is correct.

13    Q    The two I have described previously?

14    A    Yes, sir.

15    Q    Alright.  So, at any rate, you didn't ask that

16  those eleven be asked those questions?

17    A    That is correct.

18    Q    And you agree that there was no downside to this?

19  Couldn't have hurt your client?

20    A    In a general proposition, yes.

21    Q    Alright.  Next - going onto B, Your Honor, which is

22  on page 8 - and this is Mr. Saunders' failure to exhaust your

23  allotted peremptory challenges.  Have you read this morning

24  the voir dire testimony of Lynn Benjamin?

1-117

1    A    Yes.

2    Q    Which involved 110 through 121 of 226 of the voir

3    dire process?

4         MR. BENNETT:  And, Your Honor, for purposes of the

5    record, this is 26th day of February 1998.

6    Q    Is it accurate to say that her questions on voir

7    dire showed a clear bias in favor of law enforcement officers

8    over the testimony of a lay witness?

9    A    Yes.

10        THE COURT:  What pages?

11        MR. BENNETT:  110 to 121.

12        THE COURT:  Thank you.

13        BY MR. BENNETT:

14   A    Well, yeah.  I mean, she certainly did indicate

15   that, although I think she was stronger on the death penalty.

16   But that is my memory.

17   Q    That was going to be my next question.  She was

18   even stronger on the death penalty, wasn't she?

19   A    Oh, absolutely.  I think the judge was totally

20   wrong not to excuse her.

21   Q    Huh?

22   A    I think the judge was totally wrong not to excuse

23   her.

24   Q    Yeah.  Alright.  So the next part of it was

1-118

1    questions on the death penalty, and she was really pro State,

2    wasn't she?

3         A    Yes.

4         Q    Pro death?

5         A    Yes.

6         Q    And, in fact, as a result of all of the questions,

7    on page 121, you move to strike?

8         A    Right.

9         Q    And it reads as follows, 9...line 9, "Defense would

10   respectfully move to strike 11."  Mr. Rur-...Rur-...Ruark...

11   Ruark --

12             MR. VINCENT:  Whatever.

13             MR. BENNETT:  Well, give it to me again.  I want to

14   get it right.

15             MR. VINCENT:  That's okay.  Just go.

16             MR. BENNETT:

17        Q    "The State must object."  The Court, "I will hear

18   you."  Pros-, or the State, "No, sir, the State doesn't wish

19   to be heard."  Now, what does that indicate to you as a

20   lawyer when all you are saying is "Objection.  I have nothing

21   to add to the record."?

22        A    Well, the difference between a defense attorney

23   saying that and a prosecutor saying that, prosecutor, the

24   fact that he objects on the record doesn't gain him anything,

1-119

1    you know, at all.  It's pro forma.  A defense attorney who

2    says something like that is usually...doesn't have much to

3    say.

4        Q    Well, is it not also accurate though, if a...if a

5    prosecutor wants to in fact convince a judge of his or her

6    position, he would add either case law or a factual basis for

7    the...for the judge to keep the person on the record?

8            MR. VINCENT:  Objection.

9        A    I can't --

10            MR. VINCENT:  He's asking him to speculate what a

11   prosecutor does.  I thought we were here talking about

12   defense counsel.

13            THE COURT:  I'll sustain.

14            MR. BENNETT:  Alright.

15            BY MR. BENNETT:

16       Q    At any rate, that's what the transcript shows, and

17   the court then proceeds, does he not, to deny your challenge?

18       A    Correct.

19       Q    Alright.  When you heard that done, you believed,

20   did you not, that you had a very good issue on appeal on the

21   wrongful denial of challenge for cause?

22       A    I believed the judge was wrong, but I don't wear a

23   red robe, so I can't say is a good issue, but I don't know

24   what the Court of Appeals might have done with it.  I did

1-120

1    recognize it as a good issue.  The quality, that I can't

2    speculate about.  I just don't know.

3         Q    As an experienced capital litigator, you are

4    familiar with the history and rulings of the Court of Appeals

5    of Maryland in death penalty cases?

6         A    Absolutely, sir.  Also the Supreme Court.

7         Q    Talking about the Supreme Court today or back then?

8         A    Both.  I practice federally, so I have known the

9    Supreme Court.

10        Q    Now, it is always helpful, is it not, for a defense

11   attorney, so to speak, to have a hold card in his pocket for

12   possible appeal?  Even when you lose below?

13        A    If you can get one, absolutely.  Yes, sir.

14        Q    Alright.  Then why did you, in this case, fail to

15   exhaust your allotted peremptory challenges, which, in

16   effect, waive that possible issue for an appeal?

17        A    We got down to eighteen strikes, and I can only

18   tell you...let me tell you what my procedure is, which I have

19   never varied in any capital case, which is that we rate all

20   of the jurors and then we...sometimes, we use index cards,

21   sometimes, we use a chart, and we chart out how we view them

22   on death, especially in a case like this where

23   guilt/innocence, we had virtually  no chance.  So, in that

24   instance, our primary goal is to get a jury that we feel we

1-121

1    can convince to give life, so that we look at the pattern of

2    striking and keep aware of how many strikes we have, how many

3    strikes the government has, and what the panel coming up is,

4    and we make choices.  At a certain stage in striking the

5    jury, we look at the panel, we look at the number of strikes

6    the government had left - and I can't recall off the top of

7    my head --

8        Q    It was two.

9        A    And it was our consensus that, if we exercised two

10   more strikes, we would end up of course with the government

11   then free to use their other two to remove some jurors we

12   liked and leave us with a far worse panel.  The flip side of

13   that is did we take that chance and assume that we have

14   reversible error, therefore, we can take that risk of having

15   a more death prone jury.  It's a judgement call we made at

16   the time, judgement call I have made repeatedly.  And that's

17   what we did.

18       Q    I missed the last part.

19       A    It's a judgement call we made at the time, a

20   judgement call that I have made repeatedly and continue to

21   make.

22       Q    Can you indicate here are you sure that you had in

23   mind at that time in regard to the exercise of your

24   peremptory strikes and how many you had left and the State

1-122

1    had left, that you were consciously thinking of the fact of

2    possible reversible error on the denial of the challenge for

3    cause of Ms. Benjamin?

4        A    I never try a case without thinking about

5    reversible error.

6        Q    Well, of course generally, but I am talking about

7    Lynn Benjamin.

8        A    You are asking me to reconstruct from years ago.  I

9    can tell you that I do not make a choice like that without

10   considering all of the consequences.  I cannot sit here and

11   say that I can reconstruct my thinking at the time exactly.

12   I do know that I was very conscious of that.  I am very

13   familiar with Morgan versus Illinois.  I am very familiar

14   with Witherspoon.  I am also familiar with the fact that it

15   is...if I used a peremptory to remove that juror instead of

16   ...in other words use all of my strikes and use a peremptory

17   to remove the juror, there was the possibility that, because

18   I removed her from the jury panel that served, that it

19   wouldn't matter.  It, you know, it's one of those things

20   where you can never totally tell, you know, how...how things

21   might shift.  And the question is whether or not you risk

22   someone's life by doing that. I made that choice.

23       Q    Alright.  Let's move onto the next issue, Number C

24   - page 8, Your Honor - during the guilt/innocence phase of

1-123

1    the trial, counsel failed - this is the allegation - to

2    effectively cross examine critical and important witnesses

3    called on behalf of the State, including, but not limited to,

4    Charles Foy and Jonah Miles.  I am not going to question you

5    about Charles Foy.  We are going to limit it to Jonah Miles.

6        A    Okay.

7        Q    She was the Defendant's wife, correct?

8        A    Correct.

9        Q    She provided information of what the Defendant did

10   after the crime and helped the police recover physical

11   evidence?

12       A    Correct.

13       Q    In effect, part of the facts she testified to would

14   have been in the category of destruction of evidence?

15       A    Yeah.

16       Q    Dumping clothes in a dumpster?

17       A    Yeah.

18       Q    Alright.  You knew at the time that she testified

19   she had been charged in Wicomico County with accessory after

20   the fact to murder, correct?

21       A    I don't remember the exact charges.  I knew she had

22   charges.

23       Q    That was it - accessory after the fact to murder.

24   And were you aware that that case was pending against her?

1-124

1    A    I knew a criminal case out of this was pending

2  against her.

3    Q    Now, your direct examination of her was on March

4  10th pages 101, 102, consists of one page.  I ask you to read

5  it to yourself.

6    A    Sure.

7    Q    The bottom of 101, which is page...line 23, and

8  then the entire page 102.

9         THE COURT:  Which transcript is that?

10        MR. BENNETT:  March 10th, Your Honor, 1998.  It's

11  the second day of trial.

12        BY MR. BENNETT:

13    A    Sure.

14        Okay.

15    Q    In fact, you did ask her about the case pending in

16  Wicomico County?

17    A    Correct.

18    Q    There was a hearing out of the presence of the jury

19  before she testified in regards to her marital privilege.  Do

20  you remember that?

21    A    I remember that being an issue, yes.

22    Q    And she waived her husband/wife marital privilege

23  to the satisfaction of the judge?

24    A    I believe so, yes, sir.

1-125

1    Q    Of course that could only have been invoked by her.

2    You had no standing as to that privilege?

3    A    Right.

4    Q    Then she came back in and testified on direct and

5    then on cross in front of the jury?

6    A    Yes, sir.

7    Q    Alright.  On cross on page 102, you never asked her

8    any questions dealing with her waiver of the...of the

9    husband/wife privilege in front of the jury, did you?

10   A    No, sir.

11   Q    You could have done that to show bias, couldn't

12   you?

13   A    I...conceivably, I guess, but I...it wasn't where

14   we were going.

15   Q    Well, where were you going on guilt/innocence?

16   A    Well, Mr. Miles had given a full somewhat bizarre

17   confession.

18   Q    Uh-huh.

19   A    He subsequently had been identified in possession

20   of the victim's credit cards by multiple individuals and was

21   using them.  He told his wife what he had done.  His wife

22   talked to other people about it, etcetera.  We were not going

23   in there saying that...we had no basis going in and saying

24   that Jonah did it and, therefore, you know, she's trying to

1-126

1    dump on Jody Miles.  We were trying to get a felony as

2    opposed to premeditated murder conviction if we at all could.

3    We were trying, if possible, to convince the jury that the

4    robbery was afterthought and not the purpose, so that going

5    into bias as to his wife really was of no use.

6         Q    Well, you also go, were you not, before the State

7    as resting its case, planning on attacking on cross

8    examination some of the nuances on the Defendant's statement?

9         A    I don't understand the question.

10        Q    He gave a videotaped statement?

11        A    Yes, sir.

12        Q    It was obtained by law enforcement officers?

13             MR. VINCENT:  It was audiotaped.

14        Q    Audiotaped obtained by law enforcement officers?

15        A    Yes, sir.

16        Q    You were going to use whatever you could to your

17   advantage?

18        A    Yes, sir.

19        Q    The other portions of it you were going to try and

20   hope to be able to either explain away or mitigate?

21        A    No, sir.

22        Q    He did discuss in his statement, did he not, his

23   alleged role with Jonah after the incident?

24        A    I don't recall, but probably, yes.

1-127

1    Q    Alright.  You are saying that you did not want in

2   any way point out that Jonah was in any respect not being

3   candid with the court?

4    A    There was nothing in cross examining Jonah that

5   would assist me in the theory that we were presenting to the

6   jury.

7    Q    Well then let me ask you this.  Why did you ask

8   this series of questions if you weren't attempting to

9   establish bias?  First, "You presently still face charges out

10  of this same set of incidents.  Is that correct?", "Yes, I

11  do."  Question, "As accessory after the fact?", "Yes."  "And

12  the case has not yet come to trial?", "No, sir."  "Have you

13  been offered any plea agreements to testify or any other

14  offer from State's Attorney?", "No, I haven't."  "Have you

15  been offered any immunity?", "No."  "Have you been offered

16  anything with regard to the question of any ultimate

17  sentencing on your part?", "No."  Why would you ask those

18  questions at all if you weren't interested in establishing in

19  front of the jury that she was getting some deal or bias?

20   A    Well, two reasons.  One is maybe she would answer

21  yes and then I could explore it.  Two, if there were a deal

22  that was not told me and she testified under oath that

23  something that the State's Attorney knew was false and he

24  failed to inform me of it, it would provide grounds for post

1-128

1  conviction.

2       Q    Well...but the problem with that approach is, is it

3  not correct, that you didn't know the answers to those

4  questions?  You got hammered on each one of them?

5       A    No, I knew the answers.

6       Q    Well, you are going to ask an open ended question

7  dealing with whether she's facing charges, and she says yes.

8  "Case has not yet come to trial?", "No."  "Been offered any

9  plea agreements?", "No, I haven't."  "Offered any immunity?",

10  "No."  Those last two questions are pro State, aren't they?

11      A    They were questions I felt appropriate to ask at

12  the time.

13      Q    If in fact there was a plea agreement, you would

14  want to bring that out, wouldn't you?

15      A    Yes.

16      Q    If there's no plea agreement, what's to be gained

17  bringing out the fact that there is none?

18      A    Again, let me repeat.  I had been told there wasn't

19  any.  I had never had a chance to speak to Jonah directly.

20  She was represented by counsel.  I have had occasion where I

21  have been told there's no plea agreement and no understanding

22  and, from the stand, the witness has said, "Oh, yes, there

23  is.  I talked to Detective So and So and he would do

24  something like that.", so I ask the questions.

1-129

1    Q    You didn't ask...in light of that line of

2    questioning, you had some followup questions you could have

3    asked her, didn't you, in regards to the fact that her case

4    wasn't going to be disposed of until after Jody's case?

5    A    I could have.

6    Q    Huh?

7    A    I could have.

8    Q    And that was actually what happened, isn't it?

9    A    I assume so.  I didn't follow it.

10    Q    You also could have asked her...you also could have

11    had a copy of the docket entries to use to impeach her,

12    correct, in her case?

13    A    We may have had that.  I don't recall.  I mean,

14    we --

15    Q    Well, the record doesn't reflect that you asked her

16    any questions (unclear)?

17    A    I know.  That's a separate question, sir.

18    Q    Pardon?

19    A    That's a separate question.  You asked whether or

20    not we had seen it or had it, and I believe we did

21    investigate it, because we...we investigated her.  We went

22    and talked to her cell mate from one of the detention

23    centers.  We got information about her background.  We

24    interviewed her friends.  So I know we did an investigation

1-130

1    about her.

2                           (Docket entries were

3                           marked for identification

4                           as Petitioner's Exhibit

5                           No. 3.)

6       Q     You didn't use that investigation on cross in

7    regards to the docket entries, did you?  Did you look at

8    Exhibit 3?

9       A     No, I didn't use that.

10      Q     For instance, you could have asked this question,

11   couldn't you, but you didn't – "Isn't it a fact that, on June

12   9, 1997, the court set bond in your case and you were

13   released?"

14      A     I could've.

15      Q     "And you have been out on bond ever since then,

16   correct?"

17      A     Yes, that's a question I could've asked.

18      Q     And that would have been for nine months prior to

19   the trial in this case, since the trial was in March and her

20   case was then disposed of the very following month, April?

21   Now, you couldn't have brought that out because it didn't

22   occur yet, but that's the inference you could have put in the

23   jury's mind by the additional question if you are waiting for

24   disposition of this case to be followed...to follow the trial

1-131

1    of Jody Miles, correct?

2        A    If she had been the one making him out to be the

3    person, and her testimony was critical in whether he would be

4    found guilty or innocent, I would have done a whole different

5    form of cross.  I didn't do that, because it didn't have that

6    purpose.

7        Q    Yeah.  Except that, during the trial, you didn't

8    indicate to the jury during opening statement what your

9    theory of the case was, correct?

10       A    Yes, that's true.

11           MR. BENNETT:  Your Honor, we would like to

12   introduce a certified copy of the docket entries, which is

13   Number 3.

14           THE COURT:  Any...any objection?

15           MR. VINCENT:  Assuming it's from our court in

16   Wicomico County, I have no objection.  May I see it?  Thank

17   you, sir.

18           No objection.

19           MR. BENNETT:  Alright.  That's --

20           THE COURT:  3...Petitioner's 3 is admitted.

21           MR. BENNETT:  Thank you, Your Honor.

22                                   (Petitioner's Exhibit No.

23                                   3, previously marked for

24                                   identification, was

1-132

1                              received into evidence.)

2          BY MR. BENNETT:

3     Q    Next issue, Mr. Saunders, D, during

4     guilt/innocence --

5          THE COURT:  Before you...before you get to the next

6     issue, let's break for lunch.  I am going to ask you to be

7     back at quarter after one, in an hour.

8          MR. BENNETT:  Very good.

9          THE COURT:  And we will continue on at that time.

10         (There was some discussion between Counsel and The

11    Court regarding possible restaurants to go to for lunch.)

12         (A luncheon recess was taken at 12:10 p.m..)

13                        - oOo -

14                    AFTERNOON SESSION

15                      1:30 P.M.

16         THE COURT:  I neglected to ask prior to the

17    beginning of the hearing, and I typically ask, have...and

18    what I am going to do is take a brief recess just for a few

19    minutes, but have the Parties discussed this case with a view

20    towards some settlement which would negate the need for

21    further proceedings?  If you haven't, I would just suggest

22    that you take a few minutes and go in the room and just see

23    if there is any way to --

24         MR. RUARK:  Your Honor, to be quite candid with the

1-133

1    Court, I do not know that there is any room for any type of

2    settlement.

3            THE COURT:  Well, there's always room for a

4    settlement.

5            MR. RUARK:  Well, there...there is, Your Honor, and

6    I appreciate the Court's...the Court's view.  The State has

7    been approached earlier by previous counsel, and the State's

8    position was that we are proceeding full speed ahead, Your

9    Honor.

10            MR. BENNETT:  Well, that's previous counsel.

11            MR. RUARK:  Pardon?

12            MR. BENNETT:  That's previous counsel.  I, of

13    course, added at least two supplemental petitions, including

14    what we consider one of our strongest counts, the Allen --

15            THE COURT:  I'll take...I'll take ten minutes and

16    just ask if there...if you will take a few minutes to discuss

17    the case in...in private back in the jury room.

18            MR. BENNETT:  Well, if they...if --

19            MR. RUARK:  I will.  Your Honor, before, if I

20    could, just as a suggestion, maybe for judicial economy as

21    much as anything else, and as long as counsel...defense

22    counsel has no objection, the State would like to go ahead

23    and move the trans-...the entire transcript into evidence as

24    well as ask the Court to take judicial notice of this entire

1-134

1    file.

2            THE COURT:  I am going to take judicial notice of

3    the entire criminal...underlying criminal file, including the

4    transcript, which was prepared for appeal purposes.

5            MR. RUARK:  Thank you.

6            MR. BENNETT:  Now, this --

7            THE COURT:  The full...the full transcript.

8            MR. BENNETT:  If the State is saying that,

9    regardless of change in counsel and the additional

10   information and issues that I raised, that they are not

11   prepared to put any offer on the table period, then the ten

12   minutes would be wasted.

13           MR. RUARK:  I think the Judge just directed us to

14   go speak, so....

15           MR. BENNETT:  Oh, alright.  Well, I hear you.

16           THE COURT:  I...I'll hear at the end of ten

17   minutes.  I am not taking a stand one way or the other, --

18           MR. BENNETT:  I know you are not.

19           THE COURT:  -- but I...but I certainly urge all

20   parties to discuss the case, because, you know, in any case,

21   you have to look at them objectively.  You are looking at it

22   as advocates, and I look at it from a different standpoint.

23   And there, you know, there is no certainty unless you all put

24   certainty to it sometimes.

1-135

1          MR. BENNETT:  Alright.  We'll do that.

2          THE COURT:  I'll take a short recess.

3          (Brief recess.)

4          MR. RUARK:  Your Honor, thank you --

5          THE COURT:  Okay.  Wait.

6          MR. RUARK:  I am sorry.  Thank you for the

7  opportunity to meet.  We did make a good faith effort and an

8  offer to resolve this matter, which was declined, and,

9  therefore, the State's, as I am sure the Defense is, ready to

10  proceed.

