JODY LEE MILES,          *

      Inmate # 272-901,       *       IN THE

      MCAC, 401 East Madison Street,

      Baltimore, MD 21202,       *       CIRCUIT COURT

      Petitioner,       *       FOR QUEEN ANNE'S COUNTY,

      v.       *       MARYLAND,

STATE OF MARYLAND       *       Case # 4789PC

      Respondent.       *

\*    \*    \*    \*    \*\*\*\*\*\*    \*    \*    \*    \*

## MOTION TO REOPEN POST-CONVICTION PROCEEDINGS
## AND STAY PROCEEDINGS TO ALLOW AMENDMENT OF MOTION

Petitioner Jody Lee Miles, by and through counsel, Robert W. Biddle and C. Justin Brown, of Nathans & Biddle, LLP, respectfully moves this Court, pursuant to Md. Code, Crim. Pro. Article § 7-104, to re-open his post-conviction proceeding and to stay any action on this Motion for a period of 120 days. This Motion is based upon new information and issues that have been discovered in the past month. The request for a stay is based upon the unexpected July 1, 2007, death of Mr. Miles' prior post-conviction counsel. A memorandum of law in support of this Motion follows.

### I. INTRODUCTION

On March 19, 1998, Jody Lee Miles was sentenced to death for the killing of Edward Atkinson near a rest stop in Wicomico County, Maryland. Although Miles gave a statement to police offering a vague theory of self-defense, and although his wife led

police to the purported murder weapon, it never become entirely clear at trial, or since, how Miles ended up at the rest stop and how he met up with Atkinson.

Undersigned counsel was appointed to this case on July 12, 2007, following the death of post-conviction counsel Fred Warren Bennett in a car accident. Since that time, counsel has been scrambling to catch up with the case and review the file in its entirety. In so doing, counsel has discovered four issues that merit a hearing before this Court. It is in the interest of justice that these issues be heard by a Maryland court.

The first two issues are based upon ineffective assistance of post-conviction counsel. First, post-conviction counsel was ineffective for failing to follow-up on what was arguably the most promising lead in the case -- the discovery of an individual named Mary Snively who was with Miles during the crime and who could probably offer a comprehensive explanation of what happened. A review of Bennett's files indicates that a prior attorney, William Kanwisher, was close to reaching Snively, but the trail was abandoned some time after the case was transferred to Bennett.[1] Undersigned counsel has reason to believe that the defense will be able to contact this witness if given a reasonable amount of time.

The second ineffective assistance of counsel claim is based on a failure of the defense to adequately assess Miles' mental health. While thorough psychological evaluations have become standard in death penalty defenses nationwide, this process has

---

[1]Kanwisher, Miles' original post-conviction counsel, left the case due to health problems. Bennett took over for him.

-2-

been overlooked in the instant case. As a result, undersigned counsel has engaged Dr. Neil Blumberg, who has briefly evaluated Miles. Dr. Blumberg has already made an important discovery about Miles: he suffers from a severe category of Post-Traumatic Stress Disorder that came about due to years of extensive sexual and physical abuse while Miles was an adolescent. Dr. Blumberg and Janice Stevenson, a psychologist, are currently investigating how this disorder may be related to the conduct for which Miles is charged, but they need more time to reach a firm result. The nature of the sexual abuse suffered by Miles is critical to this case in light of the facts that 1) the killing took place near a rest stop frequented by homosexual men and 2) the victim was gay or bi-sexual.

The third new issue to arise since undersigned counsel became involved in the case is the discovery that the State's forensic firearms expert, Joseph Kopera, had been regularly perjuring himself by giving false testimony about his qualifications. Kopera testified in Miles' trial and perjured himself when he stated that he had degrees from the University of Maryland and Rochester Institute of Technology. Kopera went on to testify that the gun found in the Choptank River could have been the weapon used to kill Atkinson – thereby bolstering the crucial testimony provided by Miles' wife about the murder weapon. It is the contention of the defense that when the State suborns perjured testimony from a witness in a death penalty case, regardless of whether the prosecution was aware of it, a Due Process violation occurs and a new trial is merited.

The last issue raised in this Motion concerns the citizen wire tap used by police against Miles that the Court of Appeals found to be illegal. Based on the date when the wire tap was obtained by police, and the date when the Grand Jury convened and issued a charging document against Miles, the defense has reason to believe that illegal evidence was put before the Grand Jury. In order to resolve this potential issue, undersigned counsel has petitioned the Wicomico County Circuit Court and this Court to obtain a transcript of the Grand Jury proceedings. More time is necessary to follow up on this developing issue.

While the above issues are right now sufficient to merit a post-conviction hearing, the petitioner respectfully requests additional time to develop these issues. This is necessary because defense counsel will have had this case less then a month as of the time of this filing. If the Court were to grant a stay of 120 days, the State would not be prejudiced because, at the moment, Maryland does not have a legal method to conduct an execution.

## II. PROCEDURAL HISTORY

On March 12, 1998, a Queen Anne's County jury found Jody Miles guilty of felony murder, robbery with a deadly weapon, robbery, and use of a handgun in the commission of a crime of violence. Shortly after midnight on March 19, 1998, he was sentenced to death.

Miles filed a Motion for New Sentence on March 26, 1998, which was denied on July 7, 1998. He then filed a timely appeal with the Maryland Court of Appeals, which was denied on Sept. 18, 2001. *Miles v. State*, 365 Md. 488 (2001).

