# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JODY LEE MILES                 :

                          :

      v.                    :      Civil No. CCB-07-2135

                          :

SIMON WAINWRIGHT, WARDEN     :

                          :

## <u>MEMORANDUM</u>

On the evening of April 2, 1997, in the trees beyond Old Bradley Road, a single-lane byroad up the east bank of the Nanticoke River, a short-cut between Mardela Springs and Sharptown, Mr. Jody Lee Miles shot and killed Mr. Ed Atkinson. What happened, why it happened, and how the courts probe such quandaries many years later is the subject herein.

This is a habeas case. Mr. Miles asks this court to vacate his felony murder conviction in the Circuit Court for Queen Anne's County because his trial counsel failed to pursue an adequate investigation into his life history. This investigation, he contends, would have uncovered a legacy of devastating sexual abuse Mr. Miles suffered as a child that would have recontextualized the facts of this murder case before the trial jury. Critically, this is now an asserted guilt-phase deficiency.[1] An adequate investigation, Mr. Miles asserts, would have provided the jury with a compelling alternative narrative for the tragedy that transpired: What took place in the woods that day was not the product of an preconceived intent to rob the victim,

---

[1] As detailed below, Mr. Miles initially raised this claim as an asserted sentencing-phase failure to obtain mitigating information relevant to whether he would receive the death penalty. After his sentence was reduced to life without parole, he reframed his petition to allege a guilt-phase failure to investigate facts pertaining to his guilt/innocence of felony murder.

1

but instead the result of a post-traumatic stress-related episode arising when he was reminded of events that took place in the woods outside his childhood home when he was repeatedly and routinely sodomized, between the ages of eleven and fourteen, by a man named Charlie Stevenson, his mother's boyfriend at the time. (Dr. Blumberg Aff. ¶¶ 3–4, ECF No. 7-1). Had trial counsel adequately performed his duty and discovered this evidence, Mr. Miles claims, there is a reasonable probability that the jury would have declined to find the requisite intent to rob, thereby rendering a different verdict.

To win here, Mr. Miles must surmount the imposing double-deference standard erected by *Strickland v. Washington*, 466 U.S. 668 (1984), and 28 U.S.C. § 2254(d). *Strickland* requires deference to trial counsel's decision making, and § 2254(d) requires deference to the state court's *Strickland* determination. Accordingly, Mr. Miles must show that: (1) trial counsel's performance was deficient, *see Strickland*, 466 U.S. at 687–88; (2) prejudice resulted from counsel's deficient performance, *see id.* at 691–92; and (3) the Maryland state court decisions rejecting his ineffective assistance of counsel claims were contrary to clearly established federal law, or resulted in a decision based on an unreasonable determination of the facts as presented in the state court proceedings, *see* § 2254(d)(1)–(2).[2] This is a heavy burden. Mr. Miles's claims have been exhausted in state court and are otherwise procedurally ripe for review here on their merits. While Mr. Miles does show that his constitutional claim was not adequately adjudicated

---

[2] In full, 28 U.S.C. § 2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

by the state courts, he has not demonstrated that he was prejudiced by his counsel's allegedly deficient performance. Therefore, his request for habeas relief will be denied.

## BACKGROUND

### I. The Facts

Mr. Miles shot and killed Mr. Atkinson with a single .22 caliber bullet to the left rear of his head on April 2, 1997. *Miles v. State*, 365 Md. 488, 502–03, 506 (2001). The basic facts of what transpired have never been in dispute. Mr. Atkinson was shopping at Small's tuxedo store at a mall called the Center at Salisbury, Maryland when he received a page. *Id.* at 499–500; (Trial Tr., Mar. 9, 1998, at 79:14–81:20, ECF No. 66-1).[3] Mr. Atkinson immediately left the mall, *Miles*, 365 Md. at 500, about five or ten minutes before 4 p.m., (Trial Tr., Mar. 9, 1998, at 81:23 – 82:5).[4] Shortly thereafter, Mr. Miles and Mr. Atkinson met at a rest stop off Route 50, just past Mardela Springs, Maryland.[5] (Trial Tr., Mar. 11, 1998, at 31:10–21, 53:2–54:9, 70:2–71:8, ECF No. 66-3). At 5:30 p.m., Harry Vaughn Hughes., Jr., a man who lived along Old Bradley Road, was taking out the trash when he saw Mr. Atkinson drive by in a Toyota Camry. *Miles*, 365 Md. at 500; (Trial Tr., Mar. 9, 1998, at 92:17–93:18, 102:19–25). Old Bradley Road is a narrow dirt road off Route 50, less than a mile from the rest stop. (*Id.* at 107:25–108:13). When Mr. Hughes saw Mr. Atkinson drive by, he was alone in the car. (*Id.* at 97:22–25). Mr. Atkinson smiled and waved at Mr. Hughes, who waved back. (*Id.* at 93:18–21). Fifteen minutes later, Mr. Hughes heard a single gunshot. (*Id.* at 93:24–94:3).

