```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
 2                      NORTHERN DIVISION

 3    _____ )
      JODY LEE MILES,                 )
 4            Petitioner              )
         v.                           ) Civil Docket No. CCB-07-2135
 5                                    )
      SIMON WAINWRIGHT, et al.,       )
 6            Respondents             )
      _____ )
 7                                           Baltimore, Maryland
                                             March 9, 2018
 8                                           2:32 PM to 3:20 PM

 9             THE ABOVE-ENTITLED MATTER CAME ON FOR
                         MOTIONS HEARING
10            BEFORE THE HONORABLE CATHERINE C. BLAKE

11                    A P P E A R A N C E S

12    On behalf of the Plaintiff:

13          Robert W. Biddle, Esquire
            Erika S. Alsid, Esquire
14
      On behalf of the Defendants:
15
            Ryan R. Dietrich, Esquire
16          Edward Kelley, Esquire

17

18

19

20

21        Proceedings recorded by mechanical stenography,
      transcript produced by computer.
22    _____

23              MARTIN J. GIORDANO, RMR, CRR, FOCR
                 U.S. Courthouse, Fourth Floor
24                 101 West Lombard Street
                   Baltimore, Maryland 21201
25                      410-962-4504
```

<u>**PROCEEDINGS OF MARCH 9, 2018**</u>

1

2    **THE CLERK:**  All rise.  This Honorable Court now

3    resumes in session, The Honorable Catherine C. Blake presiding.

4    **THE COURT:**  Good afternoon.  You can all be seated.

5    **THE CLERK:**  The matter now pending before this Court

6    is Civil Docket Number CCB-07-2135, *Jody Lee Miles versus*

7    *Simon Wainwright*.

8    Counsel for the Petitioner, Robert W. Biddle and

9    Erika S. Alsid.

10    Counsel for the Respondent, Ryan R. Dietrich and

11    Edward Kelley.

12    This matter now comes before the Court for the

13    purpose of oral argument.

14    **THE COURT:**  All right.  Good afternoon again.  We are

15    indeed here for oral argument.  I believe we are here on the

16    third amended petition for writ of *habeas corpus*.  I was

17    pleased to gather from all of this that I think we don't have

18    any issue about exhaustion.  We don't have any procedural

19    default.  We have the ineffective assistance of counsel

20    argument, and not that that is not a complex issue, but I don't

21    have any sanguinary laws or anything of that nature.  And it is

22    also obvious from the briefing that this is not simply a

23    mitigation issue anymore; this is an actual innocence claim as

24    to felony murder.

25    And I'm happy to hear what you all would like to say

1    in addition to what's in your papers, point me to specific

2    parts of the papers or the records that you want me to focus

3    on.  I'm generally familiar with it, and I've certainly read

4    all the memoranda.  I may not have completely digested all the

5    exhibits, but I'm happy to hear your theory, starting with

6    counsel for Mr. Miles.

7            **MR. BIDDLE:**  Thank you very much, Your Honor.

8    Robert Biddle, Nathans and Biddle.

9            So, Your Honor, with the Court's permission, we'd

10   like to split our argument as follows:  Twenty minutes

11   initially, and then rebuttal, ten minutes, at the end.

12           **THE COURT:**  That would be fine.

13           **MR. BIDDLE:**  And, of those 20 minutes, approximately

14   about 15, my co-counsel, Erika Alsid, will address the

15   underlying facts.

16           **THE COURT:**  Okay.

17           **MR. BIDDLE:**  And that really goes to the issue of why

18   it matters that the jury at trial didn't hear that Mr. Miles

19   had been a victim of child abuse and what impact that had on

20   the verdict and the evolution of the proceedings.

21           I'll then spend a few minutes on the next step of the

22   analysis, which is the AEDPA § 2254 analysis, the

23   unreasonableness of a State Court's rejection of the claims,

24   and then that will be --

25           **THE COURT:**  Okay.

1        **MR. BIDDLE:**  -- Ms. Alsid.

2        **MS. ALSID:**  Thank you.

3        Good afternoon, Your Honor.

4        **THE COURT:**  Good afternoon.

5        **MS. ALSID:**  In Mr. Miles' case, there were a number

6    of red flags, signals, smoke warnings for defense counsel, for

7    his trial counsel.  And I want to go through with you some of

8    those and why they are so important for the Court's

9    consideration.

10        What everyone knew is that this incident occurred in

11    the woods in Southern Maryland, that it started at a rest stop

12    area.  What defense counsel knew was that Mr. Miles had offered

13    a completely nonsensical story about a fictitious loan shark

14    named Morrison, and defense counsel did initiate an

15    investigator, and they were able to come up with no evidence,

16    no witnesses in support of this story.

17        So defense counsel is sitting there thinking, "What

18    happened?"  Right?  We know that he wasn't going because of

19    some fictitious loan shark named Morrison, and what was going

20    on here?  And, when you go through all of the exhibits and

21    everything that we've attached, we're trying to kind of drill

22    down for you what those things were, those red flags that

23    defense counsel was aware of.

24        The first is that they were aware of the fact that

25    the rest stop that Mr. Miles and Mr. Atkinson first encountered

1     each other, that that rest stop was known by the police to be a

2     meeting spot for homosexual men.  In fact, defense counsel, in

3     the guilt/innocence phase of the case, called Corporal Benton

4     for the sole purpose of asking him that question.  The jury, of

5     course, was left to understand and try to figure out what in

6     the world that had to do with anything, right?

7          Also within the file available to trial counsel were

8     all of the investigations done by the police, and the police

9     interviewed many of Mr. Atkinson's friends.  It came to be that

10    his family did not know that he was homosexual, but his friends

11    were very well aware of this fact.

12          Through those interviews, a witness, Julia Clark

13    Timmons, was interviewed.  She advised that Mr. Atkinson lived

14    a double life, and his family did not know that he was

15    homosexual.  She described his sex life as extremely

16    promiscuous, and stated that he was a pathological liar.  She

17    reported that she lived in an area in Salisbury where she used

18    to see him cruising between 4:00 and 6:00 p.m. in an area that

19    was known to be frequented by homosexuals.  She was not called

20    as a witness at trial.

21          Adam Christopher Westhoff was also interviewed by

22    police.  He reported something similar, that Mr. Atkinson had

23    advised him of several gay bars that he visited in Rehoboth,

24    Delaware.

25          Lisa Moore Robbins was interviewed by State Police as

1    well.  She advised that Mr. Atkinson was her best friend until

2    six years prior, when they had a falling out because he thought

3    that she told someone that he was gay.

4           Sherri Trader Hynes also gave information in this

5    regard.  When called by defense counsel in the guilt/innocence

6    phase, the sole question really posed to her was:  Did

7    Mr. Atkinson owe people money sometimes, the gist?  That was

8    it.

9           So you have defense counsel knowing that this

10   fictitious loan shark makes no sense, and presenting no

11   evidence of it because they could find no evidence and it made

12   no sense, but asking -- calling one witness -- one fact witness

13   to the stand to testify that Mr. Atkinson sometimes owed people

14   money, and calling Corporal Benton to the stand to say that the

15   rest area was a place for homosexuals to meet.  And what would

16   happen is they would meet there, and then they would drive off

17   to another area.  So the act was not actually occurring at this

18   rest stop, but it was the meeting location.

19          The other thing that defense counsel knew and

20   admitted was that they went willingly -- Mr. Atkinson and

21   Mr. Miles went willingly to the location believing that

22   something was going to occur.  Mr. Saunders said at trial:  We

23   know that Mr. Atkinson went there voluntarily, and so, at this

24   point, we know he went there for himself and for whatever

25   reason, and he met Mr. Miles.  No force or violence.

1          We also know that Mr. Miles had no prior violent

2    criminal history.  We also know that Mr. Miles was known to be

3    hyperactively heterosexual, something I've learned through the

4    course of this case, and something that Dr. Blumberg has

5    advised in the pleadings before this Court that happens with

6    individuals who have been sexually abused as a child.  If it

7    happens in an instance like Mr. Miles, that they tend to become

8    hyper-heterosexual because they believe that people see them

9    and see what happened to them.

10          And this was in evidence presented before the Court.

11    In fact, at the sentencing phase, there was evidence that there

12    were two places Mr. Miles went after things if he wanted it.

13    This was either alcohol or a relationship with women, and that

14    was the final thing that was readily known, which is that

15    Mr. Miles had a problem with alcoholism since the time he was

16    about 14 years old.  It, of course, was not known why he had

17    this problem, other than attributed generally to somewhat of a

18    difficult upbringing.

19          Then we have Dr. Bellow.  Dr. Bellow is asked by

20    defense counsel to come in and interview Mr. Miles.

21          **THE COURT:**  Right.

22          **MS. ALSID:**  She does this one time.  That is it.  She

23    administers the MMPI, but she does not administer the Trauma

24    Symptom Inventory.

25          Dr. Blumberg, by way of his affidavit, advises that,

1     at the time of Mr. Miles' trial, the TSI was the only specific

2     test to assess the impact of trauma, and that, when Dr. Bellow

3     knew that there were these other instances of a difficult

4     upbringing, of physical abuse by his mom, that she should have

5     had administered that test.

6          The second thing he said was that's so important is

7     that, in any capital case, the mental health professional

8     should not be meeting with the defendant one time, but

9     particularly in an instance where we have a victim of childhood

10    sexual abuse.  And what he said is that, the TSI, what it does

11    is it allows a victim to identify factors that relate to the

12    abuse without actually coming out and saying, "I was abused."

13         Dr. Blumberg says as well that it is common knowledge

14    that individuals who are victims of abuse do not come forward

15    in a one-time meeting and disclose something that they have not

16    disclosed for 15 or 20 years.

17         Dr. Bellow had no training in clinical psychology.

18    She had no formal training in forensic psychology.

19         And Mr. Saunders, lead trial counsel, admitted in his

20    affidavit that is before this Court that more should have been

21    done, that she should have done another interview.  He should

22    have requested that she do that, and it was not done.

23         Now, what happened when Dr. Blumberg got involved is

24    that he met with Mr. Miles multiple times.  He administered the

25    TSI.  He also had before him all kinds of information that

1    Dr. Bellow did not have but was available at the time of trial.

2         And what does Dr. Blumberg discover?  He discovers,

3    in working with Mr. Miles, a history of horrendous childhood

4    abuse at the hands of a man by the name of Charlie Stevenson.

5         That abuse, we're not going to get into, because we

6    don't believe there is even any dispute about the fact that it

7    occurred.  Quite an investigation was done in order to prove

8    that that abuse had occurred, because Mr. Stevenson is no

9    longer here with us.

10         **THE COURT:**  Right.

11         **MS. ALSID:**  Dr. Blumberg, in doing his proper

12    evaluation, determined that not only would this information

13    have been critical to mitigation, but, in fact, that there was

14    self-defense.  As he continued talking to Mr. Miles, what he

15    came to realize is that Mr. Stevenson had abused Mr. Miles in

16    the woods by their apartment in Delaware, and this was violent.

17         And what happened with Mr. Atkinson occurs in the

18    woods in a form of some form of homosexual liaison, and

19    Mr. Miles, who Dr. Blumberg diagnosed with PTSD and says

20    Dr. Bellow should have diagnosed with PTSD, says that he has an

21    absolute post-traumatic stress moment in the woods, where he

22    panics.  He goes right back to the abuse by Mr. Stevenson.

23         The jury in this case, even with none of this

24    information in front of them -- remember, what they had is this

25    rest stop is a homosexual meeting spot.  That's what they know.

1    And Mr. Atkinson sometimes owed people money.

2         They found Mr. Miles not guilty of first-degree,

3    premeditated murder with just that little bit of information.

4         There was a wealth of information available to

5    defense counsel.  There were red flags everywhere, and,

6    unfortunately for Mr. Miles, those red flags were not pursued.

7         Thank you.

8         **THE COURT:**  If you could clarify your current thought

9    about, setting aside the loan shark, exactly how and why this

10   meeting was set up and was to occur.

11        **MS. ALSID:**  So we actually don't think that it was

12   set up in the way of you would maybe now -- a text message or

13   through some newspaper article or something like that.  This

14   rest stop, what we understand would happen is cars would come

15   to the rest stop.  Two men, who know what it is that they're

16   about and want, would see one another, would sort of look at

17   each other, would go off to another spot, usually in the woods,

18   in these wooded areas that are near this rest stop.