11          THE COURT:  Okay.  Go ahead.

12          You may continue your cross examine - , or your

13  direct.

14          MR. BENNETT:  Thank you, Your Honor.

15          THE COURT:  You were on Paragraph D, I think.

16          MR. BENNETT:  Yes.

17               DIRECT EXAMINATION(resumed)

18          BY MR. BENNETT:

19     Q    Right before we left for lunch, we had gotten up to

20  Page 8, Paragraph D doing...dealing with your raising in

21  front of the court the fact that your client told you that he

22  was brought into the court room, or - excuse me - passed

23  through a hallway and brought into the court room in shackles

24  and leg irons...leg shackles and handcuffs.  You moved for a

1-136

1    mistrial on that matter, correct?

2        A    Yes, sir.

3        Q    It was denied, correct?

4        A    Yes.

5        Q    You did not ask for an individual voir dire of the

6    twelve jurors to see...to determine or see which, if any, of

7    the jurors saw the Defendant with handcuffs or leg shackles.

8    Is that correct?

9        A    My memory is unclear on that.  The record will have

10   to speak for itself in terms of that.

11       Q    Alright.  If the record reflects that no individual

12   voir dire of the juror member...jury members occurred, why

13   would you not have asked for that?

14       A    Again, I have only a partial memory of this.  I do

15   recall the issue being raised.  I also recall walking that

16   same area where my client says he was seen.  I recall seeing

17   that, if in fact he was seen at all, that he could not have

18   been seen in the whole room but only a small part.  Beyond

19   that, I have no immediate memory.

20       Q    Okay.  You do not remember putting on the record

21   that it was impossible for the jurors to have seen Mr. Miles,

22   do you?  Or did you?

23       A    I have just told you what my memory is.

24       Q    Alright.  Other than that, why would you not want

1-137

1    to inquire of the jurors as to whether they saw him in

2    handcuffs and leg shackles?

3        A    I have no present memory of exactly how we handled

4    that and what we did.

5        Q    Could that possibly be a trial tactic or strategy

6    not to have a juror voir dired if they see the Defendant in

7    handcuffs and leg shackles?

8        A    Again, I had a trial team and the client.   I

9    certainly know we talked about it, but I have no present

10   memory of what we decided and how we decided it.

11       Q    Aside from the fact of your lack of any present

12   memory, I am asking you really, hypothetically, a client

13   calls to your attention and the record bears out and the

14   judge supported it, that is the configuration of the court

15   room and the hallway, that he was witnessed by the jury being

16   brought into the court room in handcuffs and leg shackles,

17   why would you have not asked for an individual voir dire?

18   Hypothetically aside from your memory?

19       A    There could be several reasons, but I would be

20   speculating.

21       Q    There would be no risk to the Defendant in asking

22   such an individual voir dire, would there?

23       A    I don't know.   It's a...you certainly emphasize the

24   point that he was in fact shackled and brought back in court

1-138

1  from jail by doing so.  We have very carefully dressed him in

2  civilian clothes and presented him in a manner that he would

3  walk around the court room freely.  So, yes, something...

4  there could be a downside, but I am not saying.  As I said, I

5  can't reconstruct my thinking of that time period.

6      Q    You...you could have asked the judge, could you

7  not, to formulate a question to each member of the jury at

8  the bench, "Did you see the Defendant and what, if anything,

9  did you see the Defendant wearing when he came into the court

10  room?", without pointing out what it was?

11     A    Possibly, yes.

12     Q    Okay.  Alright.  The next issue is G on Page 9,

13  Your Honor.  This deals with the argument of the issue

14  whether you presented a coherent and consistent theory of the

15  case.  Did you, in part of your...as part of your preparation

16  for this hearing, re-read or read your opening statement?

17     A    I re-read the entire sentencing.

18     Q    No, opening statement on guilt/innocence?

19     A    No, sir, I did not.

20     Q    Huh?

21     A    No, sir, I did not.

22     Q    Are you aware that it consists of approximately six

23  pages?

24     A    That wouldn't surprise me.

1-139

1    Q    Pardon?

2    A    That wouldn't surprise me.

3    Q    Are you aware that, in your opening statement,

4    there are no facts that you allege in regards to the case?

5    A    That wouldn't surprise me either.

6    Q    Are you aware, in your opening statement, you put

7    forth to the jury no defense theory of the case?

8    A    That wouldn't surprise me either.

9    Q    Now, you knew going in that the State had a

10    confession/statement of the Defendant?

11    A    Correct.

12    Q    You knew that, from that statement/confession, you

13    had a possible argument for factual statement in opening

14    statement that it was, at worst, second degree murder, use of

15    a handgun on one...on one hand, and robbery afterthought on

16    the other from the face of his statement itself, correct?

17    A    If you believed the statement in toto, yes.

18    Q    Alright.  And without even indicating to the jury

19    whether or not your client was going to testify, you could

20    have presented that in your opening statement, correct?  That

21    "The evidence will show, from his statements...."?

22    A    No.

23    Q    Why not?

24    A    First off, I was never sure until the very end

1-140

1    whether or not Jody Miles would testify.  And were he to

2    testify, the last version of events that he gave me

3    significantly differed from the confession, and I wasn't a

4    hundred percent sure, if he went on the stand, if, in fact,

5    he would stick to the last version he gave me.  So,

6    therefore, my opening was without presenting the theory.

7         Q    You had discussed with the...Mr. Miles before the

8    trial began what your recommendation was going to be on

9    whether he was going to be called as a witness, didn't you?

10        A    Yes, but it's totally up to him.

11        Q    Yes, we know that.  And your advice was going to be

12   that he not testify, right?

13        A    Absolutely, if he was going to testify to what he

14   told me this last version.

15        Q    You ended up in fact presenting the jury two

16   defense - second degree based on his mental state generally

17   and that there was no felony murder; and, second, robbery

18   afterthought - correct?

19        A    I believe that correctly states it.  I haven't read

20   it in awhile.

21        Q    Next issue, Number H, in both guilt/innocence and

22   sympathy, you and Mr. McFadden, or you or Mr. McFadden failed

23   to call Steve Bailey to the stand?

24        A    True.

1-141

1    Q    Alright.  Are you familiar with this gentleman?

2    A    Yes, sir.

3    Q    Had he been interviewed prior to trial?

4    A    Yes, sir.

5    Q    By who?

6    A    By my investigator Donald Steil.

7    Q    Alright.  Were you in the court room when he

8    testified today?

9    A    Yes, sir.

10   Q    Alright.  He introduced an element of a second

11   person being at the scene, a woman with another car, correct?

12   A    Yes, sir.

13   Q    Alright.  Now, let's go through, first,

14   guilt/innocence.  The State did not call her?

15   A    Her?  I don't --

16   Q    Excuse me.  Him.

17   A    Oh, Mr. Bailey, yes.

18   Q    Alright.

19   A    I don't think that anyone ever determined who the

20   lady in the red dress was.

21   Q    Right. The State did not call him.  He was

22   subpoenaed by the State?

23   A    Yes, sir.

24   Q    Alright.  You gathered from that, did you not, at

1-142

1    the close of the State's case that they wanted their theories

2    of the case to be consistent with his statement/confession

3    and not introduce the element of a second person being

4    present?

5         A    Well, --

6         Q    At the scene?

7         A    -- you are asking me to speculate about the

8    government's thinking, and I can't do that.

9         Q    But you saw what they presented?

10        A    Yes, sir.

11        Q    You knew they hadn't called Bailey?

12        A    Yes, sir.

13        Q    You knew that Bailey would have testified that

14   there was a woman there?

15        A    Yes.  And, as a matter of fact, we also identified

16   another individual who would have said something similar.

17        Q    Alright.  But you knew, when the government rested

18   its case, it did not call and introduce evidence in front of

19   the jury or any theory in front of the jury by evidence that

20   there were two people involved at the actual scene?

21        A    Well, when you say involved, what we had was, at

22   some time the day of the murder at a time in which the black

23   car was still there, somebody saw a female and a red car.

24   That does not put it approximately at the exact time of the

1-143

1    murder.  It does not put the individual with Jody Miles.

2    Jody Miles was never seen with that alleged female

3    afterwards.  So that, yes, one could speculate that, somehow,

4    it's connected to the murder, but we had nothing to go on

5    from Mr. Bailey or the other individual which would in fact

6    tie that sighting to the commission of the murder.

7        Q    On the other hand, there was nothing in Mr. Miles'

8    confession or statement that put a second person at the

9    scene, woman or man, at any time other than the victim,

10   correct?

11       A    You are talking about his statement to the police?

12       Q    Yes.

13       A    That is true.

14       Q    Alright.  What was your theory as to...what was

15   your reason as to why you didn't call Bailey?

16       A    We interviewed him.  He added nothing to our theory

17   of the case that it was a murder that was not premeditated.

18   And so, as a result...so we didn't call him.

19       Q    Alright.  That takes care of guilt/innocence.  Now

20   you are coming up with sentencing and the death penalty is on

21   the table, right?

22       A    Yes, sir.

23       Q    Why wasn't he called in connection with the death

24   penalty in connection with a possible mitigator of residual

1-144

1    doubt, which you could have argued that there was another

2    person that aided and abetted that has gone free and the

3    Defendant shouldn't receive the death penalty?

4        A    Well, that would require a tremendous leap and

5    contradict something else, which is that, in years of doing

6    death penalty work and interviewing jurors after the fact,

7    they have advised me in the strongest terms that the most

8    significant mitigating factor that they consider in giving

9    life as opposed to death is remorse - the expression of it in

10   allocution or testimony.  Therefore, from the beginning of

11   this, I was counseling Jody that - excuse me - Mr. Miles that

12   what he needed to do was to find some way to tell the jurors:

13   1) that this was a terrible mistake that he had done it; and

14   that he couldn't believe, especially given his history of

15   nonviolence, that he was the same person who did that.  To go

16   and then say, "Well, let's go blame it on someone else.",

17   would have undercut any remorse.  It's...it's, you know, it's

18   doing shotgun litigation, which is maybe there was an aider

19   and abettor that got away, maybe this, maybe that, but, you

20   know, Jody was going to express remorse, which I considered

21   one of the most significant mitigators.

22       Q    Well, let's go into that.  Actually, his allocution

23   at sentencing is unsworn and is not subject to cross

24   examination, correct?

1-145

1    A    Correct.

2    Q    He could have given the same allocution message

3  that he gave - which in fact at least one juror, but less

4  than twelve, did say that the man shows remorse - without

5  going into at all the woman, correct?

6    A    Well, yeah.  Absolutely.

7    Q    Alright.  And you then argue in closing argument

8  the issue of residual doubt from what Mr. Bailey has

9  testified to?

10   A    That makes no sense.  You know, I had a full

11  confession, bizarre as it was.  I had physical facts that

12  were consistent.  Other than the fact that somebody saw an

13  individual near the crime scene who wasn't mentioned by Mr.

14  Miles, presented nothing that I could argue residual doubt.

15   Q    Did...you saw Mr. Bailey testify here today?

16   A    Yes, sir, I did.

17   Q    Alright.  He had a good memory of the...of the

18  event that he saw because he said he heard about it the very

19  next day that the decedent was missing, correct?

20   A    I don't doubt that he saw the female.

21   Q    You just didn't think it would advance your case?

22   A    Correct.

23   Q    Did you consider it in the context of both

24  guilt/innocence and sentencing or only guilt/innocence?

1-146

1      A     I obviously considered it in both.

2      Q     Did you...you are aware that we called earlier in

3  this case today before you Dr. Robert Johnson?

4      A     You...I didn't know he had already testified, but

5  you indicated you were going to call him as a witness.

6      Q     Alright.  And he testified as an expert social

7  scientist in the area of how persons with long term sentences

8  adjust to prison life?

9      A     Yes, I am familiar with his theory.

10     Q     Alright.  Pardon?

11     A     I am familiar with his...his theories on that.

12     Q     Alright.  Did you or Mr. McFadden interview any

13  social science...scientist expert in this area?

14     A     Are you talking ever, or are you talking about this

15  case in particular?

16     Q     This case?

17     A     No, but let me qualify that, which is that, in my

18  role as supervising attorney for capital litigation, you

19  know, I was very familiar with Dr. Johnson and several other

20  individuals who testify in a similar nature and, in fact, had

21  hired Mr. Johnson for certain...Dr. Johnson for certain

22  cases.  I was fully cognizant of his theories, fully

23  cognizant of his credentials, and I saw no reason to bring

24  him into this case for several reasons.

1-147

1    Q    Well, if I don't ask you, I am sure the State will,

2    so give us the reasons.

3    A    Well, first off, Dr. Johnson's theories are, you

4    know, that, essentially, and it's consistent throughout the

5    literature, that violent criminals age out - the older they

6    get, the less violent they get, and, as time goes on, the

7    level of incidents inside of prison drop dramatically.  So

8    the bottom line is, is that you take someone who is extremely

9    dangerous on the street, incarcerate them, and have very few

10   chances of a...a correctional officer or another inmate being

11   harmed by the individual despite the extreme amount of

12   violence that they have done on the street.  The distinction

13   in this case was fairly clear in my mind.  First off, Jody -

14   excuse me - Mr. Miles had no history of violence, and we had

15   corroborated that extensively through individuals who we

16   test-...who we...who knew him.  We interviewed correctional

17   officers at, I think four or five separate institutions.  We

18   subpoenaed records from every incarceration that he had been

19   involved in.  And the fact of the matter was that we already

20   had proof that he was not a danger inside an institution.  He

21   didn't need to age out.  He...his behavior consistently over

22   history, and as a psychiatrist will tell you, his, you know,

23   his past behavior is the best predictor of future behavior.

24   He had this one anomalous incident where he committed this

1-148

1  murder which was inconsistent with his life pattern.

2      Q    Well, in fact then, Dr. Johnson or some similar

3  expert would have been even able to give a stronger opinion

4  in this case with the lack of any prior violent history,

5  correct?

6      A    I don't know that it could do anything other than

7  ...because experts like him do not testify about what Mr.

8  Miles himself would be and what (unclear).  They talk

9  statistics.  They talk what the literature says.

10     Q    Well, you didn't hear his testimony today, do you

11  ...did you?

12     A    No, sir.

13     Q    So you don't know what he testified to today?

14     A    No.  I am talking about what I know from prior

15  conversations with him and reviewing his testimony in prior

16  incidents.  If --

17     Q    So you don't know how much of his testimony today

18  was devoted specifically factually to Jody Miles as opposed

19  to statistics?

20     A    Well, of course I don't.

21     Q    Alright.  You are aware, are you not, that lack of

22  future dangerousness is a specific statutory mitigator?

23     A    Yes, sir.

24     Q    You said that both you and Mr. McFadden had

1-149

1  subpoenaed or gotten available every prior record on

2  incarceration?

3      A    That's by memory.  If we missed one, I don't know

4  about it, but I do know that we subpoenaed a large number of

5  records, and we introduced them into evidence.

6      Q    Well, let's see if maybe you missed on.

7  Defendant's...Petitioner's Exhibit Number 1.  There's a four

8  month period of incarceration at a county correctional center

9  not introduced into evidence at trial.

10     A    Well, hold on.  May I?  Well, I don't have the full

11 list here.  I do have that we interviewed Mr. Miles

12 extensively about his prior incarcerations, and we had a

13 list.  And I do know that we subpoenaed a large number of

14 records and introduced them.  Whether or not that's one of

15 them, I can't say.

16     Q    Alright.  Well, if in fact the trial record shows

17 that this was not a Defense exhibit at the sentencing

18 hearing, which is the only time you would want to introduce

19 it, would you agree then that you missed this record?

20     A    That would...if that's what the record says, then

21 that would be the case.

22     Q    And it shows on Number 3 and Number 4, escape risk,

23 none or unknown, and for institutional conduct - which carry

24 ...carries serious disciplinary infractions - none or

1-150

1    unknown, you would have wanted to introduce that into

2    evidence, wouldn't you?

3        A    Sure.  It was con-...it would be consistent with

4    the several other records that we introduced, plus, also, Mr.

5    Steil's testimony regarded the interviews of correctional

6    officers that he did.

7        Q    The more the better on the issue of lack of future

8    dangerousness, right?

9        A    I can't disagree with that.

10       Q    Especially if you are not going to interview or

11   call an expert, correct?

12       A    No, I think they are seperate.

13       Q    Alright.  Well, if you had records showing lack of

14   serious violent...crimes of violence, good institutional

15   adjustment, and an expert to flesh that out, along with

16   interviews of the Defendant and statistics, wouldn't all of

17   that be better than just records?

18       A    Not necessarily.  First off, you take a look at the

19   jury that you are appealing to in terms of their background

20   and whether or not Dr. Johnson would, at the time, you know,

21   he's an academic, and he also is not dealing, you know, he

22   deals with this in a different way.  And to be quite honest,

23   I have used Dr. Johnson in cases where I don't have much to

24   work with, because he can take an individual who is very

1-151

1    violent and argue for me that that violence will go away over

2    time.  I didn't have that case.  I didn't need him to say

3    that.  And so I made the decision that I didn't need to use

4    him as an expert.  Would it have hurt?  I don't know.  Would

5    it have helped?  I don't know.  But I did make that decision

6    based on the fact that I had extensive evidence that Mr.

7    Miles was not going to be a future danger.

8        Q    Well, you are aware of Supreme Court cases, <u>Wiggins</u>

9    <u>versus Smith</u> and other cases, that say that there's a duty to

10   investigate, correct?

11       A    Oh, absolutely.

12       Q    Alright.  So how could you have rejected using Dr.

13   Johnson in a specific case, Jody Miles, or some other expert

14   without seeing, or without hiring an expert to at least see

15   the Defendant, look at the base file, and then you sit down

16   with them and make a reasonable determination as to whether

17   he should or should not testify?

18       A    Well, first off, based on my conversation with Jody

19   Miles and the examination by my psychologist of him, I was

20   never, ever going to let him sit down and talk to my client

21   and then open it up for the government to see him, period.

22   Second, --

23       Q    Are you talking about Dr. Johnson?

24       A    Yes.  You said interview your client and...and look

1-152

1   at records and then testify.  Had I done that, I would have

2   opened up Mr. Miles to be seen by the government's expert,

3   which I wasn't going to do based on my knowledge of the

4   things he said, the way he tested, and the opinions that came

5   down from that.

6       Q    You...you think that the...that Dr. Johnson, as an

7   agent of the defense attorney talking to your client would

8   have required him then to be examined, Mr. Miles?

9       A    If...if I present...if I offered him as a witness,

10   yes.  Absolutely.  Otherwise, he would be excluded as a

11   witness if I said only my expert is to talk to my client.

12   It's just absolutely clear.

13       Q    And what was your concern with the issue of

14   sentencing to have their side see your client in your

15   presence knowing then by that time that you had lost on the

16   issue of first degree murder and he as eligible for death?

17       A    Okay.  The reason is very clear.  The same reason I

18   didn't present a psychologist, which was the psychologist

19   examined my client and gave him very damning opinion in terms

20   of manipulation, in terms of callousness, in terms of an

21   unwillingness to take responsibility and would have undercut

22   my whole argument that he in fact was remorseful.  He

23   presented himself as wanting to find a way to get out of

24   this.  He didn't consider it that big a deal.  And so there

1-153

1    was no way...no way I was letting the government get their

2    hands on that and interview him.

3         Q    Well, if you didn't call the psychologist because

4    of that, then assuming arguendo he had to be interviewed by a

5    State expert, they couldn't have introduced the State expert,

6    could they?

7         A    Run that by me again.

8         Q    If you hired a psychologist to interview Mr. Miles

9    who gave you preliminary opinion that he was manipulative,

10   whatever it is, --

11        A    Right.

12        Q    -- and you end up not using him, --

13        A    Right.

14        Q    -- the State, even if they had an expert opinion,

15   or - excuse me - even if they had an expert who interviewed

16   Mr. Miles, they couldn't put him on because there would be

17   nothing to rebut in that area, correct?