Central to the Court of Appeals opinion was a determination that the recording of the telephone call itself and all evidence seized by the police pursuant to the execution of a search warrant for Jona Miles' property was properly suppressed, but the trial court properly admitted the murder weapon. A Petition for Writ of Certiorari was filed and subsequently denied by the United States Supreme Court on February 25, 2002. *See Miles v. Maryland*, 534 U.S. 1163 (2002).

In 2002, William Kanwisher was appointed as lead post-conviction counsel for Miles. On September 18, 2002, Kanwisher filed a Petition for Post-Conviction Relief in this Court. A Supplemental Pro Se Petition for Post-Conviction Relief was filed by Petitioner.

In the Fall of 2005, Kanwisher withdrew as lead counsel due to a heart condition he learned of that Spring. Kanwisher was succeeded by Fred Warren Bennett, who was assisted by two associates from the Baltimore law firm of Whiteford, Taylor & Preston, LLP, Ericka Alsid Short and Ranak Jasani. On January 9, 2006, Bennett filed, a Second Supplemental Petition for Post-Conviction Relief.

The post-conviction hearing was held in this Court, sitting in Kent County, on June 22 to 23, 2006. This Court denied the Petition by the Memorandum Opinion and Order

filed on August 21, 2006.

On October 25, 2006, counsel for Petitioner filed an Application for Leave to Appeal from the Denial of Post-Conviction Relief . The Court of Appeals of Maryland denied Petitioner's Application for Leave to Appeal in a one-page Order dated March 13, 2007. Petitioner filed a Petition for Writ of Certiorari with the United States Supreme Court on June 11, 2007. That Petition is pending.

On July 1, 2007, Bennett was killed in a car accident. At the time of his death, he had not yet prepared the 28 U.S.C. §2254 Petition that was due about six weeks later.

On July 12, 2007, Robert W. Biddle was appointed as counsel to Miles. The two attorneys who had worked with Bennett, Short and Jasani, remained on the case.

Contemporaneous to this Motion, Miles is filing the following: a Motion to Correct Illegal Sentence (Queen Anne's County Circuit Court Case # 4789), a Motion to obtain the transcript of the Grand Jury testimony of Cpl. Benton of the Maryland State Police (Queen Anne's County Case # 4789, and Wicomico County Case # 97-CR-1143), and a federal habeas corpus petition pursuant to 28 U.S.C. § 2254.

### III. FACTS

On April 4, 1997, Edward Joseph Atkinson's body was found in a wooded area on Old Bradley Road in Wicomico County.

During the subsequent investigation, the police learned that Atkinson's credit cards had been used at several locations after his death. Meanwhile, a Caroline County resident

-6-

intercepted and recorded a cellular telephone conversation of a man and a woman discussing the crime. The taped conversation was turned over to police, who figured out that the callers were Miles and his wife, Jona Miles.

Jona Miles subsequently provided information about her husband and showed the police where she had disposed of a handgun thought to have been used in the killing. Police later found a handgun, and at trial the State's weapons expert, Joseph Kopera, testified that the weapon belonged to the same class of firearms that had been used to kill the victim.

After the gun was recovered, police arrested Jody Miles. He was indicted and charged on May 9, 1997, with felonious homicide, robbery, robbery with a deadly weapon, first-degree assault and use of a handgun in a crime of violence in connection with the death of Atkinson. The State filed a Notice of Intention to Seek the Death Penalty on July 29, 1997.

Public defender Tom Saunders was Miles' lead trial counsel. Because of pre-trial publicity, the case was removed from Wicomico County. Defense counsel filed a Motion to Suppress the wiretap information, which was granted in part.

The State's theory at the trial, which lasted from March 9 to March 12, 1998, was that Miles either killed Atkinson during the course of a robbery, or that he had committed a willful, deliberate and premeditated murder. The defense conceded that Miles killed Atkinson, but contended it was second-degree murder.

The defense called two witnesses – a State investigator who identified the area near the crime scene as a known meeting place for homosexual men, and a friend of Atkinson who testified that Atkinson frequently borrowed money. Although Petitioner gave a statement to police offering a vague theory of self-defense that was presented to the jury, the evidentiary record in court fails to show conclusively how Petitioner ended up at the rest area stop and how he encountered the victim.

The jury subsequently acquitted Petitioner of first-degree premeditated murder, but convicted him of felony murder, robbery with a deadly weapon, robbery and use of a handgun in the commission of a crime of violence.

At the sentencing hearing, from March 17 to March 18, 2005, the State presented the testimony of Dorothy Atkinson, the victim's mother. The defense called Donald Steil, a private investigator who interviewed several witnesses; Lisa Hopkins, Miles' older sister who briefly testified about their impoverished childhood; Carrie Cooper, the mother of Miles's daughter; and Ann Stanfield Hagert, a social worker who conducted a purported psycho-social assessment of Miles and concluded that he was raised in a chaotic, abusive and impoverished family.

The jury sentenced Miles to death.

## IV. ARGUMENT

### *a. This court may reopen this case in the interest of justice.*

The issues raised in this Motion are sufficient for the Court to reopen Miles' post-

conviction proceeding. Under Maryland law, "[t]he court may reopen a postconviction proceeding that was previously concluded if the court determines that the action is in the interests of justice." MD. CODE ANN., CRIM. PRO., § 7-104.