---

[3] Internal pagination to the trial transcripts does not always correspond to CM/ECF pagination. When citing to the transcripts, the court refers to the internal page numbers.

[4] The jury did not receive phone records (nor have they subsequently been introduced) listing the identity of who paged Mr. Atkinson. But Mr. Atkinson's friend Sherry Hines testified that she paged and spoke to him before he left the mall, around 4 p.m. (Trial Tr., Mar. 9, 1998, at 71:8–72:5).

[5] While the nature of the encounter is very much in dispute, the fact that Mr. Miles and Mr. Atkinson initially met at the rest stop on Route 50 is not. The location of the encounter is included in every version of events put forth at trial and post-conviction litigation.

The events that transpired after the shooting are similarly undisputed. Mr. Atkinson's body was found two days later by his brother. *Miles*, 365 Md. at 500. Mr. Atkinson's body was located over 300 feet from his car, which was parked at the mouth of a small cabled path off Old Bradley Road. (State's Trial Ex. 6, ECF No. 84-6). There were signs of a struggle, *Miles*, 365 Md. at 500, and Mr. Atkinson had sustained one gunshot wound to the back left of the head, (State's Trial Ex. 13 at 3–4, ECF No. 84-16). Mr. Atkinson's pockets had been emptied, and his wallet and keys were missing. *Miles*, 365 Md. at 500. It was later discovered that Mr. Miles had used Mr. Atkinson's credit cards to buy, among other things, gas and a diamond ring. *Miles*, 365 Md. at 500–01; (Trial Tr., Mar. 10, 1998, at 53:2–54:9, ECF No. 66-2). Other valuables, meanwhile, were left at the scene, including two strings of pearls in the center console of Mr. Atkinson's car. (Trial Tr., Mar. 12, 1998, at 63:10–14, ECF No. 66-4). Mr. Miles returned to the scene the next day to bury the body but left because the police were present. *Miles*, 365 Md. at 503.

The .22 caliber revolver Mr. Miles carried with him on the day of the murder was discovered to have been taken from James Cooper, the father of a former girlfriend of Mr. Miles with whom he has a daughter. (Trial Tr., Mar. 10, 1998, at 78:15–82:19, ECF 66-2). After the murder, Mr. Miles's wife, Ms. Jona Miles, threw the handgun and other inculpatory evidence into the Choptank River near Denton, Maryland, where it was later retrieved. *Miles*, 365 Md. at 502. Mr. Miles was arrested on April 22, 1997, and shortly thereafter issued a lengthy statement in which he admitted to killing Mr. Atkinson. *Id.* at 502–03.

While the broad strokes of what occurred are not in dispute, the nature of the encounter between Mr. Miles and Mr. Atkinson, and specifically the formation of Mr. Miles's intent to rob

Mr. Atkinson, is contested and remains central to Mr. Miles's plea for post-conviction relief. A brief background is thus in order. The defense theory at trial was generally consistent with Mr. Miles's statement that he was working on behalf of a loan shark to collect a package from Mr. Atkinson, and that he fired the gun when he became scared that Mr. Atkinson himself was reaching for something (presumably a weapon) in his suit jacket pocket. (Trial Tr., Mar. 12, 1998, at 60:18–66:18, ECF 66-4). According to this theory, Mr. Miles is guilty of second-degree murder, but not premeditated murder or felony-murder based on a preconceived specific intent to rob. (*Id.* at 67:23–68:16).[6] The state did not have a different version of events to offer the jury for how the two men ended up in the woods; the prosecution simply argued that what occurred was a robbery and a premeditated murder. (*Id.* at 44:1–55:6, 72:20–73:4).

On post-conviction, Mr. Miles advances a very different account of what occurred. As reported to Dr. Neil Howard Blumberg, Mr. Miles, severely intoxicated, stopped to use the bathroom at a rest area that served as a homosexual pick-up spot. (Dr. Blumberg Aff. ¶ 5, ECF No. 7-1). The bathroom was occupied, so he left. (*Id.*). A man from the rest area pursued Mr. Miles as he was leaving and trailed him down Route 50. (*Id.*). To lose the man, Mr. Miles turned down a narrow dirt road. (*Id.*). When he thought the man was no longer following him, Mr. Miles stepped out of the car in a wooded area to relieve himself. (*Id.*). But then the car pulled up and the man got out. (*Id.*). The man started advancing on Mr. Miles, who hid. (*Id.*). Mr. Miles then saw the man playing with his pants zipper, an act Mr. Miles thought was sexually motivated. (*Id.*). Mr. Miles felt trapped, recalling similar circumstances where he was sexually

---

[6] Not presented at trial, but set forth during post-conviction proceedings, was Mr. Miles's statement to trial counsel that admitted knowledge of the rest stop as a rendezvous for homosexual encounters, omitted the loan shark theory, and explained the events as a robbery gone bad. (Post-Conviction Hr'g Tr., June 22, 2006, 203:12–204:13, ECF No. 74-4).