19        And we think that what occurred is exactly that, that

20   Mr. Miles goes to this rest stop not for the purpose of meeting

21   Mr. Atkinson, or not for the purpose of engaging in this type

22   of interaction, but he goes to the rest stop, he says, by way

23   of information now available to the Court, because he's been

24   drinking all day, the alcoholism that we've talked about, and

25   he goes to actually use a porta potty that's there.  And, when

1    he goes to leave the rest stop, Mr. Atkinson -- they have an

2    exchange, a look at each other.  And Mr. Atkinson starts

3    following him.

4            And this is where they end up in the woods.  And what

5    Mr. Miles says is that he is -- and this is what he's reporting

6    to Dr. Blumberg, and this is what's in Dr. Blumberg's affidavit

7    to the Court -- that, while driving from the rest area, he

8    realizes he's being pursued by Mr. Atkinson.  He reports being

9    freaked out by this man.  He doesn't know Mr. Atkinson.

10   They've never met before.

11           In an effort to lose Mr. Atkinson, he -- and,

12   remember, he's drinking.  He had been drinking all day, so you

13   have to factor this into it.  He is driving down Old Bradley

14   Road toward a wooded area, and he no longer sees Mr. Atkinson's

15   car.  He tried to get away.  And so he exits his vehicle

16   because he remembers:  I stopped to go to the bathroom, and I

17   couldn't go to the bathroom because someone was in the porta

18   potty and taking forever, so I have to go to the bathroom.

19           So he pulls over and walks into the woods to go to

20   the bathroom, and he hears a car pull up, and the car that he

21   hears pull up is Mr. Atkinson's.

22           That's the link between the rest area, where they

23   met, and how Mr. Miles and Mr. Atkinson end up in the woods

24   together.

25           **THE COURT:**  Okay.

1      **MR. BIDDLE:**  Your Honor, a few minutes here on the

2   governing law.

3          So, just briefly, at the time of trial, remember it

4   was a capital case --

5          **THE COURT:**  Yes.

6          **MR. BIDDLE:**  -- and Mr. Saunders and his team had an

7   obligation to thoroughly investigate all mitigating evidence

8   that could be helpful to a jury, and Dr. Blumberg's affidavit

9   shows that employing Dr. Bellow, who wasn't clinically trained,

10  who wasn't properly forensically trained, who was a

11  psychologist with no prior death penalty experience, and really

12  was just a clinician, to do what we call in the death-penalty

13  defense field a drive-by evaluation of this defendant in just a

14  couple of hours, was woefully insufficient for both defending

15  the case on the merits at trial, or defending the case in the

16  death penalty phase.

17          And the Court can -- although it's not a capital case

18  now, the Court is instructed by *Strickland* to view counsel's

19  decisions as counsel had to make them at the time, and, at the

20  time --

21          **THE COURT:**  That was one of the things I was going

22  to --

23          **MR. BIDDLE:**  Yeah.

24          **THE COURT:**  -- ask you, whether you think that's

25  clear just from *Strickland*, or is there anything else that

1    addresses that that we are now not talking about a capital case

2    in the same way?

3            **MR. BIDDLE:**  Well, we're not talking about it in the

4    same way, but *Strickland* instructs that hindsight is to be

5    minimized as much as possible, meaning you have to look at what

6    the expectations were for Mr. Saunders and his team at the time

7    they decided or that it occurred, that Ms. Bellow only saw the

8    defendant once for two hours.

9            **THE COURT:**  Well, but that's usually hindsight being

10   applied slightly differently --

11           **MR. BIDDLE:**  I understand.

12           **THE COURT:**  -- for the benefit of the defense

13   counsel.

14           **MR. BIDDLE:**  Yes, it's a different point, but it's

15   key to realize that the expectation was -- so Mr. Saunders'

16   team fell down in that respect.  So, under *Strickland*, we

17   believe the record is compelling that the representation was

18   deficient at the time of this representation prior to trial,

19   1998, 1999.

20           Secondly, the prejudice was substantial because the

21   jury, in order to find Mr. Miles guilty of felony murder, had

22   to find that the murder was committed in the course of a

23   robbery.  And Dr. Blumberg's affidavit, his testimony, his

24   investigation showed compelling evidence that it wasn't

25   committed in the course of a murder -- I'm sorry -- in the

1    course of a robbery; it related to this post-traumatic stress

2    flashback.

3           Now, we don't have to prove this beyond a reasonable

4    doubt.  We don't have to absolutely prove his actual innocence

5    of felony murder.  We just have to show there is a substantial

6    probability of a different result, which, in this case, would

7    be one juror holding out.  We don't have to show that every

8    juror would have agreed to it, but the case law is clear, in

9    the different result analysis across the board, one juror

10   holding out.  And, in this case, looking at the way other

11   Courts have looked at prejudice, there is a compelling case for

12   prejudicial impact under *Strickland*.

13          Moving briefly to the second aspect, the AEDPA

14   analysis, here we see an unreasonable application of Supreme

15   Court law and an unreasonable determination of the facts.  The

16   State Court basically blamed the victim in saying Mr. Miles

17   didn't speak up soon enough that he was traumatized.

18          And it's particularly appropriate -- here we are 11

19   years after this was filed, and we're in the height of the Me

20   Too movement, where women are coming forth about harassment and

21   rape and mistreatment years later after it occurred, and we're

22   recognizing that these kinds of traumatic events can take years

23   for people to be strong enough to talk about in the right

24   context, that it's particularly inappropriate to blame

25   Mr. Miles for not disgorging this really difficult subject in

1    the course of a two-hour meeting with someone who wasn't even a

2    specialist in clinical psychology or forensic psychology, and

3    didn't even administer the Trauma Symptom Inventory.

4              So that's not reasonable.  And, by any test, whether

5    you say is it objectively reasonable?  Could reasonable jurists

6    disagree?  Could you find a reasonable judge that would agree

7    with this?  It's just not appropriate in this day and age to

8    blame the victim in a child abuse case for not speaking up

9    early enough.  And, with all due respect to the State, they

10   don't harp on this point, but they make the same point in their

11   brief, which we object to.

12             Secondly, Your Honor, and then I'll turn it over to

13   the State, the State Court, in the face of this evidence, in

14   face of the strength of it, baldly finds in the denial of the

15   third motion to reopen that a jury would not have changed its

16   mind, that it would have still found that this incident was

17   solely about a robbery because, in fact, after the fact, yes,

18   some of the items from the victim were taken, but his car

19   wasn't taken, and there were items in the car that were not

20   taken.

21             So, had this jury that obviously struggled and

22   carefully reviewed the evidence and rejected first-degree,

23   premeditated murder, had they heard that there was a completely

24   different explanation for what was going on, post-traumatic

25   stress, it's quite unlikely that all 12 jurors would have

1    agreed beyond a reasonable doubt that this defendant committed

2    this murder in the course of trying to rob the victim in the

3    woods away from his car.

4            He's found in the woods some distance.  It's a number

5    of yards.  I believe it's 50 to a hundred yards.  I've been out

6    there.  You can't even see from the spot you're permitted to go

7    to where, in fact, Mr. Atkinson's body was found.

8            So, for all those reasons, Your Honor, we ask the

9    Court -- and we'll further address the Court in rebuttal -- to

10   find that the *Strickland* standard and the AEDPA standard is met

11   here, and that relief should be ordered by way of a new trial.

12           Thank you.

13           **THE COURT:**  Okay.  And I recognize I'll obviously

14   consider everything that's in here, but you're particularly

15   focusing on, in terms of the unreasonable application of the

16   facts to the law, that Mr. Miles didn't come forward and talk

17   about his abuse, and then the denial of the third motion to

18   reopen.  Essentially you're saying that that was a clearly

19   unreasonable application of the prejudice aspect?

20           **MR. BIDDLE:**  Yes, Your Honor.  Yes, Your Honor.  It's

21   whatever the -- and I'm sure the State will list all of them.

22   There is no reasonable argument that *Strickland* was met.  The

23   result is not debatable among reasonable jurists.  Could fair-

24   minded judges disagree about the outcome, or was the result

25   objectively unreasonable?  And it was objectively unreasonable.

1          We believe we meet all the standards, whether the

2      Court looks at *Harrington versus Richter*, *Wiggins*, *Williams*

3      *versus Taylor*, which is the Fourth Circuit case, and so forth.

4          Thanks.

5          **THE COURT:**  Okay.  Thank you both.

6          Yes?

7          **MR. DIETRICH:**  May it please the Court, Your Honor.

8          Ryan Dietrich for the State of Maryland.

9          **THE COURT:**  Yes.

10         **MR. DIETRICH:**  If I sound off, I have been sick for

11     the last few days, so I apologize.

12         **THE COURT:**  I'm sorry.

13         **MR. DIETRICH:**  I look much better than I sound, I

14     promise you.

15         **THE COURT:**  Okay.

16     (Laughter.)

17         **MR. DIETRICH:**  But, with respect to the State's

18     argument, we're going to be focusing on at least three points

19     with regard to how to address this case.

20         First of all, with respect to the extensive and

21     exhaustive investigation that trial counsel took in this case

22     to determine and to address mitigation evidence as well as

23     evidence for guilt/innocence, we will also be addressing the

24     fact that Mr. Miles did not disclose, as Mr. Miles was the only

25     person alive who knew this fact that could support his argument

1    today.

2         And, finally, taking a look at what trial counsel

3    knew about what Mr. Miles' account of what happened, not --

4    we're going to be looking at three accounts here:  The account

5    that Mr. Miles gave to the police when he was arrested; the

6    account that he gave to Dr. Blumberg; and, most importantly, to

7    the State, the account that he gave to his counsel prior to

8    trial.

9         Now, the standard here is the *Strickland* standard,

10   but, because we're here on a *habeas* review, it is doubly

11   deferential to the State, so we have to look at it through that

12   prism.

13        So what we're looking at is:  Did counsel do a

14   sufficient investigation into Mr. Miles' background, his state

15   of mind, all those things for mitigation?  And my opposing

16   counsel wants to focus on the psychologist and narrow it down

17   to just the psychologist when, in fact, counsel -- not only

18   counsel himself, but counsel and his team, whether it be a

19   social worker, the psychologist, all the other people at his

20   disposal -- investigators -- engaged in a thorough and

21   exhaustive interview process of Mr. Miles' family -- I believe

22   at least one of his former wives, his sisters, his mother --

23   all in an effort to get at what they say they should have

24   gotten in this case, which was background information.

25             **THE COURT:**  The social worker, if I recall, had

1    several interviews at least --

2              **MR. DIETRICH:**  That's correct.

3              **THE COURT:**  -- with Mr. Miles, and there was also a

4    fact investigator.

5              **MR. DIETRICH:**  That's correct.  And then trial

6    counsel -- I believe he testified at the post-conviction

7    hearing that he spent 80 to 100 hours with Mr. Miles in

8    conjunction with this case.

9              Now, keep in mind that, again, Mr. Miles is the only

10   person who knows this information, but also that Mr. Miles

11   knows that this is the time to disclose that information.

12   They're talking about mitigation evidence, fact innocence

13   evidence, and so Mr. Miles isn't clueless as to why those

14   interviews are happening.

15             And so we look at the case law.  We look at the

16   standard, because we don't look at it in isolation, as I think

17   opposing counsel wants us to look at it.  But, globally, did

18   they do enough?  Because, under *Strickland*, you only need to do

19   as much investigation as the facts point you to.

20             So, in this case, they not only investigated, but

21   they found things.  They found Mr. Miles' background, traumatic

22   background in terms of the abuse by his mother and abuse by the

23   men that his mother were involved with -- violence, physical

24   abuse, emotional abuse, all these things, alcoholism.  They

25   found this.  They went and they tried to figure out what the

1  roots of those were.

2        So this isn't is a case like *Rompilla* or *Wiggins*

3  where you can point to things that trial counsel didn't look

4  at, or avenues that were just not even, step one, taken down

5  that pathway.  Instead, they took a look, they investigated,

6  they found things, they found relevant things, and those things

7  related to the subject matter that they were looking for, and

8  they related to mitigation.

9        **THE COURT:**  Is it reasonable to think, though, that

10  something like this childhood sexual abuse would be the hardest

11  to get at, if you will, would take the longest and the most

12  perhaps skillful interview methods or testing?

13        **MR. DIETRICH:**  I think that's probably a fair

14  assessment of the subject matter that we have here.  The State

15  doesn't back away from the sensitive matter of it.  But, again,

16  it's not looking at was something there that was not found?