18        A    No.

19        Q    How so?

20        A    First off, if I give notice, unless there's a

21   protective order - and that's usually done way in advance of

22   trial - if I give notice that I intend to use an expert, turn

23   over the qualifications, have my client interviewed, the

24   government then can interview him and, to my knowledge, at

1-154

1     that point, they, even if I change my mind at the last

2     moment, it's not rebuttal.  Secondly, I would consider it

3     flagrantly incompetent of me, given that information, to

4     allow the government any access to him whatsoever.

5          Q     Do you have one case that you can cite that says,

6     if you don't put on a psychologist who has interviewed your

7     client, that the government can put on their psychologist who

8     has interviewed your client when it's...when there's issue?

9          A     What do you mean no issue?

10         Q     There's no issue because you didn't put into...you

11     did not put in your case?

12         A     Yes, there is an issue in that I say that he's not

13     a future danger, and if I decide to withdraw my psychologist

14     and they have interviewed him and he presents, you know, in

15     that opinion, a clear and present danger, there is a risk

16     that that individual can testify.

17         Q     Well, --

18         A     And even if they can't testify about the opinion,

19     they may be able to testify about the statements, because one

20     of the things that occurs if the individual has been properly

21     prepared by the government is that he is advised that nothing

22     he says is privileged.  And so, therefore, even the

23     statements can come in ab-...even if you can keep out an

24     opinion.

1-155

1  Q  If the door has been opened, correct?

2  A  The door is opened if I say that he is not a future

3 danger, which was exactly my theory in sentencing.

4  Q  That's assuming, after you have - and we are going

5 to move on very quickly, because we, as you can tell,

6 disagree - that's assuming, is it not, that you present other

7 area...other evidence of future dangerousness in the case

8 other than a psychologist, who you don't choose to call?

9  A  In my professional opinion, once I know the danger

10 of exposing him to the other side, I will not do it and take

11 the chance.  And there was no upside of having Dr. Johnson,

12 simply on an academic basis, say something that I had already

13 proven.

14  Q  You keep saying on an academic basis?

15  A  Yes, sir.  He's an academic.

16  Q  Without hearing what he testified here today?

17  A  I know Dr. Johnson.  I have interviewed him.

18    MR. VINCENT:  Objection.  He is arguing with the

19 witness at this point.

20    THE COURT:  Sustain.

21    BY MR. BENNETT:

22  Q  Did you conduct the interviews of mitigation

23 witnesses or was the Mr. McFadden?

24  A  It was a mixture.

1-156

1      Q    Pardon?

2      A    It was a mixture.

3      Q    Do you know...do you remember the names of the

4  mitigation witnesses that you interviewed?

5      A    Not off the top of my head.  What I can say is that

6  the way in which I did it was, Mr. Steil, actually, what we

7  do is we work as a team.  So I had a social worker...once the

8  psychologist was ruled out, I had a social worker, Mr.

9  Steil, my investigator, Arch McFadden and myself.  And we

10  would meet regularly.  Mr. Steil was sent out to locate

11  people, do initial interviews.  Sometimes, Arch McFadden

12  accompanied him initially.  Sometimes, Arch went later with

13  ...with him.  We had real problems with the family.

14  Initially, two of the sisters wouldn't talk to us.  The

15  brother never did.  One sister did.  So we brought in the

16  social worker to work that angle, and she eventually got the

17  mother and the other daughters to talk with us.  I made

18  judgement calls about which individuals.  I think I sat in on

19  some conversations with the sisters.  I had some others.

20  Again, I can't go witness by witness, but, anyone we were

21  going to call, I sat in on an interview with, even if Mr.

22  McFadden was going to present them.  And I made judgement

23  calls as to various other individuals based on my interaction

24  with them wether or not they would make a good witness.    I

1-157

1    don't know if I have answered you completely, but that's....

2        Q    You would agree, would you not, that there is a

3    duty in a death penalty case, for purposes of mitigation, to

4    interview and...interview potentially helpful mitigation

5    witnesses?

6        A    Absolutely.

7        Q    And that's even included in the ABA standards, is

8    it not?

9        A    Absolutely.

10       Q    Mentioned in <u>Wiggins versus Smith</u>?

11       A    And subsequent cases.

12       Q    Alright.  And so, if the witnesses are not

13   interviewed, there cannot be a reason determination as to

14   whether they should be called in mitigation.  Is that

15   correct?

16       A    Well, when you say when witnesses are not

17   interviewed, I don't know which witnesses you are speaking

18   of.  I can give you a list of the people that we interviewed.

19   We interviewed a large number of witnesses, and, you know,

20   searched pretty extensively to get background both in terms

21   of family, work history, people he worked with, people he was

22   intimate with, etcetera.

23       Q    You...one way to obtain mitigating witnesses is to

24   talk to Witness A and, when you interview Witness A, say, "Do

1-158

1    you know other people that would give favorable background

2    information or helpful information on Jody Miles?", correct?

3        A    Of course.

4        Q    Alright.  Were you aware that there were at least

5    two family members in some respect, relatives, and a close

6    friend that were never interviewed?

7        A    Who are you speaking of?

8        Q    Janice Lewis, David Wood, Lauren Miles, all of whom

9    are going to be testifying here.

10       A    Okay.  The names don't ring a bell.  Hold on a

11   second.  I have a list here of names of people who we

12   identified as potential witnesses and tried to interview all

13   of them.  I can go through it if you want.

14       Q    Well, an easier way would be see if on that list --

15       A    Uh-huh.

16       Q    -- are included the names of Janice Lewis, David

17   Wood and Lauren Miles.

18       A    I don't see their names on here, and I have

19   reviewed my investigator's written reports, and I don't see

20   them in the memorandums.

21       Q    Alright.

22       A    And...but I also note that...I also don't see that

23   Mr. Miles himself had mentioned those names either, because

24   we have rather extensive notes.  He was interviewed literally

1-159

1  for dozens and dozens of hours.

2      Q    Well, your duty to investigate and find mitigating

3  witnesses, you would agree, would go beyond what your client

4  has told you?

5      A    Of course, and that's what we did.

6      Q    Huh?

7      A    Of course, and that's what we did.

8      Q    Now, let's assume for purposes of argument they

9  weren't interviewed.   So, if they weren't interviewed, they

10  wouldn't have been in the universe of people that could have

11  been considered to be called.  Is that right?  You would

12  never put a witness on the stand --

13      A    Well, if I...if I didn't know them...of them or

14  they hadn't been willing to be interviewed, I obviously

15  wouldn't know about them.

16      Q    Alright.  Two people were interviewed but not

17  called - Melissa Burner and Beverly Daisy.  Do you know why?

18      A    Melissa Burner and Beverly Daisy.  Hold on.

19      Q    Who will be testifying here today or tomorrow.

20      A    When you say Melissa Burner, are you speaking Missy

21  Burner, Jody's sister?

22      Q    Yes.

23      A    Yes, she was actually interviewed by our social

24  worker and reference is made by her in her notes.  Missy

1-160

1    Burner refused to testify as a witness in the case.    Only

2    Lisa Hopkins of the sisters agreed to testify.

3        Q    That's what your notes show?

4        A    That's what my notes and my memory show.

5        Q    Alright.

6        A    I...I remember it very clearly, because let me...

7    let me...what...what happened is, is that there is a lot of

8    shame in this family about what occurred, and there was a lot

9    of sexual and physical abuse.    Her mother, who had extreme

10   ambivalent feelings, was a mentally ill woman.    And it

11   actually took an enormous amount of effort to get Lisa

12   Hopkins to trust us enough to come in and testify.    The

13   others refused.    In fact, Chris Miles never even talked to

14   us.

15       Q    So your statement on Melissa Burner is that she

16   refused to testify, Missy.    Is that correct?

17       A    Correct.

18       Q    Beverly Daisy, interviewed but not called.

19       A    If you'll bear with me a moment, I will have to

20   look through the investigator's file to see what notes we

21   have on her.

22           When you say Beverly Daisy, are you speaking of his

23   first wife?

24       Q    Yes.

1-161

1    A    Oh, okay.  Oh, no, we interviewed her, yes.

2    Q    I know.  I said you interviewed her, but she wasn't

3    called.

4    A    Yeah.

5    Q    Well, why not?

6    A    As I recall, she was --  Now, let me try to find

7    the notes.  There were issues, and I can't recall exactly

8    what they were.  Yeah.  Because he married her when he was

9    about seventeen or so.  They had twins who died in a car

10   accident.

11   Q    Alright.  That doesn't seem yet, from what you have

12   said, a reason not to call her.

13   A    I wasn't stating that that was the reason.  I can't

14   find any exact notes.  I do know that we interviewed her.  I

15   do know that we made a conscious decision not to call her.

16   It wasn't a matter of oversight.  I mean, we...we knew full

17   about her.  We had interviewed Jody extensively about her.

18   We talked to other people about her.  And we interviewed her

19   directly.

20   Q    Alright.  At any rate, you did not call her after

21   you interviewed her?

22   A    Yes, sir, that's correct.

23   Q    Alright.  Next issue.

24        MR. BENNETT:  Your Honor, that covers I and J.

1-162

1    They are combined, really.

2       Q     We are now on K on Page 10.   This dealt with the

3    closing argument by the State during the sentencing hearing,

4    transcript 3/18/98 Page 107 where the State argued, "Consider

5    that in the weighing process that it was an intentional

6    killing.  The Defendant didn't want to look into the eyes of

7    Mr. Atkinson, and he stuck that gun in the back of his head.

8    Weigh those factors in your mind when you are weighing those

9    aggravating factors against the mitigating factors in this

10   case."  And you did not - that's on Page 108, so it's 107 and

11   108 --

12      A     Yes, sir.

13      Q     You did not lodge an objection?

14      A     That's correct.

15      Q     Now, the Defendant was convicted of felony murder,

16   correct?

17      A     Yes, sir.

18      Q     Which is, in this case, an intent to commit a

19   robbery with the use of a handgun but, potentially, on intent

20   to kill.

21      A     Potentially.

22      Q     Alright.

23      A     I mean, all it...all felony murder does is get rid

24   of premeditation.  It still leaves the other elements of

1-163

1    second degree murder potentially.

2        Q    Alright.  You had...the jury, by that time, had

3    already acquitted Mr. Miles of willful, deliberate,

4    premeditated murder?

5        A    Correct.

6        Q    The only aggravating...aggravating circumstance was

7    felony murder aggravated?

8        A    Yes, sir.

9        Q    Why did you not object to that?

10       A    I didn't believe it was objectionable.  It was

11   within the range of argument.

12       Q    Within the range of?

13       A    Of argument.

14       Q    Final argument.  Alright.  L.  This is a matter

15   that went up on appeal in a different context which deals

16   with, deep during their deliberations, the note from the jury

17   at 11:30 at night.

18       A    Yes, sir.

19       Q    Do you remember when the jury went out

20   approximately?

21       A    Jury went out early evening - 5:30, 6, 7, something

22   like that.

23       Q    Are you sure it wasn't earlier than that?

24       A    It might have been.  It's been a long while.

1-164

1                              (A partial transcript was

2                              marked for identification

3                              as Petitioner's Exhibit

4                              No. 4.)

5          MR. BENNETT:  Could I have this stapled and marked

6     as my next exhibit?

7          It will be Petitioner's 4, which is a partial

8     transcript, Your Honor, of the sentencing phase, the juror's

9     note at 11:20 p.m..

10         Q    Now, you have read this over, haven't you, that

11    portion?

12         A    Oh, repeatedly.

13         MR. VINCENT:  What page, sir?

14         MR. BENNETT:  It's Pages 2 through 8 of a partial

15    transcript.  And the reason I am using that is I don't have

16    the page numbers from the original trial because they are

17    blocked out at the top.  I mean, I can't tell what pages they

18    were, but it would be right before the verdict.

19         MR. VINCENT:  Alright, sir.  Thank you.

20         BY MR. BENNETT:

21         Q    Let me see if this is what happened.  The jury is

22    deliberating and they sent out a note.  Is that correct?

23         A    Yes, sir.

24         Q    And when they send out the note, the court

1-165

1    obviously asked the attorneys back into the court room?

2        A    Yes, sir.

3        Q    He summarized the content of the note and basically

4    re-instructed the jury in accordance with the...the verdict

5    form on Issues 5 and 6?

6        A    Yes, sir.

7        Q    Alright.  Which would be do the aggravators

8    outweigh the mitigators.  And then, depending on what they

9    do, your verdict is either life or death - excuse me - some

10   form of death or whatever follows after that.  Did...the

11   first point I have is, when the court indicated what was in

12   the note, you didn't ask to see the note, did you?

13       A    Correct.

14       Q    When the court gave the instruction on unanimity,

15   you didn't object to the court's instruction, correct?

16       A    Correct, because, based on what the judge told us,

17   the note indicated the consensus of the trial team was that

18   that was a fair statement to make.

19       Q    Now that you have read the note more than once, you

20   would have taken a different action?

21       A    Absolutely.

22       Q    Alright.  Explain to the Court, had you read the

23   note at that time and before the note was sent back to the

24   jury, --

1-166

1    A    Uh-huh.

2    Q    -- what corrective action would you have sought

3    from the judge?

4    A    Well, first off, the note, you know, it's much to

5    my regret that I simply trusted that Judge Sause was reading

6    it to me correctly.  And, in fact, I should mention that,

7    after he read it and went off the bench, we then made a

8    request that the note be given to us.  He promised it would.

9    We made actually two more requests.  It never came out, and

10   we didn't get to see it until the jury returned the verdict.

11   But, moving on, seeing the note, it immediate --

12   Q    Well, let me stop you there on that point.

13   A    Yes, sir.

14   Q    After you did read the note, you made a post-trial

15   motion for a new trial, didn't you?

16   A    Yes, sir.

17   Q    On that issue?

18   A    Yes, sir.  Because the note gave a clear indication

19   that the jury was potentially hanging.  And I don't believe

20   that the instruction that was given which acquiesced in was a

21   fair instruction based on the nature of the note.  I would

22   have asked for a couple of things.  First, that this was more

23   equivalent to maybe - and, again, it's hindsight, but - maybe

24   something like a modified Allen charge, which would make sure

1-167

1   the jurors were emphasized to them not to give up their

2   honest beliefs.  I would have also asked that the jury, which

3   would have been discretionary for the judge, that the jury be

4   questioned as to whether or not they wanted to go home and

5   get a fresh start the next day.  But, again, I was not privy

6   to enough information to make those recommendations.

7          Q    Well, if you had seen the actual note, you also

8   might have taken a third course, correct, which was to ask

9   the court to declare a mistrial based on the face of the note

10  which showed fairly strongly that there was a hung jury?

11         A    I...I would have asked for it, though I don't think

12  it would have been granted.  Yes, I would have asked for it,

13  but, again, I don't think it would have been granted given

14  the length of time that had gone by.

15         Q    Alright.  Now, I have got the appellate opinion

16  here.

17              MR. BENNETT:  I want to clean up a couple of

18  things, Your Honor.

19         Q    The first is, it says, in the opinion of the Court

20  of Appeals, at approximately 4:00 p.m., they began their

21  deliberations.  And here...here is the note in question,

22  because I don't think it's even on part of that transcript.

23  The third note, which was at 11:20, Section B Paragraph 2,

24  "If we are not unanimous, do we enter no automatically, or do

1-168

1  we need to be unanimous that no is the answer?"  And then

2  Section 6, "How can we answer this question if we are not

3  unanimous on the no vote?"  That's the actual note that came

4  back.

5      A    Yes, sir.

6      Q    That wasn't, in substance, what the court told you,

7  was it?

8      A    No.  And, in fact, I hate to say it, but I felt I

9  was affirmatively misled.  However, that may not have been

10  the case.  It may have simply been an error on the judge's

11  part, but that's how it felt.

12      Q    Now, if you had read the...you already testified,

13  if you had read the note, you would have taken different

14  action?

15      A    Yes, sir.

16      Q    One of possible three if you include the motion for

17  a mistrial?

18      A    Yes, sir.

19      Q    Alright.  By not asking to see the note before he

20  answered it in the first place, the note...sent the note, or

21  - excuse me - gave them re-instructions, the jury was in

22  effect told the same thing they were at the beginning of the

23  trial at the sentencing phase?

24      A    Yes.

1-169

1     Q    The beginning of the sentencing...at the end of the

2    sentencing phase?

3     A    Yes, they were.

4     Q    And the note then wasn't a specific answer, was it

5    - excuse me - the answer back by the court wasn't a specific

6    answer to the questions they had raised?

7     A    In my opinion, it wasn't.

8     Q    So, in that respect, is it not accurate that it was

9    not a tactic or a strategy for you not to ask for the note?

10     A    Oh, God, no, it wasn't.

11     Q    That would have been an oversight?

12     A    In hindsight, I really should have requested the

13    note.  I am not sure if the law would have required the judge

14    to turn it over to me, but he very likely might have.

15     Q    Oh, you --

16     A    It --

17     Q    There is no question in your mind whatsoever, aside

18    from turning it over for you to hold and...and have, you are

19    entitled, as a defense attorney, to read the note?

20     A    Except where the --

21    MR. VINCENT:  Objection.  Is this a question?

22    MR. BENNETT:  Yes.

23    THE COURT:  Well, it...that was --

24    MR. BENNETT:  Question mark at the end.

1-170

1          THE COURT:  I am sorry.  I didn't mean to laugh.

2          MR. BENNETT:  That's alright.  Question mark at the

3     end.

4          THE COURT:  Ask your next question.

5          MR. BENNETT:  Okay.

6          BY MR. BENNETT:

7     Q     Is it not accurate in your opinion that a litigant

8     in a case, especially a death penalty case, is entitled to

9     review the exact content of a note from the jury?

10    A     Except if a portion of the note indicates like a

11    split, or how they are voting, or some other matter that

12    shouldn't be communicated to counsel before the end of the

13    case.

14    Q     Alright.  And that wasn't this?

15    A     True.

16    Q     Alright.  Very good.

17         MR. BENNETT:  Next is M on Page 10 and 11, Your

18    Honor.

19    Q     During the sentencing phase, the ar-...the

20    allegation is you failed to object when the court instructed

21    the jury that their decision must be based on the evidence

22    when the law allows for mitigating factors outside the scope

23    of evidentiary foundation, including but not limited to the

24    Defendant's allocution.  There was no instruction in this

1-171

1    case that they could consider as evidence the Defendant's

2    allocution, that is the statement he made unsworn during the

3    sentencing hearing.  Are you aware of that?

4         A    Yes, I read the instructions.

5         Q    Huh?

6         A    Yes.

7         Q    Alright.  Now, you failed to object to that

8    instruction?

9         A    I didn't object to it.  That's right.

10        Q    Alright.  You are aware that the law does entitle

11   ...does entitle the Defendant to introduce, as a mitigating

12   factor, as a locket-type mitigator, non-statutory, the fact

13   of his allocution?

14        A    Yes, sir.

15        Q    Alright.  Why did you not seek that...that

16   instruction?  A separate instruction that you can consider as

17   a mitigator the Defendant's allocution?

18        A    I considered the instructions to cover the issue

19   sufficiently.  I argued allocution, and the government never

20   argued that allocution wasn't evidence or couldn't be

21   considered.  So, in the context of the instructions and the

22   context that I was free to argue it and did extensively, in

23   the context of the fact that the government never argued that

24   they shouldn't consider it, that it wasn't evidence, it was

1-172

1  essentially a non-issue.  The jury had it in front of them.

2  I was free to argue it.  And, in fact, at least one juror,

3  you know, found that his allocution was a mitigator.

4      Q    Well, isn't that all the more reason why a specific

5  instruction on that would have been helpful since one juror,

6  but less than twelve, we know, found that his allocution was

7  a mitigating factor, that, if there had been a specific

8  instruction on it, you might have pulled in additional

9  jurors?

10     A    You are asking me to speculate.  I don't know.

11     Q    The fact that the instruction uses the word

12  evidence generically in terms of mitigation, --

13     A    Yes, sir.

14     Q    -- consider the...all evidence in mitigation, and

15  that the State didn't object to your argument on allocution,

16  what does that have to do with you speak...you seeking an

17  affirmative instruction?