In *Gray v. State*, 388 Md. 366 (2005), the Court of Appeals discussed motions to reopen post-conviction proceedings and affirmed a broad interpretation of the phrase "interests of justice." In an effort to give specific examples of when such a motion could be granted, the Court stated the following: "While it is within the trial court's discretion to decide when 'the interests of justice' require reopening, we note that some reasons for reopening could include, for example, ineffective assistance of postconviction counsel or a change made in the law that should be applied retroactively." *Id.* at 383 n.7 (citing *Harris v. State*, 160 Md. App. 78 (2004) (discussing defendant's motion to reopen post-conviction proceeding for ineffective assistance of post-conviction counsel); *Stovall v. State*, 144 Md. App. 711, 715-16 (2002) (discussing the same)).

In *Love v. State*, upon which the logic of *Gray* was based, the Court of Special Appeals listed even more grounds for ordering a new trial in the interests of justice – among them "newly discovered evidence." 95 Md. App. 420, 427 (1993).

Miles meets this bar because his claims are based upon ineffective assistance of post-conviction counsel and the discovery of new evidence. Certainly in a death penalty case, the concern of meeting the interests of justice is greater than it is in any other case. By allowing these issues to go forward to a new post-conviction hearing, the Court will

serve justice by getting closer to what actually happened on the day of the murder, by reaching the correct sentence for Miles, and by removing any taint of perjured testimony that may be associated with the trial. These are the kinds of circumstances the Legislature had in mind when it used the words "in the interests of justice."

### b. Ineffective assistance of post-conviction counsel

Miles' post-conviction counsel was ineffective for 1) not sufficiently investigating and interviewing the key witness in this case, Mary Snively, and 2) not conducting a comprehensive mental health examination that could help Miles by raising mitigation issues. These failures amounted to a deficient performance by counsel, thereby prejudicing Miles.

The test for ineffective assistance of counsel is the familiar two-prong test derived from *Strickland v. Washington*, 466 U.S. 668 (1984), as defined by *Williams v. State*, 326 Md. 367 (1992). The same standard of ineffective assistance of counsel that applies to trial counsel and appellate counsel applies to post-conviction counsel. *Stovall v. State*, 144 Md. App. 711, 723 (2002).

Under *Strickland,* Petitioner must first show that trial counsel's performance was deficient in that, under "prevailing professional norms, his counsel's representation, objectively speaking, fell below a standard of reasonableness." *Williams*, 326 Md. at 373, (citing *Strickland*, 466 U.S. at 688). Second, Petitioner must show that counsel's deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. Prejudice under

-10-

*Strickland* requires a showing only that "the particular and unreasonable errors of counsel actually had an adverse effect on the defense." *Williams v. State*, 326 Md. 367, 374 (1992).

Further discussing prejudice, the Supreme Court stated that in attempting to demonstrate that counsel's deficiencies prejudiced the defense, "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Strickland*, 466 U.S. at 693. The *Williams* court explained that "[i]n other words, the prejudicial effect of counsel's deficient performance need not meet a preponderance of the evidence standard." *Williams*, 326 Md. at 375. As such, the Court of Appeals noted that a defendant need only show that, based on counsel's errors, there is a "substantial or significant possibility that the verdict of the trier of fact would have been affected." *Id.* Of course, even a single serious error by counsel can provide a basis for a finding of ineffective assistance of counsel. *In re Parris W.*, 363 Md. 717, 726 (2001).

A failure to properly investigate pertinent facts may result in unreasonable tactical decisions based on incomplete information. *Wiggins v. Smith*, 539 U.S. 510 (2003).

### 1. Failure to follow the Snively lead.

Post-conviction counsel was ineffective for failing to adequately investigate Mary Snively so she could be used as a mitigation witness.[2] Snively, who is sometimes referred

---

[2]Miles also argues that a stay of these proceedings is merited to provide additional time to investigate this witness and other investigative leads. The Court of Appeals has long recognized the Sixth Amendment right of a criminal defendant to use court procedures to obtain evidence on his behalf. *See Wilson v. State*, 345 Md. 437 (1997). Here, there are pressing issues relating to the

to as Mary Busick, was a friend of Miles who is thought to have been at the scene of the crime. Perhaps better than anybody else, she would be able tell almost everything that transpired on Old Bradley Road. Through a last-minute review of the case file that previously was in the sole possession of Bennett, undersigned counsel became aware of an investigative lead pertaining to this issue that is likely to allow the defense to reach and interview Snively for the first time.

It is the current view of undersigned counsel that the value of this lead was never appreciated by Bennett. There could be no possible strategic reason for not continuing the effort to locate this critical witness. *See* Ex. 4 (Jasani affirmation).

Snively is essential to this case – and to the interests of justice – because it remains unknown exactly what transpired on April 2, 1997. The police account, of a botched robbery, does not make sense. Nor does the account Miles gave in his statement to police – in which the crime was driven by a debt owed to a mysterious loan shark name Morrison. Snively is the only person in a position to clear the air and allow the Court to find the truth.

Failure to investigate a key witness is grounds for an ineffective assistance of counsel claim. *See* Exs. 2, 3 (Mark Olive resume and affidavit). In three recent cases, the Supreme Court required post-conviction courts to carefully scrutinize the extent to which

---

facts of the crime, the death of victim, and mitigation that can only be resolved if this Court stays further proceedings on the Motion to Reopen and allows counsel to pursue discovery pursuant to Maryland Rules 4-264, 4-265, and 4-266.

defense counsel investigated crucial issues; in each case failure to do so was found to be ineffective assistance of counsel. *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003) (failure to investigate defendant's background and other mitigating evidence); *Williams v. Taylor*, 529 U.S. 362 (2000) (failure to present adequate mitigation at sentencing).