abused as a boy. (*Id.*). He then used deadly force to protect himself. (*Id.* ¶ 9).[7] Afterward, he took

some of Mr. Atkinson's belongings as a mere afterthought.[8] Mr. Miles argues that knowledge of

---

[7] In full, Dr. Blumberg's report lists the following sequence of events:

> Mr. Miles reported that, on the date of the offense, he had been driving around and was drinking for hours. He stopped at a Dunkin Donuts in Seaford. He went to a park in Seaford to meet Dawn Jett, a stripper friend, but she never showed. He drove to Salisbury to look for a prostitute. He met one and he later dropped her at a house and stopped at a convenience store where he purchased more beer. He drove to a park in Salisbury by the river and sat and had a beer. He then drove on Rout [*sic*] 50 West. He had to go to the bathroom. He saw a rest area on the left side of the highway in Mardela and went into the rest area. The door to the port-a-potty was closed and Mr. Miles waited. After waiting awhile, he decided to leave. While driving from the rest area, he realized he was being pursued by another vehicle driven by a man (whom he subsequently learned was Mr. Atkinson). Mr. Miles reported that he saw Mr. Atkinson staring at him. He reported being 'freaked out' by the man. In an effort to lose the pursuing car, Mr. Miles drove down Old Bradley Road toward a wooded area. He no longer saw Mr. Atkinson's car. Mr. Miles exited his vehicle to go to the bathroom in the woods, when he saw the other car pull next to his. It was the same car that had been following him. Mr. Miles hid behind a tree. He thought at first that Mr. Atkinson did not see him. Mr. Miles related that Mr. Atkinson began walking into the woods and started coming towards him. Mr. Atkinson had his hand on his zipper, 'it seemed like he was playing with his zipper'. [*sic*] Mr. Miles reported 'freaking out'. [*sic*] Mr. Atkinson continued to walk toward him, tugging at his zipper. Mr. Miles thought Mr. Atkinson's actions were sexually motivated. He felt afraid, trapped, and cornered. He was unfamiliar with this wooded area. Mr. Miles reported that when he was younger, when Mr. Stevenson was in the area, he would escape into the woods. He also ran into the woods to escape from his mother. He was very familiar with the wooded area and could easily escape from his mother and Mr. Stevenson. However, Mr. Miles felt unsafe and trapped in the unfamiliar wooded area where Mr. Atkinson was pursuing him.

(Dr. Blumberg Aff. ¶ 5, ECF No. 7-1). Dr. Blumberg then concluded:

> It is my opinion to a reasonable degree of medical certainty that, as a result of the previous years of significant sexual abuse by Mr. Stevenson, coupled with other significant emotional and physical abuse by his mother and her numerous boyfriends and husbands, Mr. Miles suffered from Posttraumatic Stress Disorder at the time of the offense. Mr. Miles experienced intense psychological distress when he was exposed to Mr. Atkinson advancing toward him in a homosexually aggressive manner. He experienced intense fear, helplessness and horror as Mr. Atkinson's sexually predatory behavior directly resembled the sexual abuse that he was subjected to as a child and adolescent. Mr. Miles felt emotionally overwhelmed. Mr. Atkinson's behavior prior to his death acutely exacerbated Mr. Miles' Posttraumatic Stress Disorder and led Mr. Miles to hold the subjective belief that his life, safety, and physical integrity were imminently endangered. Mr. Miles' overwhelming anxiety and panic in response to Mr. Atkinson's behavior severely distorted his ability to think and perceive events in a rational manner. Truly thinking that his life was imminently in danger, Mr. Miles believed that he needed to use deadly force to defend and protect himself. The acute exacerbation of his Posttraumatic Stress Disorder substantially impaired his thinking and behavioral controls and led Mr. Miles to hold the subjective belief that his use of deadly force was the only means by which he could defend and protect himself.

(*Id.* ¶ 9).

his history of sexual abuse would have given trial counsel sufficient means to contest the robbery narrative and defeat a finding of the specific intent to rob. (Third Amended Petition for Writ of Habeas Corpus ("Third Am. Pet.") at 2–3, ECF No. 65).

## II.   Procedural History

On May 9, 1997, Mr. Miles was indicted in the Circuit Court for Wicomico County, Maryland, where the shooting took place, on homicide, robbery, and related charges. (Third Am. Pet. at 4). The state filed a Notice of Intention to Seek the Death Penalty on July 29, 1997. (*Id.*). Thereafter, the case was removed to the Circuit Court for Queen Anne's County. (*Id.*). The case went to trial and remained a death penalty case. On March 9, 1998, a jury acquitted Mr. Miles of first-degree premeditated murder, but convicted him of felony murder, robbery with a deadly weapon, and other lesser included offenses. (*Id.*). A capital sentencing hearing was held the following week, and Mr. Miles was sentenced to death. (*Id.*). He filed motions for a new trial and a new sentencing hearing with the trial court, but they were denied. (*Id.* at 5).