17  That's not the standard.  The standard is:  Did they do enough

18  to look for things that could have been found?  And so --

19        **THE COURT:**  And what's your -- I mean, I understand

20  the argument is that the psychologist should have done

21  additional interviews, should have administered an additional

22  test, and did not.

23        **MR. DIETRICH:**  Yeah.  And, just for -- yes.  And,

24  just to back up a second with regard to Dr. Blumberg, if you're

25  familiar with, I believe, the first and second motion to

1    reopen, those related ostensibly to mitigation evidence.  And

2    so, in Dr. Blumberg's affidavit, he testified or he states that

3    Dr. Bellow did not -- her one-time meeting with the defendant

4    did not satisfy norms with regard to death-penalty litigation

5    with regard to mitigation.

6         So, at that point, his opinion really relates to

7    mitigation; not necessarily to fact innocence -- factual

8    development, and I think that comes into play much stronger

9    with respect to what counsel had with regard to what his belief

10   and what Mr. Miles had told him with regard to what the facts

11   were.  And so I think it is very critical that Mr. Miles was

12   the only person alive who knew and could disclose this

13   information, and that he knew the stakes, and that he was

14   presented with multiple opportunities to disclose it.

15        Now, the State -- we throw a lot about victim blaming

16   around, but it's really the delegation of fault for why this

17   didn't come out.  Counsel can't be at fault for not pursuing

18   something that counsel did not know was there.  And so, in

19   terms of figuring out from a legal standpoint, from the

20   *Strickland* doubly-deferential standpoint, looking backwards,

21   you have to take that into account, that this was not

22   disclosed, especially in regard to counsel's interaction with

23   Mr. Miles.  Counsel stated that Mr. Miles was cooperative.

24        So that takes this out of those cases where they said

25   that there is an obligation to look beyond a defendant or a

1    defendant's family who is obstinate, who refuses to cooperate.

2    He was cooperative.  So counsel had no reason not to believe

3    that Mr. Miles was being forthright, especially, again, given

4    that Mr. Miles knew the stakes that were at play.

5         Also, trial counsel described Mr. Miles as candid.

6    So he's cooperative and candid.  So trial counsel had every

7    reason to believe that what Mr. Miles had disclosed to him as

8    well as the social worker, the psychologist, and investigator

9    was, in fact, the true story.

10        And, if you look at the social worker's testimony,

11   she states that there were ways -- that she employed methods of

12   looking and testing someone, because, again, I think it's

13   proper from a psychological, clinical standpoint to not

14   necessarily take someone's word for it.  So she did --

15        **THE COURT:**  Right.

16        **MR. DIETRICH:**  -- and she stated that she employed

17   some methods, asking questions framed a few different ways,

18   asking different people, so that she could get at the truth

19   that maybe wasn't being brought out on the surface by

20   Mr. Miles.

21        So, finally, if I can move to what Mr. Miles told

22   trial counsel in terms of what the real story had or at least

23   the real story at that point.  And so, if we know Miles'

24   statement to the police involved that he had met Mr. Atkinson

25   at the location with regard to enforcing a loan shark.

1          Now, Miles' statement to Blumberg, we've also

2     discussed that.  That's where he's at -- Miles is at the rest

3     stop, he wants to use the bathroom, he's unable to, he leaves,

4     and he's being followed, and believes he's shaken the person

5     who is following him, stops to relieve himself, and then is

6     confronted by the victim in a sexually-suggestive manner, and

7     the shooting happens then.

8          Miles' statement to counsel, which counsel testified

9     to at the post-conviction hearing, was that Miles was at the

10    rest stop, he made eye contact with the victim, Miles left the

11    rest stop in a manner that he knew the victim would follow him,

12    the victim did follow him, they stopped at the woods, Miles

13    gets out, and, at that point, he cocks a gun, and essentially

14    announces a robbery, and had intended to announce a robbery the

15    whole time.  In other words, stated a different way, Miles set

16    the victim up by going there and pretending, at least in the

17    view of his account, that he was setting up a sexual liaison

18    just to rob this person, to rob the victim.

19          So, knowing that, that's the state of mind right

20    there.  You know, we talked about whether he had a duty to

21    investigate the state of mind.  Well, Mr. Miles just told

22    counsel his state of mind, that his state of mind was to rob

23    them -- rob the victim, and that state of mind was formed

24    before the shooting.

25          The whole idea of the PTSD defense is that Miles was

1    surprised or that Mr. Miles was confronted and had no idea what

2    to do or was placed back in the terror and the moment of his

3    childhood sexual abuse.  And so, when you look at the statement

4    that Mr. Miles gave to his counsel right before trial or in the

5    lead-up to trial, that undercuts that whole account.

6            And so --

7            **THE COURT:**  Now, trial counsel went ahead with sort

8    of what you would call after-thought robbery argument or

9    defense at trial --

10           **MR. DIETRICH:**  That --

11           **THE COURT:**  -- in any event.

12           **MR. DIETRICH:**  Yes.

13           **THE COURT:**  So all right.  But -- okay.

14           **MR. DIETRICH:**  And what I think is interesting in the

15   record is that, at post-conviction, trial counsel talks about

16   sort of his thought process in deciding what to do with this

17   statement that Mr. Miles has given him.

18           Of course, if what Mr. Miles said was true and if he

19   was to testify to that, that would be slam-dunk felony robbery,

20   right?  He went there.  He may not have meant to shoot him --

21   the victim, but he went there to rob him, and shot him and

22   killed him in the process.  Textbook felony robbery, slam dunk,

23   you're going to get felony robbery.

24           So what's interesting is that trial counsel testified

25   that he was teaching a capital offense clinic at the time, and

1    he presented these two accounts to his students to see what

2    their reaction was, kind of a mock jury in a sense.  And he

3    said that his students were much more receptive to the

4    statement that Mr. Miles gave to the police than they were to

5    the statement that -- to this new account, where he had formed

6    the intent to rob before he went there.

7         And so, based on that, that I think it's a sound

8    trial decision, because, again, he's -- and what trial counsel

9    testifies to is he had -- you know, he can't change history,

10   and he can't change the account that Mr. Miles shot the victim.

11   That ship has left the port.  But what he can say is he can

12   battle the premeditated murder, and he can battle the felony

13   robbery by sort of setting it up that there was no intent to

14   rob.

15        So that's the gamble and the strategy that is taking

16   place, but what's more important is put ourselves in the shoes

17   of trial counsel to say:  What was reasonable for trial counsel

18   to do and expend his resources on, knowing that Mr. Miles has

19   just told him that he went there to intend to rob the victim?

20        So there is only so much you can do with that, and it

21   eliminates any reliance on PTSD as a possibility.  So, looking

22   back, it would not be reasonable, especially in light, again,

23   of that exhaustive and thorough investigation to expend more

24   resources trying to find something that he didn't even know

25   about that wouldn't affect something that he did know about.

1          And, with that, Your Honor, unless there are any

2     questions, I'll submit.

3          Thank you.

4          **THE COURT:**  Okay.  No.  Unless there is anything you

5     want to comment on about the case law.

6          **MR. DIETRICH:**  No, thank you, Your Honor.

7          **THE COURT:**  Okay.  Mr. Biddle?

8          **MR. BIDDLE:**  Thank you, Your Honor.

9          So, starting first with this third statement by

10    Mr. Miles, if there was any red flag in this case that was

11    huge, like the Fort McHenry flag, it was the second statement

12    by Mr. Miles.  So totally inconsistent with the first one that

13    it was a, you know, effort to collect a debt.  Now you've got a

14    man with a red flag that we've already talked about, the

15    drinking that's known about, the site of the incident that's

16    known about, the sexual identity of the victim that's known

17    about, and now he's talking about walking into the woods with a

18    gun.  And what does Mr. Saunders do?  And I respect

19    Tom Saunders, but he test drives this idea with a bunch of law

20    students, Your Honor?

21          The right thing to do, by the very manuals he's

22    written and the lectures he's given, is to go back to a

23    qualified mental health professional like Dr. Blumberg, who was

24    available at the time, and say, "Look, I've got these red

25    flags, I've got this client that's told two completely

1      different stories about what happened.  We need to know what

2      happened."

3              **THE COURT:**  Tell me about this red flag.  I mean, why

4      is it so unusual that someone would tell a false story to the

5      police when they're first caught, trying to make something up

6      that is not incriminating, and yet tell perhaps a more accurate

7      version of events to their own counsel?

8              **MR. BIDDLE:**  But there is no reason, Your Honor,

9      necessarily to credit that statement over any of his other

10     statements.  At this point, you have someone who is drinking

11     heavily.  You know that from the social worker reports.  You

12     know the unique characteristics of the location of the crime.

13     You know the man doesn't have a criminal -- a violent criminal

14     record.  And you've got a total flip-flop in a description of

15     the incident.  And you ask law students about it for their

16     advice?

17              Your Honor, it stretches credulity to say that that's

18     an appropriate way to respond to a defendant in a capital

19     case's changing account of the crime in light of the other red

20     flags that we've talked about here.

21              Instead of this providing confidence for or restraint

22     for the reasonableness of Mr. Saunders' strategy and his

23     decisions, it's further evidence that he should have found an

24     appropriate expert.  He should have found someone more

25     qualified than a first-year law student to give him advice on

1    what to do with it, and Neil Blumberg or someone like that

2    would have been the right person to go to.

3         Secondly, Your Honor, in terms of the case law -- and

4    I do need to spend a few minutes on this -- the case law is

5    clear under *Wiggins*, under *Rompilla*, under *Pruitt*, under the

6    several court of special -- I'm sorry -- the several Courts of

7    Appeals cases cited in our brief -- *Pruitt*; by *Gray versus*

8    *Branker*, which is a Fourth Circuit decision -- that it's not

9    sufficient to just do a little bit in an area.  If the results

10   and the status of a case is such at a time that there are

11   reasonable reasons to continue to investigate, you should

12   continue to investigate.

13        And the limited -- the very limited drive-by that

14   Dr. Bellow did was not sufficient to resolve these issues with

15   the site of the crime, the heavy drinking, the obsessive

16   promiscuous heterosexual activity that he had.  When you look

17   at other cases that consistently reject the prosecution's

18   defense of convictions by pointing to one expert being

19   called -- for example, *Pruitt* that we cite in the brief, or

20   Rompilla -- I'm sorry -- *Wiggins*, a case by Judge Motz, that

21   Judge Motz' granting of the writ, which was reversed by the

22   Fourth Circuit, was then affirmed by the Supreme Court, in that

23   Judge Motz found that not enough was done in the *Wiggins* case.

24   They had a psychologist.  They did some investigation.  They

25   gathered some records.  But the Supreme Court found that that

1    was not enough.

2            So it's clear -- it's well-established, even after

3    *Harrington versus Richter*, that, if a trial attorney

4    essentially does a little bit of work in an area, that that's

5    constitutionally sufficient.  The Courts are very careful to

6    scrutinize:  Is it the right kind of expert?  And it's what's

7    done in *Pruitt*.  That's what's done in *Wiggins*.  Was the right

8    person brought in?  Was the right information collected?  Same

9    with *Rompilla*.

10           So the benchmark is not as low as the State would ask

11   you to find here, and it's not astronomically high under

12   *Harrington versus Richter* either, because all of the cases

13   cited in our reply are post-*Harrington versus Richter.*  And

14   they look at experts, cases where one expert was called but not

15   the right expert, or the expert wasn't given the right

16   information, or they're alibi cases where one alibi witness was

17   presented but there are five more that weren't called, and

18   Courts find that insufficient and rejecting the argument of,

19   well, one alibi witness was enough; you don't need five of

20   them.

21           The Constitution demands more.  It demands more of

22   trial counsel than what the State would suggest.  And the cases

23   do call out attorneys for stopping before they learn what they

24   needed to know.  The State said, "Well, it's not really fair to

25   hold counsel responsible for what he didn't know."

1         Well, the case law says:  If counsel does reasonable

2    investigations, strategic decisions made on the basis of those

3    reasonable investigations cannot be questioned.  They are not

4    the basis for post-conviction relief, and we accept that.  We

5    accept that principle, and, applying that principle to this

6    case at the point that trial was approaching -- that

7    Mr. Saunders had these multiple statements; that he had a

8    client that started drinking as a teenager, sometimes 18 beers

9    a day; that had no prior criminal record; that was in the woods

10   with a gay man, yet no one seemed to have any evidence why he

11   would be in that location with such a person under the

12   circumstances -- counsel should not have stopped his

13   investigation.  They should not have relied on the one-time,

14   two-hour visit.