18     A    Again, you are asking me to reconstruct thinking of

19  many years ago.  I have looked at this.  The instructions as

20  a whole did in no way preclude the jury from considering the

21  allocution.  There was nothing about how the case proceeded

22  that kept them from, you know, considering it.

23     Q    Isn't it always helpful to your client to have an

24  instruction that in effect potentially helps his case, such

1-173

1  as this, as opposed to a generic instruction that the jury

2  might think evidence means anything, we don't know what it

3  means?

4      A    Again, you are asking me to speculate that.  The...

5  the record is what it is.  These are the instructions that we

6  requested.  The judge gave them without objection on our part

7  in regard to that.  And --

8      Q    Alright.  Alright.  The jury returned a sentencing

9  verdict but they had not yet been discharged when you were

10  allowed to see the verdict form, as was the State.  In the

11  verdict form --

12          MR. BENNETT:  We are no N now, Your Honor, under

13  11.

14      Q    In the verdict form, it shows as a mitigator by at

15  least one but less than twelve, life imprisonment without

16  parole is sufficient?

17      A    Yes, sir.

18      Q    Now, after that, you never asked the court to voir

19  dire jury members separately to see if in fact that was their

20  verdict or a just a factor that they considered but overall

21  rejected in the final weighing process, did you?

22      A    No, because the form signed by all of the jurors

23  dealt with that.

24      Q    Well, of course it did.  But the question is, if...

1-174

1    if...if a person comes back, a juror, life imprisonment

2    without parole is sufficient, isn't that capable of being

3    interpreted easily as in effect that's what their view was on

4    the proper sentence?

5         A    I don't know that you could make that leap.

6    Obviously, by agreeing that death was the appropriate

7    sentence, they had overridden that.  And I don't know of any

8    case law in Maryland that allows me to voir dire a jury once

9    they have reached a unanimous verdict and done it in the

10   formal way that we do death penalty cases.

11        Q    Until they are discharged and the verdict is

12   recorded, you, as an attorney, always have the opportunity to

13   seek action by a court, correct?

14        A    If there's reason to, yes, sir.

15        Q    Alright.  Now, let's say there is no case law that

16   would set aside the verdict with that there.  Isn't it a

17   different matter to ask a trial judge in his and her...his or

18   her inherent discretion to voir dire the jury to see if in

19   fact there is confusion?  After all, you only need one vote.

20        A    Yes, I know that.

21        Q    Huh?

22        A    Yes, I know that.

23        Q    Alright.  But by not calling it to the attention of

24   Judge Sause, you don't know how he would have reacted to

1-175

1    that, do you?

2        A    Not at all.

3        Q    Huh?

4        A    No, I don't at all.

5        Q    Alright.  I think we have covered O in another

6    section.  Let me see if it's...it's, in substance, the same

7    as the...the previous one.  O deals with the failure to

8    request an Allen-type charge.  Alright.  P, Page 12.  P is

9    another spinoff of a previous one that you both failed to

10   request an instruction or argue specifically that his

11   allocution could be considered in determining the existence

12   of mitigating circumstances.  You argued mitigation, clearly,

13   right?

14       A    Yes, sir.

15       Q    You argued his allocution?

16       A    Yes, sir.

17       Q    You indicated that he showed response, or - excuse

18   me - remorse?

19       A    Yes.

20       Q    You didn't though, did you, directly tell the jury,

21   based on the court's instructions, you can consider his

22   allocution as evidence?

23       A    Did I use those exact words?

24       Q    Right.

1-176

1    A    I don't know.  I would have to read the...my

2  closing argument again.

3    Q    So the record would speak for itself on that?

4    A    Yes, sir.

5    Q    Alright.  And of course, without asking for that

6  instruction, you might have still been able to argue it, but

7  you would have been in an even stronger position to argue

8  that fact, that is allocution is evidence, if you can preface

9  it with "As His Honor has instructed you, my client's

10 allocution is evidence in this case.", correct?

11   A    I...I don't know.

12   Q    You --

13   A    I don't know if it would have stronger.  That's,

14 you know --

15   Q    Well, you...you...isn't it always better when you

16 are arguing to a jury to, so to speak, dignify the person in

17 the black robe by in effect saying, "As His Honor" or "Her

18 Honor has told you", and then in effect be able to cite it

19 word for word?

20   A    In the abstract?  Yes.  I had instructions that

21 gave me full range to argue the mitigation that I intended to

22 argue, and I did do it.

23   Q    Alright.  We are now going to - and this is not my

24 pleading, but I think we discussed it - the Brady issue that

1-177

1    he raised pro se, Mr. Miles.

2         A    Oh, I am sorry.  I don't know what it is.

3         Q    Alright.  It deals with telephone records that were

4    turned over by the State to post conviction counsel and to me

5    dealing with Verizon records of a cell phone of Jody Miles?

6         A    Yes, sir.

7         Q    Alright.

8         A    I...I think this is the one where a victim's family

9    member managed to obtain?

10        Q    Did what?

11        A    A victim's family mender...member managed to

12   obtain?

13        Q    Well, --

14        A    Is that what you are speaking of?

15        Q    I believe he not only obtained them, but he changed

16   the address on them.

17        A    Yeah, that's how he obtained them.

18        Q    Yeah.  Alright.

19             MR. BENNETT:  I want to introduce, which was

20   provided to me, Your Honor, by Mr. Vincent, two documents

21   that he received.  And, actually, can we stipulate that these

22   were in the possession of the State prior to trial?  I think

23   you told that.

24             MR. VINCENT:  It appears from the date that they

1-178

1    were, sir.

2              MR. BENNETT:  Pardon?

3              MR. VINCENT:  It appears from the date that they

4    were, sir.

5              MR. BENNETT:  That would be - excuse me - 5A and

6    5B.

7                                    (Telephone records were

8                                    marked for identification

9                                    as Petitioner's Exhibit

10                                   Nos. 5A and B.)

11             BY MR. BENNETT:

12        Q    While she is marking those, you had pretty much a

13   policy of, from what you remember, open file discovery?

14        A    I believe...I believe so.  I...I know we had full

15   discovery.

16        Q    Alright.  Well, full discovery?

17        A    Right.

18        Q    You do not remember, do you, ever receiving

19   telephone records from Verizon listing the Defendant's name

20   in care of Atkinson Trucking Company?

21        A    I don't know.  I don't recall.  I did have phone

22   records.  Because we tracked a time line using the phone

23   records.

24        Q    If you have phone records, you would have reviewed

1-179

1    them?

2         A    Yes, sir.

3         Q    You knew the Defendant, from your interviews of

4    the...of the client, didn't work at Atkinson Trucking

5    Company, correct?

6         A    Yes.

7         Q    Alright.  And so if part of the records that you

8    received were from the State's Attorney's Office that had an

9    address Jody L. Miles, Atkinson Trucking Company, you would

10   have discussed that with your client for sure, wouldn't you?

11        A    I am sure it might have come up.

12        Q    Well, it came up for another reason, and that is

13   the victim is an Atkinson, right?

14        A    Yes, sir.

15        Q    And the brother is an Atkinson?

16        A    Yes, sir.

17        Q    And so you would have wanted to discuss that with

18   your client to make sure there wasn't going to be any

19   problems with prior knowledge of the victim, or something

20   else that you weren't aware of in the case?

21        A    Again, I am sure I would have.  I don't have any,

22   you know, immediate memory of it.

23        Q    Alright.

24             MR. BENNETT:  I would like to introduce into

1-180

1  evidence 5A and 5B.

2          MR. VINCENT:  May I see those just a minute, Fred?

3          THE COURT:  You want...what are they?  Just Verizon

4  records?

5          MR. BENNETT:  Yes.  Well, Verizon...actually, Bell

6  Atlantic.

7          MR. VINCENT:  Bell Atlantic 9X, I think.

8          THE WITNESS:  Mr. Bennett, if I could see it, I

9  could tell you whether or not I have ever seen it before.

10          MR. BENNETT:  Alright.

11          THE COURT:  Did you offer 4, partial transcript?

12          MR. BENNETT:  Good point.  I didn't, but I would

13  like to.

14          THE COURT:  Any objection to the partial

15  transcript?

16          MR. VINCENT:  No objection.  The Court has the

17  original anyway.

18          MR. BENNETT:  Could you read my --

19          MR. VINCENT:  No...no objection.

20          BY MR. BENNETT:

21     Q    You say show it to you so you can see if you ever

22  saw that?

23          THE COURT:  Any objection to 5A and 5B?  Any

24  objection to 5A and 5B?

1-181

1          MR. VINCENT:  No, sir.

2          THE COURT:  Admitted.

3                                    (Petitioner's Exhibit Nos.

4                                    4, 5A and 5B, previously

5                                    marked for identification,

6                                    were received into

7                                    evidence.)

8          BY MR. BENNETT:

9      A    Ye, sir, I would have had to review it, because we

10   did a time line for April 2nd, April 3 surrounding the crime,

11   and we have documented on our time line what phone calls came

12   into Mr. Miles' cell phone and which calls went out at

13   different time periods and where they were to.

14     Q    You are saying you did review them?

15     A    Yes, sir.

16     Q    Well, if you reviewed them, was it the method of

17   discovery in the case that you would get documents from the

18   State with a cover letter indicating what was contained?

19     A    I don't recall that that was always the case.  I...

20   I can't state that.  But see, the reason I say this is that

21   here's out of my investigator's file a time line prepared for

22   me, and it shows on there the various incidents where he used

23   cards, what reports were made by people, and it also lists

24   phone calls that were made from Jody's - excuse me - Mr.

1-182

1  Miles' phone.  And that is the same time period that your

2  record there covers.

3       Q    Alright.  You have your time line.  So let's assume

4  you had the...that your investigator, at least, had the

5  telephone records.

6       A    I would have given them to him in that case.

7       Q    Alright.

8       A    He didn't receive discovery directly.

9       Q    Do you...did you notice and remember and use at all

10 the fact that they at...in the address of Atkinson Trucking

11 Company?

12      A    We may have checked into it, but I don't see any

13 reason I would have used it.,

14      Q    Why wouldn't you have wanted to use it on cross

15 examination of the victim's brother in regards to why he

16 would change the billing address of the Defendant in this

17 case?

18      A    Well, first off, the answer is pretty obvious.  He

19 was trying to find information against the individual who he

20 thought killed his brother.  Secondly, it would not be a

21 particularly useful line of cross examination.

22      Q    Well, he was the one that discovered the body?

23      A    Yeah.

24      Q    And you...you wouldn't think that it would be a

1-183

1   useful line of examination at all that a person changed an

2   address...a billing address on a cell phone without either

3   contacting the Office of the State's Attorney or a

4   representative of the Defendant?

5       A    Okay.  Again, Mr. Bennett, we come back to I had a

6   theory of the case.  And I wasn't doing a shotgun legal

7   approach.  I had a theory, and all of my cross examination

8   was based on that.  It was absolutely useless for me to do

9   that line of cross examination where I am arguing this is a

10  felony murder, not a premeditated murder.

11      Q    No, actually, you were going beyond arguing it was

12  a felony murder, because that gets you still in the death

13  penalty territory, doesn't it?  You were get...arguing

14  hopefully for second degree or robbery afterthought?

15      A    Actually, my wildest dreams, I didn't think I would

16  get felony murder, but I was arguing for more than that, yes.

17      Q    Alright.

18      MR. BENNETT:  Your Honor, we would introduce, or

19  move to introduce - what was that?  5L?  They are already in,

20  aren't they?

21          THE COURT:  They are in.

22          MR. BENNETT:  Alright.

23          BY MR. BENNETT:

24      Q    That takes care of the Brady.  Now, we are on the

1-184

1   supplement and then the second supplement.  Almost done at

2   least on direct, Mr. Saunders.

3       A    Yes, sir.

4       Q    You failed to object both on opening statement,

5   transcript 3/9/98, and then on close where Mr....where the

6   State argued, "I took an oath of office to protect the people

7   of Wicomico County."?

8       A    Yes.

9       Q    I assume your answer is going to be you didn't find

10  that particularly objectionable?

11      A    It was on the edge.  I chose not to object because

12  it didn't go any further.

13      Q    Next, Number 2, the - page 2 of my supplement, Your

14  Honor - Lee Ann Fisher was directed by the Defendant as to

15  what - excuse me - by Jonah Miles as to where the gun and

16  ammo was in the Choptank River --

17      A    Yes, sir.

18      Q    -- by an act of pointing?

19      A    Yes, sir.

20      Q    Going back to law school, assertive conduct, --

21      A    Yes, sir.

22      Q    -- the act of picking somebody out in a lineup,

23  it's considered to be hearsay, correct?

24      A    Sometimes, it is, yes.  However, if I can

1-185

1  anticipate, Jonah Miles was going to testify, or already had

2  testified.  I was not contesting that there was a gun or

3  where it had been placed.  It was of no moment given the

4  theory that I was taking.  So I didn't object when there was

5  hearsay she pointed it out there and he went and retrieved

6  it.

7      Q    Well, you...you have given that answer a number of

8  times of no moment, wasn't your theory of the case,

9  etcetera, --

10     A    Yes, sir.

11     Q    -- when you have deliberately foregone objections.

12 Is that right?

13         MR. VINCENT:  Objection.  He's arguing with the

14 witness.

15         MR. BENNETT:  No, I am asking.

16         THE COURT:  Well, I am going to sustain.

17         MR. BENNETT:  Alright.

18         THE COURT:  Ask another question.

19         BY MR. BENNETT:

20     Q    You have testified in a number of areas, more than

21 one, where you didn't take certain action because it was not

22 consistent with your theory of the case.  Is that correct?

23     A    Yes, sir.

24     Q    You are aware of the standard in Maryland of

1-186

1  reversible error if an error is made, correct?  Standard of

2  review?

3      A    Yes, sir.

4      Q    That it has to be harmless beyond a reasonable

5  doubt, correct?  Under <u>Dorsey v. State</u>.

6      A    I...I am familiar with <u>Dorsey</u>.

7      Q    Alright.  That covers evidentiary errors and evi-

8  ...evi-...evidentiary errors and instructional errors,

9  correct?

10     A    To the best of my knowledge, yes.

11     Q    So even assuming it's not consistent a hundred

12  percent with your theory of the case, in a death penalty

13  case, knowing who the appellate reviewers are, that is the

14  Court of Appeals, and the success rate in death penalty case

15  litigations on appeal, why wouldn't you want to protect the

16  record as best as possible even if you are ultimately not

17  going to argue that theory of the case to the jury?

18     A    I preserved all of the objections that I thought

19  were appropriate.  I had a...for lack of a better word, a

20  bulletproof confession audiotaped, fully voluntary putting

21  him as the man who pulled the trigger and committed the

22  murder.  At that point, I obviously made reasoned decisions

23  based on that fact which I couldn't make go away.  We all

24  have different styles.  I concentrate on the fact that I have

1-187

1    a theory.  I go with it.  I ask my questions consistent with

2    that.  And that's what I did.

3        Q    Alright.  The next one that I talked to you about

4    at length, which is the robbery afterthought State versus

5    Allen issue.

6        A    Yes, sir.

7        Q    During closing argument where you did come up with

8    your...where you did develop two theories of the case,

9    including robbery afterthought, --

10       A    Yes, sir.

11       Q    -- you argued that for three solid pages of the

12   transcript.  And I am talking about transcript 3/12/98 Pages

13   62 through 65.

14       A    I haven't read it, but I'll take your word for it.

15       Q    Alright.  Well, --

16       A    I, I mean, I remember making the argument.

17   Absolutely.

18       Q    That...that specific argument, correct?

19       A    Yes, sir.

20       Q    In other words, you argued to the jury that the

21   formation of any intent to commit a robbery occurred after

22   the shooting?

23       A    Yes, sir.

24       Q    Partly on...you didn't argue it this way, but you

1-188

1    could have extended out logically that he wouldn't need

2    anything he had now, he was dead.  That's a crass way of

3    putting it.

4         A    Yes, sir.

5         Q    Alright.  Now, --

6         A    I think I phrased that it was opportunistic.

7         Q    Yeah.  You did not seek an instruction supporting

8    that theory of the case, correct?

9         A    Correct.

10         Q    There was evidence in the record from the

11    confession itself that would have supported a request for

12    that instruction, correct?

13         A    There was evidence that would support it, but then

14    I would have to assume that the Court of Appeals would

15    overturn - I think it's Higgenbotham and the dicta in

16    Stebbing.

17         Q    Yeah.  Both of which were Court of Special Appeals

18    cases?

19         A    Was Stebbing Court of Appeals?

20         Q    Stebbing was a Court of Appeals a number of years

21    old.

22         A    Yeah.  Right.  And...and the reason I am very

23    familiar with Stebbing is because we had argued rather

24    forcefully in that death case that the taking of items from

1-189

1  the victim after death did not qualify it as the death

2  penalty...for the death penalty, and we lost.

3      Q    Now, you are aware, are you not, that a defendant

4  is entitled to an instruction in a criminal case on any

5  theory of the case in which there is some evidence to support

6  the defense?

7      A    Yes.

8      Q    Alright.  It's a fairly pro-defendant standard?

9      A    Yes.

10     Q    Alright.  And you indicated on the question before

11 that, from the confession itself, you would have had every

12 reason to make a request for an instruction based on the

13 confession?

14     A    Based on the subsequent case law in this

15 jurisdiction, I had the factual foundation for such an

16 instruction, yes, sir.

17     Q    Alright.  Now, was it a tactic...it was not a

18 tactic or a strategy not to seek that instruction, was it?

19     A    No, sir.

20     Q    Alright.  So, if it's not a tactic or a strategy,

21 that would be an oversight, correct?

22     A    No, sir.

23     Q    Huh?

24     A    No, sir.  I wasn't prescient it enough to know that

1-190

1    the Court of Appeals would overturn that case.  And I regret

2    that.  And I regret that I didn't see that that was a

3    possibility.

4        Q    So you are saying --

5        A    Let...let me clarify.  It's not an oversight,

6    because I was fully aware of the law and fully aware of my

7    facts.  If you want to say it's a mistake because I didn't

8    foresee that the Court of Appeals would overturn it or that

9    there was a strain of case law developing in other

10   jurisdictions which the Court of Appeals would adopt, yes, it

11   would be a mistake, but it wasn't on oversight.

12       Q    Well, but you also said it wasn't a tactic?

13       A    No, of course not.  I read the law.  I knew what

14   the law was.  And based on the reading of Maryland law at the

15   time, I was not entitled to the instruction.

16       Q    Well, you made an argument to the jury?

17       A    Yes, sir.

18       Q    It's always better when you make an argument to the

19   jury to have instructions that will support the argument?

20       A    Yes, sir.

21       Q    The worst that could have happened is you made a

22   request for an instruction in this case consistent on

23   "developing case law", presented it to the judge, and he

24   denies it with a rubber stamp.  That would have been the best

1-191

1    thing in this case, wouldn't it?

2         A    That would have been better than its present

3    posture, yes, sir.

4         Q    No, it would have been the best thing because then

5    Miles - correct me if I am wrong - Miles becomes the Allen

6    case?

7         A    Distinct possibility of that, yes, sir.

8         Q    Huh?

9         A    Distinct possibility of that, yes, sir.

10        Q    And...and then on direct appeal, it's back for a

11   whole new trial, because that's guilt/innocence, isn't it?

12        A    Yes, sir.

13        Q    Alright.  So by not requesting that instruction,

14   even though you did a closing argument, even though there was

15   a strain of developing case law?

16        A    Well, I know now there's a...there was a strain of

17   developing case law.  I don't know that I knew at the time

18   that there was case law outside of Maryland that I could

19   carry over.  I knew what Maryland case law was.

20        Q    Well, were you aware in Allen itself that they

21   cites case I think going back to the '80's?

22        A    Oh, yes, sir.  I have read Allen.

23        Q    Alright.  So if you had done independent research,

24   you could have used those cases as the formation for an

1-192

1  instruction and said really that Stubbing...Stebbing doesn't

2  address the issue, and Higgenbotham is not directly on point

3  and requested it?

4      A    I could have, yes.

5      Q    Alright.  Doesn't prescient enough really mean, in

6  the context of the appellate courts, that a decision comes

7  down at a later time in a whole new area of the law which no

8  attorney could anticipate?