The facts of *Rompilla*, another death penalty case, are right on point with the facts of the instant case. In *Rompilla*, the Supreme Court held that trial counsel had been ineffective for failing to examine a defendant's readily available conviction file in an effort to develop mitigation issues. 545 U.S. at 378. If Rompilla's attorneys had examined these and other files, the Court found, they likely would have found a "range of mitigation leads" that could have produced a real impact at sentencing. *Id.* at 390.

The same thing that happened to Rompilla happened to Miles – with the difference that Miles' file was actually in the possession of Bennett, the post-conviction attorney. Either Bennett failed to thoroughly review the file, and therefore never knew of or appreciated the value of the lead contained therein, or he was aware of the lead and he never followed-up on it. Regardless of the scenario, the result is the same: counsel was ineffective for not pursuing the lead that would have produced arguably the most important defense witness in this case.

The issue of Mary Snively is not new to this case. Although she has never been reached by the defense, Kanwisher came close. Through an investigator, Kanwisher was

able to locate her ex-husband, Carl Snively. The ex-husband informed the investigator that he receives child-support payments from her through a Delaware court. At the time he was interviewed, Carl Snively thought she was living in Indiana. It is the belief of undersigned counsel that this link, along with extra time granted by the court and the power of subpoena, is enough to locate Snively.

It is virtually undeniable that Snively, a friend of Miles and his wife, is the person who was spotted at the crime scene. According to Rebecca Chips, a close friend of Miles, Snively has the exact same appearance as the woman observed by witness Steven Bailey at the scene of the crime. She was described as a white female in her late 20s, about 5' 3" to 5' 4", with a stocky build and short dark hair above the shoulders.

Bailey stated that on the day of the murder he was driving north on Old Bradley Road on his way home. As he drove past the area where the murder occurred, he saw a woman preparing to walk across a road. As he approached, she abruptly turned her head and walked away.

After hearing news of the murder, Bailey realized he may have observed a suspect and he contacted the police. He reported that the woman was trying to hide her face. The State did not call Bailey to testify (although he was summonsed) and the defense never spoke to him. Bailey did, however, testify in the post-conviction hearing before this Court. In doing so he corroborated the identity of Snively through his description of her. His testimony underscores the need to locate and interview her.

-14-

Snively was clearly connected in some way to the murder[3] – and it is in the interest of justice that the defense have a chance to contact her. Prior to the murder, Snively and Miles took a two-day trip to Tennessee for a court hearing. Snively later told a friend that she and Miles had "screwed around."

Chips told a defense investigator in 2004 that Miles, his wife Jona and Snively stayed at her house the weekend of the murder. At some point during that weekend, while Miles was gone, Snively told Chipps, without elaboration, that Jody had "hurt somebody."

Snively's only interview was with police on April 25, 1997, just days after Miles and his wife had been arrested. She stated that Jona Miles had asked her to watch her children because her husband had shot and killed a man and they were going to retrieve the victim's car. She said that she didn't go to the police because "I didn't know if it was true... Jona is a good liar." During her statement, Snively denied involvement in the murder. She claimed that the night of the murder she was at Jona Miles' house with Larry Holden, Jona's cousin.

The Court file in this case shows that both sides at various times identified Snively as a witness, however, neither side successfully served her with a summons to appear as a

---

[3] On November 11, 2004, a defense investigator spoke with Jona Miles' father and brother.  At the meeting, Jona's brother blurted out, "Did you all ever find that Mary Busick [Snively]?" When the investigator asked what he meant, the brother stated that Snively was with Jody when the murder was committed. He then said, "Didn't you see that sketch of the girl that the artist drew?"

trial witness. *See* Ex. 11 (efforts to summons Snively).

The facts above show that Snively is a critical witness who needs to be located, interviewed, and produced to testify. Had post-conviction counsel properly reviewed the case file in his possession, and followed up on it, he could have better developed this issue and it could have resulted in new mitigation claims that could have been successfully litigated.

### 2. Failure to pursue mental health evidence.

Post-conviction counsel was also ineffective for failure to pursue mental health evidence that could have been extremely persuasive in mitigation. *See* Ex. 2. Although undersigned counsel has had very little time to investigate this issue, the preliminary findings by noted forensic psychologist Dr. Neil Blumberg are alarming: Jody Miles suffers from chronic Post-Traumatic Stress Disorder that is the result of prolonged sexual and physical abuse during his childhood. *See* Ex. 7.

Although the testing that Dr. Blumberg has done to date provides powerful evidence that could have been used in mitigation, undersigned counsel believes that, with more time, this issue could be developed more thoroughly and that a link could be established between this diagnosis and the offense for which Miles was convicted. At this time, it seems possible that there could be a relationship between the sexuality of the victim and the sexual trauma that Miles suffered as an adolescent.

A second mental health expert, Janice Stevenson, Ph.D., was also recently brought into the case. She agrees with Dr. Blumberg's assessment that more time is needed to thoroughly examine Miles' mental health. She also notes that she is aware of no logical reason why Miles' prior attorneys, with whom she is familiar in a professional capacity, would have consciously decided there was no need to thoroughly evaluate Miles. *See* Ex. 17, 18 (Stevenson resume and affidavit).

Failure to investigate mental health and other background evidence for use in mitigation is an established ground for ineffective assistance of counsel. In *Wiggins v. Smith*, 539 U.S. 510 (2003), another death penalty case, the Supreme Court held that a petitioner's Sixth Amendment rights were violated when his trial attorney failed to investigate the defendant's background and present evidence of his unfortunate upbringing at mitigation. The evidence that the *Wiggins* attorney failed to investigate was similar to the evidence that was just uncovered with regard to Miles.[4] Among other things, Wiggins had been subject to "severe physical and sexual abuse... at the hands of his mother and while in the care of a series of foster parents." *Id.* at 516.