Then came his direct appeal. Mr. Miles timely appealed his convictions to the Court of Appeals of Maryland. They were affirmed, albeit in a 4-3 decision. (*Id.* at 5).[9] Mr. Miles then filed a petition for writ of certiorari to the United States Supreme Court from the direct appeal, but it was denied. (*Id.*).

Mr. Miles's quest for habeas relief began in the Circuit Court for Queen Anne's County, where he filed a petition for post-conviction relief on September 19, 2002. (*Id.*). The Circuit Court held a hearing in 2006 and proceeded to deny Mr. Miles's claims for relief in full. (*Id.*;

---

[8] As explored below, this version does not explain why Mr. Miles had taken a gun with him that day or why Mr. Atkinson was shot in the back of the head.

[9] The dissent focused on what they believed to be the admission of evidence tainted by an illegal wiretap. *Miles,* 365 Md. at 573–74 (Raker, J., dissenting).

Aug. 21, 2006, Mem. Op. and Order, ECF 2-1). Mr. Miles filed an Application for Leave to Appeal from the Denial of Post-Conviction Relief, which the Court of Appeals of Maryland summarily denied in 2007. (Third Am. Pet. at 6, ECF No. 65; Mar. 13, 2007, Ord., ECF 2-2). Mr. Miles then filed his second petition for writ of certiorari with the United States Supreme Court—this time from his state habeas denial—which also was denied. (Third Am. Pet. at 6, ECF No. 65).

Mr. Miles filed his first federal habeas petition in this court on August 13, 2007. (Pet. for Writ of Habeas Corpus, ECF No. 1). On March 2, 2008, Judge Andre Davis stayed proceedings on this petition to allow Mr. Miles to pursue and exhaust state court remedies. (Third Am. Pet. at 6, ECF No. 65). Mr. Miles did so.

Back in state court, Mr. Miles raised, for the first time, facts pertaining to sexual assault, claiming that his trial counsel was ineffective for its failure to investigate, discover, and present such evidence. (*Id.* at 7). But Mr. Miles's motion to reopen proceedings in the Circuit Court for Queen Anne's County was denied, as was his appeal from that denial. (*Id.* at 7–8). Mr. Miles also filed multiple motions to correct his allegedly illegal sentence, challenging Maryland's death penalty statute. (*Id.* at 8). These too were denied. (*Id.*). In 2012, Mr. Miles filed a second motion to reopen in the Circuit Court for Queen Anne's County based on additional evidence of sexual abuse. (*Id.*). It was denied, as was Mr. Miles's application for leave to appeal. (*Id.*). In 2015, he filed a third and final motion to reopen, which also was denied. (*Id.*).

Mr. Miles's claim that his trial counsel was ineffective for his failure to uncover and present his mental health history and history of sexual abuse is now before this court. He contends that, because the Maryland courts have denied this claim, it has been properly

8

exhausted. (*Id.*). The state does not argue that Mr. Miles's present habeas petition should be dismissed for failure to exhaust. (Answer to Pet. for Writ of Habeas Corpus ("Answer") at 20,[10] ECF No. 74). Mr. Miles has amended his federal habeas petition since its original filing with permission of this court. His third amended petition is the most recent version.[11]

Procedurally, therefore, Mr. Miles's third amended federal habeas petition—which contains a single claim for ineffective assistance of counsel at the guilt-innocence phase of his capital trial—is ripe for review here. He filed his first § 2254 petition within the one-year deadline imposed by 28 U.S.C. § 2244(d). Mr. Miles now asks this court to vacate his felony murder conviction pursuant to § 2254.[12]

## ANALYSIS

### I.    Standard of Review

Under the operative statutory regime, promulgated in the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal district court will only entertain a state prisoner's application for a writ of habeas corpus if he or she is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Before any such review may take place, the petitioner must exhaust all state court remedies, meaning that all claims must be first presented before available state tribunals. 28 U.S.C. § 2254(b); *Jones v.*

---

[10] The court refers to internal page numbers, rather than the CM/ECF page numbers (which do not correspond), when citing to the Answer.

[11] Separately, Mr. Miles continued to challenge Governor O'Malley's commutation of his death sentence to life without parole, arguing that the state legislation that abolished the death penalty unconstitutionally curtailed the executive's prerogative to impose a revised sentence less than life without parole. The Court of Special Appeals of Maryland rejected his argument on the merits, *see Miles v. Hogan*, No. C–02–CV–15–002710, 2018 WL 871525, at *1 (Md. Ct. Spec. App. Feb. 12, 2018), and the Circuit Court for Anne Arundel County entered a declaratory judgment to that effect.

[12] While this was not an evidentiary proceeding, the court heard oral argument and later requested that the parties submit a transcript of Mr. Miles's statement that was audio recorded by the police and played before the jury. Additionally, the court asked for and received additional exhibits that were introduced at trial. (R. Suppls., ECF Nos. 82–87). These documents illustrated certain aspects of the testimony already in the record but did not add any new facts.