15        Yes, there were other steps taken.  There was a

16   social worker.  There was a alcohol specialist.  But, Your

17   Honor, they were looking at sort of generic mitigation.  Yes,

18   the person has a bad background.  They had some difficulties in

19   their life.

20        They're not zeroing in on:  What was the Defendant's

21   state of mind at the time of the offense?  And that's clearly

22   what Dr. Blumberg was looking at, and that's what I told him to

23   do.  I said:  Nobody in this case knows what was going through

24   this defendant's head when he was there.  The evidence is all

25   over the place.  You need to find out.

1          And, in just a few -- more than one, but a couple,

2     two or three visits, Mr. Miles admitted that he had been

3     victimized.  And it was reasonable for him to wait.  He needed

4     to have confidence with someone he was meeting with.  He needed

5     to meet with someone who was qualified and experienced in

6     clinical and forensic psychiatry, which is what Dr. Blumberg is

7     experienced in, and obviously he's testified in this courthouse

8     many times and is very knowledgeable on how to deal with these

9     issues.

10          **THE COURT:**  Sure.

11          **MR. BIDDLE:**  And it just wasn't enough for

12     Mr. Saunders to rely on Dr. Bellow in this case, and that's why

13     a new trial should be ordered.

14          Thank you.

15          **THE COURT:**  Okay.  All right.  Anything else on the

16     State side?

17          **MR. DIETRICH:**  Just briefly, Your Honor.

18          Just in response to what counsel should have done,

19     had the obligation to do, you know, it's one thing -- and I

20     keep falling back on that third account or the second account,

21     the account that Mr. Miles gave to trial counsel.  That's a

22     factual statement that counsel had the right to rely on as the

23     factual basis for what really happened.

24          To the extent that there is a state-of-mind question,

25     it relates to factual statements given by Mr. Miles in the

1    context of the interview by Dr. Blumberg.  So, had Mr. Miles

2    given that -- what he told as a matter of fact, not with regard

3    to sexual abuse or his history or anything that he -- but with

4    regard to what he says happened on that day, it might be a

5    different story.

6          But, again, the factual basis of the events that

7    happened, that trial counsel had at that time, were that

8    Mr. Miles went there with the intent to rob, did rob, and shot

9    and killed Mr. Atkinson during the course of that robbery.

10          That's all.  Thank you.

11    **THE COURT:**  Okay.  All right.  Well, thank you all.

12    I appreciate it.  It's helpful to hear your views on presenting

13    it, and I thank you for your very thorough briefing as well,

14    and I will get you a written ruling in due course, so I

15    appreciate it.

16          **MR. BIDDLE:**  Thank you, Your Honor.

17          **MS. ALSID:**  Thank you, Your Honor.

18          **THE CLERK:**  All rise.  This Honorable Court now

19    stands adjourned.

20       (Proceedings adjourned.)

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5          I, Martin J. Giordano, Registered Merit Reporter and

6    Certified Realtime Reporter, in and for the United States

7    District Court for the District of Maryland, do hereby certify,

8    pursuant to 28 U.S.C. § 753, that the foregoing is a true and

9    correct transcript of the stenographically-reported proceedings

10   held in the above-entitled matter and that the transcript page

11   format is in conformance with the regulations of the Judicial

12   Conference of the United States.

13

14                      Dated this 26th day of December 2019.

15

16          _Martin J. Giordano_____

17          MARTIN J. GIORDANO, RMR, CRR

18          FEDERAL OFFICIAL COURT REPORTER

19

20

21

22

23

24

25

## 1

**100** [1] - 19:7
**101** [1] - 1:24
**11** [1] - 14:18
**12** [1] - 15:25
**14** [1] - 7:16
**15** [2] - 3:14, 8:16
**18** [1] - 30:8
**1998** [1] - 13:19
**1999** [1] - 13:19

## 2

**20** [2] - 3:13, 8:16
**2018** [2] - 1:7, 2:1
**2019** [1] - 33:14
**21201** [1] - 1:24
**2254** [1] - 3:22
**26th** [1] - 33:14
**28** [1] - 33:8
**2:32** [1] - 1:8

## 3

**3:20** [1] - 1:8

## 4

**410-962-4504** [1] - 1:25
**4:00** [1] - 5:18

## 5

**50** [1] - 16:5

## 6

**6:00** [1] - 5:18

## 7

**753** [1] - 33:8

## 8

**80** [1] - 19:7

## 9

**9** [2] - 1:7, 2:1

## A

**able** [1] - 4:15
**ABOVE** [1] - 1:9
**above-entitled** [1] - 33:10
**ABOVE-ENTITLED** [1] - 1:9
**absolute** [1] - 9:21
**absolutely** [1] - 14:4
**abuse** [18] - 3:19, 8:4, 8:10, 8:12, 8:14,
  9:4, 9:5, 9:8, 9:22, 15:8, 16:17, 19:22,
  19:24, 20:10, 24:3, 32:3
**abused** [3] - 7:6, 8:12, 9:15
**accept** [2] - 30:4, 30:5
**account** [13] - 18:3, 18:4, 18:6, 18:7,
  21:21, 23:17, 24:5, 25:5, 25:10, 27:19,
  31:20, 31:21
**accounts** [2] - 18:4, 25:1
**accurate** [1] - 27:6
**act** [1] - 6:17
**activity** [1] - 28:16
**actual** [2] - 2:23, 14:4
**Adam** [1] - 5:21
**addition** [1] - 3:1
**additional** [2] - 20:21
**address** [4] - 3:14, 16:9, 17:19, 17:22
**addresses** [1] - 13:1
**addressing** [1] - 17:23
**adjourned** [2] - 32:19, 32:20
**administer** [2] - 7:23, 15:3
**administered** [3] - 8:5, 8:24, 20:21
**administers** [1] - 7:23
**admitted** [3] - 6:20, 8:19, 31:2
**advice** [2] - 27:16, 27:25
**advised** [4] - 5:13, 5:23, 6:1, 7:5
**advises** [1] - 7:25
**AEDPA** [3] - 3:22, 14:13, 16:10
**affect** [1] - 25:25
**affidavit** [6] - 7:25, 8:20, 11:6, 12:8,
  13:23, 21:2
**affirmed** [1] - 28:22
**after-thought** [1] - 24:8
**afternoon** [4] - 2:4, 2:14, 4:3, 4:4
**age** [1] - 15:7
**agree** [1] - 15:6
**agreed** [2] - 14:8, 16:1
**ahead** [1] - 24:7
**al** [1] - 1:5
**alcohol** [2] - 7:13, 30:16
**alcoholism** [3] - 7:15, 10:24, 19:24
**alibi** [3] - 29:16, 29:19
**alive** [2] - 17:25, 21:12
**allows** [1] - 8:11
**ALSID** [6] - 4:2, 4:5, 7:22, 9:11, 10:11,
  32:17
**Alsid** [4] - 1:13, 2:9, 3:14, 4:1
**amended** [1] - 2:16
**analysis** [4] - 3:22, 14:9, 14:14
**announce** [1] - 23:14

**announces** [1] - 23:14
**apartment** [1] - 9:16
**apologize** [1] - 17:11
**Appeals** [1] - 28:7
**application** [3] - 14:14, 16:15, 16:19
**applied** [1] - 13:10
**applying** [1] - 30:5
**appreciate** [2] - 32:12, 32:15
**approaching** [1] - 30:6
**appropriate** [4] - 14:18, 15:7, 27:18,
  27:24
**area** [10] - 4:12, 5:17, 5:18, 6:15, 6:17,
  11:7, 11:14, 11:22, 28:9, 29:4
**areas** [1] - 10:18
**argument** [10] - 2:13, 2:15, 2:20, 3:10,
  16:22, 17:18, 17:25, 20:20, 24:8,
  29:18
**arrested** [1] - 18:5
**article** [1] - 10:13
**aside** [1] - 10:9
**aspect** [2] - 14:13, 16:19
**assess** [1] - 8:2
**assessment** [1] - 20:14
**assistance** [1] - 2:19
**astronomically** [1] - 29:11
**Atkinson** [19] - 4:25, 5:13, 5:22, 6:1,
  6:7, 6:13, 6:20, 6:23, 9:17, 10:1,
  10:21, 11:1, 11:2, 11:8, 11:9, 11:11,
  11:23, 22:24, 32:9
**Atkinson's** [4] - 5:9, 11:14, 11:21, 16:7
**attached** [1] - 4:21
**attorney** [1] - 29:3
**attorneys** [1] - 29:23
**attributed** [1] - 7:17
**available** [5] - 5:7, 9:1, 10:4, 10:23,
  26:24
**avenues** [1] - 20:4
**aware** [3] - 4:23, 4:24, 5:11

## B

**background** [5] - 18:14, 18:24, 19:21,
  19:22, 30:18
**backwards** [1] - 21:20
**bad** [1] - 30:18
**baldly** [1] - 15:14
**Baltimore** [2] - 1:7, 1:24
**bars** [1] - 5:23
**based** [1] - 25:7
**basis** [4] - 30:2, 30:4, 31:23, 32:6
**bathroom** [5] - 11:16, 11:17, 11:18,
  11:20, 23:3
**battle** [2] - 25:12
**become** [1] - 7:7
**beers** [1] - 30:8
**BEFORE** [1] - 1:10
**behalf** [2] - 1:12, 1:14
**belief** [1] - 21:9
**believes** [1] - 23:4

**Bellow** [11] - 7:19, 8:2, 8:17, 9:1, 9:20, 12:9, 13:7, 21:3, 28:14, 31:12
**benchmark** [1] - 29:10
**benefit** [1] - 13:12
**Benton** [2] - 5:3, 6:14
**best** [1] - 6:1
**better** [1] - 17:13
**between** [2] - 5:18, 11:22
**beyond** [3] - 14:3, 16:1, 21:25
**BIDDLE** [15] - 3:7, 3:13, 3:17, 4:1, 12:1, 12:6, 12:23, 13:3, 13:11, 13:14, 16:20, 26:8, 27:8, 31:11, 32:16
**Biddle** [5] - 1:13, 2:8, 3:8, 26:7
**bit** [3] - 10:3, 28:9, 29:4
**Blake** [1] - 2:3
**BLAKE** [1] - 1:10
**blame** [2] - 14:24, 15:8
**blamed** [1] - 14:16
**blaming** [1] - 21:15
**Blumberg** [16] - 7:4, 7:25, 8:13, 8:23, 9:2, 9:11, 9:19, 11:6, 18:6, 20:24, 23:1, 26:23, 28:1, 30:22, 31:6, 32:1
**Blumberg's** [4] - 11:6, 12:8, 13:23, 21:2
**board** [1] - 14:9
**body** [1] - 16:7
**Bradley** [1] - 11:13
**Branker** [1] - 28:8
**brief** [3] - 15:11, 28:7, 28:19
**briefing** [2] - 2:22, 32:13
**briefly** [3] - 12:3, 14:13, 31:17
**brought** [2] - 22:19, 29:8
**bunch** [1] - 26:19

# C

**CAME** [1] - 1:9
**candid** [2] - 22:5, 22:6
**cannot** [1] - 30:3
**capital** [6] - 8:7, 12:4, 12:17, 13:1, 24:25, 27:18
**car** [6] - 11:15, 11:20, 15:18, 15:19, 16:3
**careful** [1] - 29:5
**carefully** [1] - 15:22
**cars** [1] - 10:14
**case** [34] - 4:5, 5:3, 7:4, 8:7, 9:23, 12:4, 12:15, 12:17, 13:1, 14:6, 14:8, 14:10, 14:11, 15:8, 17:3, 17:19, 17:21, 18:24, 19:8, 19:15, 19:20, 20:2, 26:5, 26:10, 28:3, 28:4, 28:10, 28:20, 28:23, 30:1, 30:6, 30:23, 31:12
**case's** [1] - 27:19
**cases** [7] - 21:24, 28:7, 28:17, 29:12, 29:14, 29:16, 29:22
**Catherine** [1] - 2:3
**CATHERINE** [1] - 1:10
**caught** [1] - 27:5
**CCB-07-2135** [2] - 1:4, 2:6
**certainly** [1] - 3:3
**CERTIFICATE** [1] - 33:1