9      A    I don't think I have ever heard it defined that

10  way.

11      Q    Well, have you heard it defined some other way

12  then?

13      A    You are asking me how the Court of Appeals would

14  interpret something.  And...and we could get back into

15  debating what Wiggins and all that says.  The fact of the

16  matter is it's going to be for a court to determine whether

17  or not I should have formulated the instruction at that time.

18  That's up to the Court.

19      Q    Alright.  You did...you did use the word mistake,

20  correct?  I did hear that?

21      A    Yes.

22      Q    Made a mistake in not asking for that instruction?

23      A    Certainly in hindsight.  Absolutely.

24      Q    You are aware, are you not, that, if the attorney

1-193

1    in Allen, with the same case law in effect, Stebbing and

2    Higgenbotham at that time, had never requested that

3    instruction in Allen, it never would have gone up and been

4    reversed in Allen, right?

5            MR. VINCENT:  Objection.

6            THE COURT:  Sustain.

7            BY MR. BENNETT:

8        Q    You did not call at the sentencing hearing a

9    representative of the Maryland Parole Commission, right?

10       A    No, sir.

11       Q    You did ask for an alternate verdict of life

12   without parole?

13       A    Yes, sir.

14       Q    But you did not have testimony fleshing out the

15   various differences between life, life without parole and

16   death?

17       A    I had an instruction that said life without parole

18   was life without parole, you do not get out.

19       Q    That was the court?

20       A    Yes, sir.

21       Q    Alright.  You had the option to call witnesses?

22       A    Yes, sir.  But as you said, I had the gentleman in

23   the black robe tell the jury that life without parole is life

24   without parole, you can't get out.

1-194

1    Q    But in your case in chief at the sentencing

2    hearing, the jury could have heard from a person from the

3    Maryland Commission...the Maryland Parole Commission

4    specifically as to the various three options in addition to

5    what the judge said?  Which is a...a short sentence in the

6    middle of long instructions, right?

7    A    Are you asking two questions?  Could I have?

8    Obviously, I could have.  I chose not to.  I had the

9    instruction.  I felt it was sufficient.

10    Q    Alright.  You are aware that, in a large number of

11    capital cases, defense attorneys call a representative from

12    the Maryland Parole Commission to come and testify in front

13    of the jury?

14    A    I don't know what's going on currently in Maryland.

15    When I was doing litigation, it would occur a certain

16    percentage of the time.  I am not even sure majority, but it

17    would occur sometimes.

18    Q    And in those cases, that defense attorney would

19    have gotten the same instruction you got, right?

20    A    I assume so.  However, I also have seen a downside

21    in that, in one instance where we put on the Parole

22    Commissioner, the prosecutor was allowed to go into issues of

23    escape and violence.  And so it can have a downside if the

24    judge permits it.

1-195

1    Q    Well, that would have been well beyond the scope of

2    direct, correct?

3    A    If the judge says that it can be done, then it's a

4    question of reversible error, and you make your choices

5    whether or not you want to make that risk.

6    Q    Well, you won't know that until you call somebody.

7    That's the...the risk of litigation in any case, correct?

8    A    And I made the decision that, with the instruction,

9    I didn't need to call a Parole Commissioner.

10    Q    You didn't base that decision on what happened in

11    some other case, did you?

12    A    I based the decision on my reasonable judgement to

13    the case I had and how I could argue it.

14    Q    The last issue deals with - it's in the second

15    supplement - in your motion for judgement of acquittal, you

16    are familiar with the Metheny case, are you not?

17    A    Yes, sir.

18    Q    You did not include on a motion for judgement of

19    acquittal an argument based on the theory in Methany that

20    there was insufficient evidence that the robbery occurred

21    during the commission of the murder as opposed to being an

22    afterthought robbery on the basis that the State should be

23    stuck with the same confession that they introduce?  In other

24    words that the jury couldn't believe parts of it and

1-196

1   disbelieve other parts when there's been no evidence to

2   contradict how the...how the murder convict...how the murder

3   occurred?

4       A    Yes, sir.  And, again, this goes back to our prior

5   discussion of I based things on the law in Maryland at that

6   time and did not foresee the Metheny/Allen decision to

7   overrule that.

8       Q    Well, but if you were aware...you knew enough to

9   make an argument on felony murder - excuse me - robbery

10  afterthought?

11      A    Yes, sir.  And I considered myself lucky to be

12  allowed by the judge to do so.

13      Q    Well, but you did?

14      A    What?

15      Q    You did do so, and you got away with it if that's

16  what you are saying, right?

17      A    Yes.

18      Q    Alright.  And so, if you knew about it and you said

19  you made a mistake in not seeking an instruction on it, and

20  it's in the same subject area, why would it not have been a

21  basis for an MJOA?

22      A    My saying it's a mistake is it's a mistake in

23  hindsight that I wasn't able to foresee the future that the

24  Court of Appeals would overturn it.  Alright?  I based my

1-197

1  decision on MJOA and on the instructions on the state of law

2  at the time that I was litigating this case.

3      Q    Now, let's go back to that very briefly, and then I

4  am done.  Do you agree that you did not research cases

5  outside the State of Maryland in the area of robbery

6  afterthought?

7      A    I can't agree with that.

8      Q    You can't?

9      A    No, sir.  I do know that I researched the issue.  I

10  cannot reconstruct what I did and what I read and saw at this

11  particular time.

12     Q    Well, let's...let's pick up on that.

13     A    Yes, sir.

14     Q    If you did research and if in fact, in the <u>Allen</u>

15  case, there are cited more than five cases prior to 1998 when

16  this case was tried supporting this theory of defense and

17  which is the basis, in large part, for the <u>Allen</u> decision,

18  then you certainly would have come up with them, wouldn't

19  you?

20     A    I don't know how you can say that.  In the same way

21  that Justice (unclear) Thomas said we should have all seen a

22  <u>Apprende</u>(Sp.?), <u>Blakely</u> and <u>Booker</u> coming, and yet, you know,

23  ninety-nine percent of the criminal defense community didn't

24  see it coming and saw it as a surprise.

1-198

1    Q    No, this is a different question.  When you say,

2    Mr. Saunders, that you researched the area outside of the

3    State of Maryland --

4    A    No, sir.  Let me rephrase that.  You asked me can I

5    state that I didn't research it.  I said I can't state that.

6    I do know that I always do research.  I can't tell you

7    exactly what cases I read outside of Maryland.  I do know I

8    read the Maryland cases.  I knew the Maryland, you know,

9    precedent.  I probably looked at other cases.  I can't tell

10   you which ones.  That's as much as I can say.

11   Q    Well, with all due respect, I thought, about three

12   minutes ago, maybe four, that you flatly said that you

13   researched cases outside the State of Maryland.  Is that

14   right or wrong?

15   A    I believe I probably did.

16   Q    Then I get back to the question that I --

17   A    But I can't...I can't state unequivocally.

18   Q    Alright.  But you believe you did?  Why then would

19   you have been unable to find these five or six, or whatever

20   number of cases it is cited in Allen that are in the

21   Defendant's favor and use that as the basis for an

22   instruction request?

23   A    Look, you know, hindsight is always wonderful.

24   There are also a set of cases that support the Higgenbotham,

1-199

1    you know, position in other jurisdictions as well.

2         Q     This is not hindsight.  This is...this is before

3    trial.  This is not being prescient.  This is the research

4    you would have done which would have supported the basis for

5    a jury instruction and obtained a reversal for Mr. Miles?

6              MR. VINCENT:  Objection.  He's arguing with the

7    witness.

8         Q     Is that correct?

9              THE COURT:  Sustain.

10        Q     I am talking about legal research that you say you

11   conducted before trial before you had formulated your jury

12   instructions in this area since you obviously thought about

13   it because you argued it in closing argument?

14             MR. VINCENT:  Is that a question?

15             MR. BENNETT:  Yes.

16             BY MR. BENNETT:

17        Q     Did...why didn't you pick up these favorable cases?

18        A     I can't tell you.

19        Q     Could it be because you didn't in fact do the

20   research?

21        A     No, sir.

22        Q     Then, if you did --  Alright.  You have no reason

23   then why you...you can provide the Court no answer why you

24   did not submit to the trial judge these favorable cases as

1-200

1    the basis for an instruction.  Is that right?

2        A    Maryland case law was settled at that point.  I

3    relied on that.  And I got freedom from the court to argue a

4    theory that was not supported under Maryland law.  That's as

5    much as I can tell you.  I always research my cases.  I did

6    research.  I can't tell you which cases I read or didn't

7    read.  I can't tell you wether I read the cases that support

8    Higgenbotham in other jurisdictions and the ones that

9    attacked it.  I can't tell you that.

10            MR. BENNETT:  Nothing further.

11            THE COURT:  Let's take ten minutes.

12            (Brief recess.)

13            THE COURT:  Who is cross examining?

14            MR. VINCENT:  I am, Judge.

15                    CROSS EXAMINATION

16            BY MR. VINCENT:

17        Q    Mr. Saunders, how long were you head of the unit -

18    was it called the Capital Unit, Death Unit?

19        A    Well, initially, I was in charge of the Capital

20    Unit for about a year and a half to two years, then went to

21    Baltimore County for seven years.  And when I came back, it

22    was - this is a bureaucratic thing - it had become a

23    division, and I was head of that division for seven years.

24        Q    How many death penalty cases have you personally

1-201

1    tried?

2         A    In the State of Maryland, my memory is around

3    twenty.  And since going into federal litigation, I have

4    handled...I think I am on my sixth federal death case at the

5    moment, and I have two 2054's out of - excuse me, I am

6    speaking bureaucratize - I have two federal post convictions

7    out of Alabama that are present...presently in the Eleventh

8    Circuit, and I had one in Texas a couple of years ago.

9         Q    At the time you tried or represented Mr. Miles in

10   1998, how many had you tried in Maryland?

11        A    At that point, probably around seventeen myself as

12   first chair, and...and approximately --

13        Q    How many of them --  You may have anticipated my

14   next question.

15        A    Approximately.

16        Q    How many others did you supervise or participate

17   in?

18        A    In terms of death eligible cases, I had, by that

19   time, supervised well over a hundred.  Not all of them were

20   actually...led to capital litigation, but they were eligible

21   and we worked on mitigation to convince government - excuse

22   me - the State not to pursue it.  Some of them I supervised

23   through the full litigation.

24        Q    You were asked about the individual voir dire of

1-202

1    the jurors upon the allegation that the Defendant, well,

2    Petitioner then...Defendant then, Petitioner now was seen,

3    and wouldn't the risk of asking the questions regarding

4    seeing the Defendant coming up the hall accentuate the

5    problem?

6         A    You know, I can't fully reconstruct exactly what

7    went on.  I know it was brought to our attention.  I know I

8    made a mistrial motion at the request of my client.  And I

9    remember, as I said, going out in the hallway, retracing the

10   steps and seeing if I could see or not there was a

11   significant risk.  And, in my mind, my memory is that I

12   severely discounted that there, you know, the truth of it or

13   the risk.  I talked with my trial team.  We made a decision.

14   I can't reconstruct it.  It wasn't made without

15   consideration.  I just can't reconstruct exactly what my

16   trial team and I talked about in coming to the conclusion

17   that we dealt with it the way we did.

18        Q    You indicated there was some concern in your

19   opening statement and why you limited it.  As you were, you

20   weren't sure if the Defendant was going to testify,

21   particularly with the last version that he had given you.

22   What was the last version that your client had given you?

23        MR. BENNETT:  Objection.  It's not an

24   attorney/client relevance because we know what was presented

1-203

1    at trial, which was in fact his confession.  They never went

2    with it.

3         MR. VINCENT:  It goes to his decision making.  The

4    question was asked about his broad opening statement.

5    Counsel doesn't know what the Defendant's...whether he's

6    going to testify and, if he does, what he's going to say.

7    The Defendant's version which he is aware of goes into Mr.

8    Saunders making decisions on trial tactics at that point and

9    how to proceed.  I think it's relevant.

10        THE COURT:  I'll overrule.

11        BY MR. VINCENT:

12   A    The...the last version that I had was that Mr.

13   Miles admitted that he had made eye contact with the victim

14   at the rest stop; that, when he left the rest stop, he knew

15   that the victim would follow him.  He denied that he had ever

16   done that before or that he was intending to have a liaison.

17   He drove down the road and pulled into the side, and he said

18   he knew that the victim would be along shortly.  He had a gun

19   in the console that he had stolen from - I think it's Carry

20   Cooper's father - if my memory is correct.  He stepped out

21   with the gun.  He cocked the gun.  He walked into the field

22   or woods - I can't recall - and he waited for the victim.

23   The victim's car came.  The victim came out of the car and

24   began looking for Mr. Miles.  They had a confrontation.  The

1-204

1    victim was shot.  He said that he didn't intend for the gun

2    to go off, it just went off.  He then went to the victim's

3    car, got the victim's wallet, left the scene, used the

4    victim's credit cards.  Sometime later, he came back thinking

5    to move the body and the police were already there.

6         Q    Did he indicate to you in some way that he

7    announced a robbery or made any indication to the victim that

8    ...that he wanted his property?

9         A    Yes.  My memory is I think he asked for the keys to

10   the victim's car, but...but he clearly made it clear that it

11   was a robbery.

12             MR. BENNETT:  Was or was not?

13             THE WITNESS:  Was.

14             BY MR. VINCENT:

15        Q    In your preparation for the trial and in weighing

16   the version that the Petitioner had given the police with

17   what he had eventually given you, did you undertake some

18   process to kind of see how it played out?

19        A    Yes, sir.  My inclination initially was to have him

20   testify about the robbery, because the confession was

21   absolutely bizarre presenting himself as an enforcer for a

22   loan shark, and there was no way Mr. Miles was sophisticated

23   enough or capable enough a criminal to be an enforcer.  No

24   loan shark would trust him with that.  But...so my

1-205

1   inclination was to have him tell the truth and argue that he,

2   you know, that, again, like he said in his statement, that he

3   didn't intend for the gun to go off, it went off by accident.

4   The fly in the ointment was our concern about his statement

5   about cocking the gun.  So we...I was teaching a death

6   penalty clinic at that point, and we took the members of that

7   death penalty seminar and we used them as a mock jury.  We

8   first took a poll of them as to what their views on the death

9   penalty were.  Then we presented them with the government's

10  case.  We presented them with the defense of arguing his

11  confession that was given by the police, and we took a vote.

12  Then we gave the alternative version, which is the latest

13  version that Mr. Miles had given me, and we took another

14  vote.  And far more of them voted for death on the second

15  alternative than the first.  And then we talked to those who

16  had changed their votes and found out their opinions and why

17  and made the considered decision that, as bizarre as the

18  confession was, unless the client insisted otherwise, that

19  that's what we had to go with.

20       Q    Do you have any idea how many hours or times you

21  talked with the Petitioner about the preparation of the case?

22       A    Oh, it was...it was nearly endless.  First off,

23  there were a lot of issues Mr. Miles had to deal with in, you

24  know, personal life.  He told us a lot of things that were

1-206

1  untrue to start with, so we had to work through it a great

2  deal.  I would conservatively say that I probably spent at

3  least eighty to a hundred hours with him myself, and then my

4  trial team spent other time, as well.

5      Q    In dealing with Mr., or dealing with the

6  Petitioner, did you have difficulty with him in terms of

7  family issues and getting family members to cooperate now

8  that they're...they are here apparently now, but --

9      A    Well, Mr. Miles was relatively forthcoming after a

10 while after we had established a relationship, and he was

11 relatively candid in my memory about how dysfunctional his

12 mother was and the kind of life.  I think he minimized some

13 things, but he was more open than some people have been in

14 the past in my experience.  We had tremendous difficulty with

15 the family.  Our initial contacts with two of the sisters,

16 they refused to talk to us.  Only one sister, initially,

17 agreed to talk to us.  The brother, to my knowledge, never

18 did.  And we had to bring in a social worker to work that

19 angle.  In addition, the mother was...the social worker was

20 the best with her.  We had to leave it there.  I don't know

21 whether it was interaction with males or...as opposed to a

22 female, but she was, in our opinion, quite mentally

23 disturbed.  She was erratic.  She was not a good historian.

24 She was very self-centered.  And she had a lot to hide

1-207

1  considering what we knew about Mr. Miles' history.

2      Q    Was there some apprehension on the part of the one

3  sister that did testify about even taking the stand if the

4  mother was in the court room?

5      A    Oh, absolutely.  And that's not uncommon.  In fact,

6  it took a great deal of effort to convince her to testify.

7  When you are asking someone to come in and testify against

8  their mother to say that the mother was abusive, neglectful,

9  dangerous, it's extremely hard, even for adults, and much

10  less someone who has been damaged by that.  So that we had to

11  work with her extensively to get us to trust us and believe

12  it.  And the social worker was very important in that, too,

13  to...to have someone there to help her work out that.

14  Luckily, the social worker was able to talk - at least my

15  memory is if I remember the report correctly - was able to

16  talk to the mother and the sisters outside the court room,

17  which allowed us then to flesh out and corroborate through

18  her testimony and report the testimony of the one sister who

19  agreed to testify.

20      Q    The...the sister who refused to testify - Ms.

21  Burner I think it was - did she indicate why she did not want

22  to testify?  Do you recall?

23      A    I...I don't recall.  There actually were two

24  sisters who wouldn't testify.  There was...there were three

1-208

1    sisters, one brother.  One brother, we never were able to

2    establish any kind of informational contact with him.  Two

3    sisters refused to testify but ultimately did speak to my

4    social worker.

5            MR. VINCENT:  Does the Court have the exhibits from

6    the trial?  Specifically Defense Exhibit 14 at sentencing I

7    should say?

8            THE COURT:  We have a...we have a box.

9            MR. VINCENT:  I guess they are still at Queen

10   Anne's County perhaps.  We would ask the Court at some point

11   take judicial notice of Exhibit...particularly Exhibit...all

12   of the exhibits, but specifically Exhibit Number 14 - which

13   it appears, Mr. Saunders, you offered into evidence.

14           BY MR. VINCENT:

15      A    Are you speaking of the social worker's report?

16      Q    No.  A number of exhibits you offered into evidence

17   included the institutional records, and specifically Queen

18   Anne's County records are listed, or - excuse me - Caroline,

19   Exhibits 14 - reading from the transcript Page 42 of March

20   17th --

21      A    My memory is that I introduced exhibits from at

22   least four institutions.  I could be wrong, but it was more

23   than one.  There were...there were...there were several

24   institutions that we introduced records of.

1-209

1    Q    It appeared to be...right, it appeared to be

2    Wicomico, Queen Anne's, Caroline and apparently the State of

3    Delaware?

4    A    Yes, sir.

5    Q    Or some records from Delaware?

6    A    Yes, sir.

7    Q    I think you may have been shown Exhibit...the

8    Defense Exhibit which is 1.  Do you know whether or not that

9    was the same exhibit that was offered from Caroline County

10   that you offered...same exhibit as what you offered as Number

11   14?  Have any idea?

12   A    I don't know.

13   Q    When he was housed, was he just housed in Wicomico

14   and Queen Anne's County for purposes of this trial?

15   A    I don't recall.

16   Q    Do you have a list of...of witnesses that were

17   interviewed by your investigator, or is that a list of all of

18   the witnesses that were interviewed by all of the

19   participants?

20   A    Well, what I have is we had what we called an

21   interest list with names, addresses and phone numbers and how

22   people were related to this case.  So this was the list that

23   we prepared with the idea that these are people we're

24   interested in.  At some point, we may have chosen not to

1-210

1    interview someone based on information that I received, but

2    this was...this was also not a static list.  It was a list

3    that we kept updating as we got more information or more

4    leads.  But this document is...is out of my investigator's

5    file, and, in fact, looks to be relatively far along in the

6    investigation in terms of our interest list.

7        Q    Your investigator was Mr. --

8        A    Donald Steils, S-t-e-i-1.

9        Q    Steil.  And as you have indicated, he just recently

10   passed away?