---

[4] In *Wiggins*, the Court noted that the post-conviction social worker had based her conclusions and opinions on several sources in addition to interviews with the petitioner. She had relied on social services, medical and school records, as well as interviews with family members. *Id.* at 516. By contrast, Dr. Blumberg has only had met with Miles for two two-hour-and-fifty-minute sessions. Neither he nor any other mental health expert has had the opportunity to sufficiently review all of the pertinent documents related to Miles and to speak to family members who may be able to offer insight into his background. *See* Exs. 7, 18. This is additional reason to give the defense more time to pursue this claim.

In addition to *Wiggins*, other cases affirm the duty of counsel to investigate mental health evidence for the purpose of mitigation. In *Rompilla v. Beard*, 545 U.S. 374 (2005), the Supreme Court held that an attorney has the duty to investigate, even when the defendant and his family informed the attorney that there was no mitigation worth pursuing. The attorney was ineffective because there were "obvious signs" that defendant suffered physical abuse as a child, beyond that which was reflected in mental health evaluations. *Id.* at 392-93; see also *Burt v. Uctman*, 422 F.3d 557 (7th Cir. 2005) (finding a duty to request a new psychiatric evaluation because defendant's behavior and other known facts should have alerted attorneys that previous evaluation was insufficient); *Jacobs v. Horn*, 395 F.3d 92 (3d Cir. 2005) (requiring trial counsel to fully inform evaluating psychologist of facts of defendant's case).

In this case, there is no evidence that a thorough examination has ever been conducted, despite almost a decade on death row. Some nine years ago Dr. Shelly Bellow, a defense psychologist, saw Miles, but she did not prepare a report. Additionally, a social worker, Ann Hagert, worked with Miles, but she was not qualified to make a diagnosis. Trial counsel Tom Saunders later testified in the post-conviction hearing that "the psychologist examined my client and gave him very damning opinion in terms of manipulation, in terms of callousness, in terms of an unwillingness to take responsibility and would have undercut my whole argument that he in fact was remorseful. He presented himself as wanting to find a way to get out of this. He didn't consider it that big

a deal." (6/22/06 Tr. 1 at 152-53).

This analysis, however, misses the point. While, at that time, Miles may have exhibited a lack of remorse, that does not necessarily mean there were not other characteristics that could help Miles in mitigation. It is very well possible that the past traumas that Miles suffered were the very reason he showed a lack of remorse. By no means should the analysis have ended where it did.

The role of Dr. Bellow is also clouded by a lack of documentation. First, there are no records of her work in trial counsel's files, so counsel cannot just assume she did a sufficient job. Nor is there evidence at this time about what background information Dr. Bellow received (or did not receive) regarding Miles's history and the facts of the crime. *See Jacobs v. Horn*, 395 F.3d 92 (3d Cir. 2005) (finding an attorney's investigation insufficient because he did not supply expert with sufficient background information). Without this documentation, there is no way post-conviction counsel could have been confident that this crucial process had been sufficiently pursued. As the Supreme Court has made clear in *Wiggins*, *Rompilla* and *Williams*, it is not enough for post-conviction counsel to just trust that trial counsel did a sufficient job in a certain phase of the case – especially when a defendant faces execution.

Finally, there were clear indicia pointing defense attorneys toward additional evaluation. Prior attorneys for Miles knew he had grown up in an extremely traumatic home environment, which should have hinted at mental health issues. Also, Miles' post-

arrest mental health records, which were available to prior counsel, revealed mental health impairment. Saunders admitted this in the post conviction hearing: "There is a lot of shame in this family about what occurred, and there was a lot of sexual and physical abuse. [The] mother, who had extreme ambivalent feelings, was a mentally ill woman." (6/22/06 Tr. 1 at 160).

Dr. Blumberg's and Dr. Stevenson's initial reports are conclusive proof that a real mental health issue existed – if only counsel had taken the time and effort to pursue it.

With this in mind, it would be disingenuous to assert that the failure to perform comprehensive mental health work on Miles could have been a strategic decision of counsel. Even if counsel had decided that the fruits of such investigation were not likely to help in a trial or a hearing, there is no excuse not to investigate in the first place. Kanwisher and Ranak Jasani, an attorney who worked with Bennett before his death, have made this clear in their affirmations to the Court. *See* Exs. 4, 6, 18.

With more time, and the hiring of another mental health expert who can further explore Miles' background, undersigned counsel believes this issue can be thoroughly explored to the extent required by the Supreme Court in *Wiggins*. The result, will show that trial counsel and post-conviction counsel were ineffective under *Strickland* for failure to investigate Miles' mental health background.

*b. The perjured testimony of State expert Joseph Kopera.*

This Motion should be granted based on the recent discovery that the State's weapons expert, Joseph Kopera, perjured himself in Miles' trial. At this time, without further investigation, defense does not know the extent to which Kopera's testimony was false. But, at the very least, he lied about his qualifications that allowed him to be admitted as an expert and offer opinion testimony.