*Sussex I State Prison*, 591 F.3d 707, 712–13 (4th Cir. 2010). If the state court issues a ruling on

the merits on a claim for post-conviction relief, § 2254(d) governs the federal inquiry. *Byram v.*

*Ozmint*, 339 F.3d 203, 206 (4th Cir. 2003). § 2254(d) specifies:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to
> the judgment of a State court shall not be granted with respect to any claim that was
> adjudicated on the merits in State court proceedings unless the adjudication of the
> claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme Court
> of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts
> in light of the evidence presented in the State court proceeding.

§ 2254(d). Federal review is limited to the law and facts as they were at the time of the state

court merits decision. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003); *Cullen v. Pinholster*, 563 U.S.

170, 181–82 (2011).

Two avenues to relief exist under § 2254(d)(1). First, relief may be warranted if the

petitioner can show that the state post-conviction decision is "contrary to" Supreme Court

precedent. This occurs when "the state court applied a rule that contradicts the governing law set

forth in Supreme Court cases, or confronted a set of facts that are materially indistinguishable

from a Supreme Court decision and nevertheless arrived at a result different from that

precedent." *Williams v. Stirling*, 914 F.3d 302, 311–12 (4th Cir. 2019) (quoting *Williams v.*

*Taylor*, 529 U.S. 362, 405–06 (2000) (internal quotation and alteration marks omitted). Second,

habeas relief is due where the state decision constitutes an "unreasonable application" of

Supreme Court precedent. A state court unreasonably applies Supreme Court precedent in a post-

conviction merits decision when it "correctly identifies the governing legal rule but applies it

unreasonably to the facts of a particular prisoner's case." *Taylor*, 529 U.S. at 407–08.[13] "In order for a federal court to find a state court's application of [Supreme Court] precedent unreasonable, the state court's decision must have been more than incorrect or erroneous. The state court's application must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520–21 (internal citation and quotation marks omitted).

Section 2254(d)(2) provides a third avenue for a state prisoner to seek habeas relief in federal court under the AEDPA regime. A petitioner may be entitled to habeas relief in federal district court if the state post-conviction decision was based on a factual determination "sufficiently against the weight of the evidence that it is objectively unreasonable." *Winston v. Kelly*, 592 F.3d 535, 554 (4th Cir. 2010); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)."To secure habeas relief, the petitioner must demonstrate that a state court's [factual] finding . . . was incorrect by clear and convincing evidence, 28 U.S.C. § 2254(e)(1), *and* that [it] was 'objectively unreasonable' in light of the record before the court." *Winston*, 592 F.3d at 555. Here, because the parties agree that Mr. Miles's claims are properly exhausted, (Answer at 21, ECF No. 74), and are not otherwise procedurally barred, this court's role is to review the state court's merits decision under the § 2254 rubric.

Mr. Miles asks this court to review the state court's merits adjudication of his guilt-phase ineffective assistance of counsel claim. Criminal defendants have a constitutional right under the Sixth Amendment to effective assistance of counsel. *Gideon v. Wainwright*, 372 U.S. 335, 344–45 (1963). Any person challenging his or her sentence on ineffective assistance of counsel grounds must meet the two-prong test announced in *Strickland v. Washington*, 466 U.S. 668

---

[13] While the rule or standard must have been established by the Supreme Court, its application by lower courts may be relevant in assessing the reasonableness of a state court's decision. *See Williams v. Thurmer*, 561 F.3d 740, 745 (7th Cir. 2009); *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007).

(1984). First, "a petitioner must show that counsel's performance was deficient" by showing that the quality of representation "fell below an objective standard of reasonableness." *Id.* at 687–88. As discussed below, both the Supreme Court and the Fourth Circuit have considered, at length, how this standard applies to assertions that trial counsel failed to adequately investigate. First, trial counsel has a duty to conduct reasonable investigations or to reasonably decide that certain investigations are unnecessary. *Id.* at 691. Second, the petitioner must show that counsel's deficient performance led to prejudice; that, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also Elmore v. Ozmint*, 661 F.3d 784, 869–70 (4th Cir. 2011). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding." *Harrington v. Richter*, 562 U.S. 86, 104 (2011). While a "show[ing] that counsel's actions more likely than not altered the outcome" is not required, *Strickland*, 466 U.S. at 693, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112. In applying *Strickland*, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697; *see also Rodriguez v. Bush*, 842 F.3d 343, 346 (4th Cir. 2016). As explained below, Mr. Miles has failed to show that he was prejudiced by his trial counsel's allegedly deficient performance. Accordingly, his present habeas petition can be resolved on *Strickland*'s prejudice prong alone.