**Certified** [1] - 33:6
**certify** [1] - 33:7
**change** [2] - 25:9, 25:10
**changed** [1] - 15:15
**changing** [1] - 27:19
**characteristics** [1] - 27:12
**Charlie** [1] - 9:4
**child** [3] - 3:19, 7:6, 15:8
**childhood** [4] - 8:9, 9:3, 20:10, 24:3
**Christopher** [1] - 5:21
**Circuit** [3] - 17:3, 28:8, 28:22
**circumstances** [1] - 30:12
**cite** [1] - 28:19
**cited** [2] - 28:7, 29:13
**Civil** [2] - 1:4, 2:6
**claim** [1] - 2:23
**claims** [1] - 3:23
**clarify** [1] - 10:8
**Clark** [1] - 5:12
**clear** [4] - 12:25, 14:8, 28:5, 29:2
**clearly** [2] - 16:18, 30:21
**CLERK** [3] - 2:2, 2:5, 32:18
**client** [2] - 26:25, 30:8
**clinic** [1] - 24:25
**clinical** [4] - 8:17, 15:2, 22:13, 31:6
**clinically** [1] - 12:9
**clinician** [1] - 12:12
**clueless** [1] - 19:13
**co** [1] - 3:14
**co-counsel** [1] - 3:14
**cocks** [1] - 23:13
**collect** [1] - 26:13
**collected** [1] - 29:8
**coming** [2] - 8:12, 14:20
**comment** [1] - 26:5
**committed** [3] - 13:22, 13:25, 16:1
**common** [1] - 8:13
**compelling** [3] - 13:17, 13:24, 14:11
**completely** [4] - 3:4, 4:13, 15:23, 26:25
**complex** [1] - 2:20
**computer** [1] - 1:21
**Conference** [1] - 33:12
**confidence** [2] - 27:21, 31:4
**conformance** [1] - 33:11
**confronted** [2] - 23:6, 24:1
**conjunction** [1] - 19:8
**consider** [1] - 16:14
**consideration** [1] - 4:9
**consistently** [1] - 28:17
**Constitution** [1] - 29:21
**constitutionally** [1] - 29:5
**contact** [1] - 23:10
**context** [2] - 14:24, 32:1
**continue** [2] - 28:11, 28:12
**continued** [1] - 9:14
**conviction** [4] - 19:6, 23:9, 24:15, 30:4
**convictions** [1] - 28:18
**cooperate** [1] - 22:1
**cooperative** [3] - 21:23, 22:2, 22:6

**Corporal** [2] - 5:3, 6:14
**corpus** [1] - 2:16
**correct** [3] - 19:2, 19:5, 33:9
**counsel** [59] - 2:8, 2:10, 2:19, 3:6, 3:14, 4:6, 4:7, 4:12, 4:14, 4:17, 4:23, 5:2, 5:7, 6:5, 6:9, 6:19, 7:20, 8:19, 10:5, 12:19, 13:13, 17:21, 18:2, 18:7, 18:13, 18:16, 18:17, 18:18, 19:6, 19:17, 20:3, 21:9, 21:17, 21:18, 21:23, 22:2, 22:5, 22:6, 22:22, 23:8, 23:22, 24:4, 24:7, 24:15, 24:24, 25:8, 25:17, 27:7, 29:22, 29:25, 30:1, 30:12, 31:18, 31:21, 31:22, 32:7
**counsel's** [2] - 12:18, 21:22
**couple** [2] - 12:14, 31:1
**course** [11] - 5:5, 7:4, 7:16, 13:22, 13:25, 14:1, 15:1, 16:2, 24:18, 32:9, 32:14
**Court** [21] - 2:2, 2:5, 2:12, 7:5, 7:10, 8:20, 10:23, 11:7, 12:17, 12:18, 14:15, 14:16, 15:13, 16:9, 17:2, 17:7, 28:22, 28:25, 32:18, 33:7
**court** [1] - 28:6
**COURT** [36] - 1:1, 2:4, 2:14, 3:12, 3:16, 3:25, 4:4, 7:21, 9:10, 10:8, 11:25, 12:5, 12:21, 12:24, 13:9, 13:12, 16:13, 17:5, 17:9, 17:12, 17:15, 18:25, 19:3, 20:9, 20:19, 22:15, 24:7, 24:11, 24:13, 26:4, 26:7, 27:3, 31:10, 31:15, 32:11, 33:18
**Court's** [3] - 3:9, 3:23, 4:8
**courthouse** [1] - 31:7
**Courthouse** [1] - 1:23
**Courts** [4] - 14:11, 28:6, 29:5, 29:18
**credit** [1] - 27:9
**credulity** [1] - 27:17
**crime** [3] - 27:12, 27:19, 28:15
**criminal** [4] - 7:2, 27:13, 30:9
**critical** [2] - 9:13, 21:11
**CRR** [2] - 1:23, 33:17
**cruising** [1] - 5:18
**current** [1] - 10:8

# D

**Dated** [1] - 33:14
**days** [1] - 17:11
**deal** [1] - 31:8
**death** [4] - 12:11, 12:12, 12:16, 21:4
**death-penalty** [2] - 12:12, 21:4
**debatable** [1] - 16:23
**debt** [1] - 26:13
**December** [1] - 33:14
**decided** [1] - 13:7
**deciding** [1] - 24:16
**decision** [2] - 25:8, 28:8
**decisions** [3] - 12:19, 27:23, 30:2
**default** [1] - 2:19
**defendant** [7] - 8:8, 12:13, 13:8, 16:1,

21:3, 21:25, 27:18
**defendant's** [2] - 22:1, 30:24
**Defendant's** [1] - 30:20
**Defendants** [1] - 1:14
**defending** [2] - 12:14, 12:15
**defense** [17] - 4:6, 4:12, 4:14, 4:17, 4:23, 5:2, 6:5, 6:9, 6:19, 7:20, 9:14, 10:5, 12:13, 13:12, 23:25, 24:9, 28:18
**deferential** [2] - 18:11, 21:20
**deficient** [1] - 13:18
**degree** [2] - 10:2, 15:22
**Delaware** [2] - 5:24, 9:16
**delegation** [1] - 21:16
**demands** [2] - 29:21
**denial** [2] - 15:14, 16:17
**described** [2] - 5:15, 22:5
**description** [1] - 27:14
**determination** [1] - 14:15
**determine** [1] - 17:22
**determined** [1] - 9:12
**development** [1] - 21:8
**diagnosed** [2] - 9:19, 9:20
**Dietrich** [3] - 1:15, 2:10, 17:8
**DIETRICH** [14] - 17:7, 17:10, 17:13, 17:17, 19:2, 19:5, 20:13, 20:23, 22:16, 24:10, 24:12, 24:14, 26:6, 31:17
**different** [9] - 13:14, 14:6, 14:9, 15:24, 22:17, 22:18, 23:15, 27:1, 32:5
**differently** [1] - 13:10
**difficult** [3] - 7:18, 8:3, 14:25
**difficulties** [1] - 30:18
**digested** [1] - 3:4
**disagree** [2] - 15:6, 16:24
**disclose** [5] - 8:15, 17:24, 19:11, 21:12, 21:14
**disclosed** [3] - 8:16, 21:22, 22:7
**discover** [1] - 9:2
**discovers** [1] - 9:2
**discussed** [1] - 23:2
**disgorging** [1] - 14:25
**disposal** [1] - 18:20
**dispute** [1] - 9:6
**distance** [1] - 16:4
**District** [2] - 33:7
**DISTRICT** [2] - 1:1, 1:1
**DIVISION** [1] - 1:2
**Docket** [2] - 1:4, 2:6
**done** [10] - 5:8, 8:21, 8:22, 9:7, 20:20, 28:23, 29:7, 31:18
**double** [1] - 5:14
**doubly** [2] - 18:10, 21:20
**doubly-deferential** [1] - 21:20
**doubt** [2] - 14:4, 16:1
**down** [5] - 4:22, 11:13, 13:16, 18:16, 20:4
**Dr** [28] - 7:4, 7:19, 7:25, 8:2, 8:13, 8:17, 8:23, 9:1, 9:2, 9:11, 9:19, 9:20, 11:6, 12:8, 12:9, 13:23, 18:6, 20:24, 21:2, 21:3, 26:23, 28:14, 30:22, 31:6, 31:12,

32:1
**drill** [1] - 4:21
**drinking** [7] - 10:24, 11:12, 26:15, 27:10, 28:15, 30:8
**drive** [3] - 6:16, 12:13, 28:13
**drive-by** [2] - 12:13, 28:13
**drives** [1] - 26:19
**driving** [2] - 11:7, 11:13
**due** [2] - 15:9, 32:14
**dunk** [2] - 24:19, 24:22
**during** [1] - 32:9
**duty** [1] - 23:20

**E**

**early** [1] - 15:9
**Edward** [2] - 1:16, 2:11
**effort** [3] - 11:11, 18:23, 26:13
**either** [2] - 7:13, 29:12
**eliminates** [1] - 25:21
**emotional** [1] - 19:24
**employed** [2] - 22:11, 22:16
**employing** [1] - 12:9
**encountered** [1] - 4:25
**end** [3] - 3:11, 11:4, 11:23
**enforcing** [1] - 22:25
**engaged** [1] - 18:20
**engaging** [1] - 10:21
**ENTITLED** [1] - 1:9
**entitled** [1] - 33:10
**Erika** [3] - 1:13, 2:9, 3:14
**especially** [3] - 21:22, 22:3, 25:22
**Esquire** [4] - 1:13, 1:13, 1:15, 1:16
**essentially** [3] - 16:18, 23:13, 29:4
**established** [1] - 29:2
**et** [1] - 1:5
**evaluation** [2] - 9:12, 12:13
**event** [1] - 24:11
**events** [3] - 14:22, 27:7, 32:6
**everywhere** [1] - 10:5
**evidence** [17] - 4:15, 6:11, 7:10, 7:11, 12:7, 13:24, 15:13, 15:22, 17:22, 17:23, 19:12, 19:13, 21:1, 27:23, 30:10, 30:24
**evolution** [1] - 3:20
**exactly** [2] - 10:9, 10:19
**example** [1] - 28:19
**exchange** [1] - 11:2
**exhaustion** [1] - 2:18
**exhaustive** [3] - 17:21, 18:21, 25:23
**exhibits** [2] - 3:5, 4:20
**exits** [1] - 11:15
**expectation** [1] - 13:15
**expectations** [1] - 13:6
**expend** [2] - 25:18, 25:23
**experience** [1] - 12:11
**experienced** [2] - 31:5, 31:7
**expert** [6] - 27:24, 28:18, 29:6, 29:14, 29:15

**experts** [1] - 29:14
**explanation** [1] - 15:24
**extensive** [1] - 17:20
**extent** [1] - 31:24
**extremely** [1] - 5:15
**eye** [1] - 23:10

**F**

**face** [2] - 15:13, 15:14
**fact** [18] - 4:24, 5:2, 5:11, 6:12, 7:11, 9:6, 9:13, 15:17, 16:7, 17:24, 17:25, 18:17, 19:4, 19:12, 21:7, 22:9, 32:2
**factor** [1] - 11:13
**factors** [1] - 8:11
**facts** [5] - 3:15, 14:15, 16:16, 19:19, 21:10
**factual** [5] - 21:7, 31:22, 31:23, 31:25, 32:6
**fair** [3] - 16:23, 20:13, 29:24
**falling** [2] - 6:2, 31:20
**false** [1] - 27:4
**familiar** [2] - 3:3, 20:25
**family** [4] - 5:10, 5:14, 18:21, 22:1
**fault** [2] - 21:16, 21:17
**FEDERAL** [1] - 33:18
**fell** [1] - 13:16
**felony** [7] - 2:24, 13:21, 14:5, 24:19, 24:22, 24:23, 25:12
**few** [6] - 3:21, 12:1, 17:11, 22:17, 28:4, 31:1
**fictitious** [3] - 4:13, 4:19, 6:10
**field** [1] - 12:13
**figure** [2] - 5:5, 19:25
**figuring** [1] - 21:19
**file** [1] - 5:7
**filed** [1] - 14:19
**final** [1] - 7:14
**finally** [2] - 18:2, 22:21
**fine** [1] - 3:12
**first** [10] - 4:24, 4:25, 10:2, 15:22, 17:20, 20:25, 26:9, 26:12, 27:5, 27:25
**first-degree** [2] - 10:2, 15:22
**first-year** [1] - 27:25
**five** [2] - 29:17, 29:19
**flag** [4] - 26:10, 26:11, 26:14, 27:3
**flags** [6] - 4:6, 4:22, 10:5, 10:6, 26:25, 27:20
**flashback** [1] - 14:2
**flip** [1] - 27:14
**flip-flop** [1] - 27:14
**Floor** [1] - 1:23
**flop** [1] - 27:14
**FOCR** [1] - 1:23
**focus** [2] - 3:2, 18:16
**focusing** [1] - 16:15, 17:18
**follow** [2] - 23:11, 23:12
**followed** [1] - 23:4
**following** [2] - 11:3, 23:5