11       A    Yes, that's correct.

12       Q    But you had access to his file?

13       A    Yes, I recovered it early on when you subpoenaed

14   and did a subpoena duces tecum as to my files.  This was the

15   only file I had access to.

16           MR. VINCENT:  Madame Clerk, I have lost count.

17   Mark this as 5.  Offer this into evidence.

18                                  (A witness list was marked

19                                  as State's Exhibit No. 5

20                                  and received into

21                                  evidence.)

22       A    If you --  Sorry.

23           MR. VINCENT:  I guess I could make a copy --

24       A    If you wish, I also have...I can give you...run

1-211

1    through this in terms of telling you who, you know, I have

2    got notes of that we interviewed.

3        Q    Yes, sir, if you would, sir.

4            MR. BENNETT:  Your Honor, there really was no

5    question pending.  We appreciate his volunteering.  There was

6    no question.

7            MR. VINCENT:  Well, we'll ask it.

8            THE COURT:  Next question.

9            BY MR. VINCENT:

10       Q    Who else was interviewed other than who's on the

11   list, sir - because that is my question?

12       A    Yes, sir.  We interviewed Don Jet on May 16, '97.

13   We interviewed Gail Spivey, S-p-i-v-e-y, January of '98.  We

14   interviewed Lisa Marie Porter January 8th of '98.  We

15   interviewed Rebecca Chips on 2/23/98.  We interviewed Thomas

16   Quarter, who was Mr. Miles' step-father - I am looking for a

17   date, oh - February 9, '98.  We...these notes indicate a

18   survey of the various scenes.  We have a life line

19   chronology.  Let me see.  And of course interviews with Mr.

20   Miles himself.  Lisa Hopkins, Jim and Kay Cooper, Rebecca

21   Chips, Steve --

22           MR. BENNETT:  That's duplicative, Your Honor. That

23   was already mentioned once for the record.

24       A    Steve Bailey, Fayetta Downes, Georgian Potter,

1-212

1   William Fish Brown, Cornelius Potter, Sergeant Greenwood,

2   Captain - I think it's - F-a-s-s-o-n, Fasson, Gail Spivey.

3   Of course a review of the evidence.  And of course I

4   interviewed my social worker extensively about her contacts

5   with the mother and the sisters who weren't working very well

6   with us.  We interviewed - I think his name is Lou Kyle,

7   K-y-l-e, who was the doorman at Hampton Inn.  Followup

8   interview with Fayetta Downes.  Attempt to interview Brenda

9   Stant, William Brown, Georgian Potter, Cornelius Potter,

10  Sergeant Greenwood, Captain Easson, Maurice Lively, who was

11  his mother's current husband at that time.  I mentioned Mr.

12  Porter already.  I don't know if I mentioned Lisa Porter.  A

13  Mary Busick at Studio 404.  There were more, but I don't have

14  any further notes at the moment.

15      Q    Generally, what would be the source of information,

16  or the source of those names?

17      A    Well, of course we start with the client.  We get a

18  full life history, a full chronology.  We do a birth to

19  whenever...birth...birth to the present history with him.  We

20  then, you know, once we have that...and also then we get a

21  full family picture going back as many generations as he can

22  remember in terms of location, people, etcetera.  And then we

23  begin...we begin searching.  We go out and knock on doors and

24  look for people, do, you know, phone book searches, computer

1-213

1    searches to try to locate where people are at the time.

2    Every time we go out and interview, we ask about other

3    people.  You know, do they know where so and so is, etcetera,

4    etcetera.  We keep expanding the list as it comes along.  And

5    we would hold usually about monthly meetings with the trial

6    team to discuss what people had found out, who was the best

7    person to go in to interview a particular person based on

8    what we knew.  If a person wasn't talking, whether or not we

9    could find someone who could approach the person.  Things

10   like that.  So it was a cumulative, long term process.

11       Q    The...the trial team or you personally, did you

12   receive the records from the phone --  Obviously, you were,

13   because you were able to trace the phone calls that were

14   made.  Do you know what the source of the phone records were?

15       A    No, I don't remember that.  All I know is that,

16   without the phone records, we could not have constructed the

17   time line for the two days where we note every single

18   incident that occurred that we had evidence about.

19       Q    Would your file --  I guess that...they researched

20   it.  I think that answers the question.  Did you...did you

21   speak or interview...she is now listed as Beverly Daisy, the

22   ...the first wife?  Was she cooperative, do you recall?

23       A    My memory is that we managed to interview her,

24   because we had information about her.  I am not sure which

1-214

1   one of our trial team managed to do that.  I can't recall

2   right now.

3       Q    Was there a decision...conscious decision made not

4   to call her or did she not cooperate?  Do you recall?

5       A    Well, it cer-...the decision that she wasn't on the

6   stand was either a conscious decision she...she would refuse.

7   Certainly, I was not going to not call her if she had

8   something useful and was willing to cooperate.  You know, we

9   went out with the intention of being able to call every

10  single witness that we could.

11      Q    That's all we have, sir.  Thank you.

12           THE COURT:  Any redirect?

13           MR. VINCENT:  Judge, subject to recalling him if

14  something else arises through other witnesses.

15           MR. BENNETT:  Yeah, I have some redirect, Your

16  Honor.

17                  REDIRECT EXAMINATION

18      BY MR. BENNETT:

19      Q    On the shackles issue, I think you made a statement

20  on cross that you weren't sure that your client was being

21  truthful with you in regards to what he saw?

22      A    Yes, sir.

23      Q    For the record, on Page 126 of March 10, 1998 at

24  the bottom, you said the following.  Let me read what you

1-215

1    said.

2        A    Yes, sir.

3            MR. VINCENT:  I am sorry.  What was that passage

4    again, sir?

5            MR. BENNETT:  126, last sentence, and then on 127.

6            MR. VINCENT:  Thank you.

7            MR. BENNETT:  You are welcome.

8            BY MR. BENNETT:

9        Q    This is, again, March 10th.  "Your Honor, for the

10   record, it has come to my attention that my client, when he

11   came up for the proceedings this afternoon, as he was fully

12   shackled and brought down the hallway toward the court room

13   down the hallway in front of the jury room, the jury door

14   room was open.  The jury was seated there.  The jury observed

15   him walking down the hall in shackles, and no effort was made

16   to close the door by the individual who was in charge of the

17   jury.  That this was also observed by the two correctional

18   officers who were escorting him.  Counsel had a break...we

19   Counsel had a break and had a chance to talk to him about the

20   applicable law and question him about what he wanted to do.

21   And we are, at this point, making a motion for a mistrial."

22       A    Yes, sir.

23       Q    Now, why would you make a motion for a mistrial if

24   you didn't believe your own client, first?

1-216

1    A    My...my client reported to me.  Regardless of my

2    opinion, I felt that I should go ahead and make the motion

3    because he requested it.

4    Q    Well, but you control the litigation other than the

5    question whether he testifies, right?

6    A    You are asking me why I did it.  That's why I did

7    it.

8    Q    Well, he not only told you according to what you

9    said on the record that he saw it, that this was also - this

10   is what you pointed out to the court - this was also observed

11   by two correctional officers who were escorting him?

12   A    That --

13   Q    Now, --  Huh?

14   A    That's what Mr. Miles said to me.

15   Q    Yeah.  Isn't that all the more reason to, if

16   necessary voir dire the correctional officers and, based on

17   what they say, or in addition to what they way, voir dire the

18   jurors?

19   A    As I mentioned, I went back in the hallway,

20   re-walked the...that space.  My memory is...I am fairly

21   certain - I can't say with a hundred percent certainty - I am

22   fairly certain I spoke with the correctional officers, as

23   well.  I talked to my trial team, and we made a decision not

24   to pursue it any further.

1-217

1     Q    Not to what?

2     A    Not to pursue it any further.

3     Q    Alright.  Then later that same day on the shackles

4    issue, on 146 to 147, the court says at the bottom of 145,

5    "Now, Mr. Sam...Saunders, you have a matter.", Mr. Sanders,

6    "Yes, Your Honor.  Let me again state, if I may, Your Honor",

7    and then you put on the record again, and you go into more

8    detail.  And what you say there is, "I waited until we had

9    our first break, at which point I consulted with him as to

10   what exactly happened.  He indicated to me he was coming down

11   the hallway in full view of the jury room.  And I will say it

12   for the record - Your Honor, is fully aware of it...Your

13   Honor is fully aware of it - as you come down that hallway,

14   the door opens such that you can view the entire hallway.

15   And as he was coming down toward the jury room, the door was

16   open."  And then Mr. Miles says, "The door swung open."

17   Saunders...Mr. Saunders, page 147, "Or the door swung open.

18   And I believe I have forgotten the captain's name - I am

19   sorry - the bailiff."  Mr. Saunders, "Yeah.  The bailiff was

20   standing by the door.  No effort was made to close the door.

21   Mr. Miles then continued to walk toward the jury room right

22   in front of it.  He indicates that he was observed by the

23   jurors.  Then he turned into the court room where he could no

24   longer be seen by the jurors.  Your Honor, after having a

1-218

1   chance to consult with my co-counsel and my client in regard

2   to this matter, and I have apprised him on what I understand

3   the law in Maryland to be, we, at this point, are making a

4   motion for a mistrial." So, again, you move for a mistrial,

5   and, this time, you said after consulting with co-counsel.

6   Talked about then the possibility of an alternate if one of

7   them had seen it. The court talked about the age of the

8   court house, etcetera. You were, in...in effect, a part of

9   your argument, you were referring to the court's knowledge of

10  the jury room and where it's located in regards to how

11  prisoners come into the court room?

12      A   Yes, sir.

13      Q   So are you telling this Court today that what Mr.

14  Miles said happened couldn't physically have happened or you

15  didn't believe him for a different reason?

16      A   It could physically have happened, yes, sir.

17  However, I don't think the entire jury could...could have

18  seen him if the door was open as wide as he said. But

19  regardless, it was a hallway, a door to the jury room, and

20  being an old court house, he is brought past that jury room.

21      Q   Well, let's assume it wasn't the whole jury but it

22  was only four of them. You didn't ask for a voir dire of

23  those that could see him?

24          MR. VINCENT: Objection. I think we have been

1-219

1   through this.

2          THE COURT:  Pardon?

3          MR. VINCENT:  This is nothing new.  I think we have

4   been through this.

5          MR. BENNETT:  Well, except they covered it on cross

6   and brought out the fact that he wasn't truthful.

7          THE COURT:  I'll permit you some leeway in that

8   regard.

9          MR. BENNETT:  Huh?

10          THE COURT:  I think it's been covered, but I'll

11   allow you to briefly go over it.

12          MR. BENNETT:  One last -- Alright.  Alright.  Just

13   last point.

14          BY MR. BENNETT:

15     Q     You said not all, you didn't believe, could see it.

16   You didn't ask for a voir dire of any of them, right?

17     A     Based on the information I had at the time from my

18   client, my co-counsel, my observations, talking to the

19   correctional officers, I decided not to pursue it any

20   further.

21     Q     Alright.  Now, I am going to ask, in the interest

22   so that we can move it along, that if you hear a question

23   that calls for a yes or no answer, that you try and give that

24   to me.  Would you do that?

1-220

1           MR. VINCENT:  Objection.  It's redirect.  It's his

2    witness.

3      Q     You mentioned the name Thomas Quarter?

4      A     Yes, sir.

5      Q     That he was interviewed?  You mentioned that?

6      A     Yes, sir.

7      Q     He was not called?

8      A     Yes, sir.

9      Q     He was Jody's step-father?

10     A     Yes, sir.

11     Q     Why was he not called in mitigation?

12     A     My memory is is that, when he was interviewed, he

13   was seventy-six years old.  He was in very bad health.  He

14   still was in love with Jody's mother to a certain extent, and

15   we made the decision to present his information through the

16   social worker.

17     Q     He --  Well, that's what you did also with some

18   mitigation witnesses.  You submitted it not only through the

19   social worker but your investigator, correct?

20     A     Yes, sir.  Of course.

21     Q     Okay.  Instead of calling correctional officers,

22   including Fayetta Downes, --

23     A     Yes.

24     Q     -- who testified here earlier today, you called

1-221

1    your investigator who basically became a summary witness,

2    didn't he?

3         A    He testified to his interviews.

4         Q    And so the jury never had an opportunity to see the

5    correctional officers face to face or...and hear them

6    describe their own personal views of Mr. Miles, did they?

7         A    If the correctional officers --  We interviewed a

8    lot of correctional officers.  If they had believed that they

9    were going to be subpoenaed into the court room, they would

10   not have talked with us, most of them.  That is consistently

11   ...over years of litigation, that has been the case.  If I go

12   to an institution and start talking about summonsing folks

13   off the pod, etcetera, they will not talk to us.  So, to a

14   certain extent, my investigator was instructed that, if

15   necessary to get people to talk with him, we could use him as

16   a sentencing witness with the ability to tell the folks that

17   they would not be subpoenaed in themselves.

18        Q    Well, how is it then that Fayetta Downes was able

19   to testify today pursuant to a subpoena after she was

20   interviewed?

21             MR. VINCENT:  Objection.

22             THE COURT:  Sustain.

23             BY MR. BENNETT:

24        Q    Don't you run the risk then that, on a proper

1-222

1    objection by the State during the sentencing hearing, the

2    summary witness, your investigator, will not be allowed to

3    testify?

4           MR. VINCENT:  Objection.

5    Q    Because it's hearsay?

6           THE COURT:  Is not a certain amount of hearsay

7    permitted in the sentencing part of the...in the sentencing

8    phase?

9           MR. BENNETT:  Yeah, some is.  But that doesn't mean

10   that every judge will allow that.

11          THE COURT:  I am going to sustain.

12          MR. BENNETT:  Alright.

13          BY MR. BENNETT:

14   Q    Before you go to a sentencing hearing and present

15   the witnesses, you don't know how a judge will act on a

16   particular objection, do you?

17   A    No, but I know the case law in terms of what I can

18   present at sentencing.

19   Q    Now, in this case, were any correctional officers

20   called in as mitigation witnesses?

21   A    No, sir.

22   Q    You say there was an attempt to interview Fayetta

23   Downes but she wouldn't give an interview?

24   A    Fayetta Downes?

1-223

1     Q     I think you mentioned that on cross.  There was an

2  attempt to interview Fayetta Downes --

3            MR. VINCENT:  No, that's not what she said.

4            MR. BENNET:  What?  I am sorry.  What?

5            MR. VINCENT:  That isn't what he said.  Actually,

6  Mr. Steil testified to what Ms. Downes said.

7            MR. BENNETT:  Alright.  Then I missed that.  It's

8  my fault.

9            BY MR. BENNETT:

10    Q     You say the first wife was interviewed, Beverly

11  Daisy, but not called.  Is that correct?

12    A     That's my memory.

13    Q     You did say that it was your goal to call every

14  single witness that was interviewed that could help Mr.

15  Miles' case?

16    A     Yes.  And that is a judgement call the trial team

17  makes on several levels.  First off, is the person willing to

18  come in?  If they aren't willing to come in, are they

19  compellable?  And if they are compelled, will they hurt me?

20  Third, their ability to transmit information in the court

21  room in a coherent way that won't undermine things, in other

22  words by embarrassment or otherwise, will give different

23  information than they have given to my social worker or

24  investigator.  And, finally, how they appear.  Sometimes, I

1-224

1    can get good information from someone who appears inherently

2    incredible or difficult and, luckily at sentencing, I then

3    have the option of presenting it through a secondary witness,

4    such as an expert, such as a social worker, or by hearsay

5    through an investigator.  It's a set of choices that we make

6    as a trial team based on our evaluation of who the witness

7    is, what information they have, the possibility they will

8    spin us, the possibility that they may give different

9    information.

10        Q    And to the extent that a witness is not

11   interviewed, you can't make those value judgements, correct?

12        A    Of course.

13        Q    You said you relied on your social worker Ann

14   Haggert?

15        A    Yes, sir.

16        Q    Were you aware that she did not interview Tom

17   Quarter, the step-father?

18        A    I don't know.  I have an interview in my file that

19   Mr. Steil did.  And you are asking me to recall too many

20   details.  I'd have to actually review her report.

21        Q    Sure.

22             MR. BENNETT:  If the Court will indulge me one

23   moment.

24        Q    Cross examination by the State of your social

1-225

1    worker, Page 107 of March 17th, "I noticed --

2         MR. VINCENT:  Objection.  I think this is outside

3    the scope of the cross.

4         MR. BENNETT:  He mentioned Tom Quarter on cross.

5         MR. VINCENT:  I did not...not in the social worker.

6         THE COURT:  He indicated that he had been

7    interviewed.

8         MR. BENNETT:  That's what I am testing.

9         THE COURT:  I'll permit it.

10        MR. VINCENT:  Yes, sir.

11        BY MR. BENNETT:

12   Q    "I noticed when you were talking about interviewing

13   individuals that - correct me if I am wrong - you did not

14   speak with Tom Quarter directly?", "No, I did not interview

15   Tom Quarter."

16   A    Yes.  As an expert, she relied upon my...the

17   investigation done by my investigator, which she is allowed

18   to do.

19   Q    Yes, but the next question put by the State was,

20   "Did you attempt to interview Mr. Quarter since he seemed to

21   be the only male with significant influence within the

22   Defendant's life?", "No, sir, I didn't."  Now, you knew you

23   were going to be using her as a witness?

24   A    Yes, sir.

1-226

1      Q    And she was doing a social sherv-...service, or

2   social service summary background and testifying in that

3   capacity?

4      A    Yes, sir.

5      Q    Whose decision was it made...whose decision...you

6   are saying...in regards to the seventy-six year old age of

7   Mr. Quarter, was he seventy-six then?

8      A    Seventy-six at the time that we interviewed him.

9      Q    Alright.  There was no indication that he couldn't

10  make it to the court house to testify, was there?

11     A    I don't recall that there was a problem.

12     Q    You don't recall that there was a problem?

13     A    I...I don't recall either way.

14     Q    Well...so you can't testify here today the reason

15  why he wasn't called?

16     A    Yes, sir, I can.

17     Q    Well, it was not health related?

18     A    Mr. Quarter knew Jody as a very small child very

19  briefly before Jody's mother left him.

20     Q    Right.

21     A    He lost contact with the family for a long period

22  of time.

23     Q    Right.

24     A    And he was about seventy-six when he's interviewed.

1-227

1  '71/'72, he moves to Delaware to be close to the family and

2  actually lives next to one of the sisters.

3      Q    Right.

4      A    He stated, during the entire time period he was

5  here, he only saw Jody three or four times, so that he had no

6  current information.  He gave good background information to

7  corroborate some of the abuse, etcetera, which is what we

8  wanted.  He, however, could say little or nothing about Jody

9  except that he knew him as an extremely small boy and had

10 seen him three of four times in the last several years.

11     Q    Well, you testified earlier that it was going to be

12 difficult to call daughters of the mother --

13     A    Yes, sir.

14     Q    -- because of the emotional bond to the mother?

15     A    Yes, sir.

16     Q    He wouldn't have been in that category, would he?

17     A    I would have had mixed feelings about it, because I

18 think he was still in love with Mr. Miles' mother.  And I

19 would have had to weigh that if he had more significant

20 information, but he didn't.  He was a decent historian to

21 corroborate some stuff for us.

22     Q    A decent historian who corroborated?

23     A    Yes, sir.

24     Q    So that's all helpful, is it not, to have more than

1-228

1    one witness to corroborate some other fact?

2        A    We made a decision as a trial team which witnesses

3    to call, which witnesses to use as summary, which witnesses

4    to use for hearsay, and we did what we did.  We interviewed

5    people.  We knew what we were doing.  And we made decisions

6    based on that.

7        Q    Alright.

8            MR. BENNETT:  Nothing further.

9            MR. VINCENT:  Nothing else, sir.  Thank you.

10           THE COURT:  You may step down.

11           THE WITNESS:  May I be excused?

12           THE COURT:  I will have to ask you to --  I guess

13   you are excused for the afternoon.

14           Counsel, --

15           THE WITNESS:  Your Honor, I should advise the Court

16   that I am flying up to upstate New York this evening.  I will

17   be back on Sunday evening.