False testimony by a state expert is a constitutional Due Process violation warranting a new trial. A defendant convicted by false testimony must be granted a new trial based on due process, the interests of justice and the integrity of the court. "The government of a strong and free nation does not need convictions based upon such [false] testimony. It cannot afford to abide with them." *Mesarosh v. United States*, 352 U.S. 1, 14 (1956); *accord People v. Cornille*, 448 N.E.2d 857, 862 (Ill. 1983) ("It is antithetical to our system of justice to refuse to grant a new trial for a defendant when it has been convincingly established that he was convicted on the basis of false testimony.").

In this case, Kopera perjured himself while he was a State law enforcement official. When he took the stand against Miles, he was testifying in his official State capacity. As such, the State is charged with the "knowing use of perjured testimony," even when the individual prosecutor did not know he was lying. "If the state through its law enforcement agents suborns perjury for use at trial, a constitutional due process claim would not be defeated merely because the prosecuting attorney was not personally aware

of this prosecutorial activity." *Schneider v. Estelle*, 552 F.2d 593, 595 (5th Cir. 1977);

*accord State v. Williams*, 392 Md. 194, 210 (2006); *United States v. Kelly*, 35 F.3d 929,

933-34 (4th Cir. 1994); *Boyd v. French*, 147 F.3d 319, 329 (4th Cir. 1998); *Strickler v.*

*Green*, 527 U.S. 263, 301 (1999) (applying *Brady* rule to evidence "known only to police

investigators and not to the prosecutor," quoting *Kyles v. Whitley*, 514 U.S. 419, 438

(1995)).

Similarly, in *Barbee v. Warden, Maryland Penitentiary*, the Fourth Circuit held

that it is of no concern whether the individual prosecutor is also a victim of the

suppression of material information because the failure of the state in general is not

excused by the lack of knowledge of the individual prosecutor. 331 F.2d 842, 846 (4th

Cir. 1964). Convictions obtained through the use of perjured testimony may be set aside

without any inquiry into prejudice. *Id.* at 847.

In the case of Miles, undersigned counsel is not sure of the extent to which Kopera

perjured himself. While he clearly lied about his qualifications, the defense team has not

yet had the chance to review his substantive testimony – and possibly consult a firearms

expert – to determine whether he lied when he opined that the gun found in the Choptank

River could have fired the bullet that killed Atkinson.[5] However, it is clear that Kopera

lied when he stated 1) that he had a mechanical engineering degree from the University of

---

[5] The bullet and the weapon have been retained by the Circuit Court for Queen Anne's
County and therefore can be examined.

Maryland[6] and 2) that he had an engineering degree from the Rochester Institute of Technology. (3/10/98 Tr. 128-29). *See* Exs. 12-14.

Based on his history, it is reasonable to believe that Kopera could have lied about more than just his credentials. When the Office of the Public Defender began investigating Kopera in early 2007, his response was more deception. When confronted with his assertions under oath that he had a degree from the University of Maryland, Kopera tried to clear his name by producing a forged University of Maryland transcript. *See* Ex. 16. This conduct shows that Kopera's dishonesty was no accident. Even when he realized he was caught, and defendants were questioning the role of his lies in their convictions, he chose to escalate his deception rather than come clean with the truth.

Regardless of the extent of Kopera's deception in Miles' trial, his testimony had a material effect.[7] When Kopera said he had degrees from Maryland and R.I.T., he elevated his standing in the eyes of the Jury. Then, he testified that the weapon found in the Choptank River could have been the gun that fired the bullet that killed Atkinson.

---

[6] The trial transcript of this testimony notes that the name of the university where Kopera claimed to have received a degree in mechanical engineering was inaudible. However, he is likely to have said "Maryland" based on his testimony in other cases and the false resume he was known to have circulated. *See* Exs. 13-16.

[7] Although Miles argues that the Kopera issue should be viewed as a Due Process violation, he also maintains that relief is merited under the Maryland standard for newly discovered evidence. Under that standard, first, the evidence must be material. *Stevenson v. State*, 299 Md. 297, 304 (1984). Then, the evidence must comport with the standard set forth by the Court of Appeals in *Yorke v. State*: "The newly discovered evidence may well have produced a different result, that is, there was a substantial or significant possibility that the verdict of the trier of fact would have been affected." 315 Md. 578, 588 (1989).

(3/10/98 Tr. 140-41). This opinion testimony appeared to confirm the testimony of the State's star witness, Jona Miles, who had testified that she had dropped the holstered gun into the river near Denton, Maryland.

At the very least, this Court should give the defendant the opportunity to thoroughly investigate this claim. This is in the interest of all parties involved in this case — for the reason that, presumably, no party wants the final outcome to be tainted by the false testimony of the State's expert witness. By allowing the defendant time to discover the extent of Kopera's deception, and the opportunity to raise and fully litigate this issue in a hearing, the unfortunate circumstances of Kopera's testimony can be put to rest.

### c. The presentation of illegal evidence to the Grand Jury.

This issue came to the attention of undersigned counsel only days before the filing of this Motion. Nevertheless Miles wishes to preserve this issue in State court while further investigation is pending.

This claim is based upon a cellular phone conversation that was picked up by James Towers, a Caroline County resident who was at home monitoring police and fire radio transmissions. Towers heard the phone call and, thinking it might be related to the killing he had heard about in the news, recorded the call. The trial court granted a motion to exclude that evidence, a ruling that was later upheld by the Maryland Court of Appeals. *Miles v. State*, 365 Md. 488 (2001). Undersigned counsel has reason to believe that the contents of this call may have been presented to the Grand Jury and used to secure the

indictment against Miles.[8]

This claim could potentially fall under the category of ineffective assistance of counsel based upon the failure of any of Miles' prior attorneys to obtain the Grand Jury transcript.