## II.    Discussion

The first step in any federal habeas case under AEDPA's § 2254 regime is to review the state habeas court's ruling on the claims presented. As discussed, the federal court must identify the rule applied by the state court and assess the reasonableness of its application, giving the state court's rationale proper deference. *See Stirling*, 914 F.3d at 311–12. As the Supreme Court recently explained in *Wilson v. Sellers*, "[d]eciding whether a state court's decision involved an unreasonable application of federal law or was based on an unreasonable determination of fact requires the federal habeas court to train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims . . . and to give appropriate deference to that decision." 138 S. Ct. 1188, 1191–92 (2018) (internal citations and quotation marks omitted). The *Sellers* Court described a federal habeas court's task under § 2254(d) as

> straightforward . . . when the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion. In that case, a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable. We have affirmed this approach time and again.

*Id.* at 1192 (string citation omitted).[14] The Court then explained that a more "difficult" case "concerns how a federal habeas court is to find the state court's reasons when the relevant state-

---

[14] The *Sellers* court clarified that the *Harrington v. Richter* framework for ascertaining hypothetical grounds supporting a state court's summary decision pertains only to cases in which there has never been a reasoned decision by the state court on the merits of the federal claim. The Court explained: "Had we intended *Richter*'s 'could have supported' framework to apply even where there is a reasoned decision by a lower state court, our opinion in *Premo* [decided the same day as *Harrington v. Richter*] would have looked very different. We did not even cite the reviewing state court's summary affirmance. Instead, we focused exclusively on the actual reasons given by the lower state court, and we deferred to those reasons under AEDPA." *Sellers*, 138 S. Ct. at 1195–96 (citing *Premo v. Moore*, 562 U.S. 115, 132 (2011)). Where, as here, the state court did provide its reasons for denying a habeas petition, the proper threshold inquiry is whether the state court's reasons were reasonable. If they were not, the court does not ask whether other reasons could have supported the state court's decision and then defer to those reasons, it instead proceeds to review the petitioner's claim *de novo*, without the layer of deference to state courts imposed by AEDPA. *See, e.g., Stirling*, 914 F.3d at 312–14 (performing both the *de novo* and § 2254 inquiries as dual necessary predicates for federal habeas relief). In the ineffective assistance of counsel under *Strickland* context, however, the court still defers to strategic decisions made by trial counsel. *Strickland*, 466 U.S. at 688.

court decision on the merits. . . does not come accompanied with those reasons. For instance, the decision may consist of a one-word order, such as 'affirmed' or 'denied.' What then is the federal habeas court to do?" *Id.* To resolve this difficulty, the *Sellers* Court held that:

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

*Id.*

Mr. Miles's case involves a single guilt-phase ineffective assistance of counsel claim on federal review, decided by the Circuit Court for Queen Anne's County. The decision was appealed in the form of a request for leave to appeal from a denial of a petition for post-conviction relief and was summarily denied by the Maryland Court of Special Appeals on September 27, 2016. (Den. of Appl. for Leave to Appeal, ECF No. 63-1). Thus, the Circuit Court's denial of Mr. Miles's third motion to reopen post-conviction proceedings is the last reasoned opinion on the merits of the constitutional claim that is challenged in the presently pending petition for habeas relief. (Mem. and Order, Oct. 1, 2015, ("Circuit Court merits decision"), ECF No. 66-5). Under the *Sellers* "look through" doctrine, the Circuit Court merits decision is thus the decision subject to § 2254(d) review. *See Sellers*, 138 S. Ct. at 1192; *Grueninger v. Virginia*, 813 F.3d 517, 525 (4th Cir. 2016). The Circuit Court merits decision does not cite to federal law, but appears to deny the claim on both *performance* and prejudice grounds, as tracked using italics and underlining below.

14

The Circuit Court merits decision reads as follows:

Miles claims that newly discovered evidence shows that he was suffering from post-traumatic stress disorder at the time of the shooting. He further claims that the intent for the shooting was rooted in his post-traumatic stress rather than robbery. It follows, he suggests, that because he had no intent to rob the victim, he could not have committed felony murder. Surely, however, the jury could infer that Miles' intent was robbery since he actually robbed the victim. Further, his own claims that he met the victim in an attempt to settle a debt for a third-party "loan shark" supports this inference. Although Miles now claims the intent to rob was formulated after the shooting, a reasonable jury could, and clearly would, conclude otherwise.

*Miles further claims that trial counsel erred in not probing his true motive in the shooting, most specifically by failing to identify his post-traumatic stress disorder ("PTSD") prior to trial. He contends that his PTSD, brought on by adolescent sexual abuse in wooded areas, caused him to feel trapped and in fear for his life, leading him to act in what he perceived as self-defense. Despite multiple opportunities, Miles never divulged the information regarding his PTSD until 2007. Specifically, he asserts that trial counsel failed to have a meaningful psychological evaluation done prior to trial, instead relying on one three hour interview.* He claims prejudice in that this trial counsel failure deprived the jury of the context of the crime, i.e. the victim's pursuit of Miles in hopes of a homosexual encounter. Miles suggests that the victim's actions triggered Miles' PTSD.