**follows** [1] - 3:10
**FOR** [2] - 1:1, 1:9
**force** [1] - 6:25
**foregoing** [1] - 33:8
**forensic** [3] - 8:18, 15:2, 31:6
**forensically** [1] - 12:10
**forever** [1] - 11:18
**form** [2] - 9:18
**formal** [1] - 8:18
**format** [1] - 33:11
**formed** [2] - 23:23, 25:5
**former** [1] - 18:22
**Fort** [1] - 26:11
**forth** [2] - 14:20, 17:3
**forthright** [1] - 22:3
**forward** [4] - 8:14, 16:16
**Fourth** [1] - 1:23, 17:3, 28:8, 28:22
**framed** [1] - 22:17
**freaked** [1] - 11:9
**frequented** [1] - 5:19
**friend** [1] - 6:1
**friends** [2] - 5:9, 5:10
**front** [1] - 9:24

### G

**gamble** [1] - 25:15
**gather** [1] - 2:17
**gathered** [1] - 28:25
**gay** [3] - 5:23, 6:3, 30:10
**generally** [2] - 3:3, 7:17
**generic** [1] - 30:17
**GIORDANO** [2] - 1:23, 33:17
**Giordano** [1] - 33:5
**gist** [1] - 6:7
**given** [6] - 22:3, 24:17, 26:22, 29:15, 31:25, 32:2
**globally** [1] - 19:17
**governing** [1] - 12:2
**granting** [1] - 28:21
**Gray** [1] - 28:7
**guilt/innocence** [3] - 5:3, 6:5, 17:23
**guilty** [2] - 10:2, 13:21
**gun** [2] - 23:13, 26:18

### H

**habeas** [2] - 2:16, 18:10
**hands** [1] - 9:4
**happy** [2] - 2:25, 3:5
**harassment** [1] - 14:20
**hardest** [1] - 20:10
**harp** [1] - 15:10
**Harrington** [4] - 17:2, 29:3, 29:12, 29:13
**head** [1] - 30:24
**health** [2] - 8:7, 26:23
**hear** [4] - 2:25, 3:5, 3:18, 32:12
**heard** [1] - 15:23

**hearing** [2] - 19:7, 23:9
**HEARING** [1] - 1:9
**hears** [2] - 11:20, 11:21
**heavily** [1] - 27:11
**heavy** [1] - 28:15
**height** [1] - 14:19
**held** [1] - 33:10
**helpful** [2] - 12:8, 32:12
**hereby** [1] - 33:7
**heterosexual** [3] - 7:3, 7:8, 28:16
**high** [1] - 29:11
**himself** [3] - 6:24, 18:18, 23:5
**hindsight** [2] - 13:4, 13:9
**history** [4] - 7:2, 9:3, 25:9, 32:3
**hold** [1] - 29:25
**holding** [2] - 14:7, 14:10
**homosexual** [5] - 5:2, 5:10, 5:15, 9:18, 9:25
**homosexuals** [2] - 5:19, 6:15
**Honor** [20] - 3:7, 3:9, 4:3, 12:1, 15:12, 16:8, 16:20, 17:7, 26:1, 26:6, 26:8, 26:20, 27:8, 27:17, 28:3, 30:17, 31:17, 32:16, 32:17
**Honorable** [3] - 2:2, 2:3, 32:18
**HONORABLE** [1] - 1:10
**horrendous** [1] - 9:3
**hour** [2] - 15:1, 30:14
**hours** [3] - 12:14, 13:8, 19:7
**huge** [1] - 26:11
**hundred** [1] - 16:5
**Hynes** [1] - 6:4
**hyper** [1] - 7:8
**hyper-heterosexual** [1] - 7:8
**hyperactively** [1] - 7:3

### I

**idea** [3] - 23:25, 24:1, 26:19
**identify** [1] - 8:11
**identity** [1] - 26:16
**impact** [3] - 3:19, 8:2, 14:12
**important** [3] - 4:8, 8:6, 25:16
**importantly** [1] - 18:6
**IN** [1] - 1:1
**inappropriate** [1] - 14:24
**incident** [4] - 4:10, 15:16, 26:15, 27:15
**inconsistent** [1] - 26:12
**incriminating** [1] - 27:6
**indeed** [1] - 2:15
**individuals** [2] - 7:6, 8:14
**ineffective** [1] - 2:19
**information** [13] - 6:4, 8:25, 9:12, 9:24, 10:3, 10:4, 10:23, 18:24, 19:10, 19:11, 21:13, 29:8, 29:16
**initiate** [1] - 4:14
**innocence** [4] - 2:23, 14:4, 19:12, 21:7
**instance** [2] - 7:7, 8:9
**instances** [1] - 8:3
**instead** [2] - 20:5, 27:21

**instructed** [1] - 12:18
**instructs** [1] - 13:4
**insufficient** [2] - 12:14, 29:18
**intend** [1] - 25:19
**intended** [1] - 23:14
**intent** [3] - 25:6, 25:13, 32:8
**interaction** [2] - 10:22, 21:22
**interesting** [2] - 24:14, 24:24
**interview** [5] - 7:20, 8:21, 18:21, 20:12, 32:1
**interviewed** [4] - 5:9, 5:13, 5:21, 5:25
**interviews** [4] - 5:12, 19:1, 19:14, 20:21
**Inventory** [2] - 7:24, 15:3
**investigate** [4] - 12:7, 23:21, 28:11, 28:12
**investigated** [2] - 19:20, 20:5
**investigation** [8] - 9:7, 13:24, 17:21, 18:14, 19:19, 25:23, 28:24, 30:13
**investigations** [3] - 5:8, 30:2, 30:3
**investigator** [3] - 4:15, 19:4, 22:8
**investigators** [1] - 18:20
**involved** [3] - 8:23, 19:23, 22:24
**isolation** [1] - 19:16
**issue** [4] - 2:18, 2:20, 2:23, 3:17
**issues** [2] - 28:14, 31:9
**items** [2] - 15:18, 15:19

### J

**JODY** [1] - 1:3
**Jody** [1] - 2:6
**judge** [1] - 15:6
**Judge** [3] - 28:20, 28:21, 28:23
**judges** [1] - 16:24
**Judicial** [1] - 33:11
**Julia** [1] - 5:12
**jurists** [2] - 15:5, 16:23
**juror** [3] - 14:7, 14:8, 14:9
**jurors** [1] - 15:25
**jury** [8] - 3:18, 5:4, 9:23, 12:8, 13:21, 15:15, 15:21, 25:2

### K

**keep** [2] - 19:9, 31:20
**Kelley** [2] - 1:16, 2:11
**key** [1] - 13:15
**killed** [2] - 24:22, 32:9
**kind** [3] - 4:21, 25:2, 29:6
**kinds** [2] - 8:25, 14:22
**knowing** [3] - 6:9, 23:19, 25:18
**knowledge** [1] - 8:13
**knowledgeable** [1] - 31:8
**known** [8] - 5:1, 5:19, 7:2, 7:14, 7:16, 26:15, 26:16
**knows** [3] - 19:10, 19:11, 30:23

## L

**last** [1] - 17:11
**Laughter** [1] - 17:16
**law** [12] - 12:2, 14:8, 14:15, 16:16, 19:15, 26:5, 26:19, 27:15, 27:25, 28:3, 28:4, 30:1
**laws** [1] - 2:21
**lead** [2] - 8:19, 24:5
**lead-up** [1] - 24:5
**learn** [1] - 29:23
**learned** [1] - 7:3
**least** [5] - 17:18, 18:22, 19:1, 22:22, 23:16
**leave** [1] - 11:1
**leaves** [1] - 23:3
**lectures** [1] - 26:22
**LEE** [1] - 1:3
**Lee** [1] - 2:6
**left** [3] - 5:5, 23:10, 25:11
**legal** [1] - 21:19
**liaison** [2] - 9:18, 23:17
**liar** [1] - 5:16
**life** [3] - 5:14, 5:15, 30:19
**light** [2] - 25:22, 27:19
**limited** [1] - 28:13
**link** [1] - 11:22
**Lisa** [1] - 5:25
**list** [1] - 16:21
**litigation** [1] - 21:4
**lived** [2] - 5:13, 5:17
**loan** [5] - 4:13, 4:19, 6:10, 10:9, 22:25
**location** [5] - 6:18, 6:21, 22:25, 27:12, 30:11
**Lombard** [1] - 1:24
**longest** [1] - 20:11
**Look** [1] - 26:24
**look** [18] - 10:16, 11:2, 13:5, 17:13, 18:2, 18:11, 19:15, 19:16, 19:17, 20:3, 20:5, 20:18, 21:25, 22:10, 24:3, 28:16, 29:14
**looked** [1] - 14:11
**looking** [10] - 14:10, 18:4, 18:13, 20:7, 20:16, 21:20, 22:12, 25:21, 30:17, 30:22
**looks** [1] - 17:2
**lose** [1] - 11:11
**low** [1] - 29:10

## M

**man** [5] - 9:4, 11:9, 26:14, 27:13, 30:10
**manner** [2] - 23:6, 23:11
**manuals** [1] - 26:21
**MARCH** [1] - 2:1
**March** [1] - 1:7
**Martin** [1] - 33:5
**MARTIN** [2] - 1:23, 33:17

**MARYLAND** [1] - 1:1
**Maryland** [5] - 1:7, 1:24, 4:11, 17:8, 33:7
**matter** [7] - 2:5, 2:12, 20:7, 20:14, 20:15, 32:2, 33:10
**MATTER** [1] - 1:9
**matters** [1] - 3:18
**McHenry** [1] - 26:11
**mean** [2] - 20:19, 27:3
**meaning** [1] - 13:5
**meant** [1] - 24:20
**mechanical** [1] - 1:21
**meet** [4] - 6:15, 6:16, 17:1, 31:5
**meeting** [10] - 5:2, 6:18, 8:8, 8:15, 9:25, 10:10, 10:20, 15:1, 21:3, 31:4
**memoranda** [1] - 3:4
**men** [3] - 5:2, 10:15, 19:23
**mental** [2] - 8:7, 26:23
**Merit** [1] - 33:5
**merits** [1] - 12:15
**message** [1] - 10:12
**met** [7] - 6:25, 8:24, 11:10, 11:23, 16:10, 16:22, 22:24
**methods** [2] - 20:12, 22:11, 22:17
**might** [1] - 32:4
**Miles** [65] - 2:6, 3:6, 3:18, 4:12, 4:25, 6:25, 7:1, 7:2, 7:7, 7:12, 7:15, 7:20, 8:24, 9:3, 9:14, 9:15, 9:19, 10:2, 10:6, 10:20, 11:5, 11:23, 13:21, 14:16, 14:25, 16:16, 17:24, 18:5, 19:3, 19:7, 19:9, 19:10, 19:13, 21:10, 21:11, 21:23, 22:3, 22:4, 22:5, 22:7, 22:20, 22:21, 23:2, 23:9, 23:10, 23:12, 23:15, 23:21, 23:25, 24:1, 24:4, 24:17, 24:18, 25:4, 25:10, 25:18, 26:10, 26:12, 31:2, 31:21, 31:25, 32:1, 32:8
**miles** [1] - 6:21
**MILES** [1] - 1:3
**Miles'** [9] - 4:5, 8:1, 18:3, 18:14, 18:21, 19:21, 22:23, 23:1, 23:8
**mind** [10] - 15:16, 18:15, 19:9, 23:19, 23:21, 23:22, 23:23, 30:21, 31:24
**minded** [1] - 16:24
**minimized** [1] - 13:5
**minutes** [6] - 3:10, 3:11, 3:13, 3:21, 12:1, 28:4
**mistreatment** [1] - 14:21
**mitigating** [1] - 12:7
**mitigation** [10] - 2:23, 9:13, 17:22, 18:15, 19:12, 20:8, 21:1, 21:5, 21:7, 30:17
**MMPI** [1] - 7:23
**mock** [1] - 25:2
**mom** [1] - 8:4
**moment** [1] - 9:21, 24:2
**money** [3] - 6:7, 6:14, 10:1
**Moore** [1] - 5:25
**Morrison** [2] - 4:14, 4:19
**most** [2] - 18:6, 20:11
**mother** [3] - 18:22, 19:22, 19:23