18           THE COURT:  Does the State wish to call the

19   witness?

20           MR. VINCENT:  Not at this point, no.

21           Excuse us, Judge, if you don't mind.  If we could

22   beg the Court's indulgence for just a minute.  Thank you,

23   sir.

24           MR. RUARK:  Your Honor, may I ask the Court a

1-229

1  question about scheduling issues?  We are at about twenty

2  minutes of five in the afternoon right now.  Was the Court

3  inclined to take all testimony today, if I could ask?

4      THE COURT:  How much more testimony is there?

5      MR. BENNETT:  We have one more attorney, and we

6  have a total of six, one who went home sick.

7      THE COURT:  I don't think we can get it all in

8  today.

9      MR. BENNETT:  Mitigation.  And we remember you

10  indicating that, if necessary, you had cleared tomorrow.

11      MR. RUARK:  Is the Court inclined to continue this

12  over until tomorrow I guess is the question?

13      THE COURT:  I think that's where we are.

14      MR. RUARK:  Okay.

15      THE COURT:  I mean, I would like to conclude it

16  today, but we are at twenty minutes of five.

17      MR. RUARK:  I would like to conclude it today if

18  possible.

19      THE COURT:  And...and while I don't mind staying -

20  not much on t.v. tonight anyway --

21      MR. BENNETT:  That's true.  Summer reruns.

22      THE COURT:  I have staff and so forth who...who

23  only buy into 8 to 5 jobs pretty much, so....

24      MR. BENNETT:  I do want to call Mr. McFadden.

1-230

1    That's the only other witness I really needed to call today,

2    the other attorney.

3            THE COURT:  Okay.

4            MR. BENNETT:  He would be much briefer.

5            MR. RUARK:  Your Honor, the State is not concerned

6    at this point that there will be a need to recall, or to call

7    Mr. Saunders in its case.  That being the case, I certainly

8    do not want to inconvenience him since he has longstanding

9    plans to leave this evening.  That being the case, I would

10   just ask for some leave of Court, understanding that it's not

11   our intent at this point to call him, if necessary, if we

12   could do it --

13           THE COURT:  We'll have to cross that bridge when we

14   come to it then.

15           MR. RUARK:  That...that would be fine.  Thank you,

16   Your Honor.  I would ask that he be excused.

17           THE COURT:  You are free to leave.

18           THE WITNESS:  Thank you.

19           THE COURT:  You are still on call for later on, but

20   not tomorrow.

21           THE WITNESS:  Yes, sir.

22           MR. RUARK:  And would the Court just allow me a

23   moment with Mr. Saunders in the hallway on a different

24   matter?

1-231

1        THE COURT:  Okay.

2        MR. RUARK:  Thank you.

3        THE COURT:  You may conduct your cross examine.

4        MR. BENNETT:  Oh, I am sorry.  Yeah.

5                  ARCHIBALD MCFADDEN,

6    a witness produced on call of the Petitioner, having first

7    been duly sworn, was examined and testified as follows:

8                  DIRECT EXAMINATION

9        BY MR. BENNETT:

10       Q    Please state your full name and business address.

11       A    Archibald George William McFadden, 201 Baptist

12   Street, Salisbury, Maryland, the Office of the Public

13   Defender.

14       Q    And how long have you been employed by the Office

15   of the Public Defender?

16       A    Going on six years this November.

17       Q    Alright.  When did you become a member of the

18   Maryland Bar?

19       A    December of 1996.

20       Q    Before your passing the bar and becoming an

21   assistant Public Defender, did you hold another position with

22   the Office of the Public Defender?

23       A    Well, I passed the bar and did some private

24   practice for five years, then I joined the Public Defender's

1-232

1    Office.  Four years.  Prior to that, I was a contractual

2    investigator for the Capital Defense Unit at the Public

3    Defender's Office.

4          Q    Alright.  So from '96 to 2001, private practice?

5          A    To, yeah, 2000, 2001.

6          Q    In Salisbury?

7          A    No, in Annapolis.

8          Q    In Annapolis.  Alright.  And from 2000 on, with the

9    office in Salisbury?

10         A    Well, Baltimore City until about eighteen months

11   ago.

12         Q    Alright.

13         A    And then I came to Salisbury.

14         Q    Big difference, huh?  Did there come a time back in

15   1997 that you were assigned along with Tom Saunders, who

16   assigned himself, to represent Jody Miles in this capital

17   case?

18         A    Yes.  Tom...Tom actually assigned me --

19         Q    Alright.

20         A    -- to represent him.

21         Q    At that time, where was the case pending when you

22   first came on the case?

23         A    Mr. Miles was being held in Wicomico County and the

24   case was pending in Wicomico County.

1-233

1    Q    Had not yet been removed?

2    A    No.

3    Q    Alright.  When it was removed, what county was it

4    removed to?

5    A    Queen Anne's County.

6    Q    Alright.  Was there a division of labor that you

7    and Mr. Saunders agreed to once the two of you got into the

8    case?

9    A    Yes.  I was fairly new to the bar, and so I

10   followed Mr. Saunders' direction by and large.  I prepared

11   and argued the motions.

12   Q    The pretrial motions?

13   A    The pretrial motions.  I did most of the

14   investigation with Mr. Steil and with Tom Saunders, splitting

15   it up, but, by and large, I decided what witnesses to

16   interview, wrote reports, and then did research and prepared

17   for trial.

18   Q    At trial, is it fair to say that, on

19   guilt/innocence, Mr. Saunders did the direct or crosses of

20   every witness?

21   A    To my memory, yes.  I don't think I did much in

22   guilt/innocence.

23   Q    Did he do, to the best of your memory, the opening

24   statement?

1-234

1     A     Yes.

2     Q     Did he do the closing argument?

3     A     Yes.

4     Q     Alright.  Now, on sentencing, you took some

5  witnesses, correct?

6     A     I did.

7     Q     Do you remember the witnesses that you handled?

8     A     Mr. Miles' sister, I believe I did the direct on.

9  I don't --

10     Q     Lisa Hopkins?

11     A     Yes, I think so.  I don't remember who else.

12     Q     Alright.  And anybody else?

13     A     Not that I recall.

14     Q     I assume then, if you did the direct of Lisa

15  Hopkins, you had interviewed her before you did the direct?

16     A     I had, yes.

17     Q     Alright.  In regards to mitigation witnesses for

18  the sentencing hearing, what was your understanding with Mr.

19  Saunders as to...that you were primarily doing, with the

20  investigator, the investigation as to the universe of

21  mitigation witnesses that you wanted to find?

22     A     Well, we were trying to find everyone we could.  I

23  mean, I spent countless hours driving around the eastern

24  shore looking for people who knew Mr. Miles and knew the

1-235

1    family.

2        Q    Would you also then interview witnesses that you

3    did find that knew Jody Miles to see if they would know

4    anybody else who knew Jody Miles, so to speak a word of mouth

5    method of leads?

6        A    Absolutely.  And Mr. Miles' sister Missy was very,

7    very helpful.

8        Q    Alright.  He had...was it two sisters or three?

9    Lisa was one.  Lisa Hopkins.

10       A    Lisa...Lisa, Missy --

11       Q    Missy Burner?

12       A    Yes.

13       Q    Debra?  And a Debra Ingram?

14       A    It sounds right.

15       Q    Alright.

16       A    Mr. Saunders' memory is much better than mine.

17   I --

18       Q    Do you remember that you and Mr. Saunders

19   interviewed Missy Burner at her place of work, which was a

20   radio station?

21       A    I remember once.  I am not sure who I was with.

22       Q    Alright.

23       A    Might...might have been Mr. Saunders, or it might

24   have been Mr. Steil.

1-236

1     Q    Alright.  After that, a decision was made not to

2  call Missy Burner as a witness?

3     A    Yes.

4     Q    Do you know the basis for that decision?

5     A    I don't.

6     Q    She was most cooperative with you, was she not?

7     A    She was very cooperative.

8     Q    She agreed to meet?

9     A    She returned all of my phone calls.  She met me

10  every time I...I asked to meet with her.  She was very

11  helpful.

12     Q    And she gave no indication to you, did she, or

13  correct me if I am wrong, that she would not testify on

14  behalf of her brother?

15     A    I don't recall.  I...she was, by far, the most

16  helpful.  I don't know why we didn't call her.

17     Q    By far, the most helpful?

18     A    Yes.

19     Q    Whose final decision would it have been that a

20  witness would not have been called?

21     A    Mr. Saunders would have consulted with me, and,

22  ultimately, it would be his decision, but certainly,

23  everything that we did, we...he consulted with me.

24     Q    Well, if he consulted with you in regards to Missy

1-237

1  Burner, and you said she was most helpful and most

2  cooperative and the most helpful of all family members.  You

3  certainly would have given Mr. Saunders a recommendation,

4  would you not, for her to be called?

5      A    My only reser-...my only reservation would be that

6  Missy was very shy, and she was not particularly intelligent

7  and not particularly well spoken.  The sister we --

8      Q    Well spoken or out spoken?

9      A    Well spoken.  She was very shy.  Took her a while

10  to get thoughts out sometimes.  Intelligent, but not

11  particularly well presented.  The sister we put on was very

12  well presented, I thought.

13      Q    Did you know...were you aware that she had two

14  years of college...high school plus two years of college?

15      A    Probably.

16      Q    Some time...you...you have no knowledge of whether

17  or not a jury could warm up to a person that's shy but

18  otherwise intelligent, correct?

19      A    I have no...I don't know what juries do.

20      Q    Huh?

21      A    I don't know what juries do.

22      Q    Alright.  Was this your first capital case?

23      A    Yes.

24      Q    I want to go over a list of some people.  Lisa

1-238

1    Hopkins was interviewed and was called, as you have

2    indicated, and you did the direct?

3        A    Yes.

4        Q    And the record would indicate the rest of the

5    questions that you asked her, right, because it's going to be

6    part of the sentencing transcript?

7        A    Absolutely.

8        Q    Missy Burner - we just covered her - interviewed

9    but not called?

10       A    Correct.

11       Q    Beverly Daisy, did you participate in the interview

12   of her, because she was interviewed but not called?

13       A    I have no independent recollection of Ms. Daisy.

14       Q    Alright.  Now, I have three names here that,

15   according to our investigation, they are going to be

16   presented as witnesses in this case.  Janet Lewis, is that

17   name familiar?

18       A    No.

19       Q    Not interviewed?

20       A    I...I don't remember.  I...I have no indication she

21   was interviewed.

22       Q    What about David Wood, a friend...a personal friend

23   of the Defendant, not a relative?

24       A    I have no memory, so I don't know.

1-239

1    Q    Were you aware that David Wood was formerly married

2    to Beverly Daisy and had adopted the Defendant's son?

3    A    No.  I...if I did, I...I don't remember.

4    Q    How about Lauren Miles, a niece?

5    A    I really have no memory.

6    Q    Alright.  Now, in connection with your input in the

7    case, you would never, yourself, in terms of making a

8    recommendation to Mr. Saunders, reject calling of a witness

9    that had not been interviewed, would you?

10    A    Can you ask that another way?

11    Q    Because it had a negative?

12    A    Yes.  I am not --

13    Q    Alright.

14    A    The...the witness list --

15    Q    In --

16    A    Oh, I am sorry.

17    Q    In determining which witnesses to call, you would

18    not advocate or advise Mr. Saunders, in your opinion, not to

19    call a witness if in fact that witness hadn't been

20    interviewed and was unknown?

21    A    I don't know that I did in this case.  I...I can't

22    say that I would rule it out as a possibility depending on

23    the circumstances, depending on what information I had.

24    Q    Well, it would be...would it not be impossible to

1-240

1    make a recommendation on an unknown witness...person who

2    hadn't been interviewed?

3        A    Yeah.  If you...you have no prior writings, no idea

4    what they are going to say, never been interviewed, I...it

5    might be a little fool hearty to call them as a witness.,

6        Q    What did you say?   The last --

7        A    Might be fool hearty to call them as a witness if

8    you don't know what they are going to say.

9        Q    Do you agree that an attorney in a capital case, as

10   part of the mitigation phase at sentencing, has a duty to

11   interview before determining whether or not a person should

12   be called as a mitigation witness?

13       A    Yes.

14       Q    Now, Lt. Fayetta Downes testified earlier.  I don't

15   know if you saw her here.

16       A    I did.

17       Q    Were you in the court room when she testified?

18       A    I was.

19       Q    Good.  She was a correctional officer in the

20   Caroline County Detention Center --

21       A    Uh-huh.

22       Q    -- and testified live here today.  She was not

23   called at the trial of Mr. Miles, and her name came before

24   the jury only in the form of a summary witness through the

1-241

1    investigator.  Are you aware of that?

2        A    I am.

3        Q    Why did, or did you have any role in deciding

4    whether or not an investigator should be called and give

5    summary testimony of other witnesses as opposed to live,

6    flesh and blood of these witnesses so to speak?

7        A    Yes, I did have a role in that.  I in fact sent Mr.

8    Steil to interview people at the Detention Center where Jody

9    was being housed.

10       Q    Yeah.

11       A    And he came back, and I know he interviewed Ms.

12   Downes.  I don't know who else he interviewed there.  What

13   was conveyed to me was that she didn't particularly remember

14   Mr. Miles, she only remembers the bad ones.

15       Q    Remembers what?

16       A    The bad ones.  So sort of an absence of memory

17   isn't that compelling.  Mr. Steil, I worked with for a long

18   time.  He is also a contractual investigator.  He is very

19   convincing on the stand.  He is a very good witness.

20       Q    Well, without having...you have no knowledge of

21   whether Mr. Steil reviewed the records at the institution, do

22   you?

23       A    Part of what Mr. Steil and I both did was gather

24   the records.  So I don't know if he reviewed them.  I am

1-242

1    reasonably certain I reviewed them, because I think I issued

2    ...I signed the subpoenas, and they...they were directed to

3    be sent to me.

4         Q    Well, among the records that we found was a

5    document from the Caroline County Detention Center,

6    Petitioner's Exhibit Number 1, signed by records manager...

7    records operator covering the period of time 7/10/96 to

8    11/26/96.

9         A    Uh-huh.

10        Q    Four months.  And about...this would have been

11   about a year before this happened?

12        A    Uh-huh.

13        Q    And in connection with Number 3 and Number 4 --

14        A    Yes.

15        Q    -- on escape risk or infractions, --

16        A    Yes.

17        Q    -- favorable to the Defendant, correct?

18        A    Known or unknown, but yeah.

19        Q    Yeah.

20        MR. VINCENT:  Exhibit is in evidence.  It's been

21   referred to several times.  It says what it says.

22        MR. BENNETT:  I am asking this witness different

23   questions as to why.

24        THE COURT:  I'll permit you some leeway.

1-243

1    BY MR. BENNETT:

2        Q    This exhibit...this exhibit was not found by you or

3    the investigator, correct?  It was not introduced into

4    evidence at the first sentencing hearing?

5        A    I would have introduced, or we would have

6    introduced all of the records we had.  Because, when I issue

7    a subpoena duces tecum, the language is generally any and all

8    documents relating to date of birth, social security and

9    name.  Those records would have come in a package to me.  I

10    don't independently recall that piece of paper.  It certainly

11    would not have been removed by me from the records I

12    received.

13        Q    Alright.

14        A    The records would have been complete.

15        Q    Alright.  If the record at trial shows that that

16    document was not introduced, --

17        A    Uh-huh.

18        Q    -- then are you saying you just never received it

19    from the Caroline County Detention Center to the best of your

20    knowledge?

21        A    To the best of my knowledge, I would not have

22    received it, because I did subpoena.

23        Q    Alright.  You have no knowledge how we obtained it?

24        A    I do not.

PENGAD • 1-800-631-6989 • www.pengad.com

LASER BOND FORM B

1-244

1    Q    Alright.  Now, a couple of other areas.  Do you

2    remember consulting with Mr. Saunders on the area of jurors

3    seeing Mr. Miles in shackles?

4    A    I remember it vaguely, yes, sir.

5    Q    Do you remember the layout of the jury room and the

6    hallway?

7    A    I do only because I think I have had more cases in

8    Queen Anne's County than Mr. Saunders.

9    Q    With the door open --

10   A    Uh-huh.

11   Q    -- and jurors inside, it is possible, is it not, to

12   see somebody walking by in the presence of correctional

13   officers?

14   A    Yes, if I could explain.

15   Q    Yeah.

16   A    The hallway goes in front of the court room and the

17   doors as you go in, and you have to come up the steps.  It's

18   an older court house.  The jury room lays basically at an L.

19   So if you were sitting at the end of the jury table, the last

20   three or four juries could...jurors could turn their head and

21   look out and see someone coming down the hall.  If you were

22   at the other end, --

23   Q    You couldn't?

24   A    -- you could not.

1-245

1    Q    Alright.

2    A    So I think it's probably limited to three or four

3    jurors at most based on the positioning of the chairs.

4    Q    Do you remember any discussion with Mr. Saunders as

5    to any tactical reason after a motion for a mistrial was made

6    not to seek an individual voir dire of juror members who

7    might have seen the shackles and the leg...and the handcuffs?

8    A    I do.

9    Q    Alright.

10    A    Because I have used the same argument that Mr.

11    Saunders and I discussed.  Given the voir dire of all of the

12    jurors, or trying to pick certain jurors out, it brings

13    attention to the fact that your client is shackled.  If it

14    becomes an issue that the client is shackled and becomes a

15    subject of discussion in the jury room, that could end up

16    hurting your client more than helping your client.

17    Q    That's assuming, is it not, that the question by

18    the court is asked specifically in regards to handcuffs or

19    shackles as opposed did you see anything occur when the

20    Defendant came by in the presence of two correctional

21    officers?

22    A    That's correct.  I certainly see the logic both

23    ways.

24        MR. BENNETT:  If the Court will indulge me.

1-246

1    Q    Do you remember any discussion with Mr. Saunders

2    specifically as to whether Steven Bailey should be called as

3    a witness either during guilt/innocence or at sentencing?

4    A    I don't remember specific discussions, no.

5    Q    Do you remember whether or not Steven Bailey was

6    interviewed by anybody on the defense team, that is the man

7    that allegedly saw a woman in a red car?

8    A    I directed Mr. Steil to interview Mr. Bailey.

9    Q    So you got the results of that interview, and she

10    was then not called, correct?

11    A    Correct.

12    Q    He was not called.  One last area.  During

13    deliberations, you remember the incident with the note that

14    came back --

15    A    Yes.

16    Q    -- at 11:30?

17    A    Yes, I do.

18    Q    And the court summarized the contents of the note.

19    Is that correct?

20    A    That's correct.

21    Q    Mr. Saunders, in your presence, never asked to see

22    it?

23    A    No.

24    Q    Were you present, also?

1-247

1       A     Yes.

2       Q     Did you consult with Mr. Saunders?

3       A     While the judge was on the bench, no.  But,

4  immediately after the judge leaving the bench, I did.

5       Q     Well, there was some period of time that elapsed

6  when the judge came into the court room and summarized the

7  contents of the note, right?

8       A     Yes.

9       Q     Alright.  And then he indicated what he proposed to

10  do, correct?

11       A     Correct.

12       Q     And then he did what he proposed to do, which is

13  gave instructions?

14       A     Correct.

15       Q     Between the period of time when he came into the

16  court room, summarized what the note said, and before he told

17  the jury his further instructions, Mr. Saunders did not ask

18  to see the note, correct?

19       A     No, he did not.

20       Q     Neither did you?

21       A     No, I did not.

22       Q     Neither did you poke Mr. Saunders and said...and

23  say, "We need to see the note."?

24       A     I never poked Mr. Saunders.

1-248

1     Q    And then the jury was re-instructed?

2     A    That's correct.

3     Q    And a verdict was returned within two hours, right?

4     A    I...I...I would have to believe you.  I don't

5 recall.  It was not long.

6     Q    Huh?

7     A    It wasn't that long.

8     Q    And, at the same time, there was no request for an

9 Allen charge or any kind of charge?  You know what an Allen

10 charge is?

11     A    Yes.  Yes.  There was...we did attempt to get the

12 note.