Maryland courts have held that law enforcement officials must adhere closely to the requirements of the Maryland Wiretapping Statute, Md. Ann. Code, Cts. & Jud. Pro. §§ 10-401 *et. seq. See State v. Siegal*, 266 Md. 256, 274 (1972) (evaluating precursor to current Statute and noting "[t]he statute sets up a strict procedure that *must* be followed and we will not abide by any deviation, no matter how slight, from the prescribed path").

When the State offers evidence before a grand jury that was improperly obtained, and the grand jury issues an indictment, dismissal of the indictment is a proper remedy. *See id.* (dismissing single-count indictment when improperly obtained evidence had been put before the grand jury); *State v. Mayes*, 284 Md. 625, 642 (1979).

Undersigned counsel has reason to believe that the contents of the illegally obtained telephone conversation between Miles and his wife may have been presented to the Grand Jury. Corporal William Benton was the only witness who went before the Grand Jury, and it is highly likely that he had access to the tape of the phone conversation. *See* Ex. 19. If this was the case, then it is also highly probable that Benton

---

[8] Counsel for Miles filed a Motion for Transcription and Disclosure of Grand Jury Minutes in the Circuit Court for Wicomico County and in this Court on the same day that this Motion was filed.

made reference to the tape – or its contents – in presenting the State's evidence to the Grand Jury. If this is the case, then the indictment against Miles must be dismissed. In addition, a failure of counsel to investigate and raise this issue amounts to ineffective assistance of counsel.

While this issue remains speculative until the defense has an opportunity to review the transcript of the Grand Jury proceedings, there exists a real possibility that this is an issue Miles should be able to pursue. As with the other issues described above, it is in the interests of justice to give the defense time to investigate and assess this issue.

## V. THE NEED TO STAY THESE PROCEEDINGS FOR 120 DAYS

With the filing of this Motion, the Petitioner respectfully asks this Court to stay any action on this Motion for 120 days so that counsel will have adequate time to further investigate and prepare the claims described above. The defense also reserves the right to raise new claims. Forcing the defense team to go forward without an extension of time, following the death of Bennett, would amount to a miscarriage of justice.[9] Simply put, one month is not enough time to litigate this stage of a death penalty case.

Granting a 120-day stay would not prejudice the State because, at the moment, the State does not have a legal method to execute prisoners. As this Court is well aware, the Court of Appeals recently found that Maryland's lethal injection procedure was not

---

[9]While Miles has had three different lead attorneys in the past 24 months, the State has had the same attorneys since the inception of the case nearly 10 years ago – Davis Ruark, State's Attorney, and Samson Vincent, Deputy State's Attorney, both of Wicomico County.

properly implemented. For that reason, there is currently a *de facto* moratorium on the death penalty in Maryland.

Also weighing in favor of granting a stay are the many postponements, extensions and other delays that have already taken place in this case. By way of example, three-and-a-half years passed between when Miles was sentenced to death in March of 1998 and the affirmation of that sentence by the Court of Appeal in September of 2001. In addition, Bennett received 120 days to familiarize himself with the case when he replaced Kanwisher as lead post-conviction attorney. While the Maryland courts have up to now been fair and prudent in granting time to assure that this case is properly litigated, it would be unfair to not extend the same courtesy to undersigned counsel.[10]

The attorneys now working on the case, along with at least two expert witnesses, and support staff and associates from their respective law firms, have been working furiously to meet the time constraints forced upon them by the filing deadline for Miles' federal habeas corpus petition pursuant to 28 U.S.C. § 2254. Despite these efforts, there simply is not enough time to fully investigate the issues described above. It would be patently unfair to cut short this litigation in such an arbitrary manner when up to now the courts have been so careful to make sure that Miles received the full benefit of

---

[10] Many of the postponements in this case have come as the result of agreements between the State and the defense. In light of that pattern, undersigned counsel attempted to get the State to consent to the stay requested here based on Bennett's death. The State refused without explanation. *See* Ex. 9 (request for consent to filing and stay); *See* Ex. 10 (State's refusal to consent to same).

Maryland's legal system. It makes no sense to punish Miles because he was unfortunate enough to lose his lead counsel to a car accident.

When unforseen circumstances arise, and a party has acted reasonably to mitigate the effects of those unforseen circumstances, failure to grant a continuance can be an abuse of discretion by the court. *Collins v. State*, 373 Md. 130 (2003) (failure to grant a continuance over a weekend to develop a response to tardy State discovery was an abuse of discretion); *Wilson v. State*, 345 Md. 436 (1997) (failure to grant continuance to obtain presence of important defense witness through service of a subpoena was an abuse of discretion).

It is essential that new counsel determine whether all viable claims have been developed in State court prior to proceeding to federal court under 28 U.S.C. § 2254. Federal law requires that Petitioners first exhaust all available remedies in state court. 28 U.S.C. § 2254(b). A petitioner must present the essence of each and every claim to the state courts to give the state courts a fair "opportunity to apply controlling legal principles to the facts bearing upon the petitioner's constitutional claims." *Picard v. Connor*, 404 U.S. 270, 276-77 (1971). Petitioner is required to pursue claims throughout the entire appellate process of the state. *Justices v. Lyndon*, 466 U.S. 294, 302-03 (1984).

The requirements to thoroughly investigate are made clear by Supreme Court case law and American Bar Association guidelines. *See* Ex. 2 (Olive affidavit). In *McFarland v. Scott*, 512 U.S. 849, 860 (1994), the Supreme Court noted that capital post-conviction

petitioners are entitled to a variety of expert and investigative services and that these

services "may be critical in the preapplication phase of a habeas corpus proceedings,

when possible claims and their factual bases are researched and identified." *Id.* at 855.