*Miles admits that the sexuality of the victim was discussed at trial, specifically pointing to the following comments of trial counsel.*

> ...we ask some difficult questions during the course of this, and I don't want you to misunderstand in any way. We ask question [*sic*] about the financial status of Mr. Atkinson, about sexual orientations. Nothing was asked was meant to [imply] that anyone, based on anything like that, had any right to hurt him . . .

*The above surely demonstrates that trial counsel was aware of and focused on the victim's sexuality. Miles' claim that newly produced evidence shows counsel's failure to further pursue this line of reasoning has previously been addressed and has no merit.* No relief will be afforded Miles, as none is due. This issue has been thoroughly reviewed and denied.

(Circuit Court merits decision, ECF No. 66-5).

15

The parties agree that the Circuit Court merits decision is the relevant state court decision under which to assess the claim now before this court. (Memo. of Law in Support of Third Am. Pet. ("Third Am. Pet. Memo.") at 9 n.2, ECF No. 66; Answer at 23–26, ECF No. 74). But the parties disagree about whether the Circuit Court merits decision meets the standard for relief under § 2254(d) and, if so, whether Mr. Miles is otherwise entitled to relief on *de novo* review.

Because the two-pronged *Strickland* test can occur in either order, and because the prejudice inquiry is ultimately dispositive, that is where the court begins. The first step in the prejudice analysis imposed by *Strickland* and § 2254(d) is to assess whether the state court's decision on the prejudice prong was contrary to, or involved an unreasonable application of, law or an unreasonable determination of the facts. § 2254(d)(1)–(2); *Stirling*, 914 F.3d at 311–12. In reaching its holding, the state court appears to have asked whether the jury "could have" decided the guilt-phase the way it did. (Circuit Court merits decision at 1, ECF No. 66-5). "The jury *could* infer," it reasoned, that there was a robbery because of the facts of the crime and Mr. Miles's statements. *Id.* If this indeed were the rule the state court applied, its holding on the prejudice prong of *Strickland* would be contrary to Supreme Court precedent because it applied "a rule that contradicts the governing law set forth" in Supreme Court cases. *See Taylor*, 529 U.S. at 405–06. *Strickland* requires a reviewing court to ask whether there is a reasonable likelihood that the result *would* have been different. But while the bulk of its reasoning is written in the conditional tense, the state court does say, presumably under the same reasoning, that a jury "clearly would" not change its decision had the proffered evidence of Mr. Miles's PTSD been presented. Assuming then that the state court rendered its prejudice holding on exclusively

16

"would have," as opposed to "could have" grounds, the state court correctly applied Supreme Court precedent.

Separately, however, it appears that the state court's reasoning was objectively unreasonable in light of the facts presented to it because of clear and convincing evidence to the contrary, *see* § 2254(d)(2)–(e)(1); *Winston*, 592 F.3d at 555, and was based on an unreasonable application of Supreme Court precedent, *see* § 2254(d)(1). The state court did not explicitly consider how the presentation of the encounter as a sexual interaction, supported by Mr. Miles's relevant life history and psychological evidence and linking the relevance of elicited evidence about the victim's sexuality, would have altered the jury's decision. Yet this is precisely the "reweigh[ing] of the totality of the . . . evidence" required. *See Stirling*, 914 F.3d at 319 (holding that the state post-conviction court unreasonably applied clearly established law when it "fail[ed] to reweigh the totality of the . . . evidence in [the] specific case" at hand). The assertion that a robbery was intended was challenged on state post-conviction by the proffered evidence of a sexual encounter, which would have supported counsel's argument to the jury that the robbery was an afterthought. *Strickland* required the state court to ask whether, upon hearing this new evidence, which Mr. Miles asserted would have provided a different backstory for how the two men ended up together in the woods, there was a reasonable likelihood that the jury would not have convicted Mr. Miles of felony murder based on robbery. But the state court never directly reached this question, instead concluding that trial counsel "focused on" the victim's sexuality in its closing argument. (Circuit Court merits decision at 2, ECF No. 66-5). In reality, trial counsel mentioned Mr. Atkinson's sexuality once, for the needless proposition that "no one had any right to hurt him"—a comment that seemed to insinuate a greater significance. (*Id.*). And yet, what such significance may have been was conspicuously missing from the balance of trial counsel's

17

argument. The impact of this statement, if it had one, would have been to add a salient fact of unexplained relevance to the jury. The state court's decision on the prejudice prong, if not contrary to Supreme Court precedent, involved an unreasonable application of Supreme Court precedent to the extent that it (1) failed to reweigh the totality of the evidence, and (2) involved an unreasonable determination of fact, at least to the extent that it concluded that trial counsel focused on the victim's sexuality, a factual determination belied by clear and convincing evidence to the contrary. Mr. Miles is therefore entitled to *de novo* review of *Strickland*'s prejudice prong.