**motion** [3] - 15:15, 16:17, 20:25
**MOTIONS** [1] - 1:9
**Motz** [2] - 28:20, 28:23
**Motz'** [1] - 28:21
**move** [1] - 22:21
**movement** [1] - 14:20
**moving** [1] - 14:13
**MR** [29] - 3:7, 3:13, 3:17, 4:1, 12:1, 12:6, 12:23, 13:3, 13:11, 13:14, 16:20, 17:7, 17:10, 17:13, 17:17, 19:2, 19:5, 20:13, 20:23, 22:16, 24:10, 24:12, 24:14, 26:6, 26:8, 27:8, 31:11, 31:17, 32:16
**MS** [6] - 4:2, 4:5, 7:22, 9:11, 10:11, 32:17
**multiple** [3] - 8:24, 21:14, 30:7
**murder** [9] - 2:24, 10:3, 13:21, 13:22, 13:25, 14:5, 15:23, 16:2, 25:12

## N

**name** [1] - 9:4
**named** [2] - 4:14, 4:19
**narrow** [1] - 18:16
**Nathans** [1] - 3:8
**nature** [1] - 2:21
**near** [1] - 10:18
**necessarily** [3] - 21:7, 22:14, 27:9
**need** [5] - 19:18, 27:1, 28:4, 29:19, 30:25
**needed** [3] - 29:24, 31:3, 31:4
**Neil** [1] - 28:1
**never** [1] - 11:10
**new** [3] - 16:11, 25:5, 31:13
**newspaper** [1] - 10:13
**next** [1] - 3:21
**nobody** [1] - 30:23
**none** [1] - 9:23
**nonsensical** [1] - 4:13
**norms** [1] - 21:4
**NORTHERN** [1] - 1:2
**number** [2] - 4:5, 16:4
**Number** [1] - 2:6

## O

**object** [1] - 15:11
**objectively** [3] - 15:5, 16:25
**obligation** [3] - 12:7, 21:25, 31:19
**obsessive** [1] - 28:15
**obstinate** [1] - 22:1
**obvious** [1] - 2:22
**obviously** [3] - 15:21, 16:13, 31:7
**occur** [2] - 6:22, 10:10
**occurred** [6] - 4:10, 9:7, 9:8, 10:19, 13:7, 14:21
**occurring** [1] - 6:17
**occurs** [1] - 9:17
**OF** [3] - 1:1, 2:1, 33:1

**offense** [2] - 24:25, 30:21
**offered** [1] - 4:12
**OFFICIAL** [2] - 33:1, 33:18
**old** [1] - 7:16
**Old** [1] - 11:13
**ON** [1] - 1:9
**once** [1] - 13:8
**one** [21] - 6:12, 7:22, 8:8, 8:15, 10:16, 12:21, 14:7, 14:9, 18:22, 20:4, 21:3, 26:12, 28:18, 29:14, 29:16, 29:19, 30:10, 30:13, 31:1, 31:19
**one-time** [3] - 8:15, 21:3, 30:13
**opinion** [1] - 21:6
**opportunities** [1] - 21:14
**opposing** [2] - 18:15, 19:17
**oral** [2] - 2:13, 2:15
**order** [2] - 9:7, 13:21
**ordered** [2] - 16:11, 31:13
**ostensibly** [1] - 21:1
**ourselves** [1] - 25:16
**outcome** [1] - 16:24
**owe** [1] - 6:7
**owed** [2] - 6:13, 10:1
**own** [1] - 27:7

---

**P**

**p.m** [1] - 5:18
**page** [1] - 33:10
**panics** [1] - 9:22
**papers** [2] - 3:1, 3:2
**particularly** [4] - 8:9, 14:18, 14:24, 16:14
**parts** [1] - 3:2
**pathological** [1] - 5:16
**pathway** [1] - 20:5
**penalty** [4] - 12:11, 12:12, 12:16, 21:4
**pending** [1] - 2:5
**people** [7] - 6:7, 6:13, 7:8, 10:1, 14:23, 18:19, 22:18
**perhaps** [2] - 20:12, 27:6
**permission** [1] - 3:9
**permitted** [1] - 16:6
**person** [9] - 17:25, 19:10, 21:12, 23:4, 23:18, 28:2, 29:8, 30:11, 30:18
**petition** [1] - 2:16
**Petitioner** [2] - 1:4, 2:8
**phase** [4] - 5:3, 6:6, 7:11, 12:16
**physical** [2] - 8:4, 19:23
**place** [3] - 6:15, 25:16, 30:25
**placed** [1] - 24:2
**places** [1] - 7:12
**Plaintiff** [1] - 1:12
**play** [2] - 21:8, 22:4
**pleadings** [1] - 7:5
**pleased** [1] - 2:17
**PM** [1] - 1:8
**point** [12] - 3:1, 6:24, 13:14, 15:10, 19:19, 20:3, 21:6, 22:23, 23:13, 27:10,

30:6
**pointing** [1] - 28:18
**points** [1] - 17:18
**Police** [1] - 5:25
**police** [8] - 5:1, 5:8, 5:22, 18:5, 22:24, 25:4, 27:5
**port** [1] - 25:11
**porta** [2] - 10:25, 11:17
**posed** [1] - 6:6
**possibility** [1] - 25:21
**possible** [1] - 13:5
**post** [8] - 9:21, 14:1, 15:24, 19:6, 23:9, 24:15, 29:13, 30:4
**post-conviction** [4] - 19:6, 23:9, 24:15, 30:4
**post-Harrington** - 29:13
**post-traumatic** [3] - 9:21, 14:1, 15:24
**potty** [2] - 10:25, 11:18
**prejudice** [3] - 13:20, 14:11, 16:19
**prejudicial** [1] - 14:12
**premeditated** [3] - 10:3, 15:23, 25:12
**presented** [4] - 7:10, 21:14, 25:1, 29:17
**presenting** [2] - 6:10, 32:12
**presiding** [1] - 2:3
**pretending** [1] - 23:16
**principle** [2] - 30:5
**prism** [1] - 18:12
**probability** [1] - 14:6
**problem** [2] - 7:15, 7:17
**procedural** [1] - 2:18
**proceedings** [2] - 3:20, 33:9
**PROCEEDINGS** [1] - 2:1
**Proceedings** [2] - 1:21, 32:20
**process** [3] - 18:21, 24:16, 24:22
**produced** [1] - 1:21
**professional** [2] - 8:7, 26:23
**promiscuous** [2] - 5:16, 28:16
**promise** [1] - 17:14
**proper** [2] - 9:11, 22:13
**properly** [1] - 12:10
**prosecution's** [1] - 28:17
**prove** [3] - 9:7, 14:3, 14:4
**providing** [1] - 27:21
**Pruitt** [4] - 28:5, 28:7, 28:19, 29:7
**psychiatry** [1] - 31:6
**psychological** [1] - 22:13
**psychologist** [7] - 12:11, 18:16, 18:17, 18:19, 20:20, 22:8, 28:24
**psychology** [4] - 8:17, 8:18, 15:2
**PTSD** [4] - 9:19, 9:20, 23:25, 25:21
**pull** [2] - 11:20, 11:21
**pulls** [1] - 11:19
**purpose** [4] - 2:13, 5:4, 10:20, 10:21
**pursuant** [1] - 33:8
**pursued** [2] - 10:6, 11:8
**pursuing** [1] - 21:17
**put** [1] - 25:16

**Q**

**qualified** [3] - 26:23, 27:25, 31:5
**questioned** [1] - 30:3
**questions** [2] - 22:17, 26:2
**quite** [2] - 9:7, 15:25

---

**R**

**rape** [1] - 14:21
**reaction** [1] - 25:2
**read** [1] - 3:3
**readily** [1] - 7:14
**real** [2] - 22:22, 22:23
**realize** [2] - 9:15, 13:15
**realizes** [1] - 11:8
**really** [8] - 3:17, 6:6, 12:11, 14:25, 21:6, 21:16, 29:24, 31:23
**Realtime** [1] - 33:6
**reason** [4] - 6:25, 22:2, 22:7, 27:8
**reasonable** [15] - 14:3, 15:4, 15:5, 15:6, 16:1, 16:22, 16:23, 20:9, 25:17, 25:22, 28:11, 30:1, 30:3, 31:3
**reasonableness** [1] - 27:22
**reasons** [2] - 16:8, 28:11
**rebuttal** [2] - 3:11, 16:9
**receptive** [1] - 25:3
**recognize** [1] - 16:13
**recognizing** [1] - 14:22
**record** [4] - 13:17, 24:15, 27:14, 30:9
**recorded** [1] - 1:21
**records** [2] - 3:2, 28:25
**red** [9] - 4:6, 4:22, 10:5, 10:6, 26:10, 26:14, 26:24, 27:3, 27:19
**refuses** [1] - 22:1
**regard** [11] - 6:5, 17:19, 20:24, 21:4, 21:5, 21:9, 21:10, 21:22, 22:25, 32:2, 32:4
**Registered** [1] - 33:5
**regulations** [1] - 33:11
**Rehoboth** [1] - 5:23
**reject** [1] - 28:17
**rejected** [1] - 15:22
**rejecting** [1] - 29:18
**rejection** [1] - 3:23
**relate** [1] - 8:11
**related** [4] - 14:1, 20:7, 20:8, 21:1
**relates** [2] - 21:6, 31:25
**relationship** [1] - 7:13
**relevant** [1] - 20:6
**reliance** [1] - 25:21
**relied** [1] - 30:13
**relief** [2] - 16:11, 30:4
**relieve** [1] - 23:5
**rely** [2] - 31:12, 31:22
**remember** [3] - 9:24, 11:12, 12:3
**remembers** [1] - 11:16
**reopen** [3] - 15:15, 16:18, 21:1

**reply** [1] - 29:13
**reported** [3] - 5:17, 5:22, 33:9
**REPORTER** [2] - 33:1, 33:18
**Reporter** [2] - 33:5, 33:6
**reporting** [1] - 11:5
**reports** [2] - 11:8, 27:11
**representation** [2] - 13:17, 13:18
**requested** [1] - 8:22
**resolve** [1] - 28:14
**resources** [2] - 25:18, 25:24
**respect** [6] - 13:16, 15:9, 17:17, 17:20, 21:9, 26:18
**respond** [1] - 27:18
**Respondent** [1] - 2:10
**Respondents** [1] - 1:6
**response** [1] - 31:18
**responsible** [1] - 29:25
**rest** [17] - 4:11, 4:25, 5:1, 6:15, 6:18, 9:25, 10:14, 10:15, 10:18, 10:20, 10:22, 11:1, 11:7, 11:22, 23:2, 23:10, 23:11
**restraint** [1] - 27:21
**result** [4] - 14:6, 14:9, 16:23, 16:24
**results** [1] - 28:9
**resumes** [1] - 2:3
**reversed** [1] - 28:21
**review** [1] - 18:10
**reviewed** [1] - 15:22
**Richter** [4] - 17:2, 29:3, 29:12, 29:13
**rise** [2] - 2:2, 32:18
**RMR** [2] - 1:23, 33:17
**Road** [1] - 11:14
**rob** [11] - 16:2, 23:18, 23:22, 23:23, 24:21, 25:6, 25:14, 25:19, 32:8
**robbery** [11] - 13:23, 14:1, 15:17, 23:14, 24:8, 24:19, 24:22, 24:23, 25:13, 32:9
**Robbins** [1] - 5:25
**Robert** [3] - 1:13, 2:8, 3:8
**Rompilla** [4] - 20:2, 28:5, 28:20, 29:9
**roots** [1] - 20:1
**ruling** [1] - 32:14
**Ryan** [3] - 1:15, 2:10, 17:8