13     MR. BENNETT:  Your Honor, is that what's it's

14 called in this county?  Because it's a federal case, but do

15 you call it the Allen or the (unclear) charge?

16     THE COURT:  Well, we refer to it as the modified

17 Allen charge.

18     MR. BENNETT:  Very good.  So we are on the same

19 wavelength anyway.  Yeah.  Alright.  Nothing further.

20               CROSS EXAMINATION

21     BY MR. VINCENT:

22     Q    One que-, well, I say one question.  Let me ask

23 this.  You indicated you didn't know why Missy Burner wasn't

24 called.  Is it you don't know why she wasn't called or you

1-249

1    don't remember why she wasn't called?

2        A    I don't remember.

3        Q    Okay.  That's all we have, sir.  Thank you.

4             MR. BENNETT:  Nothing further.

5             THE COURT:  You are excused.

6             THE WITNESS:  Thank you.

7             THE COURT:  Does that complete the testimony for

8    tonight?  Do you have a brief witness you need to call, or

9    how are we standing?

10            MR. BENNETT:  Well, we have one character witness -

11   excuse me - one mitigation witness that we really didn't want

12   to inconvenience to come back tomorrow because he is missing

13   work and pay for every day that he's here.

14            THE COURT:  How long do you anticipate?

15            MR. BENNETT:  Fifteen...fifteen minutes on direct.

16   And I don't think the State will be long.

17            THE COURT:  Okay.

18            MR. BENNETT:  And that will be it.

19            THE COURT:  Call that witness.

20            MR. BENNETT:  Go ahead.

21            MS. JASANI:  Petitioner calls David Wood.

22            THE COURT:  You may proceed.

23                         DAVID WOOD,

24   a witness produced on call of the Petitioner, having first

1-250

1    been duly sworn, was examined and testified as follows:

2                        DIRECT EXAMINATION

3           BY MS. JASANI:

4       Q    Good afternoon.  Could you please state your name

5    and spell it for the record?

6       A    My name is David Wood.  And what else did you need?

7           MR. BENNETT:  Spell it.

8       Q    You can spell it.

9       A    Oh, D-a-v-i-d W-o-o-d.

10      Q    Thank you.  And what is your address, Mr. Wood?

11      A    2285 Rudder Court, Greenbackville, Virginia 23356.

12      Q    And what is your occupation?

13      A    I am a service tech for manufactured housing and

14   DJ.

15      Q    And how long have you been...who are you employed

16   by as a service tech?

17      A    I am self-employed.

18      Q    And how long have you been self-employed for?

19      A    Ten years.  Well, I guess it's about seven years

20   for the technical stuff, and DJ'ing since '83.

21      Q    Okay.  And I am sorry.  So, prior to working...

22   being self-employed, what was your occupation?

23      A    I used to work at Purdue, Incorporated, in

24   Georgetown, Delaware.

1-251

1    Q    And how long were you with Purdue?

2    A    Fifteen years.

3    Q    Mr. Wood, do you know Jody Miles?

4    A    Yes.  Yes, I do.

5    Q    And what is your relationship to Jody Miles?

6    A    We were very good friends, and also work...working

7    companions, and we all...he also worked for me as a DJ.

8    Q    When you say that you were working companions,

9    where did you work together?

10   A    At...at Purdue.

11   Q    And for how long did you work together at Purdue?

12   A    I...I think he was there a year and a half to two

13   years --

14   Q    Okay.

15   A    -- in the late '80's, early '90's.

16   Q    Is that when you first met Mr. Miles?

17   A    Yes.

18   Q    And did you work with him in any capacity after

19   Purdue?

20   A    Yes.  He would DJ for me.  He would do nightclubs.

21   He's done weddings, birthday parties, stuff like that.

22   Q    So you have known Mr. Miles since the early 1980's.

23   Is that correct?

24   A    No, no.  It was the late '80's, early '90's.

1-252

1    Q    Late '80's, early '90's.

2    A    Yeah.

3    Q    Okay.  Are you related to Mr. Miles in any way?

4    A    No.

5    Q    During...did you say you have known him for about

6    eighteen years?

7    A    Yes.

8    Q    During the last...the eighteen years in which you

9    ...you have known him, how often would you come into contact

10   with him?

11   A    We would...we would do a lot of things together.

12   We would fish...do some fishing, skiing, as well as DJ

13   together, do some 4-wheeling, 3-wheeling, things like that,

14   and plus work together.  But even after we weren't working

15   together, we would still keep in contact and --

16   Q    So you would --

17   A    -- do...and do sports things, little things like

18   that.

19   Q    Okay.  So would you characterize your relationship

20   as being close friends?  You know him well?

21   A    Yes.  I would...I would say that easily, very close

22   friends.

23   Q    How much time would you spend together outside

24   work?

1-253

1  A Oh, I...I would say that, you know, once or twice a

2 week, we would do different things.  On weekends, it seemed

3 like that's when we would DJ a lot.  But we would also go out

4 on the boat or...or little things like that and just hung

5 out, I guess.  I don't really know really how much time, but

6 it just seemed like, I mean, we did it for quite some time.

7  Q Okay.  Mr. Wood, were you ever contacted by Jody's

8 attorneys prior to his trial in March of 1998?

9  A No.

10  Q Were you ever contacted by an investigator on

11 behalf of the defense attorneys?

12  A No.

13  Q Okay.  If you had been approached, would you have

14 been available to testify as a character witness on Jody's

15 behalf at the sentencing phase?

16  A Yes.

17  Q And would you have been willing to testify?

18  A Yes.

19  Q And if in '98 you had been called to testify at the

20 sentencing hearing, what would have been your personal

21 opinion regarding Jody's character for peacefulness?

22  A He's one of the kindest-type people I have ever

23 been around.  He's...he's a caring-type person.  He's always

24 been...I look at him like a...like a puppy, you know.  He's

1-254

1   just a very charismatic-type person and...and caring, period.

2       Q   In all of the time before Jody's arrest in 1997,

3   had you ever seen him act in a violent manner?

4       A   No.

5       Q   Had you ever seen him act physically aggressive

6   towards anyone?

7       A   No.

8       Q   Alright.  Did you ever see Jody mocked or

9   ridiculed?

10      A   Oh, yes.

11      Q   And how would he respond when that would happen?

12      A   Well, it was like kidding around.  But there was a

13  couple of times I had seen him mad.  But most I have seen him

14  ever do was just walk away and just tell them to "Shut up.

15  Leave me alone.", you know, stuff like that.  But never have

16  I ever seen him attack or do anything that would remotely

17  cause you to think that he was going to be aggressive.

18      Q   Based on your familiarity with Jody and your...your

19  long relationship with him, and if you had been called to

20  testify in 1998, what would you have said was...would be his

21  likelihood for future dangerousness?

22      A   I...I could not see him ever causing any kind of

23  harm or...or any physical problems with anybody.

24      Q   Okay.  And based on those...your observations and

1-255

1    if you had been asked in '98, what...how...whether you would

2    consider him to be a potential threat to prison guards or

3    inmates in a correctional facility, how would you have

4    responded?

5        A    Absolutely not.  He would not be a threat to

6    nobody.

7        Q    Mr. Wood, do you know Beverly Daisy?

8        A    Yes, ma'am.

9        Q    And...and how do you know her?

10        A    I had...I met her when I was playing at a nightclub

11   at...it used to be called the Sussex House in Millsboro.  And

12   ...and we eventually...we married.

13        Q    Okay.  When did you marry Ms. Daisy?

14        A    I am not really great with the dates.

15        Q    Okay.

16        A    But it was in the early '90's...in the early '90's.

17        Q    Okay.  Did you have any children together?

18        A    No, she had two children, and I had none.

19        Q    Okay.  And who are the two children that she had?

20        A    Kelly...Kelly was her little girl, Kelly Lewis, and

21   Michael Miles at that time.

22        Q    And who was Mike...you said Michael Miles.  Who was

23   Michael's father?

24        A    Jody.  Jody is Michael's father.

1-256

1     Q    How old was Michael when you married Beverly Daisy?

2     A    I think he was three...three and a half to four,

3  something like that, when we got married.

4     Q    Did there ever come a time when you decided to

5  legally adopt him?

6     A    Yes.

7     Q    Okay.  And was...what was Jody's relationship to

8  Beverly Daisy?

9     A    They didn't have any kind of relationship

10  whatsoever.  He hadn't seen her in a long time.

11     Q    Had they been married at one point?

12     A    Yes, they were married.

13     Q    Okay.  Was Jody comfortable with the...the

14  arrangement of you marrying Ms. Daisy --

15     A    Yeah.

16     Q    -- and adopting Michael?

17     A    Yes, I think only because we...we were friends

18  earlier on when he had left Purdue where we had worked

19  together, and of course nightclubs changed when the Sussex

20  House sold out and all, so we weren't DJ'ing like we were.

21  But he...we still kept in contact, very little though.

22     Q    Okay.

23     A    You know, not as much as we used to.

24     Q    Did he...did Jody attach any conditions to your

1-257

1  legally adopting Michael?

2      A    Yes.  Well, the only thing that he had ever said

3  was he just would not want Michael ever denied the right to

4  know who his real father was, and I agreed to that.

5      Q    Okay.  Did you remain as one of Michael's legal

6  guardians in '98 at the time of the trial?

7      A    Yes.

8      Q    And would you have wanted Michael to have had an

9  opportunity to develop a relationship with Jody in the

10  future, or after '98?

11      A    I would never...I would never deny Michael the

12  right to be able to speak with his biological father.  We,

13  you know, I...not to say that I would ever have allowed him

14  to have the same rights as a parent had visitation and stuff

15  like that.  After all, I did adopt Michael.  I raised him to

16  where he is now.  He'll be eighteen soon.  He was so young.

17  But I would never have denied the right for him to be able to

18  have contact with him.

19      Q    Mr. Wood, in your capacity as Michael's legally

20  adopted...legally adopted parent, what would you have

21  testified in 1998 if you had been called regarding the effect

22  in a death sentence for Jody would have had on Michael?

23      A    I...I don't think...I think it really would have

24  affected Michael.  It would have affected me.  Because, I

1-258

1    mean, we are friends...close...close friends.  And --

2         Q    Okay.  What effect would it have on Michael?

3         A    And Michael...even though Michael didn't know Jody

4    like I did, he still knew of him.  We would talk about him,

5    you know, different things.  But that...that does...I think

6    it would affect him.  And it still, to this day right now, it

7    affects him on things that happen --

8         Q    Okay.

9         A    -- to Jody.

10        Q    And if...and you started to talk about this, but if

11   you had been...if you had testified in '98 and had been asked

12   the question of - and I am sorry to have to ask you this, but

13   - the effect that Jody's death sentence would have on you,

14   how would you respond to that?

15        A    I just...I really don't even want to think about

16   it.  I just never could picture Jody being anything but a, I

17   mean, he's always kind to everyone I have ever known him to

18   be around.  And...and to this day, anyone who knows Jody

19   would know he's...he's a good hearted person.  And...and for

20   all of the contacts and the people we have done business

21   with, we worked together for so long and did...did DJ jobs

22   together for so long, I couldn't imagine knowing that he

23   would be put to death.  I..I...I can't even really think of

24   that, you know.  So I...I would have thought that would be

1-259

1  the worst thing in the world, period.

2      Q    Okay.  If you had been contacted prior...prior to

3  the trial and asked to testify in '98, would you have

4  testified as you have testified today?

5      A    Most definitely.

6      Q    Okay.

7          MS. JASANI:  Court's indulgence.

8          No further questions.

9                    CROSS EXAMINATION

10         BY MR. VINCENT:

11     Q    Where were you in 1998?

12     A    In 1998, I was at 33480 Cow House Branch Road,

13  Millsboro, Delaware still employed at Purdue at that time.

14     Q    Were you having contact with the Petitioner in '97

15  ...April of '97?

16     A    No.

17     Q    When's the last time you had contact with him prior

18  to his arrest?

19     A    Well, I guess it was...the last time we really had

20  really talked...because he had moved, I moved, we were going

21  different places.  I was...I was in Virginia a lot but also

22  going down state and all.  And I...I think the year before in

23  '96, periodically, he would call me and, a couple of times,

24  he would even come up to Purdue and just ask how Michael was

1-260

1  and...and how I was doing and stuff like that, you know.

2      Q    Was he maintaining any contact with his son?

3      A    No.  No, he would not.

4      Q    He, being the Defendant...the Petitioner, was not

5  ...Mr. Miles was not in contact with his son?

6      A    No.

7      Q    What period of time were you married to Ms. Daisy,

8  or the current Ms. Daisy?

9      A    It was...it was in the early '90's.  I just don't

10  know exactly what...what year, but it was...it was in the

11  early '90's.  I just don't remember the exact year.

12      Q    And...and during the period of that time, the

13  period of the early '90's when you were married to Ms. Daisy,

14  was the Petitioner visiting you and Ms. Daisy?

15      A    No.

16      Q    When did you become aware that he had been charged

17  with first degree murder?

18      A    It was on the news when...and, in fact, my mother

19  had called me and --

20      Q    Immediately after --

21      A    Yeah.

22      Q    -- '97?  Did you visit him in jail?

23      A    No.

24      Q    Did you have any contact with his family?

1-261

1     A    No.

2     Q    Make any...make any attempt to contact him or the

3  family?

4     A    The only one that I contact, or had contact with

5  was...was Beverly, and, of course, we would talk about it and

6  ...because we worried about Michael at the time, as well.

7     Q    The only one you were in contact with was his

8  ex-wife, I guess by that time your ex-wife, who wasn't having

9  any contact with Mr. Miles?  Have I got it right?

10     A    Right.  Something like that, yeah.

11     Q    You obviously made no attempt to contact his trial

12  counsel from your location?

13     A    I...I don't know anything about trial stuff.  I

14  didn't know who contacts who or what it would be.  And I

15  didn't even know why anyone would even contact me.  I had

16  never heard of anything like this until...until I had been

17  approached for to...for today.  I never knew of anything like

18  this.

19     Q    Were you aware, or are you aware that Mr. Miles

20  confessed to killing the victim?

21     A    I know nothing of the trial.

22     MR. BENNETT:  Objection, Your Honor.

23     A    Sorry.

24     MR. BENNETT:  You can't talk about, on cross

1-262

1    examining a character witness --

2             THE COURT:  Wait a minute.

3             MR. BENNETT:  Yeah.  I am sorry.  Can I consult

4    with him briefly?

5             THE COURT:  I'll allow you.

6             MR. BENNETT:  Huh?

7             THE COURT:   Go ahead for a minute.

8             MS. JASANI:  Your Honor, we object, because you

9    can't cross examine a character witness with facts of the...

10   of the crime which they are charged with.  These are facts,

11   Your Honor.

12            MR. VINCENT:  Well, he...is he being offered...I

13   thought he was being offered...is he being offered as a

14   character witness or not?

15            MS. JASANI:  He is offered as a character witness.

16            MR. VINCENT:  And you have asked him --  I am

17   sorry.  I'll address the Judge.  He...he was asked about his

18   opinion.  It seems to me it's fair to ask him if he knows

19   certain facts and does his opinion change based on the fact

20   that the Defendant confessed to murder.

21            MS. JASANI:  Your Honor, he was asked...he is

22   asking the character witness as to what he would testify to

23   in 1998 had he been contacted at that time.

24            THE COURT:  I believe it's a fair question on cross

1-263

1    examination.  Overrule.

2            BY MR. VINCENT:

3        Q    Were you aware that Mr. Miles had confessed to

4    killing Mr. Atkinson?

5        A    As far as I had heard through, you know, various

6    things, various relatives about a note, but I did not know

7    exactly what it said.  I never read it.

8        Q    Were you here when Mr. Saunders testified?

9        A    Yes.

10       Q    Prior...one of the prior gentlemen.  The...the fact

11   that you now know that he confessed to murder, does that

12   change your opinion as to...regarding his peaceful character?

13           MR. BENNETT:  Objection to the phrase murder.

14   (Unclear) to the shooting.

15           THE COURT:  Well, sustain.  It's a fine line.

16           MR. VINCENT:  I...I'll...I'll rephrase it.  Thank

17   you.

18           BY MR. VINCENT:

19       Q    Knowing that the Defendant confessed to shooting

20   the victim in the back of the head, does that change your

21   opinion regarding his peacefulness?

22       A    I...I honestly don't believe it.

23       Q    Don't believe it?

24       A    I...I...I just...I just have, you know, my mind

1-264

1  won't let me...I can't see...I can't see that happening.  But

2  I have never known him to be violent in any kind of way.  I

3  can't picture that, if you understand what I'm saying.

4      Q    Would it help you to tell you that that...would it

5  help if I told you there was a taped confession?

6          MS. JASANI:  Objection, Your Honor.  Asked and

7  answered.

8          THE COURT:  I...I think...I think we are over that

9  stage by now.

10          MR. VINCENT:  That's all we have, sir.  Thank you,

11  sir.

12          THE COURT:  Any other questions?

13          MS. JASANI:  Brief question, Your Honor.

14                  REDIRECT EXAMINATION

15      BY MS. JASANI:

16      Q    Mr.  Wood, even though you may not have been in

17  direct contact, or Jody may not have been in direct contact

18  in '96 in the last year, did...isn't it correct that you

19  testified that...that Jody would check in with you to see how

20  Michael was doing?

21      A    Oh, yes.  I am not sure of the exact time, but he

22  ...he would.  He would, periodically, call me, or we would

23  run into each other and he would always ask how I was doing

24  and how Mike was doing, stuff like that.

1-265

1    Q    Isn't it correct that your name could have been

2    provided by Beverly Daisy as a potential mitigation witness?

3    A    Yes.

4    Q    Thank you.

5         MS. JASANI:  No further questions, Your Honor.

6         MR. VINCENT:  Cat's out of the bag, so....  We have

7    nothing else.

8         THE COURT:  You may step down.

9         Does that conclude the...all of the witnesses for

10   today?

11        MR. BENNETT:  Yes.  And to give Your Honor an...an

12   estimate for tomorrow, we have five remaining character

13   witnesses.  The length of them should be approximately the

14   same with the exception of one.  We are recalling Lisa

15   Hopkins, who testified before all of six pages on the

16   transcript.  There will be a lot more additional material.

17   But the other five...other four should be about this length.

18   And then that would be our case.

19        THE COURT:  Any idea whether you are calling

20   witnesses?

21        MR. VINCENT:  Court's indulgence.

22        Nobody else tomorrow other than of course

23   potentially Mr. Saunders at some future date, sir.

24        THE COURT:  Is everybody staying locally, or are

1-266

1   you heading back to various locations?

2           MR. BENNETT:  We are staying locally, but what time

3   - we have people coming from Delaware - what time would Your

4   Honor like to start and we'll see if they can --

5           THE COURT:  Well, I was just trying to figure out

6   how far away people are.  I mean, where...where you are

7   located?  Are you back in Salisbury or --

8           MR. VINCENT:  We will probably end up having to be

9   back to Salisbury.

10          THE COURT:  Okay.  Why don't we say 9:30?  Is that

11  satisfactory?  You are coming from Prince George's?

12          MS. BOSSE:  I am down the street.

13          THE COURT:  Oh, okay.

14          MR. VINCENT:  She was the smart one.

15          MR. BENNETT:  I am staying over, so we are alright.

16          THE COURT:  9...9:30.

17          MR. BENNETT:  Okay.  Thank you very much.

18          THE COURT:  Court will recess.

19

20          (Court adjourned at 5:30 p.m..)

21

22

1-267

STATE OF MARYLAND, COUNTY OF KENT, TO WIT:

I, Melinda S. Kelley, Official Court Reporter for Kent County, Maryland, do hereby certify that the aforegoing testimony was taken by me on the date set forth in the Circuit Court for Kent County, Md. before The Honorable J. Frederick Price, and that this is a true copy of same.

I further certify that the testimony was recorded by me and then transcribed to the within typewritten matter in a true and accurate manner.

I further certify that I am not of counsel to any of the parties, or an employee of counsel, or related to any of the parties, or in any way interested in the outcome of this action.

_____
Melinda S. Kelley
Official Court Reporter
Kent County, Maryland

October 17, 2006