Justice O'Connor, concurring in part and dissenting in part, noted that for these services

"to be meaningful in the habeas context, they ... must be available prior to the filing of the

first federal habeas petition." *Id.* at 860.

Given the nature of this case and the voluminous materials, new counsel,

appointed July 12, 2007, will require significant time to conduct a thorough review. *See*

Ex. 2 (affidavit of Mark Olive). There are several boxes of records that must be reviewed

and analyzed, as well as a trial transcripts, sentencing transcripts, and post-conviction

hearing transcripts, to name a few of the documents of which counsel is aware.

The present deadline for filing the federal habeas petition is August 17, 2007. It

will be impossible to determine by that date whether all possible claims have been

presented to this Court. Bennett never consulted with current lead counsel about this case

prior to his death. Nor was a federal petition prepared prior to his death.

Although Bennett worked with other counsel from Whiteford, Taylor & Preston –

Ranak Jasani[11] and Erika Alsid Short – those attorneys have no criminal defense

experience prior to this case and cannot be expected to pick up the lead. Other than

knowing that Bennett read the trial transcript, they do not know what steps Bennett took

---

[11] Jasani is currently on maternity leave and will not be available to resume participation
in this matter until some time.

to decide which claims to pursue, even though they have been involved in the matter since the Fall of 2005. Short and Jasani have previously been limited to assisting Bennett on discrete tasks at his direction, such as interviewing witnesses and drafting certain documents. *See* Ex. 4 (Jasani affirmation).

If this Court decides in the interests of justice to allow this Motion to Reopen to be stayed for a period of 120 days, it will stop the clock for purposes of filing a federal habeas corpus petition and give the petitioner the time he needs to ensure that he has exhausted all of his viable State claims. 28 U.S.C. § 2244(d)(2) (tolling the time period while "a properly filed application for State post-conviction or other collateral review" is pending). The defense team will also be able to ensure that it has complied with its ethical duties to throughly review and investigate this case – so that Miles will have had the legal representation he is guaranteed by the Sixth Amendment. A single month is not enough time to litigate this crucial stage of a death penalty case.

## VI. CONCLUSION

Miles' post-conviction proceedings should be reopened and a new trial should be granted based on the following issues: ineffective assistance of post-conviction counsel for failing to investigate a key witness and failing to conduct a thorough mental health review; the perjured testimony of State weapons expert Joseph Kopera; and the illegal evidence that may have been presented to the Grand Jury. In addition, the Court should grant the defense a stay of 120 days before acting on this Motion so undersigned counsel

JODY LEE MILES,                                    *

    Inmate # 272-901,                          *        IN THE

    MCAC, 401 East Madison Street,

    Baltimore, MD 21202,                    *        CIRCUIT COURT

          Petitioner,                          *        FOR QUEEN ANNE'S COUNTY,

             v.                              *        MARYLAND

STATE OF MARYLAND                          *        Case #4789PC

          Respondent.                          *

     *     *     *     *     ******     *     *     *     *

## ORDER

Petitioner Jody Miles' Motion to Stay Proceedings for 120 days to allow time to

amend his Motion to Reopen Post-Conviction Petition is hereby granted. It is so

ORDERED.

DATE ISSUED:

                                          _____

                                          Judge J. Frederick Price

                                          Kent County Circuit Court

EXHIBITS


Ex. 1 Appointments of Robert Biddle, Esq.

Ex. 2 Affidavit of Mark Olive, Esq.

Ex. 3 Resume of Mark Olive, Esq.

Ex. 4 Affirmation of Ranak Jasani, Esq.

Ex. 5 Proof of Fax to Dr. Bellow, Ph.D.

Ex. 6 Affirmation of William Kanwisher.

Ex. 7. Neil Blumberg, M.D., statement.

Ex. 8  Neil Blumberg, M.D., resume.

Ex. 9  letter to State's Attorney and Attorney General dated July 24, 2007.

Ex. 10 State's response to letter dated July 24, 2007.

Ex. 11 Evidence of efforts by State and Defendant to summons Mary Snively at trial.

Ex. 12 Affidavit from registrar of Rochester Institute of Technology regarding Joseph

  Kopera.

Ex. 13 Letter from the University of Maryland regarding Joseph Kopera.

Ex. 14 Press Release from the Maryland State Police regarding Joseph Kopera.

Ex. 15 Joseph Kopera resume.

Ex. 16. Joseph Kopera's forged University of Maryland transcript.

Ex. 17. Resume of Janice Stevenson, Ph.D.

Ex. 18. Report of Janice Stevenson, Ph.D.

Ex. 19. Grand Jury Indictment against Jody Lee Miles.

## REQUEST FOR HEARING

Jody Miles requests an evidentiary hearing on all matters raised in this Motion to

Reopen.

Robert W. Biddle, Esq.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 10th day of August, 2007, a copy of the

foregoing Motion to Reopen, including exhibits, was mailed by first-class mail to the

following:

The Honorable Davis R. Ruark, Esquire
Sampson G. Vincent, Esquire
Office of the State's Attorney, Wicomico County
P.O. Box 1006
Salisbury, MD 21803

Kathryn Grill Graeff, Esquire
James Williams, Esquire
Office of the Attorney General, Criminal Appeals
200 St. Paul Place
Baltimore, MD 21202

Robert W. Biddle, Esq.