When the court reweighs the totality of the evidence on *de novo* review, however, it cannot say that Mr. Miles has shown a reasonable likelihood that the result of his guilt-phase trial would have been different but for his trial counsel's failure to uncover the legacy of sexual abuse he suffered and his PTSD. *Strickland*, 466 U.S. at 694. Myriad facts compel this conclusion. Mr. Miles's current contention—what he now says his trial counsel should have told the jury—is that the events of April 2, 1997 proceeded as follows: Mr. Atkinson followed Mr. Miles from the rest stop on Route 50; moments later, Mr. Miles turned down a narrow dirt road and then got out of the car to relieve himself; Mr. Miles then shot Mr. Atkinson when he pursued Mr. Miles into the woods. Mr. Miles says that what occurred was the result of an acute fear or panic response, informed by his past, that distorted his ability to perceive events rationally. (Dr. Blumberg Aff. ¶¶ 8, ECF No. 7-1). Yet this version of events is plainly belied by uncontradicted evidence. To begin, Mr. Miles and Mr. Atkinson were back in the woods together for close to fifteen minutes before Mr. Miles pulled the trigger. (Trial Tr., Mar. 9, 1998, at 93:24–94:3). This fact diametrically contradicts the version of events Mr. Miles says trial counsel should have told the

18

jury. Worse yet, whatever the reason for this encounter, the jury heard overwhelming evidence

that Mr. Miles planned it. There was no evidence in the record that Mr. Miles regularly carried a

gun; instead, the jury heard uncontroverted evidence that he stole James Cooper's .22 revolver

from his locked bedroom closet in the leadup to the shooting, and that this was the same .22 the

police retrieved from the Choptank River. (Trial Tr., Mar. 10, 1998, at 78:15–82:19, ECF 66-2).

Perhaps most damning of all, Mr. Miles shot Mr. Atkinson in the back of the head with what

was, if not a contact wound, a very close shot. The placement of the bullet and the fact that the

shot occurred over a hundred feet from any sign of struggle conveyed to the jury that, at least by

the end of this encounter, Mr. Atkinson was being held at gunpoint and under threat for more

than the final fleeting second. Even if the jury had reason to doubt the surrounding narrative of

Mr. Miles's initial confession, with its large cast of possibly apocryphal characters, the fact that

he shot Mr. Atkinson in the back of the head is entirely consistent with what he told the police: "I

was standing right behind him . . . That's when he got shot." (Police Interview at 19–20, ECF 82-

1).[15] Mr. Miles's newly proffered narrative of a sudden, unexpected approach by Mr. Atkinson,

causing overwhelming fear and a gunshot in perceived self-defense, simply does not fit.

 In the end, evidence of Mr. Miles's life history and mental illness would not have

provided the jury with an alternative explanation for why these two men were in the woods that

day. It is not as if Mr. Miles now tells the court that this was a consensual sexual encounter he

tried to cover up, or offers any other explanation that could account for the time, the planning,

and the physical evidence of how the shooting transpired. Even if Mr. Miles's current version

was presented to the jury, robbery would still be the only plausible explanation for what

transpired. It is what Mr. Miles told the police and what the jury heard Mr. Miles recount on the

---

[15] And Mr. Miles's second version of events, as told to trial counsel before trial, also included an intent to rob.

taped confession. While it is true that the fact Mr. Miles took Mr. Atkinson's belongings does not *necessitate* the conclusion that Mr. Miles formed *ex ante* the specific intent to rob, the following facts *do* support an intent to rob: (1) Mr. Miles confessed to holding Mr. Atkinson at gunpoint so that he would turn over some physical item; (2) all the physical evidence before the jury was consistent with this admission, and (3) the next morning, Mr. Miles bought his wife a diamond ring on Mr. Atkinson's credit card. Mr. Miles offers no evidence, apart from the improbable account of a sudden surprise, for why his decision to take Mr. Atkinson's belongings was a mere afterthought. There is nothing persuasive that "alters the entire evidentiary picture," *Elmore*, 661 F.3d at 871, and that would alter the inferences the jury would draw from the rest of the evidence. *Strickland*, 466 U.S. at 695–96. When the totality of the evidence is reweighed, Mr. Miles has not shown a reasonable probability of a different result at the guilt phase of his trial.[16]

## III.   Certificate of Appealability

A certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); *Buck v. Davis*, 137 S. Ct. 759, 772–73 (2017). The petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (internal citation and quotation marks omitted), or that "the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327. Because this court finds that there has been no substantial showing of the denial of a constitutional right, a certificate of appealability will be denied. *See* § 2253(c)(2). Mr. Miles may nonetheless request that the United States Court of Appeals for the Fourth Circuit issue such a

---

[16] Further, none of Mr. Miles's "equitable considerations" provide a basis for relief.

certificate. *See Lyons v. Lee*, 316 F.3d 528, 532 (4th Cir. 2003) (considering whether to grant a certificate of appealability after the district court declined to issue one).

## CONCLUSION

For the foregoing reasons, Mr. Miles's pending petition for habeas relief will be denied.

A separate order follows.

___10/17/19___
Date

_____
Catherine C. Blake
United States District Judge