## S

**Salisbury** [1] - 5:17
**sanguinary** [1] - 2:21
**satisfy** [1] - 21:4
**Saunders** [8] - 6:22, 8:19, 12:6, 13:6, 26:18, 26:19, 30:7, 31:12
**Saunders'** [2] - 13:15, 27:22
**saw** [1] - 13:7
**scrutinize** [1] - 29:6
**seated** [1] - 2:4
**second** [6] - 8:6, 14:13, 20:24, 20:25, 26:11, 31:20
**secondly** [3] - 13:20, 15:12, 28:3
**see** [7] - 5:18, 7:8, 7:9, 10:16, 14:14, 16:6, 25:1

**sees** [1] - 11:14
**self** [1] - 9:14
**self-defense** [1] - 9:14
**sense** [3] - 6:10, 6:12, 25:2
**sensitive** [1] - 20:15
**sentencing** [1] - 7:11
**session** [1] - 2:3
**set** [3] - 10:10, 10:12, 23:15
**setting** [1] - 10:9, 23:17, 25:13
**several** [4] - 5:23, 19:1, 28:6
**sex** [1] - 5:15
**sexual** [6] - 8:10, 20:10, 23:17, 24:3, 26:16, 32:3
**sexually** [2] - 7:6, 23:6
**sexually-suggestive** [1] - 23:6
**shaken** [1] - 23:4
**shark** [5] - 4:13, 4:19, 6:10, 10:9, 22:25
**Sherri** [1] - 6:4
**ship** [1] - 25:11
**shoes** [1] - 25:16
**shoot** [1] - 24:20
**shooting** [2] - 23:7, 23:24
**shot** [3] - 24:21, 25:10, 32:8
**show** [2] - 14:5, 14:7
**showed** [1] - 13:24
**shows** [1] - 12:9
**sick** [1] - 17:10
**side** [1] - 31:16
**signals** [1] - 4:6
**similar** [1] - 5:22
**SIMON** [1] - 1:5
**Simon** [1] - 2:7
**simply** [1] - 2:22
**sisters** [1] - 18:22
**site** [2] - 26:15, 28:15
**sitting** [1] - 4:17
**six** [1] - 6:2
**skillful** [1] - 20:12
**slam** [2] - 24:19, 24:22
**slam-dunk** [1] - 24:19
**slightly** [1] - 13:10
**smoke** [1] - 4:6
**social** [6] - 18:19, 18:25, 22:8, 22:10, 27:11, 30:16
**sole** [2] - 5:4, 6:6
**solely** [1] - 15:17
**someone** [10] - 6:3, 11:17, 15:1, 22:12, 27:4, 27:10, 27:24, 28:1, 31:4, 31:5
**sometimes** [4] - 6:7, 6:13, 10:1, 30:8
**somewhat** [1] - 7:17
**soon** [1] - 14:17
**sorry** [4] - 13:25, 17:12, 28:6, 28:20
**sort** [5] - 10:16, 24:7, 24:16, 25:13, 30:17
**sound** [3] - 17:10, 17:13, 25:7
**Southern** [1] - 4:11
**speaking** [1] - 15:8
**special** [1] - 28:6
**specialist** [2] - 15:2, 30:16

**specific** [2] - 3:1, 8:1
**spend** [2] - 3:21, 28:4
**spent** [1] - 19:7
**split** [1] - 3:10
**spot** [4] - 5:2, 9:25, 10:17, 16:6
**stakes** [2] - 21:13, 22:4
**stand** [2] - 6:13, 6:14
**standard** [7] - 16:10, 18:9, 19:16, 20:17
**standards** [1] - 17:1
**standpoint** [3] - 21:19, 21:20, 22:13
**stands** [1] - 32:19
**started** [2] - 4:11, 30:8
**starting** [2] - 3:5, 26:9
**starts** [1] - 11:2
**state** [8] - 18:14, 23:19, 23:21, 23:22, 23:23, 30:21, 31:24
**State** [16] - 3:23, 5:25, 14:16, 15:9, 15:13, 16:21, 17:8, 18:7, 18:11, 20:14, 21:15, 29:10, 29:22, 29:24, 31:16
**State's** [1] - 17:17
**state-of-mind** [1] - 31:24
**statement** [11] - 22:24, 23:1, 23:8, 24:3, 24:17, 25:4, 25:5, 26:9, 26:11, 27:9, 31:22
**statements** [3] - 27:10, 30:7, 31:25
**STATES** [1] - 1:1
**states** [2] - 21:2, 22:11
**States** [2] - 33:6, 33:12
**status** [1] - 28:10
**stenographically** [1] - 33:9
**stenographically-reported** [1] - 33:9
**stenography** [1] - 1:21
**step** [2] - 3:21, 20:4
**steps** [1] - 30:15
**Stevenson** [4] - 9:4, 9:8, 9:15, 9:22
**still** [1] - 15:16
**stop** [14] - 4:11, 4:25, 5:1, 6:18, 9:25, 10:14, 10:15, 10:18, 10:20, 10:22, 11:1, 23:3, 23:10, 23:11
**stopped** [3] - 11:16, 23:12, 30:12
**stopping** [1] - 29:23
**stops** [1] - 23:5
**stories** [1] - 27:1
**story** [7] - 4:13, 4:16, 22:9, 22:22, 22:23, 27:4, 32:5
**strategic** [1] - 30:2
**strategy** [2] - 25:15, 27:22
**Street** [1] - 1:24
**strength** [1] - 15:14
**stress** [3] - 9:21, 14:1, 15:25
**stretches** [1] - 27:17
**Strickland** [10] - 12:18, 12:25, 13:4, 13:16, 14:12, 16:10, 16:22, 18:9, 19:18, 21:20
**strong** [1] - 14:23
**stronger** [1] - 21:8
**struggled** [1] - 15:21
**student** [1] - 27:25
**students** [4] - 25:1, 25:3, 26:20, 27:15

**subject** [3] - 14:25, 20:7, 20:14
**submit** [1] - 26:2
**substantial** [2] - 13:20, 14:5
**sufficient** [4] - 18:14, 28:9, 28:14, 29:5
**suggest** [1] - 29:22
**suggestive** [1] - 23:6
**support** [2] - 4:16, 17:25
**Supreme** [3] - 14:14, 28:22, 28:25
**surface** [1] - 22:19
**surprised** [1] - 24:1
**Symptom** [2] - 7:24, 15:3

## T

**talks** [1] - 24:15
**Taylor** [1] - 17:3
**teaching** [1] - 24:25
**team** [4] - 12:6, 13:6, 13:16, 18:18
**teenager** [1] - 30:8
**ten** [1] - 3:11
**tend** [1] - 7:7
**terms** [5] - 16:15, 19:22, 21:19, 22:22, 28:3
**terror** [1] - 24:2
**test** [5] - 8:2, 8:5, 15:4, 20:22, 26:19
**testified** [5] - 19:6, 21:2, 23:8, 24:24, 31:7
**testifies** [1] - 25:9
**testify** [2] - 6:13, 24:19
**testimony** [2] - 13:23, 22:10
**testing** [2] - 20:12, 22:12
**text** [1] - 10:12
**textbook** [1] - 24:22
**theory** [1] - 3:5
**they've** [1] - 11:10
**thinking** [1] - 4:17
**third** [2] - 2:16, 15:15, 16:17, 26:9, 31:20
**thorough** [3] - 18:20, 25:23, 32:13
**thoroughly** [1] - 12:7
**three** [3] - 17:18, 18:4, 31:2
**throw** [1] - 21:15
**Timmons** [1] - 5:13
**today** [1] - 18:1
**together** [1] - 11:24
**Tom** [1] - 26:19
**took** [2] - 17:21, 20:5
**total** [1] - 27:14
**totally** [1] - 26:12
**toward** [1] - 11:14
**Trader** [1] - 6:4
**trained** [2] - 12:9, 12:10
**training** [2] - 8:17, 8:18
**transcript** [3] - 1:21, 33:9, 33:10
**Trauma** [2] - 7:23, 15:3
**trauma** [1] - 8:2
**traumatic** [5] - 9:21, 14:1, 14:22, 15:24, 19:21

**traumatized** [1] - 14:17
**trial** [36] - 3:18, 4:7, 5:7, 5:20, 6:22, 8:1, 8:19, 9:1, 12:3, 12:15, 13:18, 16:11, 17:21, 18:2, 18:8, 19:5, 20:3, 22:5, 22:6, 22:22, 24:4, 24:5, 24:7, 24:9, 24:15, 24:24, 25:8, 25:17, 29:3, 29:22, 30:6, 31:13, 31:21, 32:7
**tried** [2] - 11:15, 19:25
**true** [3] - 22:9, 24:18, 33:8
**truth** [1] - 22:18
**try** [1] - 5:5
**trying** [4] - 4:21, 16:2, 25:24, 27:5
**TSI** [3] - 8:1, 8:10, 8:25
**turn** [1] - 15:12
**twenty** [1] - 3:10
**two** [8] - 7:12, 10:15, 13:8, 15:1, 25:1, 26:25, 30:14, 31:2
**two-hour** [2] - 15:1, 30:14
**type** [1] - 10:21

## U

**U.S** [1] - 1:23
**U.S.C** [1] - 33:8
**unable** [1] - 23:3
**under** [9] - 13:16, 14:12, 19:18, 28:5, 29:11, 30:11
**undercuts** [1] - 24:5
**underlying** [1] - 3:15
**unfortunately** [1] - 10:6
**unique** [1] - 27:12
**United** [2] - 33:6, 33:12
**UNITED** [1] - 1:1
**unless** [2] - 26:1, 26:4
**unlikely** [1] - 15:25
**unreasonable** [6] - 14:14, 14:15, 16:15, 16:19, 16:25
**unreasonableness** [1] - 3:23
**unusual** [1] - 27:4
**up** [15] - 4:15, 10:10, 10:12, 11:4, 11:20, 11:21, 11:23, 14:17, 15:8, 20:24, 23:16, 23:17, 24:5, 25:13, 27:5
**upbringing** [2] - 7:18, 8:4

## V

**vehicle** [1] - 11:15
**verdict** [1] - 3:20
**version** [1] - 27:7
**versus** [7] - 2:6, 17:2, 17:3, 28:7, 29:3, 29:12, 29:13
**victim** [19] - 3:19, 8:9, 8:11, 14:16, 15:8, 15:18, 16:2, 21:15, 23:6, 23:10, 23:11, 23:12, 23:16, 23:18, 23:23, 24:21, 25:10, 25:19, 26:16
**victimized** [1] - 31:3
**victims** [1] - 8:14
**view** [2] - 12:18, 23:17

**views** [1] - 32:12
**violence** [2] - 6:25, 19:23
**violent** [3] - 7:1, 9:16, 27:13
**visit** [1] - 30:14
**visited** [1] - 5:23
**visits** [1] - 31:2
**voluntarily** [1] - 6:23

## W

**WAINWRIGHT** [1] - 1:5
**Wainwright** [1] - 2:7
**wait** [1] - 31:3
**walking** [1] - 26:17
**walks** [1] - 11:19
**wants** [3] - 18:16, 19:17, 23:3
**warnings** [1] - 4:6
**ways** [2] - 22:11, 22:17
**wealth** [1] - 10:4
**well-established** [1] - 29:2
**West** [1] - 1:24
**Westhoff** [1] - 5:21
**whole** [3] - 23:15, 23:25, 24:5
**Wiggins** [6] - 17:2, 20:2, 28:5, 28:20, 28:23, 29:7
**Williams** [1] - 17:2
**willingly** [2] - 6:20, 6:21
**witness** [6] - 5:12, 5:20, 6:12, 29:16, 29:19
**witnesses** [1] - 4:16
**wives** [1] - 18:22
**woefully** [1] - 12:14
**women** [2] - 7:13, 14:20
**wooded** [2] - 10:18, 11:14
**woods** [13] - 4:11, 9:16, 9:18, 9:21, 10:17, 11:4, 11:19, 11:23, 16:3, 16:4, 23:12, 26:17, 30:9
**word** [2] - 22:14
**words** [1] - 23:15
**worker** [5] - 18:19, 18:25, 22:8, 27:11, 30:16
**worker's** [2] - 22:10
**world** [1] - 5:6
**writ** [2] - 2:16, 28:21
**written** [2] - 26:22, 32:14

## Y

**yards** [2] - 16:5
**year** [1] - 27:25
**years** [6] - 6:2, 7:16, 8:16, 14:19, 14:21, 14:22

## Z

**zeroing** [1] - 30:20

| § |
|---|
| **§** [2] - 3:22, 33:8 |